Stacy Tolchin (CA SBN #217431)
*Email: Stacy@Tolchinimmigration.com*
Megan Brewer (CA SBN # 268248)
*Email: Megan@Tolchinimmigration.com*
Law Offices of Stacy Tolchin
776 E. Green St., Suite 210
Pasadena, CA 91101
Telephone: (213) 622-7450
Facsimile: (213) 622-7233

Matthew Vogel (*pro hac vice* application forthcoming)
*Email:* matt@nipnlg.org
Amber Qureshi (*pro hac vice* application forthcoming)
*Email: amber@nipnlg.org*
National Immigration Project of the National Lawyers Guild (NIPNLG)
2201 Wisconsin Ave NW, Suite 200
Washington, DC 20007
Telephone: (202) 470-2082
Facsimile: (617) 227-5495

## UNITED STATES DISTRICT COURT FOR THE
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Martin VARGAS, as Successor in Interest of the Estate of Martin Vargas Arellano, | **Complaint for Damages** |
| Plaintiff, | |
| v. | Jury Trial Requested |
| UNITED STATES OF AMERICA; THE GEO GROUP; and WELLPATH, LLC. | |
| Defendants. | |

## INTRODUCTION

1.      Plaintiff Martin Vargas is the son of Martin Vargas Arellano and files this action as Mr. Vargas Arellano's successor in interest.

2.      In December 2020, Mr. Vargas Arellano contracted COVID-19 while detained at the Adelanto ICE Processing Center ("Adelanto") under the custody of U.S. Immigration and Customs Enforcement ("ICE"). Adelanto is a privately operated immigration detention center operated by the GEO Group ("GEO"). GEO contracts medical services at Adelanto to Wellpath, LLC ("Wellpath").

3.      In the three months following his COVID-19 infection, Mr. Vargas Arellano suffered a string of COVID-related medical complications that led to multiple hospitalizations and a stroke. On March 8, 2021, Mr. Vargas Arellano died at the age of 55 due to complications brought on by COVID-19. He was in ICE custody from April 2019 up until a few days prior to his death.

4.      Defendants were aware that Mr. Vargas Arellano was at high risk of serious illness and death if he were to contract COVID-19 due to his age and multiple chronic conditions including high blood pressure, diabetes, liver disease, cellulitis, and severe psychiatric illness. ICE was also acutely aware of the risk of COVID-19 transmission in its detention facilities and the urgent need to release individuals at risk of death. At the time, this Court in *Fraihat v. U.S. Immigr. & Customs Enf't*, 445 F. Supp. 3d 709 (C.D. Cal. 2020) *rev'd and remanded*, 16 F.4th 613 (9th Cir. 2021), had found ICE's response to the pandemic systemically deficient and ordered ICE to establish custody redeterminations for individuals at risk of COVID-19. Moreover, because of the deficient conditions in Adelanto, this Court in *Roman v. Mayorkas*, No. 5:20-cv-00768-THJ-PVC, specifically ordered ICE to reduce the population of Adelanto by releasing individuals at risk of COVID-19.

5.      Despite Mr. Vargas Arellano's extreme vulnerability to COVID-19, ICE repeatedly denied his requests for release during the pandemic, even after he

became severely sick. In June 2020, ICE denied, without explanation, Mr. Vargas Arellano's petition for humanitarian parole and release. In October 2020, ICE denied another request for release under this Court's order in *Fraihat*. ICE also did not release Mr. Vargas Arellano pursuant to this Court's depopulation orders in *Roman*. In fact, even after Mr. Vargas Arellano had begun experiencing severe, lasting symptoms from COVID-19 and while he lay in a hospital bed at Providence St. Mary Medical Center, ICE opposed his release alleging he was a threat to public safety.

6.      On December 10, 2020, Mr. Vargas Arellano tested positive for COVID-19 while detained at Adelanto. A Special Master in *Roman* found that Mr. Vargas Arellano contracted COVID-19 from a Wellpath medical provider who examined him on November 29, 2020. *Roman v. Wolf*, No. 5:20-cv-00768-THJ-PVC, Dkt. 1220 at 8 (C.D. Cal. Jul. 16, 2021).

7.      After Mr. Vargas Arellano suffered brain death on February 26, 2021, on March 5, 2021, ICE released him purportedly on his own recognizance while in the hospital, where he died three days later. In fact, ICE regularly orders the "release" of individuals on their deathbeds in order to avoid the requirement to report custodial deaths.

8.      ICE actively concealed Mr. Vargas Arellano's worsening medical condition from his Qualified Representative,[1] Margaret Hellerstein, in violation of its own policies. ICE also failed to notify Ms. Hellerstein or Plaintiff Vargas of Mr. Vargas Arellano's "release" on his own recognizance or his death.

9.      Defendants refused to release Mr. Vargas Arellano despite his severe

---

[1] In 2013, an immigration judge deemed Mr. Vargas Arellano to be a member of the *Franco-Gonzalez v. Holder*, No. CV 10-cv-2211-DMG (DTBX) (C.D. Cal.), class action based on his lack of mental competency to represent himself in removal proceeding. Mr. Vargas Arellano was assigned a Qualified Representative to assist in his representation.

vulnerability to COVID-19 and in the face of internal policy and federal court orders that required ICE to reduce the detainee population at the facility because of the lack of COVID-19 protections. Defendants failed to maintain appropriate procedures to protect Mr. Vargas Arellano from contracting COVID-19 while in detention. Defendants also actively concealed his medical status and his eventual death from his family and attorney in violation of their own policies.

10.    Plaintiff Vargas seeks monetary damages as Mr. Vargas Arellano's Successor in Interest.

## EXHAUSTION

11.    On August 15, 2022, Plaintiff submitted an administrative claim under the Federal Tort Claims Act with the Department of Homeland Security ("DHS"). In his complaint, Plaintiff sought monetary damages in the amount of $2,000,000. That claim has now been pending for more than six months.

## JURISDICTION AND VENUE

12.    This Court has jurisdiction over the present action based on 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1346(b) (federal defendant), 28 U.S.C. §§ 2674, 2680 (Federal Tort Claims Act), and 28 U.S.C. § 1367 (Supplemental Jurisdiction).

13.    Venue is properly with this Court pursuant to 28 U.S.C. § 1391(e) (general venue) and 28 U.S.C. § 1402(b) (torts against the United States) because this is a civil action in which Defendant is the United States of America; because a substantial part of the events or omissions giving rise to the claim occurred in Adelanto, California, in the Central District of California; and there is no real property involved in this action.

**PARTIES**

14.     Plaintiff Vargas is a citizen of the United States.  Plaintiff Vargas is the biological son of Martin Vargas Arellano and the Successor in Interest to his father Martin Vargas Arellano.  At the time of his death, Mr. Vargas Arellano was unmarried.  Plaintiff Vargas resides in Victorville, California.

15.     Defendant United States of America is the appropriate defendant under the Federal Tort Claims Act.  28 U.S.C. § 1346(b). All federal officers referenced in the complaint were at all relevant times employees of the United States, working within the scope and course of their employment and acting as investigative and law enforcement officers for federal agencies including, but not limited to, DHS and ICE.

16.     Defendant GEO is a private prison corporation, headquartered in Boca Raton, Florida, that operates Adelanto and receives substantial federal funding.  Defendant GEO contracts with Defendant ICE to provide detention and medical services at Adelanto. The contract between GEO and ICE requires compliance with ICE's Performance Based National Detention Standards ("PBNDS").

17.     Defendant Wellpath, formerly known as Correct Care Solutions, is the medical provider at Adelanto. GEO has subcontracted the provision of medical care at the Adelanto facility to Wellpath since at least 2016. Wellpath is a corporation headquartered in Nashville, Tennessee and is one of the nation's largest for-profit correctional health care providers, currently servicing approximately 394 county jails and community facilities and more than 140 state and federal prisons in approximately 36 states.

## **FACTUAL ALLEGATIONS**

### *ICE's Response to the COVID-19 Pandemic*

18.     DHS operates the largest immigration detention system in the world. ICE, as a federal law enforcement agency within DHS, is responsible for managing the detention of noncitizens in the interior of the United States. ICE operates or oversees more than one hundred jails and detention centers. Immigrants may be detained in ICE facilities, in county and local jails that contract with ICE to detain noncitizens, or in detention facilities contracted to private prison corporations such as GEO.

19.     ICE does not directly provide medical care to all detainees housed within ICE detention centers.  Instead, it contracts frequently with private medical contractors. However, the ICE Health Services Corps ("IHSC") provides medical oversight at the facilities with private contracts.

20.     In December 2019, the virus SARS-CoV-2 was identified in China as causing an outbreak of a new, communicable respiratory illness, now known as coronavirus disease 2019, or COVID-19. Following the spread of the virus to the United States, the Secretary of Health and Human Services declared a nationwide public health emergency on January 31, 2020.

21.     On March 27, 2020, ICE issued a Memorandum on Coronavirus Disease 2019 (COVID-19), Action Plan, Revision 1.[2] On April 10, 2020, ICE published its COVID-19 Pandemic Response Requirements ("PRR").[3] The

---

[2] Memorandum from Enrique M. Lucero, Executive Associate Director of ICE Enforcement and Removal Operations, Memorandum on Coronavirus Disease 2019 (COVID-19) Action Plan, Revision 1 (Mar. 27, 2020), https://www.ice.gov/doclib/coronavirus/attF.pdf.

[3] ICE Enforcement and Removal Operations, COVID-19 Pandemic Response Requirements, Version 1.0 (Apr. 10, 2020), https://www.ice.gov/doclib/coronavirus/eroCOVID19responseReqsCleanFacilities-

memorandum and PRR established COVID-19 guidelines for facilities which included requiring screening of all detention staff for temperature and COVID-19 symptoms, and requiring that staff who did not meet the screening criteria be denied entry into the detention facility.

22.     Through subsequently issued memoranda and PRRs, ICE indicated the intention to reduce the detainee population by identifying detainees who are at a higher-risk for serious illness from COVID-19.[4]

23.     These higher risk populations included people aged 65 and older, and people of all ages with underlying medical conditions, particularly if not well controlled. Specified medical conditions included chronic lung disease, moderate to severe asthma, serious heart conditions, immunocompromising conditions, severe obesity, diabetes, chronic kidney disease undergoing dialysis, and liver disease.[5]

24.     Despite these policies, ICE has failed to meet up to these standards

---

v1.pdf. Updated versions of the PRR can be accessed here: https://www.ice.gov/coronavirus/prr.

[4] *See, e.g.*, PRR, Version 3.0 at 21 (Jul. 28, 2020), https://www.ice.gov/doclib/coronavirus/eroCOVID19responseReqsCleanFacilities-v3.pdf; PRR, Version 5.0 at 19 (Oct. 27, 2020), https://www.ice.gov/doclib/coronavirus/eroCOVID19responseReqsCleanFacilities-v5.pdf; PRR, Version 6.0 at 25 (Mar. 16, 2021), https://www.ice.gov/doclib/coronavirus/eroCOVID19responseReqsCleanFacilities-v6.pdf.

[5] *See* PRR, Version 1.0 at 5–6 (Apr. 10, 2020), https://www.ice.gov/doclib/coronavirus/eroCOVID19responseReqsCleanFacilities-v1.pdf. In later iterations of the PRR, ICE expanded the higher risk population category to include, *inter alia*, adults aged 55 and older, people of all ages with chronic health conditions, people with severe psychiatric illness. *See, e.g.*, PRR Version 5.0 at 8–9 (Oct. 27, 2020), https://www.ice.gov/doclib/coronavirus/eroCOVID19responseReqsCleanFacilities-v5.pdf.

and failed to follow the Centers for Disease Control and Prevention ("CDC")'s guidance on COVID-19 management in detention centers.[6]

25.     In fact, this Court found in *Fraihat v. U.S. Immigr. & Customs Enf't*, 445 F. Supp. 3d 709 (C.D. Cal. 2020) *rev'd and remanded*, 16 F.4th 613 (9th Cir. 2021), that ICE's directives and management of detention facilities were severely lacking. The *Fraihat* court certified two subclasses of people detained in ICE custody with risk factors or disabilities which placed them at heightened risk of severe illness and death upon contracting the virus. The *Fraihat* court also issued a preliminary injunction compelling ICE to, *inter alia*, make timely custody re-determinations for class members.

### ***The Adelanto Detention Center***

26.     In 2011, ICE and the City of Adelanto entered into an Intergovernmental Service Agreement ("IGSA") to establish an immigration facility in Adelanto. GEO was subcontracted to run the facility.

27.     In 2016, after a number of allegations about medical negligence at Adelanto emerged including several related to detainee deaths, ICE officials requested that GEO improve medical care, particularly as it applies to chronic care. In February 2016, GEO stopped providing medical care at Adelanto and contracted with Correct Care Solution, the corporate predecessor of Wellpath to provide medical care at the facility.[7]

---

[6] Current CDC guidelines on COVID-19 prevention and management at correctional and detention facilities can be accessed here: https://www.cdc.gov/coronavirus/2019-ncov/community/homeless-correctional-settings.html. Prior versions of these guidelines can be accessed here: https://www.cdc.gov/other/archived-content.html.

[7] Leslie Berestein Rojas, *Have Changes at Adelanto Immigrant Detention Center Led to Better Health Care?*, LAist 89.3 (Oct. 12, 2016), https://www.kpcc.org/2016-10-12/have-changes-at-adelanto-immigrant-detention-cente.

28. Wellpath, and its corporate predecessor Correct Care Solutions, has been sued for more than 70 deaths over the past five years and has a pattern of providing substandard care that has led to avoidable deaths.[8]

29. In 2015, the DHS Office for Civil Rights and Civil Liberties ("CRCL") found the medical treatment at Adelanto to be substandard and found that clinical leadership was not competent. Two years later, CRCL's independent subject-matter experts found that no corrections were made to address this history.[9]

30. In 2018, CRCL recommended that Adelanto hire a competent, qualified, and effective onsite clinical leader immediately, and that until new leadership took effect, at-risk detainees should immediately be removed from the facility and transferred to other facilities with well-functioning medical programs.[10]

31. CRCL also found that psychiatric leadership was absent at Adelanto and that sub-standard mental health care was occurring as a result.[11]

32. In 2019, Adelanto leadership continued to reject CRCL's findings that the lack of adequate health care leadership put detainees at risk and did not believe

---

[8] *See* Blake Ellis and Melanie Hicken, *CNN Investigates: Help Me Before it's Too Late*, CNN (Jun. 25, 2019), https://www.cnn.com/interactive/2019/06/us/jail-health-care-ccs-invs/; Hassan Kanu, *DOJ Report Exposes Failures of Jail Reform Measures*, Reuters (Sept. 9, 2021), https://www.reuters.com/legal/government/doj-report-exposes-failures-jail-reform-measures-2021-09-09/; Michael Fenne, *Private Equity Firms Rebrand Prison Healthcare Companies, But Care Issues Continue*, Private Equity Stakeholder Project (Nov. 2022), https://pestakeholder.org/wp-content/uploads/2022/11/Wellpath_HIG_2022v2.pdf.

[9] Nick Schwellenbach, *DHS Office for Civil Rights and Civil Liberties Review of Adelanto–Sent to ICE in April 2018*, Project on Government Oversight (Sept. 6, 2019), https://www.pogo.org/document/2019/09/dhs-office-for-civil-rights-and-civil-liberties-review-of-adelanto-sent-to-ice-in-april-2018.

[10] *Id.*

[11] *Id.*

that fundamental or systematic change was necessary.[12]

33.     On June 25, 2019, the City of Adelanto terminated the IGSA with ICE. On the same day, ICE awarded a contract to run Adelanto directly to the GEO Group.[13]

### *Response to the COVID-19 Pandemic at the Adelanto Facility*

34.     The Adelanto facility's response to COVID-19 has been woefully inadequate. In *Roman v. Wolf*, No. 5:20-cv-00768-TJH-PVC, 2020 WL 1952656, (C.D. Cal. Apr. 23, 2020), *aff'd in part, vacated in part sub nom. Hernandez Roman v. Wolf*, 829 F. App'x 165 (9th Cir. 2020), and *supplemented,* No. 5:20-cv-00768-TJH-PVC, 2020 WL 5797918 (C.D. Cal. Sept. 29, 2020), a class action suit on behalf of immigrants detained in Adelanto seeking relief based on the facility's failure to implement necessary protective measures during the COVID-19 pandemic, this Court's factual findings make clear that Adelanto was not safe for individuals vulnerable to COVID-19.

35.     On April 23, 2020, this Court in *Roman* issued a preliminary injunction compelling ICE*, inter alia*, to reduce the population at the facility in response to the COVID-19 pandemic. The Court found, and the Ninth Circuit affirmed, that that the conditions at the Adelanto facility in April 2020 violated detainees due process right to reasonable safety. Specifically, "the Government had failed to impose social distancing because there were 'too many detainees at

---

[12] Majority Staff Report, U.S. House of Representatives Committee on Homeland Security, *ICE Detention Facilities Failing to Meet Basic Standards of Care* at 11 (Sept. 21, 2020), https://web.archive.org/web/20200926041027/https://homeland.house.gov/imo/media/doc/Homeland%20ICE%20facility%20staff%20report.pdf.

[13] Rebecca Plevin, *How a Private Prison Giant Has Continued to Thrive in a State That Wants it Out*, Desert Sun (Jan. 24, 2020), https://www.desertsun.com/in-depth/news/2020/01/24/private-prison-giant-geo-thrives-california-state-wants-out/2589589001/.

Adelanto for its size'; newly arrived detainees were either mixed with the general population or housed with other new detainees who had arrived at different times, both of which undermined the ostensible 14-day quarantine period for new arrivals; staff were not required to wear gloves and masks; there was a lack of necessary cleaning supplies, resulting in cleaning of communal spaces that was 'haphazard, at best'; there were only three functioning showers for 118 women; there was inadequate access to hand sanitizer because dispensers were often empty and detainees had to wait for days to receive hand soap; and detainees were forced to sleep within six feet of each other due to the positions of their beds." *Hernandez Roman v. Wolf*, 829 F. App'x 165, 171 (9th Cir. 2020).

36.     Although the Ninth Circuit affirmed the preliminary injunction and accepted the factual findings in *Roman*, it vacated the specific measures ordered in the preliminary injunction because circumstances at Adelanto had changed by the time the case was before the Ninth Circuit several months later in September 2020. The Ninth Circuit remanded with instructions for the district court to develop preliminary injunction provisions based on the conditions that existed at Adelanto at that time. *Hernandez Roman v. Wolf*, 829 F. App'x 165, 174 (9th Cir. 2020)

37.     On September 29, 2020, this Court in *Roman* again found that the conditions at Adelanto were objectively unreasonable and that ICE acted in callous disregard for the reasonable safety of the individuals in detention with respect to their exposure to COVID-19. *See Roman v. Wolf*, No. EDCV2000768TJHPVCX, 2020 WL 5797918, at *6 (C.D. Cal. Sept. 29, 2020), *aff'd in part, vacated in part, remanded*, 977 F.3d 935 (9th Cir. 2020). For example, ICE had been actively and arbitrarily blocking the use of universal testing for COVID-19, even though the facility had sufficient tests onsite delivered for that purpose. *Id.* at *2–3. ICE's determination that detainees can maintain a distance of six feet from each other at all times was based on a single ICE employee who, without measuring any area, "walked around the facility and imagined in his head that every detainee had a

sphere around their body." *Id*. at *4. The Court also noted that contact tracing was not completed following a COVID-19 outbreak at Adelanto. *Id*. at *2. The Court ordered ICE to begin weekly testing for COVID-19 for all detainees and implement other measures to protect detainees from COVID-19. *Id*. at *6.

38.    On October 6, 2020, ICE reported to the *Roman* Court that almost 20% of the detainees at the facility had tested positive for COVID-19.[14]

39.    On October 15, 2020, the Court in *Roman* issued a population reduction order that found that the population level at that time and the conditions at the facility continue to pose an unreasonable risk to the safety of individuals in detention. *See Roman v. Wolf*, No. ED CV 20-00768 TJH, 2020 WL 6107069 (C.D. Cal. Oct. 15, 2020), *order clarified*, No. ED CV 20-00768 TJH, 2021 WL 4621946 (C.D. Cal. Mar. 10, 2021). The Court expressed concerns that Adelanto was not sufficiently isolating or quarantining detainees who are symptomatic of COVID-19, suspected of having COVID-19, or have been confirmed positive for COVID-19. *Id*. at *5.

### ***Detention Standards***

40.    ICE's contract with GEO to operate Adelanto mandates compliance with ICE's 2011 Performance-Based National Detention Standards ("PBNDS") as revised in December 2016.[15]

41.    ICE's PBNDS establish mandatory, non-discretionary policies and practices relating to medical care that facilities and operators of facilities must follow.

---

[14] Rebecca Plevin, *'I'm Scared for My Life': Nearly 20% of Detainees at Adelanto ICE Facility Have COVID-19*, Desert Sun (Oct. 8, 2020), https://www.desertsun.com/story/news/2020/10/07/nearly-20-detainees-adelanto-ice-facility-have-covid-19/5918914002/.

[15] *See* ICE Performance-Based National Detention Standards 2011, https://www.ice.gov/doclib/detention-standards/2011/pbnds2011r2016.pdf.

42. ICE is responsible for ensuring that the requirements of the PBNDS are followed at immigration detention facilities, including Adelanto.

43. The PBNDS provide "Medical Care" standards that require facilities to ensure that detainees have access to a continuum of health care services, including screening, prevention, health education, diagnosis, and treatment.[16]

44. The PBNDS Medical Care standards provide that CDC "guidelines for the prevention and control of infectious and communicable diseases shall be followed."[17] The PBNDS Medical Care standards also provide that "[f]acilities shall comply with current and future plans implemented by federal, state or local authorities addressing specific public health issues." [18]

45. The PBNDS Medical Care standards provide that: "Every facility shall directly or contractually provide its detainee population with . . . [m]edically necessary and appropriate medical . . . health care."[19] In furtherance of that requirement, "[e]ach facility shall have written plans that address the management of infectious and communicable diseases, including screening, prevention, education, identification, monitoring and surveillance, immunization (when applicable), treatment, follow-up, isolation (when indicated) and reporting to local, state and federal agencies."[20] Such "[p]lans shall include . . . control, treatment and prevention strategies; . . . procedures for the identification, surveillance, immunization, follow-up and isolation of patients; hand hygiene; [and]

---

[16] *Id*. at 257–281.

[17] *Id*. at 258.

[18] *Id*. at 261–62.

[19] *Id*. at 260.

[20] *Id*. at 261.

management of infectious diseases."[21]

46.     The PBNDS Medical Care standards further require that "a plan is developed that provides for continuity of medical care in the event of a change in detention placement or status."[22] "The detainee's medical needs shall be taken into account prior to any transfer of the detainee to another facility."[23]

47.     The PBNDS also include strict requirements on attorney notification upon the transfer of an individual in detention. The standards require that "the legal representative-of-record shall be notified as soon as practicable, but no later than 24 hours after the detainee is transferred." It is the responsibility of ICE to make such attorney notifications.[24]

48.     In the event that a detainee is gravely ill, the PBNDS also imposes on ICE the obligation to "immediately notify (or make reasonable efforts to notify) the detainee's next-of-kin of the medical condition and status, the detainee's location, and the visiting hours and rules at that location, in a language or manner which they can understand."[25]

49.     In April 2020, ICE established COVID-19 specific Pandemic Response Requirements ("PRR"), which sets forth mandatory requirements related to the management of COVID-19 at immigration detention facilities. ICE has updated the PRR several times throughout the course of the COVID-19 pandemic.[26] At the time of Mr. Vargas Arellano's COVID-19 illness and death, the

---

[21] *Id.*

[22] *Id.* at 276.

[23] *Id.*

[24] *Id.* at 457.

[25] *Id.* at 339.

[26] *See supra* note 3.

PRR Version 5.0 was in effect.[27] The PRR 5.0 required a list of measures be implemented at immigration detention facilities related to COVID-19 testing, isolation, prevention, and treatment.

50.     The PRR 5.0 required that detainees at high risk of COVID-19 complications must receive twice-daily "[t]emperature screening and verbal screening for symptoms of COVID19 and contacts with COVID-19 cases of all new entrants."[28]

51.     According to PRR 5.0, if a detainee has symptoms of COVID-19, "[a] medical provider must perform an initial evaluation to determine their care plan and housing placement." A medical assessment must be performed at least daily, and vital signs must be performed more frequently. Detainees with COVID-19 symptoms or who test positive for COVID-19 must be "immediately placed under medical isolation in a separate environment from other individuals, and medically evaluated."[29] Those at high-risk of complications "should be housed in the medical housing unit or infirmary area of the facility or, if unavailable, hospitalized."[30] Those "detainees who require a higher level of care than can be safely provided at the detention facility must be referred to community medical resources when needed."[31]

52.     The PRR 5.0 also required that "[i]f there has been a suspected COVID-19 case inside the facility (among incarcerated/detained persons, staff, or

---

[27] *See* PRR, Version 5.0 (Oct. 27, 2020), https://www.ice.gov/doclib/coronavirus/eroCOVID19responseReqsCleanFacilities-v5.pdf.

[28] *Id*. at 14.

[29] *Id*. at 16.

[30] *Id*. at 15.

[31] *Id*.

visitors who have recently been inside), facilities shall begin implementing management strategies while test results are pending. Essential management strategies include placing cases and individuals with symptoms under medical isolation, quarantining their close contacts, and facilitating necessary medical care while observing relevant infection control and environmental disinfection protocols and wearing recommended PPE."[32]

53.     The PRR 5.0 also mandated that facilities must comply with the CDC's Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities.[33] Like the PRR, the CDC's interim guidance imposes several requirements on ICE related to the prevention and management of COVID-19 in immigration detention facilities.[34]

***Reporting of Custodial Deaths***

54.     In 2018, Congress required ICE to publicly release reports on every in-custody death within 90 days.[35]

---

[32] *Id.* at 29.

[33] *Id.* at 8.

[34] The version of the CDC's guidance in effect during part of Mr. Vargas Arellano's COVID-19 illness—from December 3, 2020 to February 18, 2021—can be accessed here:
https://web.archive.org/web/20201210030827/https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.

The version of the CDC's guidance in effect during part of Mr. Vargas Arellano's COVID-19 illness and his subsequent death—from February 19, 2021 to March 8, 2021—can be accessed here:
https://web.archive.org/web/20210308143935/https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.

[35] House Committee on Appropriations, Department of Homeland Security Appropriations Bill, 2018, Rep. No. 115-239,
www.congress.gov/115/crpt/hrpt239/CRPT-115hrpt239.pdf.

55.     ICE is required to report custodial deaths to Congress, nongovernmental organization stakeholders, and the public in the Detainee Death report.[36]

56.     There are only five detainee deaths listed by ICE for FY 2021, the year that applied when Martin Vargas Arellano passed away.[37]

57.     Martin Vargas Arellano is not listed among the five detainees who died.

58.     Martin Vargas Arellano's release was ordered on March 5, 2021, when he was immobile in a hospital bed after he suffered a stroke. He died three days later.

59.     ICE regularly orders the "release" of detainees who are essentially on their deathbeds in order to avoid reporting custodial deaths to Congress.[38]

### *Mr. Vargas Arellano's Immigration History*

60.     Mr. Vargas Arellano is a native of Mexico who arrived in the United States when he was 2 years old.

61.     On May 15, 2013, ICE took Mr. Vargas Arellano into custody and placed him in removal proceedings. Later that year, an immigration judge found him to be a member of the *Franco-Gonzalez v. Holder*, Case No. 10-2211 (C.D. Cal.) class because he was not competent to represent himself in his removal

---

[36] *See* ICE Detainee Death Reporting (last updated Dec. 5, 2022), https://www.ice.gov/detain/detainee-death-reporting.

[37] *Id.*

[38] Andrea Castillo and Jie Jenny Zou, *ICE Rushed to Release a Sick Woman, Avoiding Responsibility for Her Death. She Isn't Alone*, Los Angeles Times (May 13, 2022), https://www.latimes.com/world-nation/story/2022-05-13/ice-immigration-detention-deaths-sick-detainees.

proceeding. Mr. Vargas Arellano was assigned a Qualified Representative to assist in his representation in 2014.

62.     Mr. Vargas Arellano was released from custody in 2014 while his Petition for Review was pending before the Ninth Circuit when ICE determined that he was not a danger to others or a flight risk. In 2018, the Ninth Circuit remanded his case at the request of the parties.

63.     ICE placed Mr. Vargas Arellano in custody again in 2019 after he was arrested based on an October 2018 violation of his obligation to register as a sex offender.  Mr. Vargas Arellano had sustained no other criminal convictions between 2014 and 2018.

64.     In November 2019, an immigration judge denied Mr. Vargas Arellano's application for withholding of removal and protection under the Convention Against Torture. Mr. Vargas Arellano's Qualified Representative appealed that decision to the Board of Immigration Appeals.

65.     On April 14, 2021, a month after Mr. Vargas Arellano's death, the Board of Immigration Appeals remanded the case to the immigration court to reconsider his eligibility for withholding of removal and protection under the Convention Against Torture, citing clear error by the immigration judge.

66.     On April 22, 2021, Mr. Vargas Arellano's removal case was terminated due to his death.

***Mr. Vargas Arellano's Detention During COVID-19***

67.     ICE was well aware that Mr. Vargas Arellano was at risk of serious illness and death if he were to contract COVID-19, due to his age and because he suffered from a number of chronic conditions including high blood pressure, diabetes, cellulitis, liver disease, and severe psychiatric illness (schizophrenia). Between April 2019 and April 2020, ICE transferred Mr. Vargas Arellano at least eleven times for inpatient care at a hospital or clinic, with stays ranging from days to several weeks.

68.     In June 2020, ICE denied, without explanation, Mr. Vargas Arellano's petition for humanitarian parole and release.

69.     On October 7, 2020, this Court in *Fraihat* clarified that its preliminary injunction applied to people subject to both discretionary and mandatory detention and that "[o]nly in rare cases should a Subclass member not subject to mandatory detention remain detained." Those subclass members subject to mandatory detention "should only continue to be detained after individualized consideration of the risk of severe illness or death, with due regard to the public health emergency." *Fraihat v. U.S. Immigr. & Customs Enf't*, No. EDCV191546JGBSHKX, 2020 WL 6541994, at *12 (C.D. Cal. Oct. 7, 2020).

70.     Mr. Vargas Arellano was a class member in *Fraihat*. He suffered from multiple chronic conditions placing him at extremely high risk of severe illness or death upon contracting COVID-19, he had been ordered released in April due to these risks, and he in fact did become severely ill as a result of contracting COVID-19 during his detention. Yet, ICE repeatedly denied his requests for release from the onset of the pandemic to days before his death.

71.     On October 29, 2020, ICE denied a request based on *Fraihat* for his release. The basis for the October 29, 2020, denial of release was that Mr. Vargas Arellano was a threat to public safety.

72.     After Mr. Vargas Arellano contracted COVID-19 in December 2020, his Qualified Representative, Margaret Hellerstein, sought a bond hearing which was scheduled for January 26, 2021. Mr. Vargas Arellano, as a *Franco* class member, was entitled to a bond hearing after 180 days of detention at which the government bears the burden of justifying continued detention.

73.     On January 20, 2021, Ms. Hellerstein spoke with Mr. Vargas Arellano about his upcoming bond hearing, and he informed her that he was still suffering from the effects of COVID-19 and that he was under medical observation. They

agreed that she would file a motion to continue the bond hearing until he could meaningfully participate.

74.     The next day, Ms. Hellerstein again spoke with him, he explained that he was feeling a bit better and that he wanted to proceed with the bond hearing. A telephonic *Franco* bond hearing was scheduled for February 2, 2021.

75.     On January 27, 2021, Mr. Vargas Arellano was hospitalized for COVID-19 pneumonia at St. Mary's Hospital.

76.     On February 1, 2021, Ms. Hellerstein attempted to set up a call with Mr. Vargas Arellano for the following morning's bond hearing. She was informed that he was offsite.

77.     On February 2, 2021, at the telephonic bond hearing, while Mr. Vargas Arellano was in hospital, ICE refused to stipulate to bond citing his criminal record.

78.     Mr. Vargas Arellano had sustained no new criminal convictions between 2014, when ICE determined that he was not a danger to others or a flight risk and released him from custody, and 2018, when was arrested and convicted for failing to register as a sex offender. His obligation to register as a sex offender arose from a 1985 conviction, when he was a juvenile. Between 1985 to 2018, Mr. Vargas Arellano had not once failed to register as required.

79.     At the February 2, 2021, bond hearing, Ms. Hellerstein withdrew the request for custody redetermination and informed the Immigration Judge that she would make a new motion once Mr. Vargas had returned from the hospital.

### ***Martin Vargas Arellano's Illness and Death***

80.     On December 10, 2020, Mr. Vargas Arellano tested positive for COVID-19. He contracted COVID-19 from a Wellpath medical provider at Adelanto who examined him on November 29, 2020.[39]

---

[39] On March 23, 2021, in *Roman v. Mayorkas*, No. 5:20-cv-00768-TJH-PVC this Court referred the death of Mr. Vargas Arellano to a Special Master for

81.     From December 2020 until March 2021, Mr. Vargas Arellano suffered a string of COVID-related medical complications that led to multiple hospitalizations, a stroke, and his eventual death.

82.     On December 11, 2020, the day after he tested positive for COVID-19, Mr. Vargas Arellano suffered from shortness of breath, fever, dry cough, and eventually COVID-19 pneumonia, for which he had to be hospitalized.

83.     On December 12, 2020, Mr. Vargas Arellano was transferred back to the Adelanto detention center but soon thereafter transferred to Providence St. Mary Medical Center due to COVID-19 pneumonia where he was hospitalized for several weeks.

84.     On December 25, 2020, Mr. Vargas Arellano was discharged from Providence St. Mary Medical Center and placed back in Adelanto.

85.     On January 4, 2021, Mr. Vargas Arellano was admitted to the Adelanto infirmary after complaining of shortness of breath.

86.     On January 26, 2021, Mr. Vargas Arellano was again hospitalized for COVID-19 pneumonia at Providence St. Mary Medical Center.

87.     On February 4, 2021, Mr. Vargas Arellano was released from Providence St. Mary Medical Center and placed back in the Adelanto infirmary.

88.     On February 17, 2021, after experiencing further shortness of breath, Mr. Vargas Arellano was hospitalized for the third and final time for COVID-19.

89.     On February 19, 2021, a Wellpath Medical Director emailed ICE's medical coordinator explaining that Mr. Vargas Arellano's medical condition has become grave, and that he was "'at great risk of pulmonary embolism and [that there was a] possibility of sudden death' due to multiple ailments, including

investigation. On July 16, 2021, the Special Master issued a Report and Recommendation, which was accepted by the Court on August 8, 2021, finding, among other things, that Mr. Vargas Arellano died of complications due to COVID-19, which he contracted at Adelanto. *See Roman v. Wolf*, No. 5:20-cv-00768-THJ-PVC, Dkt. 1220 at 8 (C.D. Cal. Jul. 16, 2021).

ongoing weakness and chest pain in the wake of COVID-19 infection." *Roman v. Wolf*, No. 5:20-cv-00768-THJ-PVC, Dkt. 1220 at 5 (C.D. Cal. Jul. 16, 2021). The Wellpath Medical Director urged ICE to evaluate whether Mr. Vargas Arellano should be released from ICE detention. *Id.*

90.     After ICE learned that Mr. Vargas Arellano was at risk of sudden death, it initiated a plan to release him. On February 22, 2021, Mr. Vargas Arellano's Deportation Officer, Sergio Guzman, reached out to Ms. Hellerstein informing her that ICE was considering releasing Mr. Vargas Arellano and for her to provide information about his housing and transportation. Ms. Hellerstein shared that information by email and asked that Mr. Guzman let her know as soon as a decision was made about Mr. Vargas Arellano's release. Mr. Guzman did not inform Ms. Hellerstein of Mr. Vargas Arellano's grave condition nor that it was the reason for ICE's consideration of release.

91.      On or about February 26, 2021, Ms. Hellerstein reached out to Mr. Guzman for an update. He informed her that no decision had been made yet about his release. He agreed to update her once the agency made a decision about his release. Ms. Hellerstein began making arrangements with the halfway house where Mr. Vargas Arellano was going to stay.

92.     On or about February 26, 2021, Mr. Vargas Arellano suffered a stroke that caused brain death.

93.     On March 5, 2021, ICE "released" Mr. Vargas Arellano purportedly on his own recognizance while in the hospital, even though he was comatose and brain dead. The release order listed the release address that Ms. Hellerstein had shared with Mr. Guzman. ICE did not inform Ms. Hellerstein nor Mr. Vargas Arellano's family of this release.

94.     On March 8, 2021, Mr. Vargas Arellano passed away due to complications brought by COVID-19. ICE did not inform Ms. Hellerstein nor Plaintiff of Mr. Vargas Arellano's death. ICE also did not report Mr. Vargas

Arellano's death to this Court in *Roman*, where he had been a class member. ICE merely reported to the Court that Mr. Vargas Arellano was released on March 8, 2021.

95.     On March 15, 2021, after class counsel in *Roman* informed Ms. Hellerstein that Mr. Vargas Arellano had been released, she contacted Officer Guzman, by phone, inquiring about his whereabouts. He informed her that he was unaware of Mr. Vargas Arellano's location. He did not inform her of Mr. Vargas Arellano's death. The next day she emailed Mr. Guzman to follow up. Mr. Guzman was instructed by his supervisors to ignore Ms. Hellerstein's email and not speak with her any further about Mr. Vargas Arellano's case.

96.     Over the next few days, Ms. Hellerstein reached out to hospitals, shelters, police stations, and the Mexican Consulate seeking information about Mr. Vargas Arellano. On March 18, 2021, she learned of her client's death after contacting the coroner's office. Plaintiff learned of his father's death shortly thereafter.

97.     Because Mr. Vargas Arellano was "released" from ICE custody prior to his death on March 8, 2021, ICE did not report his death as a custodial death to Congress.[40]

**CAUSES OF ACTION**

**COUNT ONE**

**(Federal Tort Claims Act)**

**(Negligence)**

***Defendant United States***

98.     Plaintiff incorporates the allegations in the paragraphs above as though fully set forth here.

---

[40] *See* ICE Detainee Death Reporting (last updated Dec. 5, 2022), https://www.ice.gov/detain/detainee-death-reporting.

99.     The United States is liable pursuant to the Federal Tort Claims Act for the tortious acts of its employees in "circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."  28 U.S.C. § 1346(b).

100.    Plaintiff brings this cause of action as a successor in interest to Mr. Vargas Arellano under California Code of Civil Procedure § 377.30 (Survival Action).

101.    Plaintiff is Mr. Vargas Arellano's biological son and successor in interest.

102.    At all relevant times, ICE officials acted within their scope of their employment and/or official duties as employees of DHS, an agency of the United States.

103.    ICE Health Services Corps (IHSC) oversees Wellpath's compliance with national detention standards and oversees care for ICE detainees housed in contracted facilities.

104.    Agents of the United States owed a duty of care to Mr. Vargas Arellano, and breached their mandatory, non-discretionary duties to Plaintiff, including in the following ways:

     a.   Failing to adequately shield him from contracting COVID-19;

     b.   Failing to release him despite his high risk of serious illness or death;

     c.   Failing to provide facilities and care sufficient to meet his medical needs;

     d.   Failing to properly oversee facilities and staff;

     e.   Failing to release him after he contracted COVID-19; and

     f.   Failing to communicate with his designated representative regarding his illness and transfer to hospital.

105.    Defendant's breach of duty was the direct and proximate cause and a substantial factor in bringing about Martin Vargas' injuries.

106.   The actions of Defendant United States constitute the tort of negligence under the laws of the State of California.

**COUNT TWO**

**(Federal Tort Claims Act)**

**(Intentional Infliction of Emotional Distress)**

***Defendant United States***

107.   Plaintiff incorporates the allegations in the paragraphs above as though fully set forth here.

108.   The United States is liable pursuant to the Federal Tort Claims Act for the tortious acts of its employees in "circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."  28 U.S.C. § 1346(b).

109.   Plaintiff brings this cause of action as a successor in interest to Mr. Vargas Arellano under California Code of Civil Procedure § 377.30 (Survival Action).

110.   At all relevant times, ICE officials acted within their scope of their employment and/or official duties as employees of DHS, an agency of the United States.

111.   The elements of an intentional infliction of emotional distress cause of action under California law are (1) outrageous conduct by the defendant, (2) intention to cause or reckless disregard of the probability of causing emotional distress, (3) severe emotional suffering, and (4) actual and proximate causation of the emotional distress.

112.   Agents of the United States committed outrageous conduct when they did not take adequate steps to shield Mr. Vargas Arellano from contracting COVID-19 and when they failed to release him despite multiple requests knowing that he suffered from high blood pressure, diabetes, liver disease, cellulitis, and severe psychiatric illness.

113.   Agents of the United States detained Mr. Vargas Arellano under conditions in which the facilities and level of care were not adequate to meet his medical needs.

114.   Agents of the United States acted in bad faith by actively concealing the seriousness of Mr. Vargas Arellano's condition and death from his counsel and "releasing" him on his deathbed in order to avoid having to report a custodial death to Congress.

115.   Mr. Vargas Arellano endured severe emotional suffering as a result of the outrageous conduct of Defendant United States.

116.   The actions of Defendant constitute the tort of intentional infliction of emotional distress under the laws of the State of California.

## COUNT THREE
### (Federal Tort Claims Act)
### (False Arrest/ Imprisonment)
### *Defendant United States*

117.   Plaintiff incorporates the allegations in the paragraphs above as though fully set forth here.

118.   The United States is liable pursuant to the Federal Tort Claims Act for the tortious acts of its employees in "circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."  28 U.S.C. § 1346(b).

119.   Plaintiff brings this cause of action as a successor in interest to Mr. Vargas Arellano under California Code of Civil Procedure § 377.30 (Survival Action).

120.   At all relevant times, ICE officials acted within their scope of their employment and/or official duties as employees of DHS, an agency of the United States.

121.    Agents of the United States intentionally imprisoned Plaintiff without lawful privilege and without Plaintiff's consent.  This act constituted the tort of false imprisonment under the laws of the State of California.

## COUNT FOUR

## Cal. Gov. Code § 7320

## (Violation of Detention Standards)

## Defendants Wellpath and GEO

122.    Plaintiff incorporates the allegations in the paragraphs above as though fully set forth here.

123.    Plaintiff brings this cause of action on his father's behalf as successor in interest to Mr. Vargas Arellano under California Code of Civil Procedure § 377.30 (Survival Action).

124.    GEO is a private detention facility operator.

125.    Wellpath is an agent of a private detention facility.

126.    GEO and Wellpath are required to exercise a duty of ordinary care and skill in their compliance and adherence to the detention standards of care and confinement agreed upon in the Adelanto Detention Facility contract for operations.

127.    ICE's PBNDS are the applicable standards of care as set forth in the Adelanto Detention Facility contract for operations. The PBNDS incorporates CDC guidelines on COVID-19.

128.    GEO and Wellpath engaged in tortious actions in violation of the PBNDS when they failed to adequately protect Mr. Vargas Arellano from contracting COVID-19.

129.    GEO and Wellpath engaged in tortious actions in violation of the PBNDS when they failed to provide appropriate facilities and care for Mr. Vargas Arellano's medical needs.

130.    GEO's and Wellpath's violations of the PBNDS caused Mr. Vargas Arellano's pain, suffering, and eventual death.

**COUNT FIVE**

**Cal. Civ. Code § 1714**

**(Negligence)**

**Defendants Wellpath and GEO**

131.   Plaintiff incorporates the allegations in the paragraphs above as though fully set forth here.

132.   Plaintiff brings this cause of action on his father's behalf as successor in interest to Mr. Vargas Arellano under California Code of Civil Procedure § 377.30 (Survival Action).

133.    California Civil Code § 1714 provides a statutory cause of action for negligence. To establish a claim for negligence, a plaintiff must show (1) that the defendant owed the plaintiff a legal duty; (2) that the defendant breached that duty; and (3) that the breach was a proximate or legal cause of the plaintiff's injuries.

134.   California law recognizes a "special relationship" between jailer and prisoner that gives rise to a duty of care. *Giraldo v. California Dep't of Corr. & Rehab.*, 168 Cal. App. 4th 231, 250–51, 85 Cal. Rptr. 3d 371, 386 (2008).

135.   Defendants breached their duty of care when they detained Mr. Vargas Arellano under conditions in which the facilities and level of care were not adequate to meet his medical needs, and that breach caused his pain, suffering, and eventual death.

136.   Defendants breached their duty of care when they failed to adequately protect Mr. Vargas Arellano from contracting COVID-19, and that breach caused his pain, suffering, and eventual death.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that this Court grant the following relief:

(1)    Award compensatory and punitive damages to Plaintiff in an

1   amount to be proven at trial;

2   (2)   Award costs and reasonable attorney fees under the Equal

3   Access to Justice Act, 28 U.S.C. § 2412(b) and Cal. Gov. Code

4   § 7320(c);

5   (3)   Grant such further relief as the Court deems just and

6   proper.

7

8   Dated: March 7, 2023                    Respectfully submitted,

9
                                            Stacy Tolchin
10                                          Megan Brewer
                                            Law Offices of Stacy Tolchin
11                                          776 E. Green St. Suite 210
12                                          Pasadena, CA  91101
                                            Telephone: (213) 622-7450
13                                          Facsimile: (213) 622-7233
14                                          Email:
                                            Stacy@Tolchinimmigration.com
15                                          Megan@Tolchinimmigration.com

16
                                            Matthew Vogel*†
17                                          Amber Qureshi*
18                                          National Immigration Project of
                                            the National Lawyers Guild
19                                          (NIPNLG)
20                                          2201 Wisconsin Ave NW, Suite
                                            200
21                                          Washington, DC 20007
22                                          Telephone: (202)470-2082
                                            Facsimile: (617) 227-5495
23                                          Email:
24                                          matt@nipnlg.org
                                            amber@nipnlg.org
25

26                                          *pro hac vice application
27                                          forthcoming

28

28

† *not admitted in DC; working remotely from and admitted in Louisiana only*

Counsel for Plaintiff

By: s/ Stacy Tolchin
    Stacy Tolchin