O

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

MARTIN VARGAS, as successor in interest of the estate of Martin Vargas Arellano,

        Plaintiff,

   v.

UNITED STATES OF AMERICA; THE GEO GROUP; and WELLPATH, LLC,

        Defendants.

Case No. 5:23-cv-00380-JWH-SP

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS [ECF No. 50]**

Before the Court is the motion of Defendant United States of America to dismiss the operative complaint of Plaintiff Martin Vargas.[1]  The Court finds this matter appropriate for resolution without a hearing.  *See* Fed. R. Civ. P. 78; L.R. 7-15.  After considering the papers filed in support and in opposition,[2] as well as the oral argument of counsel at the hearing, the Court orders that the United States' Motion is **GRANTED in part** and **DENIED in part**, for the reasons set forth herein.

# I.  BACKGROUND

## A.    Factual Allegations

This case arises from the death of Martin Vargas Arellano, an immigration detainee who was in custody at the Adelanto ICE Processing Center ("Adelanto") in Adelanto, California.  Arellano's son, Plaintiff Martin Vargas, brings this lawsuit as the asserted successor-in-interest of Arellano's estate.  In March 2021, Arellano died at the age of 55 due to complications from COVID-19.  Arellano had been held in ICE custody from April 2019 until a few days prior to his death.

In this lawsuit, Vargas seeks damages against the United States—the appropriate defendant under the Federal Tort Claims Act.  *See* 28 U.S.C. § 1346(b).[3]  Vargas also sues Defendant GEO Group, which is a private prison corporation that operates Adelanto and receives substantial federal funding.[4]  GEO contracts with ICE to provide detention and medical services at Adelanto.[5]  The contract between GEO and ICE requires GEO to comply with ICE's Performance Based National Detention Standards (the "PBNDS").[6]

Vargas also sues Defendant Wellpath, LLC (formerly known as Correct Care Solutions), which is the medical provider at Adelanto.[7]  GEO has subcontracted the

---

[1]    Def.'s Mot. to Dismiss (the "Motion") [ECF No. 50].

[2]    The Court considered the documents of record in this action, including the following papers:  (1) First Am. Complaint (the "Amended Complaint") [ECF No. 39]; (2) Motion (including its attachments); (3) Pl.'s Opp'n to the Motion (including its attachments) (the "Opposition") [ECF No. 55]; and (4) Def.'s Reply in Supp. of the Motion (the "Reply") [ECF No. 57].

[3]    Amended Complaint ¶ 15.

[4]    *Id.* at ¶ 16.

[5]    *Id.*

[6]    *Id.*

[7]    *Id.* ¶ 17.

provision of medical care at the Adelanto facility to Wellpath since at least 2016.[8]
Wellpath is a corporation headquartered in Tennessee, and it is one of the nation's largest
for-profit correctional health care providers, currently servicing approximately 394
county jails and community facilities and more than 140 state and federal prisons in
approximately 36 states.[9]

### 1.   Arellano's Immigration History

Arellano came to the United States when he was two years old.[10]  In May 2013,
ICE took Arellano into custody and placed him in removal proceedings to determine
whether he should be removed from the United States.[11]  Arellano was assigned a
Qualified Representative to represent him in his removal proceedings because he was a
class member in *Franco-Gonzalez v. Holder*, 2014 WL 5475097 (C.D. Cal. Oct. 29,
2014)—a case mandating legal representation for mentally incompetent individuals.[12]
Arellano suffered from chronic health conditions, including high blood pressure, diabetes,
cellulitis, liver disease, and severe psychiatric illness.[13]

In 2014, while Arellano's Petition for Review was pending before the Ninth
Circuit, an immigration judge determined that Arellano was neither a danger to society
nor a flight risk and ordered his release.[14]  However, in 2019, ICE placed Arellano in
custody again after he was arrested based upon an October 2018 violation of his obligation
to register as a sex offender.[15]

In November 2019, an immigration judge denied Arellano's applications for
withholding of removal and protection under the Convention Against Torture—two
forms of immigration protection that would have relieved Arellano from the risk of
deportation.[16]  Arellano's Qualified Representative appealed that decision to the Board of
Immigration Appeals.[17]  In April 2021, a month after Arellano's death, the Board of
Immigration Appeals remanded Arellano's case to the immigration court to reconsider

---

[8]     *Id.*

[9]     *Id.*

[10]    Amended Complaint ¶ 60.

[11]    *Id.* at ¶ 61.

[12]    *Id.*

[13]    *Id.* at ¶ 67.

[14]    *Id.* at ¶ 62.

[15]    *Id.* at ¶ 63.

[16]    *Id.* at ¶ 64.

[17]    *Id.*

his eligibility for withholding of removal and protection under the Convention Against Torture, citing clear error by the immigration judge.[18]  Later that month Arellano's removal case was terminated in view of his death.[19]

### 2.    ICE's Response to COVID-19

In January 2020, following the spread of COVID-19 to the United States, the Secretary of Health and Human Services declared a nationwide public health emergency.[20]  In March 2020, ICE issued a Memorandum on Coronavirus Disease 2019 (COVID-19), Action Plan, Revision 1.[21]

The next month, ICE established COVID-19-specific Pandemic Response Requirements ("PRR"), which set forth mandatory procedures related to the management of COVID-19 at immigration detention facilities.[22]  At the time of Arellano's COVID-19 illness and death, PRR Version 5.0 was in effect.[23]  PRR 5.0 required a list of measures to be implemented at immigration detention facilities related to COVID-19 testing, isolation, prevention, and treatment.[24]

### 3.    Related Lawsuits

While he was in custody, Arellano was a class member in two COVID-19-related lawsuits:  *Fraihat v. U.S. Immigr. & Customs Enf't*, 445 F. Supp. 3d 709 (C.D. Cal. 2020), *rev'd and remanded*, 16 F.4th 613 (9th Cir. 2021),[25] and *Roman v. Wolf*, 2020 WL 3869729 (C.D. Cal. Apr. 23, 2020).[26]

---

[18]     *Id.* at ¶ 65.

[19]     *Id.* at ¶ 66.

[20]     *Id.* at ¶ 20.

[21]     *Id.* at ¶ 21.

[22]     *Id.* at ¶ 49.

[23]     *Id.*

[24]     *Id.*

[25]     There are numerous decisions in the *Fraihat* litigation.  For the sake of simplicity, the Court identifies those cases as follows:  (1) *Fraihat v. ICE*, 445 F. Supp. 3d 709 (C.D. Cal. 2020) [hereinafter *Fraihat I*] (issuing preliminary injunction); (2) *Fraihat v. ICE*, 2020 WL 6541994 (C.D. Cal. Oct. 7, 2020) [hereinafter *Fraihat II*] (enforcing preliminary injunction); (3) *Fraihat v. ICE*, 16 F.4th 613 (9th Cir. 2021) (reversing preliminary injunction on appeal); and (4) *Fraihat v. ICE*, 2022 WL 20212706 (C.D. Cal. Sept. 16, 2022) (dissolving preliminary injunction).

[26]     There are also numerous decisions in the *Roman* litigation.  The Court identifies some of those decisions as follows:  (1) *Roman v. Wolf*, 2020 WL 3869729 (C.D. Cal. Apr. 23, 2020) (granting class certification); (2) *Roman v. Wolf*, 2020 WL 1952656, at *1 (C.D. Cal. Apr. 23, 2020) [hereinafter *Roman II*] (issuing preliminary injunction); (3) *Roman v. Wolf*, Case

In *Fraihat I*, Judge Jesus G. Bernal found that ICE's directives and management of detention facilities related to COVID-19 were lacking. In 2020, the *Fraihat* court issued a preliminary injunction compelling ICE to make timely custody re-determinations for class members in an effort to reduce the population of detainees.[27] *See Fraihat I*, 445 F. Supp. 3d at 724. In October 2020, in *Fraihat II*, the district court issued an order in view of significant concern that despite ICE's "Detained Docket Review" ("DDR") guidance, more than 70% of detainees who were not subject to mandatory detention, and who were subject to serious illness or death if they contracted COVID, remained in custody. *See Fraihat II*, 2020 WL 6541994, at *6. The *Fraihat* court ordered immediate custody determination assessments and deemed "blanket or cursory" denials of release without an individualized assessment insufficient. *Id.* at *12. The Court mandated that "[o]nly in rare cases should a Subclass member not subject to mandatory detention remain detained, and pursuant to the [DDR], a justification is required." *Id.*

In *Roman II*, Judge Terry J. Hatter, Jr., issued a preliminary injunction compelling ICE, *inter alia*, to reduce the population at Adelanto in response to the COVID-19 pandemic. *See Roman II*. The district court found, and the Ninth Circuit affirmed, that the government had violated the due process rights of individuals detained in Adelanto in April 2020 in view of the COVID-19-related conditions at the facility. *See Roman VI*, 829 F. App'x at 171.[28] In holding that the district court did not abuse its discretion, the Ninth Circuit detailed the factual findings that the district court had made in support of the preliminary injunction, including:

> the Government had failed to impose social distancing because there were "too many detainees at Adelanto for its size"; newly arrived detainees were either mixed with the general population or housed with other new detainees

---

No. 5:20-cv-00768 (C.D. Cal. Jun. 19, 2020) (allowing bail applications for class members); (4) *Roman v. Wolf*, Case No. 5:20-cv-00768 (C.D. Cal. Jul. 16, 2020) (denying bail applications for class members, including Arellano); (5) *Roman v. Wolf*, 2020 WL 6261318 (C.D. Cal. Sept. 22, 2020) (certifying mandatory class); (6) *Roman v. Wolf*, 829 F. App'x 165, 168 (9th Cir. 2020) [hereinafter *Roman VI*] (affirming in part and vacating in part the district court's preliminary injunction); (7) *Roman v. Wolf*, 2020 WL 5797918 (C.D. Cal. Sept. 29, 2020) [hereinafter *Roman VII*] (allowing individual bail applications for *Fraihat* class members); (7) *Roman v. Wolf*, 977 F.3d 935 (9th Cir. 2020) (affirming and vacating preliminary injunction); (9) *Roman v. Wolf*, 2020 WL 6107069 (C.D. Cal. Oct. 15, 2020), *order clarified*, 2021 WL 4621946 (C.D. Cal. Mar. 10, 2021) [hereinafter *Roman IX*]; (10) *Roman v. Wolf*, Case No. 5:20-cv-00768 (C.D. Cal. July 16, 2021) [hereinafter *Roman X*] (Special Master's Report and Recommendation Following the Investigation Into The Death of Martin Vargas Arellano); and (11) *Roman v. Wolf*, Case No. 5:20-cv-00768 (C.D. Cal. Aug. 8, 2021) (accepting Special Master's Report and Recommendation).

[27]     Amended Complaint ¶ 25.

[28]     *Id.* at ¶¶ 34 & 35.

who had arrived at different times, both of which undermined the ostensible 14-day quarantine period for new arrivals; staff were not required to wear gloves and masks; there was a lack of necessary cleaning supplies, resulting in cleaning of communal spaces that was "haphazard, at best"; there were only three functioning showers for 118 women; there was inadequate access to hand sanitizer because dispensers were often empty and detainees had to wait for days to receive hand soap; and detainees were forced to sleep within six feet of each other due to the positions of their beds.

*Id.*[29]

Although the Ninth Circuit affirmed the district court's preliminary injunction and accepted the district court's factual findings, it vacated the specific measures ordered in the preliminary injunction because circumstances at Adelanto had changed by September 2020—the time that the case was before the Ninth Circuit. *See id.* The Ninth Circuit remanded with instructions for the district court to develop preliminary injunction provisions based upon the conditions that existed at Adelanto at that time. *Id.* at 174.[30]

In September 2020, the *Roman* district court again found that the conditions at Adelanto were objectively unreasonable and that ICE acted in callous disregard for the reasonable safety of the individuals in detention with respect to their exposure to COVID-19. *See Roman VII*, 2020 WL 5797918, at *6. For example, ICE had been actively and arbitrarily blocking the use of universal testing for COVID-19, even though the facility had sufficient tests onsite delivered for that purpose. *See id.* at *2–*3. ICE's determination that detainees can maintain a distance of six feet from each other at all times was based upon a single ICE employee who, without measuring any area, "walked around the facility and imagined in his head that every detainee had a sphere around their body." *Id.* at *4. The district court also noted that contact tracing was not completed following a COVID-19 outbreak at Adelanto. *See id.* at *2. The district court ordered ICE to begin weekly testing for COVID-19 for all detainees and to implement other measures to protect detainees from COVID-19. *See id.* at *6.[31]

In October 2020, the district court in *Roman* issued a population reduction order, finding that the population level at that time and the conditions at the facility continued to pose an unreasonable risk to the safety of individuals in detention. *See Roman IX*. The district court expressed concerns that Adelanto was not sufficiently isolating or

---

[29]    *Id.* at ¶ 35.

[30]    *Id.* at ¶ 36.

[31]    *Id.* at ¶ 37.

quarantining detainees who were symptomatic of COVID-19, who were suspected of having COVID-19, or who had been confirmed positive for COVID-19. *See id.* at *5.[32]

That same month, the *Fraihat* district court clarified that its preliminary injunction applied to people subject to both discretionary and mandatory detention and that "[o]nly in rare cases should a Subclass member not subject to mandatory detention remain detained." *Fraihat II*, 2020 WL 6541994, at *12. Those subclass members subject to mandatory detention "should only continue to be detained after individualized consideration of the risk of severe illness or death, with due regard to the public health emergency." *Id.*[33]

### 4.    Arellano's Continued Detention

Arellano's case was subject to the procedures ordered in the *Roman* and *Fraihat* class actions.[34] In late October 2020, ICE denied Arellano's request for release under *Fraihat*, asserting that he was a "threat to public safety," without further explanation.[35]

### 5.    Arellano's Illness and Death

In December 2020, Arellano tested positive for COVID-19, which he contracted during an examination several days earlier from a medical provider employed by Wellpath.[36]

The day after Arellano tested positive for COVID-19, he reported to ICE that he was experiencing shortness of breath, fever, a dry cough, and what was eventually diagnosed as COVID-19 pneumonia, for which Arellano was hospitalized.[37] Between mid-December 2020 and late February 2020, Arellano endured persistent COVID-19 symptoms, and he was transferred back and forth between Adelanto and various hospitals.[38]

On February 17, 2021, after experiencing further shortness of breath, Arellano was hospitalized for the third and final time for COVID-19.[39] Two days later, a Wellpath

---

[32]    *Id.* at ¶¶ 38 & 39.

[33]    *Id.* at ¶ 69.

[34]    *See, e.g.*, *id.* at ¶¶ 70 & 94.

[35]    *Id.* at ¶ 71.

[36]    *Id.* at ¶ 80.

[37]    *Id.* at ¶ 82.

[38]    *Id.* at ¶¶ 83-87.

[39]    *Id.* at ¶ 88.

Medical Director emailed ICE's medical coordinator explaining that Arellano's medical condition had become grave and that Arellano was "'at great risk of pulmonary embolism and [that there was a] possibility of sudden death' due to multiple ailments, including ongoing weakness and chest pain in the wake of COVID-19 infection."[40]  The Wellpath Medical Director urged ICE to evaluate whether Arellano should be released from detention.[41]

After ICE learned that Arellano was at risk of sudden death, it initiated a plan to release him.[42]  On February 22, 2021, Arellano's Deportation Officer, Sergio Guzman, contacted Arellano's legal representative, Margaret Hellerstein, and informed her that ICE was considering releasing Arellano and asked for information regarding Arellano's housing and transportation.[43]  Guzman did not inform Hellerstein about Arellano's grave condition nor that it was the reason that ICE was considering his release.[44]

On or about February 26, 2021, Arellano suffered a stroke that caused brain death.[45]  On March 5, 2021, ICE "released" Arellano, purportedly on his own recognizance while in the hospital, even though Arellano was comatose and brain dead.[46]  ICE did not inform Hellerstein nor Arellano's family of this "release."[47]  On March 8, 2021, Arellano passed away due to complications related to COVID-19.[48]  ICE did not immediately inform Hellerstein nor Vargas of Arellano's death.[49]

## B.  Procedural Posture

Vargas commenced this action in March 2023.[50]  Two months later, Vargas amended his complaint, asserting the following eight claims for relief:

- a Federal Torts Claim Act ("FTCA") claim against the United States for negligence;

---

[40]     *Id.* at ¶ 89 (quoting *Roman X* 5).

[41]     Amended Complaint ¶ 89.

[42]     *Id.* at ¶ 90.

[43]     *Id.*

[44]     *Id.*

[45]     *Id.* at ¶ 92.

[46]     *Id.* at ¶ 93.

[47]     *Id.*

[48]     *Id.* at ¶ 94.

[49]     *Id.*

[50]     *See* Compl. [ECF No. 1].

- an FTCA claim against the United States for negligent infliction of emotional distress;
- an FTCA claim against the United States for intentional infliction of emotional distress;
- an FTCA claim against the United States for false arrest and imprisonment;
- a claim against Wellpath and GEO for violation of detention standards;
- a claim against Wellpath and GEO for negligence;
- a claim against Wellpath and GEO for negligent infliction of emotional distress; and
- a claim against the United States, Wellpath, and GEO for wrongful death.[51]

The United States moved to dismiss Vargas's first, second, third, fourth, and seventh claims for relief in June 2023,[52] and the Motion is fully briefed.

## II.  LEGAL STANDARD

### A.    Subject Matter Jurisdiction—Rule 12(b)(1)

The Federal Rules of Civil Procedure provide for the dismissal of a complaint for lack of subject-matter jurisdiction.  *See* Fed. R. Civ. P. 12(b)(1).  "A Rule 12(b)(1) jurisdictional attack may be facial or factual."  *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004).  "In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction."  *Id.*  "[I]n a factual attack," on the other hand, "the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction."  *Id.*  "In resolving a factual attack on jurisdiction," the Court "may review evidence beyond the complaint without converting the motion to dismiss into a motion for summary judgment."  *Id.*  The Court "need not presume the truthfulness of the plaintiff's allegations" in deciding a factual attack.  *Id.*

### B.    Failure to State a Claim—Rule 12(b)(6)

A claim should be dismissed under Rule 12(b)(6) when the plaintiff fails to assert a "cognizable legal theory" or the complaint contains "[in]sufficient facts . . . to support a cognizable legal theory."  *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).  To survive a motion to dismiss, the complaint must allege "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action."  *Bell Atl. Corp. v. Twombly*, 550

---

[51]    *Id.* at ¶¶ 98-167.

[52]    *See generally* Motion.

U.S. 544, 555 (2007).  The claim must be pleaded with "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), and that rises "above the speculative level," *Twombly*, 550 U.S. at 555.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.

## C.    Sovereign Immunity—FTCA

The United States is immune from civil liability unless it consents to be sued.  *See Dalehite v. United States*, 346 U.S. 15, 30 (1953) (citing *Feres v. United States*, 340 U.S. 135, 139 (1950)).  The FTCA provides a limited waiver of that sovereign immunity, under which "the United States is liable to the same extent as a private party for certain torts of federal employees . . . 'in accordance with the law of the place where the act or omission occurred.'"  *Autery v. United States*, 424 F.3d 944, 956 (9th Cir. 2005) (quoting 28 U.S.C. § 1346(b)(1)).

The FTCA's limited waiver of sovereign immunity explicitly excludes "any contractor with the United States" from its definition of "[e]mployee of the government."  28 U.S.C. § 2671.  This exclusion is known as the "independent contractor exception" to the FTCA.  Courts have construed the independent contractor exception to protect the United States from vicarious liability for the negligent acts of its independent contractors.  *See Yanez v. United States*, 63 F.3d 870, 872 n.1 (9th Cir. 1995).  "Since the United States can be sued only to the extent that it has waived its immunity, due regard must be given to the exceptions, including the independent contractor exception, to such waiver."  *United States v. Orleans*, 425 U.S. 807, 814 (1976).

The FTCA's limited wavier of sovereign immunity also excludes alleged conduct that falls under the "discretionary function exception."  28 U.S.C. § 2680(a).  The discretionary function exception precludes claims against the United States that are "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion was abused."  *Id.*  In order to determine whether the discretionary function exception applies, the court must engage in a two-step inquiry.  First, the court must determine whether the challenged conduct involves an element of judgment or choice.  *See Berkovitz by Berkovitz v. United States*, 486 U.S. 531, 536 (1988).  Second, if the conduct involves some element of choice, then the court must determine whether the conduct implements social, economic, or political policy considerations.  *See Gasho v. United States*, 39 F.3d 1420, 1435 (9th Cir. 1994).

The Supreme Court has indicated that the "basis for the discretionary function exception was Congress's desire to 'prevent judicial second-guessing of legislative and

administrative decisions grounded in'" public policy. *Berkovitz*, 486 U.S. at 536-37 (quoting *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 814 (1984)) (internal quotations omitted). When a statute or regulation allows a federal agent to act with discretion, there is a "strong presumption" that the authorized act is based upon an underlying policy decision. *United States v. Gaubert*, 499 U.S. 315, 324 (1991). Notably, to be protected from a lawsuit, the challenged decision "need not actually be grounded in policy considerations" so long as it is, "by its nature, susceptible to a policy analysis." *Miller v. United States*, 163 F.3d 591, 593 (9th Cir. 1998). The determination of whether particular governmental conduct falls within the discretionary function exception must focus on the "nature of the conduct, rather than the status of the actor." *Gaubert*, 499 U.S. at 322.

Finally, the FTCA's waiver of sovereign immunity is limited to "circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). A plaintiff must therefore show a "persuasive analogy with private conduct." *Westbay Steel, Inc. v. United States*, 970 F.2d 648, 650 (9th Cir. 1992) (quoting *Woodbridge Plaza v. Bank of Irvine*, 815 F.2d 538, 543 (9th Cir. 1987)).

## III.  ANALYSIS

This lawsuit calls upon the Court to determine the scope of various exceptions to the FTCA as applied to the tragic circumstances alleged here. Those exceptions include the independent contractor exemption and the discretionary function exemption, along with the private analog requirement. The United States also moves to dismiss various portions of the Amended Complaint for failure to state a claim.

### A.    First, Second, and Third Claims:  The Independent Contractor Exception

In its Motion, the United States argues that an exemption to the FTCA's waiver of sovereign immunity—the independent contract exception—bars limited portions of Vargas's negligence, negligent infliction of emotional distress ("NIED"), and intentional infliction of emotional distress claims ("IIED") claims. Specifically, the United States contends that Vargas's first, second, and third claims for relief should be dismissed to the extent that those claims are based upon Vargas's allegations that ICE (1) failed to shield Arellano adequately from contracting COVID-19; and (2) failed to provide facilities and care sufficient to meet Arellano's medical needs.[53]  Applying the three-part test set forth

---

[53]    Amended Complaint at ¶¶ 106(a) & (c) (negligence) & 116(a) & (c) (NIED); *see also id.* at ¶¶ 128 & 129 (IIED).

in *Edison v. United States*, 822 F.3d 510, 513 (9th Cir. 2016), the Court concludes that the independent contractor exception does bar portions of Vargas's claims at issue.

"The FTCA holds the government liable for its torts to the same extent as a private individual in similar circumstances." *Edison*, 822 F.3d at 513-14. "But the government's liability under the FTCA is limited." *Id.* at 514. "The government cannot be held liable for torts committed by its independent contractors; accordingly, the district court lacks jurisdiction to entertain such claims." *Id.* "Nevertheless, the independent contractor exception is not a complete bar to liability any time the United States employs an independent contractor." *Id.* "Some duties of care are nondelegable; others are retained by the government, if not delegated." *Id.*; *see also* 28 U.S.C. § 2671.

In *Edison*, the Ninth Circuit addressed the question at issue here: for the purposes of FTCA liability, under what factual circumstances does the government retain some of its duties to persons who are jailed in facilities operated by contractors?[54] *See Edison*, 822 F.3d at 513. In *Edison*, two prisoners contracted a disease called coccidioidomycosis, or "cocci," while they were incarcerated at a federally owned and contractor-operated prison called Taft Correctional Institution. *See id.* Both prisoners sued the government under the FTCA on the theory that the United States had breached its duty to protect them from harm. *See id.* The district court granted the government's motion to dismiss for lack of subject-matter jurisdiction under the independent contractor exception—the exception at issue here—but the Ninth Circuit reversed. *See id.* at 514.

In reaching its decision to reverse the district court, the Ninth Circuit employed a three-part test to determine whether the United States could be held liable for its ***own*** acts or omissions under the FTCA. First, the Court analyzed whether the applicable state law would impose a duty of care on a private individual in a similar situation. *See id.* at 519; 28 U.S.C. § 2674. Second, if it would, then the Court "looked to the contract and the parties' actions to determine whether the United States retained some portion of that duty for which it could be held directly liable." *Edison*, 822 F.3d at 519. Finally, even if it appeared that the government delegated all of its duties to the independent contractor, the Court asked whether the applicable state law imposed any nondelegable duties on the government. *See id.*

---

[54] The Court does not agree with the United States' argument that *Edison* does not apply to the instant case. As in *Edison*, Vargas does not seek to hold the United States vicariously liable for the acts or omissions of Wellpath and GEO. Rather, Vargas seek to hold the United States directly liable for ***its*** failure to act in response to COVID-19, outside of the scope of its relationship with Wellpath/GEO. Thus, the Court must follow *Edison* and undertake a three-step inquiry to determine whether the United States may be held liable for its own acts and omissions. *See Edison*, 822 F.3d at 518. The Court applies that analysis here.

-12-

Applying *Edison*, the Court concludes that Vargas fails at the first step. While Vargas cites cases that recognize a special relationship between jailers and prisoners,[55] he does not address whether California law would impose the duty of care alleged here on a ***private person*** in a similar situation. *See id.* For instance, in *Edison*, the Ninth Circuit concluded that the two plaintiff-prisoners had succeeded in satisfying the first prong by analogizing the government's duty to warn prisoners about cocci to a private landowner's duty under California law to act reasonably in the management of his or her property, with an awareness of "the probability of injury to others." *Id.* (quoting *Kinsman v. Unocal Corp.*, 37 Cal. 4th 659, 672 (2005)). Vargas does not direct the Court's attention to any such analogy here.

Therefore, to the extent that the Motion seeks the dismissal of Vargas's first, second, and third claims based upon the allegations that ICE (1) failed to shield Arellano adequately from contracting COVID-19; and (2) failed to provide facilities and care sufficient to meet Arellano's medical needs, the Court **GRANTS** the Motion and **DISMISSES** those portions of the Amended Complaint **with leave to amend**.

## B.    First, Second, and Third Claims:  Discretionary Function Exception

The United States next argues that another exception to the FTCA's waiver of sovereign immunity—the discretionary function exemption—bars certain aspects of Vargas's first through third claims. In particular, the United States contends that Vargas's negligence, IIED, and NIED claims should be dismissed to the extent that those claims are based upon Vargas's allegations that ICE (1) failed to oversee facilities and staff properly; and (2) failed to provide care sufficient to meet Arellano's medical needs.[56] Similarly, Vargas alleges that the United States intentionally inflicted emotional distress on Arellano by detaining him "under conditions in which the facilities . . . were not adequate to meet his medical needs."[57] Applying the law to the facts in this case, the Court concludes that the United States' attempt to shield itself from liability under the discretionary function exception fails in part.

The discretionary function exception precludes claims against the United States that are "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion was abused." 28 U.S.C. § 2680(a). To

---

[55]    In his Opposition, Vargas defines the duty of care at issue here rather broadly, as the "special duty . . . [to] protect[] against . . . detention conditions, such as environmental hazards." Opposition 17:3-4.

[56]    Amended Complaint ¶¶ 106(c) & (d) (negligence) & 116(c) & (d) (NIED).

[57]    *Id.* at ¶ 129.

determine whether the discretionary function exception applies, the Court must engage in a two-step inquiry. First, the Court must consider whether the challenged conduct involves an element of judgment or choice. *See Berkovitz*, 486 U.S. at 536. In general, governmental conduct cannot be discretionary if it violates a legal mandate. *See Nurse v. United States*, 226 F.3d 996, 1002 (9th Cir.2000). Second, if the conduct involves some element of choice, then the Court must evaluate whether the conduct implements social, economic, or political policy considerations. *See Gasho*, 39 F.3d at 1435. Both prongs must be satisfied for the discretionary function exception to apply. *See id.*

Pursuant to the discretionary function exception, the United States moves to dismiss two distinct sets of allegations in the Complaint: (1) ICE's failure to oversee Adelanto's facilities and staff properly; and (2) ICE's failure to provide adequate medical care to Arellano. As discussed below, the first group of activities involves discretionary functions, but the second group of actions does not.

### 1.    Oversight of Facilities and Staff

In his Amended Complaint, Vargas challenges ICE's "[f]ail[ure] to properly oversee facilities and staff."[58] Addressing both the first and second prongs of the *Berkovitz* test—that is, whether the challenged conduct involves an element of judgment or choice and whether that conduct implements social, economic, or policy considerations—the Court concludes that it is well established that issues of employee supervision "fall squarely within the discretionary function exception." *Nurse*, 226 F.3d at 1001; *see also Gager v. United States*, 149 F.3d 918 (9th Cir. 1998) (the government's decision to forego employee training was a discretionary one); *Tonelli v. United States*, 60 F.3d 492, 496 (8th Cir. 1995) ("[i]ssues of employee supervision and retention generally involve the permissible exercise of policy judgment," as do hiring decisions); *K.W. Thompson Tool Co., Inc. v. United States*, 836 F.2d 721 (1st Cir. 1988). The Court applies that authority to conclude that the discretionary function exception bars Vargas's FTCA claims based upon ICE's alleged supervisory acts. To the extent that Vargas's first through third claims are based upon ICE's failure to oversee facilities and staff properly, the Motion is **GRANTED** and those portions of the Amended Complaint are **DISMISSED with leave to amend**.

---

[58]    *Id.* at ¶¶ 106(d) (negligence) & 116(d) (NIED).

2.      **Failure to Provide Medically Sufficient Facilities and Care**[59]

Second, the Amended Complaint challenges the United States' failure to provide facilities and care sufficient to meet Arellano's medical needs.[60]  Here, while the question of whether the discretionary function applies is less straightforward, the Court concludes that ample allegations in the Complaint suggest that ICE failed to comply with its own internal policies.  That failure to comply removes any element of judgment or choice from the United States' actions, and, thus, the United States fails to meet its burden to show that the first prong of the discretionary function exception is satisfied.

Under the first prong of the discretionary function test, a court examines whether the United States' actions are "discretionary in nature, acts that involv[e] an element of judgment or choice."  *Gaubert*, 499 U.S. at 322  (internal quotation marks omitted).  In making that examination, it is "the nature of the conduct, rather than the status of the actor, that governs whether the discretionary function exception applies in a given case."  *Varig*, 467 U.S. at 813.  "If there is . . . a statute or policy directing mandatory and specific action, the inquiry comes to an end because there can be no element of discretion when an employee has no rightful option but to adhere to the directive."  *Terbush v. United States*, 516 F.3d 1125, 1129 (9th Cir. 2008) (internal quotation marks omitted).  In other words, where "an applicable federal statute, regulation, or policy specifically prescribes a course of action, then the requirement of judgment or choice is not satisfied."  *Miller v. United States*, 992 F.3d 878, 885–86 (9th Cir. 2021) (quotation and citation omitted).

Here, the challenged conduct arising from ICE's medical negligence cannot be discretionary because the Amended Complaint "is brimming with references to mandatory National Detention Standards that Plaintiff[] allege[s] were violated."  *Baires v. United States*, 2011 WL 6140998, at *7 (N.D. Cal. Dec. 9, 2011).  For example, the Amended Complaint alleges that the United States violated several provisions of ICE's PBNDS,[61] including those standards that require ICE to provide adequate prevention strategies for communicable diseases, such as screening and isolation.[62]

---

[59]      The Court observes that it has already dismissed this portion of the Amended Complaint under the independent contractor exception.  However, because those claims were dismissed with leave to amend and amendment does not appear to be futile, the Court elects to analyze the same allegations pursuant to the discretionary function exception.

[60]      Amended Complaint ¶¶ 106(c) (negligence) & 116(c) (NIED).

[61]      According to the Amended Complaint, "[t]he contract between GEO and ICE requires compliance with ICE's Performance Based National Detention Standards."  *See* Amended Complaint ¶ 16.

[62]      *Id.* at ¶¶ 44-46 (citing the PBNDS).

In addition, Vargas alleges that ICE failed to comply with additional internal policies that it is required to follow, including the Pandemic Response Requirements.[63] The protocol that was in effect at the time of Arellano's illness and death—PRR 5.0— required ICE to implement a list of measures at immigration detention facilities related to COVID-19 testing, isolation, prevention, and treatment.[64]  Those measures included the requirement that detainees at high risk of COVID-19 complications receive twice-daily "[t]emperature screening and verbal screening for symptoms of COVID19 and contacts with COVID-19 cases of all new entrants."[65]  If a detainee exhibited symptoms of COVID-19, then PRR 5.0 also required "[a] medical provider" to "perform an initial evaluation to determine their care plan and housing placement,"[66] among other measures.

In his Amended Complaint, Vargas alleges that the United States violated both the PBNDS and PRR 5.0 through ICE's disregard for ensuring adequate public health conditions at Adelanto during Arellano's detention.  Because ICE does not have discretion to violate the PBNDS or PRR 5.0, the United States' argument that the discretionary function applies fails at the first step.

The United States' three primary arguments to the contrary are unavailing.  First, the United States asserts that Vargas's allegations fail the first step under *Berkovitz* because the Amended Complaint does not identify any mandatory and specific requirement compelling the United States "to provide a detention facility tailored to the alleged unique medical needs of any single detainee."[67]  However, that argument is wrong.  With painstaking detail, Vargas identifies those internal policies, including a complex list of provisions—arising from both the PBNDS and PRR 5.0—that he alleges that the United States violated.  Although the United States contends that Vargas's conclusory averments are insufficient,[68] it paints too broad a brush over the several paragraphs in the Amended Complaint that identify the specific internal policies that the United States allegedly violated.

In addition, the United States' citation to *Doe v. Holy See*, 557 F.3d 1066, 1084 (9th Cir. 2009), is inapt.  In that case, the Ninth Circuit observed that the complaint at issue did not "state the terms of [the] alleged policy," nor did it "describe any documents,

---

[63]     *See* Opposition 20:15-21:17.

[64]     Amended Complaint ¶ 49.

[65]     *Id.* at ¶ 50.

[66]     *Id.* at ¶ 51.

[67]     Motion 14:1-2.

[68]     *Id.* at 14:2-12.

promulgations, or orders embodying it." *Holy See*, 557 F.3d at 1084. Here, by contrast, the Amended Complaint states exactly which terms of the policies were violated, and it references an additional internal policy—PRR 5.0—that embodies the principles of the PBNDS in the post-COVID-19 context.

Second, in its Reply, the United States argues that none of the internal policies to which Vargas refers is "derived from mandatory and specific statutes or regulations that control the precise manner in which they are executed."[69] However, the United States does not cite any case law for its theory, and it ignores Ninth Circuit authority that provides that governmental conduct cannot be discretionary when "an applicable federal statute, regulation, or *policy* specifically prescribes a course of action." *Miller*, 992 F.3d at 885-86 (emphasis added). Here, Vargas points to several policies that specifically prescribe a course of action.

Third, the United States' argument that ICE's conduct involves discretionary judgment "of the most basic kind" under the second step does not pass muster.[70] *Varig*, 467 U.S. at 819-20. To start, the United States once again mischaracterizes the allegations in the Amended Complaint. The United States improperly portrays Vargas's claim as "challenging the selection and monitoring of local detention facilities."[71] Framing the allegations as such, the United States then argues that those types of claims—that is, claims involving the federal government's discretion to select private detention facilities to house federal inmates—are typically subject to public policy analysis. *See Arora v. United States*, 144 F. App'x 627, 628 (9th Cir. 2005); *Sanchez-Soriano v. United States*, 2011 WL 6217063, at *4 (S.D. Ill. Aug. 2, 2011) (holding that "Sanchez-Soriano's claim that federal employees breached a duty of care by selecting Tri-County as the place for his detention is barred by the FTCA's discretionary function exception"); *Bethae v. United States*, 465 F. Supp. 2d 575, 538 (D.S.C. 2006) (holding that "the decision of where to house an inmate is subject to public policy analysis"). However, that is not what Vargas alleges here. Instead, Vargas challenges the United States' failure to provide facilities and care sufficient to meet Arellano's medical needs.[72] Therefore, at least under the handful of cases that the United States cites, the conduct at issue is not the type that is generally shielded by the discretionary function and is therefore exempt under the FTCA. Accordingly, pursuant to the discretionary function exception, to the extent that the United States seeks the dismissal of the portions of

---

[69]   Reply 12:20-21.

[70]   Motion 14:16-18.

[71]   *Id.* at 14:19-20.

[72]   Amended Complaint ¶¶ 106(c) (negligence) & 116(c) (NIED).

Vargas's complaint that center upon ICE's failure to provide facilities and care sufficient to provide for the decedent's medical needs, the Motion is **DENIED**.[73]

## C.    First, Second, and Third Claims:  Failure to Release Arellano

### 1.    Failure to State a Claim

The United States also moves to dismiss Vargas's first through third claims to the extent that those claims are based upon ICE's "[f]ail[ure] to release [Arellano] despite his high risk of serious illness or death"[74] and its "[f]ail[ure] to release [Arellano] after he contracted COVID-19."[75,76]  The United States also seeks the dismissal of Vargas's fourth claim—a false arrest/imprisonment claim—in its entirety.  With regard to those portions of the Amended Complaint, the United States argues that Vargas fails to state a claim, since, as an aggravated felon, Arellano's detention was mandatory; therefore, in view of that classification, Arellano could not be released absent a court order.[77]  *See* 8 U.S.C. § 1226(c).  The United States' argument fails.

In wrestling with the question of whether ICE had the discretion to release Arellano, both sides engage in complex discussions regarding the statutory authority governing the Arellano's detention.  However, the question is not whether, in view of multiple overlapping lawsuits, 8 U.S.C. § 1226(a) or (c) governed Arellano's detention.  The question is, instead:  Did ICE have the discretion to release Arellano?  It did.

In October 2020, in its order granting in part and denying in part the plaintiffs' motion to enforce the April 20, 2020, preliminary injunction in *Fraihat*—a case in which Arellano was a class member—the district court clarified that "all Subclass Members, ***including those subject to mandatory detention***, must receive custody reviews and can potentially be released under the Docket Review Guidance."  *Fraihat II*, 2020 WL 6541994, at *11.  Therefore, regardless of whether Arellano was a mandatory detainee, at the time of Arellano's detention *Fraihat* required the government to assess whether Arellano "[could] . . . potentially be released under the Docket Review Guidance."  *Id.* at *11.  That requirement, spelled out in the district court's order, firmly forecloses the

---

[73]    In view of this ruling, the Court declines to address the more nuanced constitutional argument that Vargas advances in his Opposition, particularly because the Amended Complaint does not allege any constitutional violations.  *See* Opposition 20:1-6.

[74]    Amended Complaint ¶¶ 106(b) (negligence) & 116(b) (NIED).

[75]    *Id.* at ¶¶ 106(e) (negligence) & 116(e) (NIED).

[76]    The United States additionally appears to seek to dismiss "¶ 112 (IIED)" and "¶ 121 (false imprisonment)," but the Court believes that the United States made those citations to the Amended Complaint in error.  *See* Motion 15:20.

[77]    *Id.* at 15:20-28.

United States' argument that ICE simply ***could not*** release Arellano as a matter of law. To the extent that the United States argues that Vargas has failed to state a claim based upon his alleged classification as a mandatory detainee pursuant to 8 U.S.C. § 1226(c), that aspect of the Motion is **DENIED**.

### 2.    Discretionary Function Exception

Even if Arellano's continued detention was discretionary—as the Court has concluded—the United States argues that the discretionary function exemption forecloses Vargas's claims.  Vargas responds by arguing that the United States did not have the discretion to violate the binding order in *Fraihat*.  However, because *Fraihat* expressly gave the government the ***discretion*** to release Arellano, the discretionary function must necessarily apply.[78]

In opposing the United States' Motion, Vargas advances the nuanced argument that ICE failed to comply with various judicial mandates imbedded in *Fraihat*.  For instance, Vargas accuses the United States of failing to conduct Arellano's bond hearing within one week, as the district court's order required.[79]  Vargas also contends that ICE's denial of release was "blanket" and "cursory"; ICE did not identify, as it should have, why Arellano was a "threat to public safety," and it did not justify why Arellano should be among the "rare cases" of inmates who should remain detained.[80]  However, the Court observes that the Amended Complaint challenges the United States' failure to release Arellano, and, in its current iteration, that pleading does not challenge the procedures by which the United States complied (or failed to comply) with *Fraihat*. Therefore, based upon the foregoing, the Court **GRANTS** the Motion to the extent that the first, second, and third claims are based upon ICE's failure to release Arellano. Because amendment may not be futile, those claims are **DISMISSED with leave to amend**.

### D.    First and Second Claims:  Failure to Notify

### 1.    Private Person Analog

Regarding the portions of Vargas's first and second claims that allege that the United States failed to disclose Arellano's health condition and hospitalization to his counsel,[81] the United States argues that Vargas fails to establish a private person analog as

---

[78]    Opposition 16:13-17:3.

[79]    *Id.* at 26:11-14.

[80]    *Id.* at 26:15-21.

[81]    Amended Complaint ¶¶ 106(f) (negligence) & 116(f) (NIED).

required under the FTCA.  To establish subject matter jurisdiction under the FTCA, a plaintiff must show that "a private individual under like circumstances would be liable under state law."  *United States v. Muniz*, 374 U.S. 150, 153 (1963); *see also* 28 U.S.C. § 1346(b).  Vargas fails to make such a showing here.

To satisfy the private analog requirement, the claim as alleged must demonstrate "a persuasive analogy with private conduct."  *Westbay Steel*, 970 F.2d at 650 (internal quotation and citation omitted).  Because "the federal government 'could never be exactly like a private actor,'" the Ninth Circuit requires only that the court "find the most reasonable analogy" to private tortious conduct.  *Dugard v. United States*, 835 F.3d 915, 919 (9th Cir. 2016) (quoting *LaBarge v. Mariposa Cnty.*, 798 F.2d 364, 367 (9th Cir. 1986)).  A private analog, however, need exist only under "like circumstances," not "under the same circumstances."  *Indian Towing Co.*, 350 U.S. at 64 (rejecting the argument that 28 U.S.C.§ 2674 excludes "liability for negligent performance of uniquely governmental functions" and noting that "the statutory language is under like circumstances," not "under the same circumstances").  Courts look to "the law of the place where the act or omission occurred" to determine whether a private person analogue for the government's conduct exists.  28 U.S.C. § 1346(b)(1); *see also FDIC v. Craft*, 157 F.3d 697, 706 (9th Cir. 1998).

Here, Vargas's passing references to cases involving a bank's duty to provide information to a homeowner, *see Warren v. PNC Bank Nat'l Ass'n*, 2023 WL 3182952, at *10 (N.D. Cal. Apr. 30, 2023); a jail warden's duty to communicate policies to internal staff, *see Stewart v. California*, 2019 WL 1332722, at *2 (N.D. Cal. Mar. 25, 2019); and a medical doctor's duty to communicate risks to his patient, *see Cobbs v. Grant*, 8 Cal. 3d 229, 243 (1972), are not sufficiently analogous to the circumstances alleged here.[82]  To be sure, in invoking *Est. of Duran v. Chavez*, 2015 WL 8011685, at *12 (E.D. Cal. Dec. 7, 2015), Vargas comes close to showing a "persuasive analogy with private conduct," *Westbay Steel*, 970 F.2d at 650, but he does not address in his Opposition why liability imposed upon California coroners presents "like circumstances" to those raised here.[83]  *Cf. Duran*, 2015 WL 8011685, at *12 (holding that Cal. Gov't Code § 27471(a) and Cal. Health & Safety Code §§ 7104 & 7104.1 collectively establish that a coroner has a duty to act with reasonable diligence in attempting to notify next of kin before cremation).

Finally, Vargas's citation to two immigration cases—*Nunez Euceda v. United States*, 2021 WL 4895748, at *4 (C.D. Cal. Apr. 27, 2021), and *Avalos-Palma v. United States*, 2014 WL 3524758, at *12 (D.N.J. July 16, 2014)—are not sufficient, because neither case addresses whether there is a relationship that imposes a duty under

---

[82]   Opposition 28:9-10.

[83]   *See, e.g.*, *id.* at 28:14-16.

California law that is similar to the one alleged between ICE and Vargas.  Therefore, the Court **GRANTS** the United States' Motion to the extent that it seeks the dismissal of portions of the Amended Complaint that center on the United States' failure to disclose Arellano's health condition and hospitalization to his counsel.  Because the Court does not conclude that amendment would be futile, those portions of the Amended Complaint are **DISMISSED with leave to amend**.

### 2.    Failure to State a Claim

In the Amended Complaint, the third claim for IIED alleges that agents of the United States acted in bad faith by actively concealing the seriousness of Arellano's condition and his death from his counsel and releasing him on his deathbed in order to avoid having to report a custodial death.[84]  The United States moves to dismiss that portion of Vargas's IIED claim for failure to state a claim.[85]  The United States' argument fails.

In order to recover on an IIED claim, a plaintiff must prove the following elements: "(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct."  *Christensen v. Superior Court*, 54 Cal. 3d 868, 903 (1991) (citation omitted).  Intentional infliction of emotional distress requires conduct "which is *especially calculated to cause* and does cause the claimant mental distress of a very serious nature."  *Coon v. Joseph*, 192 Cal. App. 3d 1269, 1273 (1987) (citation omitted) (emphasis in original).

In this instance, Vargas alleges that the United States' active concealment of the seriousness of his father's condition and his eventual death was extreme and outrageous conduct, that it was committed intentionally and in bad faith, and that it caused Arellano to suffer emotional distress.[86]  The United States' attempts to explain why Vargas cannot meet those elements fail.  For instance, the United States argues that Paragraph 30 of the Amended Complaint must be dismissed because "the deceased Arellano could not have suffered emotional distress."[87]  However, Paragraph 30 of the Amended Complaint alleges not only that ICE actively concealed Arellano's death, but also that ICE actively

---

[84]    Amended Complaint ¶ 130.

[85]    Motion 17:18-18:7; Amended Complaint ¶ 130.

[86]    Amended Complaint ¶¶ 127, 130, & 131.

[87]    Motion 17:20-21.

concealed "his condition."[88]   Therefore, it is not implausible that Arellano could have suffered emotional distress from ICE's failure to communicate.

The United States also argues that the Amended Complaint fails to allege that the United States acted intentionally or with reckless disregard of the probability of causing emotional distress, a requisite element of IIED.[89]   Whether the United States actually acted with the requisite intent is ultimately a factual question, and Vargas has plausibly alleged that the United States may have acted with such ill intent here.   For instance, the Amended Complaint alleges that ICE did not inform Arellano's legal representative of his hospitalization or about the seriousness of his medical condition, despite ICE's receipt of information from Wellpath that Arellano may die.[90]   The Amended Complaint also alleges that, even after Arellano was brain dead, ICE continued actively to conceal his medical condition.[91]   According to the Amended Complaint, on March 8, 2021, "Arellano passed away due to complications brought by COVID-19."[92]   However, the Amended Complaint makes the allegation that ICE informed neither Arellano's legal representative, nor Arellano's son—Plaintiff Vargas—of Arellano's death.[93]

Because the United States does not sufficiently explain why Vargas has failed to state a claim, the Court concludes that Vargas's plausible allegations satisfy the elements of an IIED claim.   Accordingly, the court **DENIES** the Motion to the extent that it seeks the dismissal of the portion of Vargas's third claim centered on the United States' concealment of the seriousness of Arellano's condition and death.

### E.   Eighth Claim:  Wrongful Death

In his eighth claim for relief, Vargas alleges that Arellano's death was a direct and proximate result "of the negligence, wrongful acts, conduct, and omissions of the Defendants."[94]   In the Motion, the United States seeks the dismissal of Vargas's eighth claim for wrongful death on the ground that it is derivative of Vargas's other claims.[95]

---

[88]   Amended Complaint ¶ 130.

[89]   Motion 17:21-24.

[90]   Opposition 28:22-24; Amended Complaint ¶¶ 88-91.

[91]   Opposition 28:24-25:1; Amended Complaint ¶¶ 93-95.

[92]   Amended Complaint ¶ 94.

[93]   *See id.*

[94]   Amended Complaint ¶ 166.

[95]   Motion 18:8-12.

Because it appears that Vargas's wrongful death claim is premised on all of the claims that the Court has dismissed, the United States' Motion is **GRANTED** with respect to the eighth claim for relief.  Because amendment would not be futile, the Court **DISMISSES** Vargas's eighth claim **with leave to amend.**

## IV.  DISPOSITION

For the foregoing reasons, the Court hereby **ORDERS** as follows:

1.      The United States' instant Motion to dismiss is **GRANTED in part** and **DENIED in part** as follows:

      a.      to the extent that Vargas's first, second, and third claims are based upon ICE's failure to shield Arellano adequately from contracting COVID-19 and ICE's failure to provide facilities and care sufficient to meet Arellano's medical needs, those claims are **DISMISSED with leave to amend**;

      b.      to the extent that Vargas's first, second, and third claims are based upon ICE's failure to oversee facilities and staff properly, those claims are **DISMISSED with leave to amend**;

      c.      to the extent that Vargas's first, second, and third claims are based upon ICE's failure to release Arellano, those claims are **DISMISSED with leave to amend**;

      d.      to the extent that Vargas's first and second claims are based upon ICE's failure to disclose Arellano's health condition and hospitalization to his counsel, those claims are **DISMISSED with leave to amend**;

      e.      the eighth claim is **DISMISSED with leave to amend**; and

      f.      to the extent that Vargas's third claim is based upon ICE's concealment of the seriousness of Arellano's condition and death, the Motion is **DENIED**.

2.      Vargas is **DIRECTED** to file an amended pleading, if at all, no later than March 8, 2024.  If Vargas chooses to file an amended pleading, then he is also **DIRECTED** to file contemporaneously therewith a Notice of Revisions to the Second Amended Complaint that provides the Court with a redline version that shows the amendments.  If Vargas does not timely file his amended pleading, then the claims herein **DISMISSED with leave to amend** will be **DISMISSED with prejudice**.

    3.      Defendants are **DIRECTED** to file their respective responses to Vargas's operative pleading no later than March 29, 2024.

       **IT IS SO ORDERED.**

Dated:  February 21, 2024

                                 John W. Holcomb
                                 UNITED STATES DISTRICT JUDGE