Stacy Tolchin
*Email: Stacy@Tolchinimmigration.com*
Megan Brewer
*Email: Megan@Tolchinimmigration.com*
Law Offices of Stacy Tolchin
776 E. Green St., Suite 210
Pasadena, CA 91101
Telephone: (213) 622-7450
Facsimile: (213) 622-7233

Khaled Alrabe
*Email: khaled@nipnlg.org*
Matthew Vogel (admitted *pro hac vice*)
*Email: matt@nipnlg.org*
Amber Qureshi (admitted *pro hac vice*)
*Email: amber@nipnlg.org*
1200 18th Street NW Suite 700
Washington, DC 20036
Telephone: (202) 470-2082
Facsimile: (617) 227-5495

(*continued on next page*)

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Martin VARGAS, as Successor in Interest of the Estate of Martin Vargas Arellano,<br><br>          Plaintiff,<br><br>          v.<br><br>UNITED STATES OF AMERICA; THE GEO GROUP; and WELLPATH, LLC.<br><br>                    Defendants. | Case No. 5:23-cv-00380-JWH-SP<br><br>Honorable Sheri Pym<br><br>**DISCOVERY MOTION**<br><br>**DECLARATION OF LABONI HOQ IN SUPPORT OF PLAINTIFF'S MOTION TO COMPEL DEFENDANT THE GEO GROUP'S FURTHER PRODUCTION OF DOCUMENTS AND AMENDED INTERROGATORY RESPONSES**<br><br>**NOTICE OF MOTION AND JOINT STIPULATION FILED** |

**CONCURRENTLY**

Hearing Date: April 9. 2024
Hearing Time: 10:00 a.m.
Location: via court's posted Zoom webinar
Jury Pre-Trial Conference: November 22, 2024
Jury Trial Date: December 9, 2024
Discovery Cut-Off: July 26, 2024

Laboni A. Hoq
*Email: laboni@hoqlaw.com*
Hoq Law APC
P.O. Box 753
Pasadena, CA  91030
Telephone: (213) 973-9004

Attorneys for Plaintiff

## DECLARATION OF LABONI HOQ

I, Laboni Hoq, declare as follows:

1.    I am the attorney of record for Plaintiff Martin Vargas in this action. The following information is based upon my personal knowledge and/or my review of files maintained by my office and/or my co-counsel in this matter. I submit this declaration in support of Plaintiff's Motion to Compel Further Responses to Plaintiff's Requests for Production of Documents ("RFPs"), Sets One and Two, and Plaintiff's Interrogatories ("Rogs"), Sets One and Two, against Defendant The GEO Group, Inc. ("GEO"). If called upon as a witness, I could and would testify to the truth and accuracy of the following information.

2.    Plaintiff has met the pre-filing conference of counsel and preparation of joint stipulation requirements contained in Federal Rule of Civil Procedure 37 and Local Rule 37 *et al.*, including by convening a Rule 37-1 conferences on October 19, 2023 (regarding RFPs Set One and Rogs Set One), and February 9, 2023 (regarding RFPs Set Two and Rogs Set Two).

3.    On June 6, 2023, Plaintiff served its first set of RFPs (Nos. 1-23) and Rogs (Nos. 1-10) on GEO.  On or about June 28, 2023 Plaintiff granted GEO a one-month extension to respond to this first set of RFPs and Rogs.

4.    On August 10, 2023, GEO served its written Responses to Plaintiff's first set of RFPs and Rogs.

5.    On October 30, 2023, Plaintiff served its second set of RFPs (Nos. 24-32) and Rogs (Nos. 11-21) on GEO.  On or about November 29, 2023 and July 19, 2023, Plaintiff granted GEO a combined two-week extension to respond to this second set of RFPs and Rogs.

6.    On December 13, 2023, GEO served its written Responses to Plaintiff's second set of RFPs and Rogs on Plaintiff.

7.    In response to Plaintiff's two sets of RFPs and Rogs, to date GEO has

produced a total of 6,693 pages of documents. The vast majority of those documents, including approximately 6,000 pages, constitute Vargas Arellano's medical records that GEO obtained from Defendant Wellpath, and which Wellpath previously produced in the litigation.

8.    Attached hereto as **Exhibit A** is a true and correct copy of Plaintiff's letter to GEO dated October 9, 2023, indentifying deficiencies in its responses to Plaintiff's first set of RFPs and Rogs.

9.    On October 19, 2023, Plaintiff convened a Local Rule 37-1 conference of counsel related to the deficiencies in GEO's responses to Plaintiff's first set of RFPs and Rogs.  At that conference, GEO committed to address and correct the deficiencies identified in Plaintiff's October 9, 2023 letter, as further explained at the conference, within the next month.  GEO failed to do so.

10.    On November 22, 2023, Plaintiff sent GEO a letter reminding it of its commitment at the October 19, 2023 Rule 37-1 conference that it would address the specified deficiencies with its responses to Plaintiff's first set of RFPs and Rogs.  In that letter Plaintiff asked GEO to respond in writing regarding thet status of the outstanding issues by December 1, 2023, otherwise Plaintiff would "proceed to prepare a motion to compel." Attached hereto as **Exhibit B** is a true and correct copy of Plaintiff's November 22, 2023 letter to GEO.

11.    Having received no response to his November 22, 2023 letter, Plaintiff sent GEO another letter on January 4, 2024.  In that letter, Plaintiff identified the remaining deficiencies with GEO's responses to Plaintiff's first set of RFPs and Rogs, and also identified the deficiencies with GEO's responses to Plaintiff's second set of RFPs and Rogs. Plaintiff asked for a response to the issues raised in the letter by January 12, 2024, absent which "Plaintiff will prepare the Local Rule 37 Joint Stipulation and proceed to file a motion to compel." Attached hereto as **Exhibit C** is a true and correct copy of Plaintiff's January 4, 2024 letter to GEO. GEO never responded to Plaintiff's January 4,

2024 letter.

12.    On January 26, 2024, Plaintiff sent GEO another letter regarding the outstanding deficiencies in its responses to Plaintiff's two sets of RFPs and Rogs. Regarding the first set of RFPs and Rogs, Plaintiff informed GEO that Plaintiff's counsel would "prepare the Joint Stipulation in support of its Motion to Compel," and outlined the grounds for the motion and the relief they would seek.  Regarding the second set of RFPs and Rogs, Plaintiff's counsel asked GEO to participate in a Rule 37-1 conference in anticipation of filing a motion to compel as to certain of the requests in those RFPs and Rogs, and outlined the grounds for the motion and the relief Plaintiff would seek. Attached hereto as **Exhibit D** is a true and correct copy of Plaintiff's January 26, 2024 letter to GEO. GEO never responded to this letter.

13.    Because GEO's counsel did not identify dates she was available to participate in this Rule 37-1 conference within the required 10 days of Plaintiff's request for the conference, Plaintiff had to schedule the conference several days later on February 9, 2024.

14.    At the February 9, 2024 conference, GEO refused to discuss the outstanding issues with its responses to Plaintiff's second of RFPs and Rogs. Despite Plaintiff having raised in numerous correspondence his intention to file a motion to compel againt GEO for its deficient and delinquent discovery responses, upon learning at the February 9 conference that Plaintiff planned to proceed with the motion, GEO's counsel stated, she is "not doing this and there is nothing to discuss." Plaintiff reminded GEO's counsel that GEO's further production of responsive information could at least help narrow the issues in dispute, but GEO's counsel refused to discuss this possibility and abruptly left the Zoom conference.

15.    On February 13, 2024, Plaintiff sent GEO an email memorializing certain aspects of the parties' February 9, 2024 conference. Among the issues that remain in dispute is GEO's unsupported position that it will only produce Covid-19 testing and

contact tracing documents relating to it staff, and not that of Defendants Wellpath and USA, claiming it does not have access to them. To date, none of the Defendants have produced a full, unredacted set of documents encompassing the testing and contact tracing related to how and from who Vargas Arellano (and apparently other detainees) contracted COVID-19.  Another issue Plaintiff raised at the February 9 conference is GEO's failure to produce transcripts of its witnesses deposed in the *Roman* litigation, which Plaintiff asked it to do in his January 4, 2024 letter. GEO took the unsupported position it does not have access to them, despite Plaintiff pointing out at the conference that Wellpath was able to obtain transcripts of its witnesses deposed in the *Roman* litigation which it produced to Plaintiff in this litigation, indicating that GEO could do the same.  GEO had no response to this information. Attached hereto as **Exhibit E** is a true and correct copy of the February 13-14, 2024 email chain between Plaintiff and GEO addressing certain of these issues.

16.    GEO's counsel responded to Plaintiff's February 13, 2024 email that same day by stating, "I have not refused to produce any documents in GEO's possession and have been working on obtaining these." *Id*. The parties later negotiated the parameters of GEO's production of "shift summaries," as well as "covid test results, the positive covid tests, the contact tracing results, the front entrance screening logs, and the covid reporting to government agencies." *Id*.  However, the parties remained at in impasse regarding Plaintiff's entitlement to shift summaries for the dates March 8, 2021 to December 31, 2021, the period after Plaintiff's father Martin Vargas Arellano's death. *Id*. Ultimately, on February 14, 2024 Geo's counsel represented that she had "asked the facility to provide the shift summaries for [Plaintiff's] requested date range." *Id*.

17.    On February 15, 2024, Plaintiff provided GEO a copy of his portion of the Joint Stipulation in support of Plaintiff's instant Motion to Compel, and asked GEO to provide Plaintiff its portion within seven days, as required by Local Rule 37.  As of that time, Plaintiff had not received the "shift summaries," or the "covid test results, the

positive covid tests, the contact tracing results, the front entrance screening logs, and the covid reporting to government agencies," that GEO had committed to produce to Plaintiff.  However, on February 16 and 22, 2024, GEO produced various additional documents, including certain records from Mr. Vargas Arellano's medical file and a document titled "IDENTIFY # Contact Tracing – Positive Cases – AIPC Staff." This latter document does not identify any staff names associated with the "Contract Tracing" data.

18.    Attached hereto as **Exhibit F** is a true and correct copy of the Scheduling Order in this case.

19.    Attached hereto as **Exhibit G** is a true and correct copy of a letter from Plaintiff's counsel Stacy Tolchin to GEO dates April 19, 2021, which GEO produced in this litigation bearing bates label GEO 00001-2.

20.    Attached hereto as **Exhibit H** is a true and correct copy of a memorandum from Judy Donato, GEO's Legal Review Coordinator to James Janecka, GEO's Facility Administrator, which GEO produced in this litigation bearing bates label GEO 00004.

21.    Attached hereto as **Exhibit I** is a true and correct copy of GEO's Records Retention policy, which GEO produced in this litigation bearing bates label GEO 00409-412.

22.    Attached hereto as **Exhibit J** is a true and correct copy of GEO's Records Management Procedure, which GEO produced in this litigation bearing bates label GEO 00413-419. GEO produced this document as Confidential.

23.    Attached hereto as **Exhibit K** is a true and correct copy of GEO's Email Retention-Disposition POLICY, which GEO produced in this litigation bearing bates label GEO 06690-6693 on February 22, 2024. GEO produced this document as Confidential.

24.    Attached hereto as **Exhibit L** is a true and correct copy of Respondent U.S. Immigration and Customs Enforcement's Responses to Petitioner's Fifth Set of

1    Interrogatories in *Roman v. Wolf*, Case No. 5:20-cv-00768-TJH-PVC, which USA

2    produced in this litigation bearing bates label USA008610-8630.

3        25.    GEO produced in this litigation a copy of  document titled Death Response

4    Plan, dated 1/20/2023, bearing bates label GEO00362-00369. Plaintiff asked GEO to

5    produce prior versions of this Plan that were in operation at times relevant to this case.

6    As of February 15, 2024, when Plaintiff provided GEO with his portion of the Joint

7    Stipulation in support of this Motion to Compel, GEO had failed to produce any such

8    documents.

9        26.    Attached hereto as **Exhibit M** is a true and correct copy of a document

10    titled Master Service Agreement between GEO and Wellpath, which Wellpath produced

11    in this litigation bearing bates label WELLPATH-MVA 005898-5926.

12        27.    USA produced 211 pages of documents (USA011325-USA11534) in this

13    litigation that bear GEO bates stamps, indicating GEO produced them in another

14    litigation. Fourteen of those pages contain contact tracing information related to

15    registered nurses at Adelanto (presumably Wellpath nurses) between August of 2020 and

16    December 2020 (USA011485-USA011498). These records do not constitute sufficient

17    responses to Plaintiff's discovery requests at issue here because they withhold critical

18    information, including because they  are redacted to withhold the names of individuals

19    involved in the contact tracing.

20        28.    USA produced in this litigation a limited number of documents titled

21    Supervisor Shift Summary, but not all such documents relevant to this case. Because

22    they are highly relevant to this case and responsive to Plaintiff's discovery, Plaintiff

23    asked GEO to produce these documents for the period June 1, 2020 to December 31,

24    2021 (without waiving Plaintiff's right to seek documents from a broader time-frame as

25    relevant). While GEO stated it would "ask[] the facility to provide me the shift

26    summaries for [Plaintiff's] requested date range," *see* Exhibit E, it has yet to commit to

27    producing them to Plaintiff. *See* Exhibit E.

28

29.    Attached hereto as **Exhibit N** is a true and correct copy of document titled Facility Entrance - Employee Wellness Screening Tool, which GEO produced in this litigation bearing bates label GEO 6497. Because they are highly relevant to this case, Plaintiff asked GEO to produce these documents for the period August 1, 2020 to December 31, 2020. *See* Exhibit E. GEO committed to producing these documents to Plaintiff, together with Covid-19 reporting to other government agencies, within the week of February 13, 2024. Ex. E. To date, it has failed to do so.

30.    USA produced in this litigation a limited number of documents titled Daily Movement Sheets, bearing bates label USA015890-92. GEO has yet to produce these documents to Plaintiff for the time period requested.

31.    Attached hereto as **Exhibit O** is a true and correct copy of ICE's Section C of the Performance Work Statement for Detention Services applicable to ICE and GEO's effective Adelanto services contract, bearing bates label USA008296-8369.

32.    Attached hereto as **Exhibit P** is a true and correct copy of GEO's Understanding of the Performance Work Statement of the effective Adelanto services contract between ICE and GEO, bearing bates label USA008423-8495.

33.    Attached hereto as **Exhibit Q** is a true and correct copy of the Special Master Report and Recommendation Following the Investigation into the Death of Martin Vargas Arellano in in *Roman v. Wolf*, Case No. 5:20-cv-00768-TJH-PVC.

34.    Defendant USA produced in this litigation some communications with GEO staff, but GEO has failed to produce any relevant internal communications with its staff responsive to Plaintiff's discovery requests.

35.    Attached hereto as **Exhibit R** is a true and correct copy of excerpts of a deposition transcript of Gabriel Valdez taken on May 13, 2021, bearing bates label USA 009271, 9282-89, 9378-90, which I highlighted to reflect passages relevant to this motion. Defendant USA produced pages USA009378-90 as Confidential or Attorneys' Eyes Only.

9

36.    Plaintiff respectfully requests that he be awarded attorneys' fees in the amount of $ 20,000, as reasonable expenses incurred in bringing this Motion pursuant to Rule 37(a)(5)(A).  This amount represents a conservative estimate of the fees that I incurred in preparing, filing and arguing this Motion. My current hourly rate is $925 and I spent at least 16 hours preparing the motion and will spend at least another 3 hours preparing a supplemental response after receiving Defendants' opposition and another approximately 3 hours appearing at and arguing the motion at the hearing. These hours of my time represents $ 20,000  in fees.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

Executed this 26th day of February 2024, in South Pasadena, California.


//s// Laboni Hoq
_____

# EXHIBIT A



October 9, 2023

Susan E. Coleman
E-mail: scoleman@bwslaw.com

*Via Email*

   Re: *Martin Vargas v. United States of America et al.*
     C.D. Cal. Case No. 5:23-cv-00380-JWH-SP

Dear Susan:

I am writing in regard to Defendant the GEO Group's ("GEO") responses to Plaintiff's Request for Production of Documents, Set One ("RFPs") and Interrogatories, Set One ("Rogs") seeking information related to the claims and defenses in this case.

As outlined below, GEO's responses to certain of these RFPs and Rogs are deficient.  Without waiving Plaintiff's right to challenge others, Plaintiff identifies here the deficiencies with the following RFPs and Rogs: RFP Nos. 1-3, 4, 8-21, and 23; Rog Nos. 5 and 8.

Pursuant to Local Rule 37-1, please let us know a time within the next 10 days that you are available to meet and confer with us to attempt to resolve these deficiencies, so we can avoid having to file a motion to compel.

  I.  **RFP Nos. 1-3, 11-19, 21**

    A. **RFP Nos. 11-19, and 21, Related to Destroyed Emails**

In response to these RFPs, all of which seek communications, GEO takes the position that it "has not retained emails from 2019-2021." *See* Responses to RFP Nos. 11-19, 21. This blanket response, and GEO's apparent unjustified destruction of relevant information, fails to meet its discovery obligations for a number of reasons.

First, the requests at issue seek communications other than emails, and GEO must search non-email files for responsive communications, both electronic and hard copy. Plaintiff therefore asks that GEO identify the locations where such communications would be stored, search those locations, and produce responsive documents to the following requests: RFP Nos. 1-3, 11-19, 21. To assist in this process, Plaintiff attaches at **Exhibit A** to this letter a list of proposed search terms and locations that we believe will yield responsive documents from ESI sources.  Regarding the search terms, we are open to discussing applying terms and connectors to them to focus the results as needed. Please let us know whether GEO will conduct these searches and produce responsive documents.

Second, GEO must establish that its destruction of emails between "2019-2021" did not violate its obligation to preserve documents in this case. "'The duty to preserve material evidence arises not only

during litigation but also extends to that period before the litigation when a party reasonably should know that the evidence may be relevant to anticipated litigation.'" *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 216 (S.D.N.Y. 2003) (quoting *Silvestri v. General Motors Corp.*, 271 F.3d 583, 591 (4th Cir.2001)). Here, GEO as ICE's contractor operating the Adelanto Setention Center should have been preserving documents related to the case *Roman v Wolf (*No. 5:20-cv-00768), which has been challenging ICE's failure to adequately protect detainees like Plaintiff's father, Mr. Vargas Arellano, from Covid-19 exposure. The Roman case was filed on April 13, 2020, and GEO should have been preserving records related to Mr. Vargas Arellano at least since that time.  Please explain why – despite commencement of the *Roman* litigation in April 2020 – GEO destroyed relevant emails after that time.

Third, while GEO produced its Document Retention Policy, assuming its destruction of emails between 2019 and 2021 was subject to that policy, GEO must provide information showing that the emails in question were in facts destroyed pursuant to that Policy. According to the Policy: "No records shall be destroyed without obtaining the appropriate approvals on a Request to Destroy Records form prior to destruction; The RRI shall: ... (ii) Identify the electronic records (including dates) which are eligible for destruction according to the Records Retention Schedule. A list of the files and dates must be attached to the Request to Destroy Records form. (iii) Obtain the necessary approvals on the Request to Destroy Records form. … (iv) Forward the Request to Destroy Records form to R&IM via records@geogroup.com, for final approval by the Director, Information Privacy." GEO 00417-418. In the event GEO claims the 2019-2021 emails were destroyed subject to this Policy, please provide us all of this supporting documentation establishing that GEO's destruction of emails followed the specified procedures set forth in the Policy.

Fourth, consistent with the Document Retention Policy, documents produced by GEO demonstrates its awareness that it should not have destroyed documents relevant to this case after April 20, 2021. On April 19, 2021, GEO received a document preservation letter from Plaintiff's counsel Stacy Tolchin, which was sent by overnight mail, asking that GEO preserve information relevant to this case. *See* GEO 00001-2.  In an April 23, 2021 memo, GEO acknowledged receipt of that letter, and GEO's Legal Review Coordinator, Judy Donato issued a memo to James Janecka, the GEO Adelanto Facility Administrator with copy to Joanne Crowder, GEO Administrative Secretary, identifying information potentially relevant to this case.  GEO 00004. In that memo Ms. Donato specifically directed that, "If you do find records to send, please send them to my attention in PDF format, if possible." *Id*. These documents make clear that after April 20, 2021, no relevant emails should have been destroyed. It also indicates that emails and other documents relevant to this case would have been forwarded to Ms. Donato in response to her April 23, 2021 memo.  Please produce any such documents, and explain the impact of the April 23, 2021 memo on any then-pending plans for document destruction, including emails from 2019-2021.

**B.   RFP No. 2, Related to Mr. Vargas Arellano's Death**

In response to **RFP No. 2**, Plaintiff seeks the following documents:

All DOCUMENTS RELATING TO the death of VARGAS-ARELLANO, including but not limited to COMMUNICATIONS between YOU and any other PERSON RELATED TO his death; any investigation into his death; any Office of Professional Responsibility reports RELATED TO his death; any action items, corrective action plans, or policy changes resulting from or RELATED TO his death; and statements from any PERSON, including but not limited to YOU, USA or WELLPATH RELATED TO his death.

In response, GEO states: "There are no responsive documents. Decedent was stable when he was transferred to the hospital, and he died at the hospital."

This response improperly evades the request.  Whether or not GEO believes Mr. Vargas Arellano "was stable when he was transferred to the hospital, and he died at the hospital," is irrelevant to its obligation to search for and produce responsive records. Please let us know whether GEO will abide by its obligation to search for documents responsive to RFP No. 2, and when it will produce responsive documents.

Further, GEO did produce a document entitled Death Response Plan, dated 1/20/2023, which is responsive to RFP No. 2. *See* GEO00362-00369. However, there appear to be two other versions of this Plan dated January 2020 and January 2021 that are responsive to this RFP as well.  Please produce those documents, as well as any documents, including communications related to their application to the death of Mr. Vargas-Arellano.

### C.   RFP Nos. 1, 11-14, Related to Mr. Vargas Arellano's Medical Conditions

These RFPs seek documents related to Mr. Vargas Arellano's medical condition while in Defendants' custody and care. The only document GEO states it produced in response is Mr. Vargas Arellano's "medical file."  As discussed below, Plaintiff questions whether GEO produced such a file. Further, simply producing a "medical file" is an insufficient response to these RFPs.

Among other things, Plaintiff asks that GEO produce the following categories of documents to satisfy its discovery obligations:

(1) All Adelanto infirmary documents setting forth Mr. Vargas Arellano's medical conditions including but not limited to medical progress reports for the period 11/28/20 to 12/1/20;
(2) All medical testing conducted at Adelanto related to Mr. Vargas Arellano's medical conditions, including but not limited to Covid-19 testing of GEO and Wellpath staff who came in contact with Mr. Vargas Arellano between October 1, 2020 and December 10, 2020;
(3) All communications related to any of topics (1) to (3);
(4) All documents showing the results of staff Covid-19 testing for any staff that came into contact with Mr. Vargas from the period October 1, 2020 to December 10, 2020, including the names of all staff who tested positive, including but not limited to the staff listed on **Exhibit B** hereto. Notably, GEO apparently conducted the Covid-testing and engaged in contract tracing for the facility, including as referenced in the December 14, 2020 report provided to the Court in the *Roman* litigation.  See **Exhibit C** attached hereto.

### II.    RFP No. 4 Related to Training Records and Performance Evaluations of GEO Staff who Interfaced with Mr. Vargas Arellano

In **RFP No. 4**, Plaintiff seeks the following documents:

All training records, performance reviews, warnings, reprimands and other disciplinary records of any and all of YOUR, USA and/or WELLPATH personnel, employees, or contractors at ADELANTO that came

in contact with or were responsible in any way for VARGAS ARELLANO (including those responsible for assessing or treating VARGAS ARELLANO or responsible for his wellbeing during detention).

In response, GEO stated, "Reviews, evaluations, training and other personnel records for Wellpath staff would be in Wellpath's custody and control and are not in GEO's custody and control. Defendant has no knowledge of any disciplinary or corrective action taken against staff as a result of their interaction with decedent." However, this response fails to address Plaintiff's request for "training records" and "performance reviews." Please confirm that GEO will search for and produce these documents, and identify when it will produce them. To assist with its search, Plaintiff is attaching as **Exhibit B** document that identifies a subset of the GEO staff that interface with or were responsible for Mr. Vargas Arellano. Please make sure to search for training records and performance reviews of each of the GEO staff referenced in these documents, in addition to any other individuals who interfaced with Mr. Vargas Arellano from October 1, 2020 to his death on or about March 8, 2021.

Further, as Wellpath is a GEO contractor, it is not plausible that GEO does not have possession, custody or control over the documents requested in RFP No. 4. While Plaintiff reserves the right to seek responsive information from GEO, we are also seeking it from Wellpath, and are open to coordinating to ensure we receive a comprehensive response from one of these two Defendants.

### III.    RFP Nos 8-9 Relating to GEO's Contracts with USA and Wellpath

In response to **RFP Nos. 8-9**, Plaintiff seeks the following documents:

**RFP No. 8:**
All DOCUMENTS RELATING TO any CONTRACT between ICE and GEO and/or WELLPATH RELATING TO GEO's operation of ADELANTO, and any modifications to those including but not limited to GEO and/or WELLPATH'S duty of care toward sick detainees.

**RFP No. 9:**
All DOCUMENTS RELATING TO any CONTRACT between YOU and WELLPATH RELATING TO YOUR operation of ADELANTO, and any modifications to those including but not limited to YOUR duty of care toward sick detainees.

In response to both of these RFPs, GEO refers only to the contract between GEO and USA, as produced by USA, and the contract between GEO and Wellpath. GEO references in response to RFP No. 9 as to the contract between GEO and Wellpath that "it has been produced." Please identify the bates number in GEO's production of this document. It does not appear to be in the only document production Plaintiff received from GEO on or about August 8, 2023.

Regarding GEO's contract with USA, GEO's production appears to be missing a number of documents attached to or referenced in the contract that are responsive to RFP Nos. 8 and 9. These include, but are not limited to: (1) the Quality Assurance Surveillance Plan (QASP), listed as Attachment 2 to the contract; (2) all Contract Discrepancy Reports (CDR); and (3) all Quality Assurance Surveillance Forms (QASF) for the relevant time period.

Further, another contract relevant to these RFPs is the ERO Covid-19 Pandemic Response Requirements (PRR). GEO 00372-399. While GEO produced the PRR, it failed to produce relevant documents referenced therein, including but not limited to (1) all annual inspection reports, and (2) all evidence of bi-weekly spot checks as required under the PRR at the Adelanto facility.

Please identify whether GEO will produce these missing documents and when it will do so.

### IV.    RFP No. 10: Identity of Mr. Vargas Arellano's Health Care Providers

In response to **RFP No. 10** , Plaintiff seeks the following documents:
All DOCUMENTS identifying by name all health care professionals who were involved in providing care to VARGAS ARELLANO, including the WELLPATH staff member who was identified in the SPECIAL MASTER REPORT as likely transmitting Covid-19 to VARGAS ARELLANO.

In response to this RFP, GEO responded: "Defendant refers to decedent's medical file, which has been produced. Defendant is not in custody or control of Wellpath staff information."  Please identify the bates range of "decedent's medical file" as produced by GEO. GEO appears to have produced Mr. Vargas Arellano's detainee file, *see* GEO 000028-000348, but not his medical file.

Regarding GEO's claim that it "is not in custody or control of Wellpath staff information," again, as GEO's contractor this claim is not plausible. As we are raising this with Wellpath as well, we specifically ask that GEO produce all documents relating to Mr. Vargas Arellano's stays at the Adelanto infirmary during the relevant time period that would identify the staff involved in his care.  While USA and Wellpath have produced some of this information, a number of responsive documents are missing, including infirmary documents from Mr. Vargas' infirmary stay on November 28 to December 1, 2020, where USA has indicated he contracted Covid-19.  Please confirm GEO will produce this information, and when it will do so.

### V.    RFP No. 23: GEO's Insurance Documents

In **RFP No. 23** Plaintiff seeks the following documents:

All DOCUMENTS RELATING TO any insurance available to YOU to defend or pay any judgment or settlement of this case, including any insurance CONTRACTS and any COMMUNICATION with any other PERSON including any insurance provider, i.e. any reservation of rights letter.

In response, GEO states: "GEO has a deductible of $3,000,000, beyond the anticipated exposure of GEO in this litigation."  While we appreciate this information, in response to RFP No. 23 GEO is obligated to produce its policy and related documents, including but not limited to any communications with its insurers about this case, and reservation of rights correspondence from its insurer, and any information about its insurer's duty to defend this case whether it is in fact covering GEO's defense costs in this case. Please let us know whether GEO will produce these documents and when it will do so.

### VI.    GEO's Deficient Rog Responses

####    A.   Rog No. 5

In **Rog. No. 5**, Plaintiff asked GEO to:

IDENTIFY all PERSONS with knowledge of how VARGAS ARELLANO may have contracted Covid-19 while at ADELANTO, *e.g.* based on access to the results of any contact tracing, including their employment position(s) and a summary of their knowledge of relevant facts.

GEO responded as follows: "Per the receiver's report in Roman v. Wolf, it was a Wellpath employee. However, GEO does not have access to this information. GEO contracted with Wellpath for all medical services to detainees during the relevant time period."

As discussed, as Wellpath is a GEO contractor, GEO should and likely does have knowledge of how USA determined that it was a Wellpath employee from who Mr. Vargas Arellano contracted Covid-19. Moreover, it appears that USA's determination of how Mr. Vargas Arellano contracted Covid-19 may have been based on contract tracing, including of a Wellpath nurse named Norma Penaloza. *See* **Exhibit D** attached hereto. As discussed, GEO should have this information as it was specifically responsible for Covid-19 related contract tracing at the facility, as reported in the December 14, 2020 report to the Court in *Roman*, in which 47 members of the Adelanto staff testified positive for COVID-19. *See* **Exhibit C**.

As such, in response to Rog. No. 5, please identify all persons who tested positive in the month prior to the time Mr. Vargas Arellano tested positive for Covid-19 or about December 10, 2020, anyone who reviewed any contract tracing conducted to determine how Mr. Vargas Arellano contracted Covid-19, and any one else who knows facts relevant to how Mr. Vargas Arellano contracted Covid-19.

      **B.   Rog No. 8**

In **Rog No. 8**, Plaintiff asked GEO to:

Describe any policies, practices, procedures and protocols YOU used to train YOUR agents (e.g. employees or contractors) to avoid transmitting Covid-19 to inmates at ADELANTO, including by IDENTIFYING the dates of those trainings and the PERSONS who were trained.

In response, GEO states: Defendant took various measures including but not limited to following ICE PRR (Covid-19 Pandemic Response Requirements), requiring correctional staff to wear masks and medical staff to wear masks/gloves and other sanitary equipment as needed/appropriate, requiring weekly covid testing of staff, screening staff for symptoms on entry to the facility, and posting notices about protocol. Defendant also incorporates by referenced GEO documents related to Covid-19 notices, protocols, and training.

While we appreciate this response, it omits information about the dates of trainings provided to its agents and the identities of the persons trained, including GEO and Wellpath staff, about the referenced policies, practices, procedures and protocols regarding how to avoid transmitting Covid-19 to inmates at Adelanto.  Please let us know whether you will provide this information, and when you will do so.

***

Please do not hesitate to contact me if you need clarification on any of these matters. I look forward to hearing from you regarding a time to discuss them.

Laboni A. Hoq

Encl.

cc:     Shiana St. John
        Jemma Parker Saunders
        Stacy Tolchin
        Megan Brewer
        Khaled Alrabe
        Amber Qureshi
        Matthew Vogel

**Exhibit A – Plaintiff's Proposed ESI Search Parameters for Defendant GEO**

## I.     Search Terms

1.   "Vargas" or "Vargas Arellano" or "Vargas-Arellano" or "Arellano" or "Martin Vargas"
2.   Martin Vargas Arellano's A# "20571880"
3.   "Special Master" or "Hon. Patrick J. Walsh" or "Patrick J. Walsh" or "Patrick Walsh"
4.   "Sergio Guzman" or "S. Guzman" or "DO Guzman" or "Guzman"
5.   "Gabriel Valdez" or "G. Valdez" or "AFOD" or "Assistant Field Office Director" or "Officer in Charge" or "OIC" or "Valdez"
6.   "SDDO Gill Montes" or "SDDO G. Montes" or "SDDO Monets" or "Montes"
7.   "Assistant Officer in Charge David Gomez" or "David Gomez" or "D. Gomez" or "Gomez"
8.   "FOD Ernesto Santacruz, Jr." or "E. Santacruz" or "Ernesto Santacruz" or "Santacruz"
9.   DFOD Art Cortez or "Art Cortez" or "Cortez"
10.  "Deportation Officer Edmundo Torres" or "DO Edmundo Torres" or "DO Torres" or "DO E. Torres" or "Torres"
11.  "Palacios"
12.  "James Scott" or "Scott"
13.  "Edward Ochoa" or "Ochoa"
14.  "Daniel Pomplun" or Pomplun
15.  "Carol A. Corbie" or "Corbie"
16.  "Norma Penaloza" or "N. Penaloza" or "RN Penaloza" or "Penaloza, RN"
17.  "Dr. Richard Medrano" or "Richard Medrano" or "MD Medrano" or "Medrano MD" or "Medrano, MD" or "Medrano"
18.  "Dr. Alex Ramos" or "Alex Ramos" or "MD Ramos" or "Ramos, MD" or "Ramos MD" or "Ramos"
19.  "Dr. Hideyuki Sakata" or "Hideyuki Sakata" or "MD Sakata" or "Sakata, MD" or "Sakata MD" or "Sakata"
20.  "Field Medical Coordinator" or " ICE Field Medical Coordinator Nicole Knight-Glass" or "Knight-Glass" or
21.  "Margaret Hellerstein" or "Hellerstein"
22.  Martin Vargas Arellano's wife – Name TBD by USA
23.  Martin Vargas Arellano's mother – Name TBD by USA
24.  "contact trac!" or "tracing"
25.  "Covid-19" or "Covid" w/10 "positive"
26.  detainee w/10 "death" or "died" or "die" or "deceased" or "passed"
27.  "coroner's office" or "coroner"
28.  "Significant Incident Report" or "SIR"
29.  "Significant Event Notification" or "SEN"

## II.    Search Locations

1.  Email Systems
2.  Other electronic messaging systems

**Exhibit A – Plaintiff's Proposed ESI Search Parameters for Defendant GEO**

    3.  ESI Shared Drives
    4.  Medical Records Files
    5.  Detainee Files
    6.  ENFORCE Alien Detention Module (EADM)
    7.  ENFORCE Alien Removal Module (EARM)

**III.**    **Search Custodians**

    1.    James Janeka, Facility Administrator, Geo Secure Services
    2.    Joanne Crowder, Administrative Secretary
    3.    Judy Donato, Legal Review Coordinator
    4.    E. Baltazar
    5.    Lt. M. Wiltshire
    6.    Sgt. K. Ortiz
    7.    Officer K. Ramos
    8.    GEO staff whose signatures appear on attached document bates labeled GEO 000169-170 (**Exhibit A-1**)
    9.    GEO staff listed on the Observation Log at **Exhibit B**.

# Exhibit A-1





**MEMORANDUM**

*Secure Services™*

Adelanto ICE Processing Center
10250 Rancho Road
Adelanto, CA 92301

TEL: 760 561 6100
FAX: 760 246 0510
www.geogroup.com

Date: 10/15/2020

To: Facility Administrator J. Janecka
cc: OIC G. Valdez

From: Lt. M. Wiltshire

### RE: 30 DAY REVIEW VARGAS-ARELLANO, MARTIN A #205718808

As of October 19, 2020, Detainee Vargas-Arellano will have been housed in Facility Initiated/Medical Cohort Administrative Segregation for 30 days, requiring Administrative review. Detainee Vargas-Arellano has continued to be seen daily by at least one member of the executive staff and medical staff formally every week. Detainee Vargas-Arellano has been held in Administrative segregation for Facility Initiated/Medical Cohort Administrative Segregation, which started September 19, 2020.

Reason for placement in segregation: Facility Initiated/Medical Cohort Administrative Segregation, for the safety and security of the Facility due to continuous offsite Medical appointments, resulting in multiple 14 day modified program/Medical evaluations.

Compliance with standard: SMU standard, page 11 subsection paragraph (c).

Special Vulnerability: Yes

Alternatives to segregation: Currently exploring alternative housing options. To include alternative facilities that may better suit the detainee's housing needs.

Administrator Reviewed _____

OIC Reviewed _____    OCT 15 2020

(G. VALDEZ)

**GEO 00169**

**ADMINISTRATIVE STATUS REVIEW**

On ___10/1/2020___, I, ___LT. WILTSHIRE___, conducted a formal review of the Special
_(Date)_                         _(Title/Name)_

Housing status of ___VARGAS-ARELLANO, MARTIN___, ___205718808___ who is presently in:
_(Detainee Name)_                    _ID#_

[ ] Protective Custody Status    [ ] Medical Segregation    [ x ] Other Administrative Segregation ___Security Risk To Self/Facility___

Authorizing Supervisor: ___LT. WILTSHIRE___

Authorizing Medical Officer (if segregation is for medical reasons): ___N/A___

Type of review: ___14 Day___    Was the detainee present during the review?    x YES    NO

Detainee has been in Administrative Segregation for ___12___ days.

The following factors were reviewed with the results as indicated:

| YES | NO | |
|-----|-----|---|
| [ x ] | [ ] | Does the reason for initial placement remain valid? |
| [ ] | [ x ] | Does the detainee pose a threat to him/herself? |
| [ ] | [ x ] | Does the detainee pose a threat to others? |
| [ x ] | [ ] | Does the detainee pose a threat to property? |
| [ ] | [ x ] | Does the detainee pose a threat to security? |
| [ ] | [ x ] | Is the detainee defiant towards authority? |
| [ ] | [ x ] | Is the detainee unwilling or unable to live in the general population (alternative housing W5B)? |
| [ ] | [ x ] | Is the detainee's habitual conduct, language, or behavior of a type which may provoke or instigate stressful/violent situations amongst the general population? |

If any of the above factors are marked "Yes", the detainee must continue his/her existing status, unless the Facility Administrator or designee
determines otherwise. If all factors are marked "No", the detainee may be released.

**DOCUMENT REVIEW**

| | | |
|-----|-----|---|
| [ x ] | [ ] | Is the detainee being offered showers at least 3 times weekly? |
| [ x ] | [ ] | Is the detainee being offered recreation at least 2 hours daily, 7 days a week? |
| [ x ] | [ ] | Is the detainee being offered three meals daily and consuming at least one meal daily? |
| [ x ] | [ ] | Is the detainee receiving daily visits from medical staff? |
| [ x ] | [ ] | Are the special housing officers signing and properly filling out the special housing assignment activity sheets? |

A "No" answer requires a comment:

I have received a copy of this review ___REFUSH TO SIGN___ / ___205718808___
_(Detainee Signature)_                    _(ID#)_

Was an interpreter/language line used?    [ ] Yes    [ x ] No

Language: _____    Staff Name: _____

After 7 consecutive days in administrative segregation, the detainee may exercise the right to appeal in writing the conclusions and recommendations of
any facility review conducted to the Facility Administrator or designee

***

**\*\*\* This section is only to be completed if the detainee is requesting (or was offered) to be removed from protective custody \*\*\*\***

I state the initial reason for my placement in Protective Custody (PC) no longer remains valid. I am requesting removal from PC status.

Detainee Signature: _____    ID#: _____    Date/Time: _____

**Segregation Review Recommendation:**
[ x ] I recommend removal from Administrative Segregation status.
[ ] I do not recommend removal from Administrative Segregation status.
Administrative Lieutenant's Signature: _X. Doly_    Date: ___10.1.2020___

[ x ] Concur with Recommendation    [ ] Release    [ ] Continue Status    [ ] Mental Health ___N/A___    Baseline Stable: Y / N

Facility Administrator or Designee Signature: _K. Rewterinas_    Date: ___10/1/2020___

OIC Signature: _____    Date: ___OCT - 3 2020___

Revised Date
07/17/2019

GEO 00170

# Exhibit B



**Secure Services™**
Adelanto ICE Processing Center

## HEALTH SERVICES OBSERVATION RECORD

| Detainee's Name: | | A# | Country | Room/Bed # | Date/Time Placed | Tentative Release Date |
|---|---|---|---|---|---|---|
| Vargas | | 205718808 | MEXICO | 549 | 12-5-2020 @ 1025 | 12-11-2020 @ 1030 |

| STATUS (Reason) | | AUTHORIZATION | | MAY HAVE: | | |
|---|---|---|---|---|---|---|
| ☒ Medical | Placed By: | DR. SAKATA | | Phone | Yes ☒ | No |
| | Released By: | | | Visitation | Yes | No |
| ☐ Psychiatric | Other Special Conditions/Pertinent Information: | | | Commissary | Yes ☒ | No |
| | | Elevated Blood Pressure | | Recreation | Yes ☒ | No |

| Day & Date | | Officer's Name (Print & Initial) | B | L | D | Phone | Shower | Clothing and Linen Exchange | Rec | CCS Stamp and Initial |
|---|---|---|---|---|---|---|---|---|---|---|
| Mon 12-7-20 | 3rd | Quintero JP | Y | | | Y | Y | N | N | |
| | 1st | S Ramirez | | M | | | | | | |
| | 2nd | M Klein | | | Y | | | | | |
| Tue 12-8-20 | 3rd | Quintero JP | Y | | | Y | Y | N | N | |
| | 1st | S. Ramirez | | M | | | | | | |
| | 2nd | J.Hernandez | | | Y | | | | | |
| Wed 12-9-20 | 3rd | Vargas | Y | | | | | | | |
| | 1st | A.Branch | | | U | N | N | N | N | |
| | 2nd | F.Thereula | | | U | N | N | N | N | |
| Thu 12-10-20 | 3rd | V.Wiuans | Y | | | N | N | N | N | |
| | 1st | F.Thereula | | U | | N | N | N | N | |
| | 2nd | D.Lara ONO | | | Y | N | N | N | N | |
| Fri 12-11-20 | 3rd | D.Lara Ar Hawu | Y | | | | | | | |
| | 1st | R. Martinez ANO | | M | | N | N | N | N | |
| | 2nd | D.Lara ONO | | | Y | N | N | N | N | |
| Sat 12-12-20 | 3rd | | | | | | | | | |
| | 1st | | | | | | | | | |
| | 2nd | | | | | | | | | |
| Sun 12-13-20 | 3rd | | | | | | | | | |
| | 1st | | | | | | | | | |
| | 2nd | | | | | | | | | |

**NOTE: All activity slots shall be filled in with either a Yes or Refused and time. If an activity is not conducted, the box will remain empty. All entries will have the time of the activity. Facility staff will make entries on the second page when conducting rounds and/or upon each detainee contact. Medical staff will authorize use of phone, visitation, recreation, etc.**

Revised 12/26/17

GEO 00223



**GEO**
Corrections & Detention
Adelanto ICE Processing Center

## HEALTH SERVICES OBSERVATION RECORD

| Detainee's Name: | | A# | Country: | Room/ Bed # | Date/Time Placed | Tentative Release Date |
|---|---|---|---|---|---|---|
| Vargas | | 205718808 | MEXICO | 557 | 12/5/2020 @1525 | |

| STATUS (reason) | | AUTHORIZATION | | MAY HAVE: | | |
|---|---|---|---|---|---|---|
| ☒ Medical | Placed By: | NP ROBLES | | Phone ☒ Yes ☐ No | | |
| | Released By: | | | Visitation ☐ Yes ☒ No | | |
| ☐ Psychiatric | Other Special Conditions/Pertinent Information: High Blood Pressure | | | Commissary ☐ Yes ☐ No | | |
| | | | | Recreation ☐ Yes ☐ No | | |

| Day & Date | Shift | Officer's Name (Print & Initial) | B | L | D | Phone | Shower | Clothing and Linen Exchange | Rec | CCS Stamp and Initial |
|---|---|---|---|---|---|---|---|---|---|---|
| Mon | 3rd | | | | | | | | | |
| | 1st | | | | | | | | | |
| | 2nd | | | | | | | | | |
| Tue | 3rd | | | | | | | | | |
| | 1st | | | | | | | | | |
| | 2nd | | | | | | | | | |
| Wed | 3rd | | | | | | | | | |
| | 1st | | | | | | | | | |
| | 2nd | | | | | | | | | |
| Thu | 3rd | | | | | | | | | |
| | 1st | | | | | | | | | |
| | 2nd | | | | | | | | | |
| Fri | 3rd | | | | | | | | | |
| | 1st | | | | | | | | | |
| | 2nd | | | | | | | | | |
| Sat | 3rd | | | | | | | | | |
| | 1st | | | | | | | | | |
| | 2nd | D.LARA CNO | | | Y | | | | Y | |
| Sun | 3rd | JQuintero JQ | Y | | | Y | Y | N | N | |
| | 1st | THAIBSON | | | | | | | | |
| | 2nd | D.LARA CNO | | | Y | N | N | N | N | |

**NOTE:** All activity slots shall be filled in with either a Yes or Refused and time. If an activity is not conducted, the box will remain empty. All entries will have the time of the activity. Facility staff will make entries on the second page when conducting rounds and/or upon each detainee contact. Medical staff will authorize use of phone, visitation, recreation, etc.



Revised 12/26/17

GEO 00224



GEO

Adelanto ICE Processing Center

Medical/Psychiatric Observation Log

Detainee's Name: Vargas

Date: Dec 11 2020

A-Number 205718808   Cell 549

Level of Observation (at least every): ☐ 30-minutes   ☒ 15-minutes (staggered)   ☐ Constant

Visual Time Check Made on Detainee

| Codes | Third Shift | First Shift | Second Shift |
|---|---|---|---|
| | Time/Code/Initials | Time/Code/Initials | Time/Code/Initials |
| 1. Beating on door/wall | 0048 / 14 / MM | 2020 / 4 / ar | 1434 / 14 / one |
| 2. Yelling or screaming | 0117 / 14 / MM | 2020 / 12 / a | 1459 / 14 / an |
| 3. Crying | 0148 / 14 / MM | 0712 / 4 / a | 1530 / 11 / one |
| 4. Cursing | 0218 / 14 / M | 0736 / 14 / JH | 1604 / 14 / one |
| 5. Laughing | 026 / N / R | 0800 / 14 / a | 1630 / 14 / 20 |
| 6. Singing | 0315 / N / R | 0825 / 14 / JH | |
| 7. Mumbling incoherently | 0354 / 10 / R | 0818 / 8 / JH | 1706 / 14 / 148 |
| 8. Standing in cell | 0920 / 14 / R | 0914 / 11 / a | 1734 / 14 / 10 |
| 9. Walking/pacing | 0449 / 14 / R | 0932 / 11 / an | 1758 / 11 / 10 |
| 10. Lying | 0504 / 14 / R | 1000 / 11 / 10 | 1838 / 10 / one |
| 11. Sitting on bunk/stool | 0523 / 14 / R | 1024 / 12 / a | 1847 / 10 / Aio |
| 12. Reading | 0553 / 14 / R | 1040 / 11 / a | 1915 / 11 / 100 |
| 13. Quiet | | 1112 / 10 / a | |
| 14. Appears to be sleeping | | 1130 / 14 / MM | |
| 15. Meal served/eating | | 200 / 10 / a | |
| 16. Out of cell | | 223 / 10 / a | |
| 17. Talking | | 246 / 10 / 10 | |
| 18. Using Toilet/Sink | | 312 / 10 / R | |
| 19. Using phone | | 328 / 14 / a | |
| 20. Receiving meds | | 400 / 4 / R | |
| 21. Cleaning cell | | | |
| 22. Exercising | | | |
| 23. Vitals check | | | |

Note: 15-minute observations may require an additional sheet.

| Officers' Assigned & Initials | D. LARA / MM | 3:53 cruz / KM | D. LARA / MM |
|---|---|---|---|
| | Matteson / JF | J Hernandez / JH | |
| | | Johnson / GH | |
| Supervisor's Review (name/time) | A 6746 Fn / P | Johnson / 10 | |

Officer making an entry will write their name and initials in this area so initials can be identified.

8/29/17

Suicide Prevention and Intervention Policy 9071907A



GEO
Adelanto ICE Processing Center

**Medical/Psychiatric Observation Log**

Detainee's Name: VARGAS

Date: DEC 10, 2020

A-Number 205718808   Cell 549

Level of Observation (at least every): ☑ 30-minutes   ☐ 15-minutes (staggered)   ☐ Constant

Visual Time Check Made on Detainee

| Codes | Third Shift Time/Code/Initials | First Shift Time/Code/Initials | Second Shift Time/Code/Initials |
|---|---|---|---|
| 1. Beating on door/wall | 0015 / 14 / ℗ | 0841 / 11 / | 1427 / 14 / |
| 2. Yelling or screaming | 0045 / 10 / LR | 0112 / 11 / | 1459 / 10 / |
| 3. Crying | 0115 / 11 / ℗ | 0740 / 11 / | 1550 / 14 / |
| 4. Cursing | 0145 / 14 / KT | 0810 / 14 / | 1627 / 14 / |
| 5. Laughing | 0215 / 14 / | 0846 / 14 / | 1030 / 14 / |
| 6. Singing | 0245 / 14 / ℗ | 0910 / 10 / | 1700 / - / |
| 7. Mumbling incoherently | 0315 / 10 / ℗ | 0940 / 14 / | 1816 / 14 / |
| 8. Standing in cell | 0345 / 14 / ℗ | 1011 / 14 / | 1843 / 14 / |
| 9. Walking/pacing | 0415 / 14 / ℗ | 1041 / 14 / | 1915 / 14 / |
| 10. Lying | 0445 / 14 / ℗ | 1112 / 11 / | 1948 / 14 / |
| 11. Sitting on bunk/stool | 0515 / 14 / ℗ | 1143 / 11 / | 2023 / 14 / |
| 12. Reading | 0545 / 14 / ℗ | 1212 / 11 / | 2048 / 14 / |
| 13. Quiet | 0615 / 14 / ℗ | 1242 / 14 / | 2119 / 14 / |
| 14. Appears to be sleeping | 0022 / 14 / PC | 1215 / 14 / | 2150 / 10 / |
| 15. Meal served/eating | | 1241 / 14 / | 2219 / 14 / |
| 16. Out of cell | | | 2249 / 14 / |
| 17. Talking | | | 2721 / |
| 18. Using Toilet/Sink | | | 2358 / 14 / |
| 19. Using phone | | | |
| 20. Receiving meds | | | |
| 21. Cleaning cell | | | |
| 22. Exercising | | | |
| 23. Vitals check | | | |

Note: 15-minute observations may require an additional sheet.

| Officers' Assigned & Initials | V. Williams / ℗ | ACB11 adk / | D. Lara / |
| | L. Rivera / LR | S. Velasco / | R. Bacon / |
| | K. Johnson / KJ | MALDONADO / | J. Kalsek / |
| Supervisor's Review (monthly) | BVWN / JR | BVWN / JR | JORMC / |

Officer making an entry will write their name and initials in this area so initials can be identified.

Suicide Prevention and Intervention Policy 907/907A

9/29/17

GEO 00226



GEO
Adelanto ICE Processing Center

Medical/Psychiatric Observation Log

Date: Dec 09, 2020

Detainee's Name: VARGAS
A-Number 205918808    Cell 549
Level of Observation (at least every): ☑ 30-minutes ☐ 15-minutes (staggered) ☐ Constant

Visual Time Checks Made on Detainee

| Codes | Third Shift Time/Code/Initials | First Shift Time/Code/Initials | Second Shift Time/Code/Initials |
|---|---|---|---|
| 1. Beating on door/wall | 2215 / 10 / ☺ | / | / |
| 2. Yelling or screaming | 2245 / 10 / ☺ | / | / |
| 3. Crying | 2300 / 10 / ☺ | / | / |
| 4. Cursing | 2315 / 14 / ☺ | / | / |
| 5. Laughing | 2330 / 10 / ☺ | / | / |
| 6. Singing | 2345 / 10 / ☺ | / | / |
| 7. Mumbling incoherently | / | / | / |
| 8. Standing in cell | / | / | / |
| 9. Walking/pacing | / | / | / |
| 10. Lying | / | / | / |
| 11. Sitting on bunk/stool | / | / | / |
| 12. Reading | / | / | / |
| 13. Quiet | / | / | / |
| 14. Appears to be sleeping | / | / | / |
| 15. Meal served/eating | / | / | / |
| 16. Out of cell | / | / | / |
| 17. Talking | / | / | / |
| 18. Using Toilet/Sink | / | / | / |
| 19. Using phone | / | / | / |
| 20. Receiving meds | / | / | / |
| 21. Cleaning cell | / | / | / |
| 22. Exercising | / | / | / |
| 23. Vitals check | / | / | / |

Note: 15-minute observations may require an additional sheet.

| | | | |
|---|---|---|---|
| | / | / | / |
| | / | / | / |
| | / | / | / |
| "Officers" Assigned & Initials | V.WILLIAMS / ☺ | / | / |
| | / | / | / |
| | / | / | / |
| ___'s Review (name/time) | A. IZALOG / P | / | / |

officer making an entry will write their name and initials in this area so initials can be identified.

revised 8/29/17

Suicide Prevention and Intervention Policy 907/507A

**GEO 00227**



GEO 00228



GEO
Adelanto ICE Processing Center

**Medical/Psychiatric Observation Log**

Date: 12·8·2020

Detainee's Name: VARGAS    A-Number: 205 A8808    Cell SUC

Level of Observation (at least every): ☐ 30-minutes    ☐ 15-minutes (staggered)    ☐ Constant

Visual Time Checks Made on Detainee

| Codes | Third Shift Time/Code/Initials | First Shift Time/Code/Initials | Second Shift Time/Code/Initials |
|---|---|---|---|
| 1. Beating on door/wall | 2231 W M | / | / |
| 2. Yelling or screaming | 2211 14 Y | / | / |
| 3. Crying | 2231 14 M | / | / |
| 4. Cursing | / | / | / |
| 5. Laughing | / | / | / |
| 6. Singing | / | / | / |
| 7. Mumbling incoherently | / | / | / |
| 8. Standing in cell | / | / | / |
| 9. Walking/pacing | / | / | / |
| 10. Lying | / | / | / |
| 11. Sitting on bunk/stool | / | / | / |
| 12. Reading | / | / | / |
| 13. Quiet | / | / | / |
| 14. Appears to be sleeping | / | / | / |
| 15. Meal served/eating | / | / | / |
| 16. Out of cell | / | / | / |
| 17. Talking | / | / | / |
| 18. Using Toilet/Sink | / | / | / |
| 19. Using phone | / | / | / |
| 20. Receiving meds | / | / | / |
| 21. Cleaning cell | / | / | / |
| 22. Exercising | / | / | / |
| 23. Vitals check | / | / | / |
| Note: 15-minute observations may require an additional sheet. | / | / | / |
| | / | / | / |
| | / | / | / |
| *Officers' Assigned & Initials | Var M | / | / |
| | / | / | / |
| | / | / | / |
| Supervisor's Review (sometime) | AUBUR 10 | / | / |

officer making an entry will write their name and initials in this area so initials can be identified.

Revised 8/29/17

Suicide Prevention and Intervention Policy 907/907A

**GEO 00229**

**GEO**
Adelanto ICE Processing Center

**Medical/Psychiatric Observation Log**

Dates: 12/8/2020

Detainee's Name: Vargas      A-Number: 205718808    Cell 549

Level of Observation (at least every): ☒30-minutes  ☐15-minutes (staggered)  ☐Constant

Visual Time Check Made on Detainee

| Codes | Third Shift | | | First Shift | | | Second Shift | | |
|-------|-------------|---|---|-------------|---|---|--------------|---|---|
| | Time/Code/Initials | | | Time/Code/Initials | | | Time/Code/Initials | | |
| 1. Beating on door/wall | 0030 | 14 | JQ | 0029 | 10 | 8n | 1430 | 10 | JH |
| 2. Yelling or screaming | 0100 | 14 | JQ | 0069 | 11 | 9n | 1500 | 10 | JH |
| 3. Crying | 0130 | 14 | JQ | 1723 | 14 | 8n | 1530 | 10 | JH |
| 4. Cursing | 0200 | 18 | GO | 0150 | 14 | 8n | 1603 | 14 | JH |
| 5. Laughing | 2230 | 11 | JQ | 0617 | 14 | 8n | 1616 | 10 | 2n0 |
| 6. Singing | 0300 | 10 | JQ | 0844 | 10 | 8n | 1430 | 10 | JH |
| 7. Mumbling incoherently | 0330 | 10 | JQ | 0916 | 11 | N | 1700 | 11 | JH |
| 8. Standing in cell | 0401 | 10 | JQ | 1939 | 11 | 9n | 730 | 14 | JH |
| 9. Walking/pacing | 0433 | 10 | JQ | 0005 | 11 | 8n | 1800 | 10 | Nn |
| 10. Lying | 0503 | 10 | JQ | 1032 | 14 | Sn | 1830 | 10 | 10 |
| 11. Sitting on bunk/stool | 0530 | 10 | JQ | 1104 | 11 | Kn | 1900 | 10 | 10 |
| 12. Reading | 0600 | 14 | JQ | 1200 | 11 | Sn | 1930 | 16 | 10 |
| 13. Quiet | 0646 | 14 | JQ | 1531 | 14 | 8n | 1945 | 10 | 10 |
| 14. Appears to be sleeping | | / | | 1219 | 14 | N | 2000 | 11 | N |
| 15. Meal served/eating | | / | | 1341 | 10 | Kn | 2110 | 10 | 14 |
| 16. Out of cell | | / | | 1341 | 14 | 9n | 2130 | 10 | 14 |
| 17. Talking | | / | | 1406 | 14 | 9n | 2130 | 14 | 14 |
| 18. Using Toilet/Sink | | / | | | / | | 2100 | 10 | |
| 19. Using phone | | / | | | / | | 2213 | 10 | |
| 20. Receiving meds | | / | | | / | | | / | |
| 21. Cleaning cell | | / | | | / | | | / | |
| 22. Exercising | | / | | | / | | | / | |
| 23. Vitals check | | / | | | / | | | / | |

Note: 15-minute observations may require an additional sheet.

| °Officers Assigned & Initials | OQuintero / JQ | SRAMIREZ / 8n | KSavoel / |
| | VWILLIAMS / GO | Stebelasco / XU | V. Moha / |
| Supervisor's Review (same/time) | 2on / | GMAN / 10 | RDURAN / |

officer making an entry will write their name and initials in this area so initials can be identified.

Suicide Prevention and Intervention Policy 90N907A

8/29/17

GEO 00230

GEO

Adelanto ICE Processing Center

**Medical/Psychiatric Observation Log**

Date: Dec. 7 2020

Detainee's Name: Vargas

A-Number: 205 718808 Cell 549

Level of Observation (at least every): ☐ 30-minutes  ☐ 15-minutes (staggered)  ☐ Constant

Visual Time Checks Made on Detainee

| Code | Third Shift Time/Code/Initials | First Shift Time/Code/Initials | Second Shift Time/Code/Initials |
|------|--------------------------------|--------------------------------|----------------------------------|
| 1. Beating on door/wall | 0030 / 14 / JQ | 0020 / 10 / SM | 1430 / 10 / |
| 2. Yelling or screaming | 0100 / 11 / JQ | 1005 / 11 / SM | 1500 / 14 / |
| 3. Crying | 0130 / 11 / JQ | 0724 / 14 / SM | 530 / 14 / |
| 4. Cursing | 1200 / 14 / | 0734 / 14 / SM | 1610 / 14 / |
| 5. Laughing | 1230 / 14 / | 0815 / 14 / SM | 1630 / 11 / |
| 6. Singing | 0300 / 14 / JQ | 0845 / 14 / FA | 1700 / 14 / |
| 7. Mumbling incoherently | 0330 / 14 / JQ | 0912 / 14 / am | 1715 / 14 / |
| 8. Standing in cell | 0402 / 14 / JQ | 0937 / 14 / MH | 1730 / 14 / |
| 9. Walking/pacing | 0430 / 11 / JQ | 1005 / 14 / MH | / 14 / |
| 10. Lying | 0500 / 11 / JQ | 1033 / 14 / SM | / 14 / |
| 11. Sitting on bunk/stool | 0530 / 10 / JQ | 1101 / 14 / SM | 1908 / 14 / |
| 12. Reading | 0600 / 10 / JQ | 1127 / 14 / SM | 1930 / 14 / |
| 13. Quiet | / | 1154 / 10 / | 2000 / 14 / |
| 14. Appears to be sleeping | / | 1221 / 14 / SM | 2030 / 14 / |
| 15. Meal served/eating | / | 1248 / 14 / MH | 2100 / 14 / |
| 16. Out of cell | / | 1312 / 14 / MH | 2200 / 14 / |
| 17. Talking | / | 1342 / 14 / SM | 2230 / 14 / JQ |
| 18. Using Toilet/Sink | / | / | 2300 / 14 / JQ |
| 19. Using phone | / | / | 2329 / 14 / JQ |
| 20. Receiving meds | / | / | 2359 / 14 / JQ |
| 21. Cleaning cell | / | / | / |
| 22. Exercising | / | / | / |
| 23. Vitals check | / | / | / |
| | / | / | / |
| Note: 15-minute observations may require an additional sheet. | / | / | / |

| °Officers° Assigned & Initials | J. Quintero / JQ | R. Ramirez / RR | M. Dios / MD |
| | L. Rivera / | H. Hayes / HH | S. Indi / SI |
| | | | J. Quintero / JQ |
| visor's Review (sometime) | Thomas / TS | A. Stilla / AS | R. Bryan / RB |

°officer making an entry will write their name and initials in this area so initials can be identified.

Suicide Prevention and Intervention Policy 90M07A

evised 8/29/17

**GEO**

Adelanto ICE Processing Center

## Medical/Psychiatric Observation Log

Date: Dec. 6 2020

Detainee's Name: Vargas   A-Number 205718908   Cell 557

Level of Observation (at least every):  ☐ 30-minutes  ☐ 15-minutes (staggered)  ☐ Constant

Visual Time Checks Made on Detainee

| Codes | Third Shift Time/Code/Initials | First Shift Time/Code/Initials | Second Shift Time/Code/Initials |
|---|---|---|---|
| 1. Beating on door/wall | 0030/ 14 /JQ | 0700/ 14 /FF | 1420/ 14 /MP |
| 2. Yelling or screaming | 0100/ 14 /JQ | 0730/ 14 /FF | 1000/ 14 /MP |
| 3. Crying | 0131/ 14 /JQ | 0757/ 14 /RU | 1543/ 10 /MP |
| 4. Cursing | 0200/ 14 /JQ | 0830/ 14 /FF | 1001/ 14 /MP |
| 5. Laughing | 0230/ 10 /KD | 0900/ 14 /FF | 1714/ 16 /MP |
| 6. Singing | 0300/ 14 /JQ | 0930/ 11 /FF | 1749/ 14 /ScD |
| 7. Mumbling incoherently | 0330/ 14 /JQ | 0955/ 10 /FF | 1819/ 14 /ScD |
| 8. Standing in cell | 0400/ 14 /JQ | 1000/ 14 /SM | 1847/ 14 /MP |
| 9. Walking/pacing | 0430/ 14 /JQ | 1031/ 14 /KU | 1918/ 14 /MP |
| 10. Lying | 0500/ 14 /JQ | 1100/ 14 /FF | 1951/ 11 /PB |
| 11. Sitting on bunk/stool | 0530/ 14 /JQ | 1121/ 14 /FF | 2015/ 11 /PB |
| 12. Reading | 0600/ 14 /JQ | 1155/ 14 /FF | 2045/ 11 /PB |
| 13. Quiet | 0620/ 10 /KD | 1235/ 10 /FF | 2116/ 14 /MP |
| 14. Appears to be sleeping | / | 1300/ 10 /FF | 2143/ 14 /MP |
| 15. Meal served/eating | / | 1330/ 14 /SM | 2230/ 14 /JQ |
| 16. Out of cell | / | / | 2302/ 14 /JQ |
| 17. Talking | / | / | 2330/ 14 /JQ |
| 18. Using Toilet/Sink | / | / | 0000/ 14 /JQ |
| 19. Using phone | / | / | / |
| 20. Receiving meds | / | / | / |
| 21. Cleaning cell | / | / | / |
| 22. Exercising | / | / | / |
| 23. Vitals check | / | / | / |

Note: 15-minute observations may require an additional sheet.

| | / | / | / |
| | / | / | / |

| *Officers* Assigned & Initials | J.Quintero / JQ | D.Waterson / FF | D.Lara / MP |
| | Challenger / P | R.Camacho / K | R.Bacon / PB |
| | | J.Jenny / SM | J.Quintero / JQ |
| Supervisor's Review (name/time) | A.Garcia / P | Franz / M | Thu / M |

y officer making an entry will write their name and initials in this area so initials can be identified.

8/29/17

Suicide Prevention and Intervention Policy 907/907A

GEO 00232

GEO

Adelanto ICE Processing Center

## Medical/Psychiatric Observation Log

Date: Dec. 5. 2020

Detainee's Name: _____ Vargas _____    A-Number 205718808    Cell 557

Level of Observation (at least every): ☑ 30-minutes    ☐ 15-minutes (staggered)    ☐ Constant

Visual Time Checks Made on Detainee

| Codes | Third Shift Time/Code/Initials | First Shift Time/Code/Initials | Second Shift Time/Code/Initials |
|---|---|---|---|
| 1. Beating on door/wall | | | 1530 / 18 / NNO |
| 2. Yelling or screaming | | | 1558 / 14 / Oue |
| 3. Crying | | | 1630 / 11 / NO |
| 4. Cursing | | | 1657 / 14 / NNO |
| 5. Laughing | | | 1730 / 14 / NN |
| 6. Singing | | | 1707 / 14 / NNO |
| 7. Mumbling incoherently | | | 1822 / 10 / NNO |
| 8. Standing in cell | | | 1858 / 10 / Ouo |
| 9. Walking/pacing | | | 1929 / 14 / NNO |
| 10. Lying | | | 2000 / 10 / DV |
| 11. Sitting on bunk/stool | | | 2033 / 10 / NNO |
| 12. Reading | | | 2055 / 23 / NNO |
| 13. Quiet | | | 2128 / 14 / NNO |
| 14. Appears to be sleeping | | | 2150 / 10 / NNO |
| 15. Meal served/eating | | | 2220 / 14 / JN |
| 16. Out of cell | | | 2300 / 14 / JN |
| 17. Talking | | | 2330 / 14 / JN |
| 18. Using Toilet/Sink | | | 0800 / 14 / SN |
| 19. Using phone | | | |
| 20. Receiving meds | | | |
| 21. Cleaning cell | | | |
| 22. Exercising | | | |
| 23. Vitals check | | | |

Note: 15-minute observations may require an additional sheet.

*Officers' Assigned & Initials

D Lara / Ou

Klviotero / JN

Supervisor's Review (something)

Any officer making an entry will write their name and initials in this area so initials can be identified.

Revised 8/29/17

Suicide Prevention and Intervention Policy 907/907A

**GEO 00233**



GEO
Corrections & Detention
**Adelanto ICE Processing Center**

## HEALTH SERVICES OBSERVATION RECORD

| Detainee's Name: | | A# | Country: | Room/Bed # | Date/Time Placed | Tentative Release Date |
|---|---|---|---|---|---|---|
| Vargas | | 205718808 | | 554 | 11-28-20 / 1600 | 12/1/20 @1610 |

| STATUS (reason) | | AUTHORIZATION | | MAY HAVE: | | |
|---|---|---|---|---|---|---|
| ☒ Medical | Placed By: | Dr. Sakata | | Phone | ☒ Yes | No |
| | Released By: | | | Visitation | Yes | ☒ No |
| ☐ Psychiatric | Other Special Conditions/Pertinent Information: | | | Commissary | ☒ Yes | No |
| | High Blood Pressure | | | Recreation | ☒ Yes | No |

| Day & Date | Shift | Officer's Name (Print & Initial) | B | L | D | Phone | Shower | Clothing and Linen Exchange | Rec | CCS Stamp and Initial |
|---|---|---|---|---|---|---|---|---|---|---|
| Mon 11/30/20 | 3rd | Quintero JQ | Y | | | Y | Y | N | N | |
| | 1st | THAIRSTON TH | | Y | | N | N | N | N | |
| | 2nd | | | | | | | | | |
| Tue 12/1/20 | 3rd | NDAMBSXI (ND) | Y | | | N | N | N | N | |
| | 1st | S. Velasco | | Y | | L | R | R | R | |
| | 2nd | Norwood A | | | Y | | | | | |
| Wed 12/2/20 | 3rd | | | | | | | | | |
| | 1st | | | | | | | | | |
| | 2nd | | | | | | | | | |
| Thu 12/3/20 | 3rd | | | | | | | | | 12/01/2020 @ 1610 |
| | 1st | | | | | | | | | |
| | 2nd | | | | | | | | | |
| Fri 12/4/20 | 3rd | | | | | | | | | back to 5B esc Krephyer |
| | 1st | | | | | | | | | |
| | 2nd | | | | | | | | | |
| Sat 12/5/20 | 3rd | | | | | | | | | released by Provider Willis |
| | 1st | | | | | | | | | |
| | 2nd | | | | | | | | | |
| Sun 12/6/20 | 3rd | | | | | | | | | |
| | 1st | | | | | | | | | |
| | 2nd | | | | | | | | | |

**NOTE:** All activity slots shall be filled in with either a Yes or Refused and time. If an activity is not conducted, the box will remain empty. All entries will have the time of the activity. Facility staff will make entries on the second page when conducting rounds and/or upon each detainee contact. Medical staff will authorize use of phone, visitation, recreation, etc.

Revised 12/26/17



**GEO 00234**



Corrections & Detention
Adelanto ICE Processing Center

## HEALTH SERVICES OBSERVATION RECORD

| Detainee's Name: | | A#: | Country: | Room/Bed # | Date/Time Placed | Tentative Release Date |
|---|---|---|---|---|---|---|
| Vargas | | 205418808 | | 554 | 11 28 2020 @ 1600 | |

| STATUS (reason) | | AUTHORIZATION | | MAY HAVE: | | |
|---|---|---|---|---|---|---|
| ☒ Medical | | Placed By: | DR SAKATA | Phone ☑ Yes ☐ No | | |
| | | Released By: | | Visitation ☒ Yes ☒ No | | |
| ☐ Psychiatric | | Other Special Conditions/Pertinent Information: | | Commissary ☐ Yes ☐ No | | |
| | | High Blood Pressure | | Recreation ☐ Yes ☐ No | | |

| Day & Date | Shift | Officer's Name (Print & Initial) | B | L | D | Phone | Shower | Clothing and Linen Exchange | Rec | CCS Stamp and Initial |
|---|---|---|---|---|---|---|---|---|---|---|
| Mon | 3rd | | | | | | | | | |
| | 1st | | | | | | | | | |
| | 2nd | | | | | | | | | |
| Tue | 3rd | | | | | | | | | |
| | 1st | | | | | | | | | |
| | 2nd | | | | | | | | | |
| Wed | 3rd | | | | | | | | | |
| | 1st | | | | | | | | | |
| | 2nd | | | | | | | | | |
| Thu | 3rd | | | | | | | | | |
| | 1st | | | | | | | | | |
| | 2nd | | | | | | | | | |
| Fri | 3rd | | | | | | | | | |
| | 1st | | | | | | | | | |
| | 2nd | | | | | | | | | |
| Sat 11 28 2020 | 3rd | | | | | | | | | |
| | 1st | | | | | | | | | |
| | 2nd | D LARA Q3P | | | Y | N | N | Y | N | |
| Sun 11 29 2020 | 3rd | NQuintero | Y | | | Y N | Y N | N N | N N | |
| | 1st | T.HAIRSTON | | Y | | N | N | N | N | |
| | 2nd | R. Bacon | | | Y | N | N | N | N | |

NOTE: All activity slots shall be filled in with either a Yes or Refused and time. If an activity is not conducted, the box will remain empty. All entries will have the time of the activity. Facility staff will make entries on the second page when conducting rounds and/or upon each detainee contact. Medical staff will authorize use of phone, visitation, recreation, etc.

Revised 12/26/17

GEO 00235



GEO
Adelanto ICE Processing Center

**Medical/Psychiatric Observation Log**

Detainee's Name: Vargas    A-Number: 205718888    Date: 12-1-20    Cell 554

Level of Observation (at least every): ☒ 30-minutes    ☐ 15-minutes (staggered)    ☐ Constant

Visual Time Checks Made on Detainee

| Codes | Third Shift Time/Code/Initials | First Shift Time/Code/Initials | Second Shift Time/Code/Initials |
|---|---|---|---|
| 1. Beating on door/wall | 0021 / 4 / | 0642 / 14 / | 1422 / 11 / |
| 2. Yelling or screaming | 0136 / 4 / | 0712 / 14 / | 1455 / 10 / |
| 3. Crying | 0104 / 4 / | 0738 / 14 / | 1512 / 10 / |
| 4. Cursing | 0131 / 14 / | 0806 / 14 / | 1531 / 10 / |
| 5. Laughing | 0157 / 14 / | 0838 / 14 / | 1609 / 16 / |
| 6. Singing | 0221 / 4 / | 0909 / 11 / | |
| 7. Mumbling incoherently | 0248 / 4 / | 0940 / 10 / | |
| 8. Standing in cell | 0314 / 4 / | 1008 / 14 / | |
| 9. Walking/pacing | 0340 / 4 / | | |
| 10. Lying | 0407 / 4 / | | |
| 11. Sitting on bunk/stool | 0432 / 15 / | | |
| 12. Reading | 0445 / 4 / | | |
| 13. Quiet | 0458 / 14 / | | |
| 14. Appears to be sleeping | 0525 / 14 / | | |
| 15. Meal served/eating | 0301 / 4 / | | |
| 16. Out of cell | 0101 / 14 / | | |
| 17. Talking | | | |
| 18. Using Toilet/Sink | | | |
| 19. Using phone | | | |
| 20. Receiving meds | | | |
| 21. Cleaning cell | | | |
| 22. Exercising | | | |
| 23. Vitals check | | | |

Note: 15-minute observations may require an additional sheet.

| *Officers' Assigned & Initials | WDAUBSKI / | S. Velasco / | A. Norwood / |
| | VALLET / | Aramucho / | |

| Supervisor's Review (pass/fhas) | 29.M / | #Elly / | Oni / |

y officer making an entry will write their name and initials in this area so initials can be identified.

ed 8/29/17    ...de Prevention and Intervention Policy 907/907A

GEO 00236

**GEO**
Adelanto ICE Processing Center

## Medical/Psychiatric Observation Log

Date: Nov. 29. 2020

Detainee's Name: Vargas    A-Number: 205718808  Cell 554

Level of Observation (at least every): ☒30-minutes ☐15-minutes (staggered) ☐Constant

Visual Time Checks Made on Detainee

| Codes | Third Shift Time/Code/Initials | First Shift Time/Code/Initials | Second Shift Time/Code/Initials |
|---|---|---|---|
| 1. Beating on door/wall | 0030 / 14 / DB | 2247 / 14 / FH | 1421 / 14 / NDB |
| 2. Yelling or screaming | 0100 / 14 / JO | 0115 / 14 / FH | 1445 / 14 / DB |
| 3. Crying | 0130 / 14 / JO | 0145 / 14 / FH | 1517 / 15 / DB |
| 4. Cursing | 0200 / 14 / JO | 0815 / 14 / FH | 1534 / 10 / DB |
| 5. Laughing | 0230 / 14 / JO | 0850 / 14 / FH | 1603 / 14 / DB |
| 6. Singing | 0300 / 14 / JO | 0916 / 14 / JO | 1638 / 14 / DB |
| 7. Mumbling incoherently | 0330 / 14 / JO | 0949 / 14 / JO | 1701 / 14 / DB |
| 8. Standing in cell | 0402 / 14 / JO | 1015 / 14 / FH | 1731 / 14 / DB |
| 9. Walking/pacing | 0435 / 10 / JO | 1045 / 14 / FH | 1752 / 14 / DB |
| 10. Lying | 0505 / 14 / JO | 1115 / 10 / JH | 1828 / 14 / DB |
| 11. Sitting on bunk/stool | 0535 / 14 / JO | 1145 / 14 / JH | 1858 / 11 / DB |
| 12. Reading | 0605 / 14 / JO | 1215 / 14 / FH | 1931 / 14 / DB |
| 13. Quiet | / / | 1244 / 14 / FH | 1956 / 14 / DB |
| 14. Appears to be sleeping | / / | 1310 / 14 / FH | 2030 / 14 / DB |
| 15. Meal served/eating | / / | 1344 / 14 / FH | 2100 / 14 / DB |
| 16. Out of cell | / / | / 7 / | 2130 / 14 / DB |
| 17. Talking | / / | / / | 2159 / 14 / DB |
| 18. Using Toilet/Sink | / / | / / | 2230 / 14 / JO |
| 19. Using phone | / / | / / | 2300 / 14 / JO |
| 20. Receiving meds | / / | / / | 2330 / 14 / JO |
| 21. Cleaning cell | / / | / / | 2359 / 14 / JO |
| 22. Exercising | / / | / / | / / |
| 23. Vitals check | / / | / / | / / |

Note: 15-minute observations may require an additional sheet.

| | | | |
|---|---|---|---|
| Officers' Assigned & Initials | R. Bacon / DB | J. Alston / AH | R. Bacon / DB |
| | J. Quintero / JO | Zeven / Abo | R. Saud. / RB |
| | Cruz/Junde / BC | Avila / AH | J. Quintero / JO |
| Supervisor's Review (sometime) | Ihmal / M | Thi / M | C.Mooney / cm |

Any officer making an entry will write their name and initials in this area so initials can be identified.

Revised 8/29/17    Suicide Prevention and Intervention Policy 907/907A

**GEO 00237**



GEO 00238

GEO

Adelanto ICE Processing Center

**Medical/Psychiatric Observation Log**

Date: NOV. 28. 2020

Detainee's Name: Vargas    A-Number 205718808 Cell 554

Level of Observation (at least every): ☑ 30-minutes   ☐ 15-minutes (staggered)   ☐ Constant

Visual Time Checks Made on Detainee

| Codes | Third Shift Time/Code/Initials | First Shift Time/Code/Initials | Second Shift Time/Code/Initials |
|---|---|---|---|
| 1. Beating on door/wall | 2258/ 14   AND | / | 1628 / 14 /00 |
| 2. Yelling or screaming | / | / | 1658 / 14 /00 |
| 3. Crying | / | / | 1729 / 14 /00 |
| 4. Cursing | / | / | 1759 / 14 /00 |
| 5. Laughing | / | / | 1828 / 14 /00 |
| 6. Singing | / | / | 1858 / 14 /00 |
| 7. Mumbling incoherently | / | / | 1930 / 10 /00 |
| 8. Standing in cell | / | / | 1800 / 14 /18 |
| 9. Walking/pacing | / | / | 2020 / 23 /18 |
| 10. Lying | / | / | 2031 / 11 /18 |
| 11. Sitting on bunk/stool | / | / | 2100 / 14 /18 |
| 12. Reading | / | / | 2129 / 14 /00 |
| 13. Quiet | / | / | 2159 / 14 /00 |
| 14. Appears to be sleeping | / | / | 2230 / 14 /18 |
| 15. Meal served/eating | / | / | |
| 16. Out of cell | / | / | 2330 / 14 /00 |
| 17. Talking | / | / | 2359 / 14 /00 |
| 18. Using Toilet/Sink | / | / | / |
| 19. Using phone | / | / | / |
| 20. Receiving meds | / | / | / |
| 21. Cleaning cell | / | / | / |
| 22. Exercising | / | / | / |
| 23. Vitals check | / | / | / |

Note: 15-minute observations may require an additional sheet.

| "Officers" Assigned & Initials | R. Bacon / RB | / | D. LARA /00 |
|---|---|---|---|
| | / | | R. Bacon /RB |
| | / | | J. Quinteros / Q |
| Supervisor's Review (sometime) | / | / | |

y officer making an entry will write their name and initials in this area so initials can be identified.

Revised 8/29/17    Suicide Prevention and Intervention Policy 907/907A

GEO 00239

# Exhibit C

## COVID-19 - Breakdown Saturation Testing - December 10, 2020

| CUMULATIVE TOTAL | |
|---|---|
| POSITIVE | 2 |
| NEGATIVE | 44 |
| REFUSED | 5 |
| PENDING | 140 |
| INCONCLUSIVE | 0 |
| RELEASED | 2 |
| HOSPITAL | 0 |
| **TOTAL** | 193 |

| EXEMPT |
|---|
| RECOVERED: 126 |
| KNOWN ACTIVE POSITIVE: 18 |

| EMPTY DORM |
|---|
| E2B |
| EMED |

| WEST 1A | |
|---|---|
| POSITIVE | 0 |
| NEGATIVE | 1 |
| REFUSED | 0 |
| PENDING | 7 |
| INCONCLUSIVE | 0 |
| RELEASED | 0 |

| WEST 1B | |
|---|---|
| POSITIVE | 0 |
| NEGATIVE | 0 |
| REFUSED | 1 |
| PENDING | 9 |
| INCONCLUSIVE | 0 |
| RELEASED | 0 |

| WEST 2A | |
|---|---|
| POSITIVE | 0 |
| NEGATIVE | 0 |
| REFUSED | 0 |
| PENDING | 0 |
| INCONCLUSIVE | 0 |
| RELEASED | 0 |

| WEST 2B | |
|---|---|
| POSITIVE | 0 |
| NEGATIVE | 0 |
| REFUSED | 0 |
| PENDING | 10 |
| INCONCLUSIVE | 0 |
| RELEASED | 0 |

| WEST 2C | |
|---|---|
| POSITIVE | 0 |
| NEGATIVE | 0 |
| REFUSED | 0 |
| PENDING | 14 |
| INCONCLUSIVE | 0 |
| RELEASED | 0 |

| WEST 2D | |
|---|---|
| POSITIVE | 0 |
| NEGATIVE | 2 |
| REFUSED | 1 |
| PENDING | 16 |
| INCONCLUSIVE | 0 |
| RELEASED | 0 |

| WEST 3A | |
|---|---|
| POSITIVE | 0 |
| NEGATIVE | 0 |
| REFUSED | 0 |
| PENDING | 17 |
| INCONCLUSIVE | 0 |

| WEST 3B | |
|---|---|
| POSITIVE | 0 |
| NEGATIVE | 0 |
| REFUSED | 0 |
| PENDING | 7 |
| INCONCLUSIVE | 0 |

| WEST 3C | |
|---|---|
| POSITIVE | 0 |
| NEGATIVE | 0 |
| REFUSED | 0 |
| PENDING | 2 |
| INCONCLUSIVE | 0 |

| WEST 3D | |
|---|---|
| POSITIVE | 0 |
| NEGATIVE | 2 |
| REFUSED | 0 |
| PENDING | 15 |
| INCONCLUSIVE | 0 |

ATTORNEYS' EYES ONLY - USA009566

| RELEASED | 0 |
|---|---|

| RELEASED | 0 |
|---|---|

| RELEASED | 0 |
|---|---|

| RELEASED | 0 |
|---|---|

**WEST 4A**

| POSITIVE | 0 |
|---|---|
| NEGATIVE | 0 |
| REFUSED | 0 |
| PENDING | 13 |
| INCONCLUSIVE | 0 |
| RELEASED | 1 |

**WEST 4B**

| POSITIVE | 0 |
|---|---|
| NEGATIVE | 0 |
| REFUSED | 0 |
| PENDING | 2 |
| INCONCLUSIVE | 0 |
| RELEASED | 0 |

**WEST 4C**

| POSITIVE | 0 |
|---|---|
| NEGATIVE | 0 |
| REFUSED | 3 |
| PENDING | 7 |
| INCONCLUSIVE | 0 |
| RELEASED | 0 |

**WEST 4D**

| POSITIVE | 0 |
|---|---|
| NEGATIVE | 16 |
| REFUSED | 0 |
| PENDING | 1 |
| INCONCLUSIVE | 0 |
| RELEASED | 1 |

**WEST 5A**

| POSITIVE | 0 |
|---|---|
| NEGATIVE | 0 |
| REFUSED | 0 |
| PENDING | 1 |
| INCONCLUSIVE | 0 |
| RELEASED | 0 |

**WEST 5B**

| POSITIVE | 0 |
|---|---|
| NEGATIVE | 0 |
| REFUSED | 0 |
| PENDING | 11 |
| INCONCLUSIVE | 0 |
| RELEASED | 0 |

**WEST 5C**

| POSITIVE | 0 |
|---|---|
| NEGATIVE | 0 |
| REFUSED | 0 |
| PENDING | 7 |
| INCONCLUSIVE | 0 |
| RELEASED | 0 |

**WEST 5D**

| POSITIVE | 0 |
|---|---|
| NEGATIVE | 0 |
| REFUSED | 0 |
| PENDING | 1 |
| INCONCLUSIVE | 0 |
| RELEASED | 0 |

**WEST MEDICAL**

| POSITIVE | 2 |
|---|---|
| NEGATIVE | 3 |
| REFUSED | 0 |
| PENDING | 1 |
| INCONCLUSIVE | 0 |
| RELEASED | 0 |

**EAST MEDICAL**

| POSITIVE | 0 |
|---|---|
| NEGATIVE | 0 |
| REFUSED | 0 |
| PENDING | 0 |
| INCONCLUSIVE | 0 |
| RELEASED | 0 |

**HOSPITAL**

| TOTAL | 0 |
|---|---|

**EAST 1A**

| POSITIVE | 0 |
|---|---|
| NEGATIVE | 4 |
| REFUSED | 0 |
| PENDING | 0 |
| INCONCLUSIVE | 0 |
| RELEASED | 0 |

**EAST 1B**

| POSITIVE | 0 |
|---|---|
| NEGATIVE | 4 |
| REFUSED | 0 |
| PENDING | 0 |
| INCONCLUSIVE | 0 |
| RELEASED | 0 |

**EAST 1C**

| POSITIVE | 0 |
|---|---|
| NEGATIVE | 3 |
| REFUSED | 0 |
| PENDING | 0 |
| INCONCLUSIVE | 0 |
| RELEASED | 0 |

**EAST 1D**

| POSITIVE | 0 |
|---|---|
| NEGATIVE | 0 |
| REFUSED | 0 |
| PENDING | 0 |
| INCONCLUSIVE | 0 |
| RELEASED | 0 |

ATTORNEYS' EYES ONLY - USA009567

EAST 2A

| POSITIVE | 0 |
|---|---|
| NEGATIVE | 4 |
| REFUSED | 0 |
| PENDING | 0 |
| INCONCLUSIVE | 0 |
| RELEASED | 0 |

EAST 2B

| POSITIVE | 0 |
|---|---|
| NEGATIVE | 0 |
| REFUSED | 0 |
| PENDING | 0 |
| INCONCLUSIVE | 0 |
| RELEASED | 0 |

EAST 2C

| POSITIVE | 0 |
|---|---|
| NEGATIVE | 3 |
| REFUSED | 0 |
| PENDING | 0 |
| INCONCLUSIVE | 0 |
| RELEASED | 0 |

EAST 1-SE

| POSITIVE | 0 |
|---|---|
| NEGATIVE | 2 |
| REFUSED | 0 |
| PENDING | 0 |
| INCONCLUSIVE | 0 |
| RELEASED | 0 |

ATTORNEYS' EYES ONLY - USA009568

| 14-Dec-20 | | | | | Testing data current as of 9:00 a.m. | | |
|---|---|---|---|---|---|---|---|
| **APC Daily Housing and COVID-19 Status Report** | | | | | | | |
| Housing Unit | # Beds | Maximum capacity | # of positive detainees currently in housing unit | # of negative detainees currently in housing unit | # of detainees refusing to be tested currently in housing unit | housing unit currently under quarantine (y/n) | housing unit designated to only hold positive COVID-19 detainees |
| E1A | 118 | 118 | 0 | 4 | 0 | N | |
| E1B | 29 | 29 | 0 | 5 | 0 | N | |
| E1B (SMU) | 18 | 18 | 0 | 2 | 0 | N | |
| E1C | 52 | 52 | 0 | 4 | 0 | N | |
| E1D | 118 | 118 | 0 | 15 | 0 | N | |
| E2A | 114 | 114 | 0 | 18 | 0 | N | |
| E2B | 114 | 114 | 0 | 0 | 0 | N | |
| E2C | 115 | 115 | 0 | 19 | 0 | N | |
| East total | 678 | 678 | 0 | 67 | 0 | | |
| W1A (SMU) | 48 | 48 | 0 | 7 | 0 | N | |
| W1B (SMU) | 64 | 64 | 0 | 9 | 0 | Y | |
| W2A | 80 | 80 | 15 | 0 | 0 | Y | Y |
| W2B | 80 | 80 | 0 | 17 | 0 | N | |
| W2C | 80 | 80 | 0 | 15 | 0 | N | |
| W2D | 80 | 80 | 0 | 19 | 0 | N | |
| W3A | 80 | 80 | 0 | 16 | 0 | N | |
| W3B | 80 | 80 | 0 | 16 | 0 | N | |
| W3C | 80 | 80 | 0 | 16 | 0 | N | |
| W3D | 80 | 80 | 0 | 16 | 0 | N | |
| W4A | 80 | 80 | 0 | 13 | 0 | N | |
| W4B | 80 | 80 | 0 | 2 | 0 | Y | |
| W4C | 80 | 80 | 0 | 14 | 0 | N | |
| W4D | 80 | 80 | 0 | 17 | 0 | N | |
| W5A | 80 | 80 | 0 | 13 | 0 | N | |
| W5B | 80 | 80 | 0 | 12 | 0 | Y | |
| W5C | 80 | 80 | 0 | 14 | 0 | N | |
| W5D | 80 | 80 | 0 | 17 | 0 | N | |
| West total | 1392 | 1392 | 15 | 233 | 0 | | |
| | | | Number of detainees housed in medical or hospital for COVID-19 related reasons | | | | |
| West Medical | 12 | 12 | 4 | 5 | 0 | Y | |
| East Medical | 2 | 2 | 0 | 0 | 0 | N | |
| Hospital | xx | xx | 1 | 0 | | | |
| | | | **Total Positives** | **Total Negatives** | | | **APC Total Population** |
| APC total | 2084 | 2084 | 20 | 305 | | | 325 |
| | | | # of staff currently positive for COVID-19 | # of staff hospitalized for COVID-19 related reasons | | | **Number of class members released or deported pursuant to the Adelanto Population Reduction Order** |
| Staff | xx | xx | 47 | 0 | | | 190 |

**ATTORNEYS' EYES ONLY – USA009535**

# Exhibit D

**14**

**Name:** Norma Penaloza
**Title:** Registered Nurse (West) FTE
**Shift:** 0700-1930
**COVID-19 tested:** 12/03/2020 AIPC (Symptomatic)
**Result:** Positive

The tracing (11.19.2020 - 12.03.2020) is as follows:

**On Thursday 11/19/20 - Friday 11/20/2020, She was present at West**.
Medical: Medical, Pharmacy, 2/3 side satellite, 4/5 side satellite, Infirmary, RHU

**On Saturday 11/21/20 - Monday 11/23/2020, she was not present at the facility due to RDO':**

**On Tuesday 11/24/20, she was present at West.**
Medical: Medical, Pharmacy, 2/3 side satellite, 4/5 side satellite, Infirmary, RHU

**On Wednesday 11/25/20, she was present at East.**
Medical: Medical, RHU, Break room

**On Thursday 11/26/20 - Friday 11/27/2020, she was not present at the facility due to RDO's**.

**On Saturday 11/29/20 - Sunday 11/29/2020, she was present at West.**
Medical: Medical, Pharmacy, 2/3 side satellite, 4/5 side satellite, Infirmary, RHU

**On Monday 11/30/20 - Wednesday 12/02/2020, she was not present at the facility due to RD**

**On Thursday 12/03/20, she was present at West.**
Medical: Medical, Pharmacy, 2/3 side satellite, 4/5 side satellite, Infirmary, RHU

**CONFIDENTIAL**

USA003957

# EXHIBIT B



November 22, 2023

Susan E. Coleman
E-mail: scoleman@bwslaw.com

*Via Email*

      Re:    *Martin Vargas v. United States of America et al.*
              C.D. Cal. Case No. 5:23-cv-00380-JWH-SP

Dear Susan:

This letter follows up on our October 9, 2023 letter and October 19, 2023 conference call regarding GEO's deficient responses to Plaintiff's Requests for Production of Documents, Set One, and Interrogatories, Set One. Because GEO's responses to date remain deficient, we ask that it respond to the following issues in writing by Friday December 1, 2023, or we will proceed to prepare a motion to compel.

During the October 19 call, GEO committed to produce additional documents, address our request for an ESI search using the search terms provided in our October 9 letter, and provide information regarding the circumstances under which it destroyed emails between 2019 and 2021. GEO also agreed to do so within a month of the meet and confer, or by November 15, 2023.

In addition to this information, GEO also agreed to get back to us about producing the following specific documents, which to date it has not done.

- **Death Response Plan [GEO00362-00369]:** This document is dated 1/20/2023. GEO agreed to produce any earlier versions applicable to the relevant time period in this case.

- **Missing Medical Records**: While GEO appears to have produced Mr. Vargas Arellano's medical file, still missing from these documents are all documentation from Mr. Vargas Arellano's Adelanto infirmary stay between November 28 to December 1, 2020. Further, we made clear on October 19 that we are not asking GEO to simply re-produce the medical records already produced by Wellpath, which we explained also omitted documents related to the referenced infirmary stay. In addition to producing these missing documents, please let us know whether GEO's production of Mr. Vargas Arellano's medical file contains documents above and beyond those produced by Wellpath, and if so the bates ranges of those documents.

- **Training Related to Covid19 Protocols**: GEO committed to producing this information for its staff at Adelanto, including both the training materials, the names of the staff trained, and the dates they attended the trainings.

- **Performance Evaluations Related to Compliance with Covid-19 Protocols**: GEO committed to search for and produce this information, including any write-up of any staff who failed to follow the protocols. To facilitate the search, we provided in Exhibit B to our October 9 letter a list of GEO staff who interfaced with Mr. Vargas Arellano, whose files should be searched to obtain this information. While you stated you thought this list comprised only Wellpath staff, you agreed to verify this.

- **GEO Contracts with Wellpath and USA**:
    - Regarding contracts with Wellpath, you agreed to verify whether the contracts that Wellpath produced in this litigation constitutes all responsive documents in this category.
    - Regarding contracts with USA, we asked that GEO produce copies of the following documents missing from USA's production:
    (1) the Quality Assurance Surveillance Plan (QASP), listed as Attachment 2 to the contract;
    (2) all Contract Discrepancy Reports (CDR);
    (3) all Quality Assurance Surveillance Forms (QASF) for the relevant time period.
    (4) From the ERO Covid-19 Pandemic Response Requirements (PRR) [GEO 00372-399]:
        (a) all annual inspection reports, and
        (b) all evidence of bi-weekly spot checks as required under the PRR at the Adelanto facility.

- **Covid-19 Testing Documents**: GEO agreed to confirm that Wellpath conducted testing of all individuals at Adelanto, including GEO, Wellpath and USA staff, as well as detainees, and maintains the records regarding the results of this training that was included in reports to the *Roman* court. *See* October 9, 2023 Letter at Exh. C.

- **Covid-19 Contact Tracing Documents**: GEO committed to determine whether it or Wellpath conducted this tracing, including the tracing related to a Wellpath nurse named Norma Penaloza. *See* October 9, 2023 Letter at Exh. D.

- **GEO's Insurance Policy and Correspondence**: While GEO has now produced a copy of the policy, we also asked GEO to produce correspondence related to the applicability of this policy to this case, including and reservation of rights letters and GEO's responses.

While GEO made document productions on October 27 and 30, 2023, these do not contain the above-referenced documents, nor do they rectify the many other deficiencies in GEO's discovery responses we identified in Plaintiffs October 9 letter, and discussed on October 19. GEO also has not responded to our request that it (1) provide information to verify that its destruction of emails between 2019 to 2021 was done pursuant to GEO's document retention policy and any litigation holds related to the *Roman* case or any other litigation, and (2) conduct an ESI search using the search parameters provided in Exhibit A to our October 9 letter, including for emails after 2021.

We look forward to GEO's response to the above-referenced issues by December 1, 2023.

Laboni A. Hoq

cc:    Shiana St. John
       Jemma Parker Saunders
       Stacy Tolchin
       Megan Brewer
       Khaled Alrabe
       Amber Qureshi
       Matthew Vogel

# EXHIBIT C



January 4, 2024

Susan E. Coleman
E-mail: scoleman@bwslaw.com

_Via Email_

  Re: _Martin Vargas v. United States of America et al._
    C.D. Cal. Case No. 5:23-cv-00380-JWH-SP

Dear Susan:

This letter follows up on Plaintiff's November 22, 2023 letter and November 29, 2023 email to Defendant GEO regarding its outstanding discovery responses, including the continuing deficiencies as to GEO's responses to Plaintiff's Interrogatories, Set One ("Rogs Set 1") and Requests for Production of Documents ("RFPs Set 1"). This letter also addresses certain of GEO's responses to Plaintiff's Interrogatories, Set Two ("Rogs Set Two) and Requests for Production of Documents, Set Two ("RFPs Set 2"), which GEO served on December 13, 2023.

As set forth in Plaintiff's November 29, 2023 email, GEO has failed to meet its own commitment to timely produce responsive information.  While GEO made an additional production on December 4, 2023, this production fails to address the vast majority of deficiencies in GEO's discovery responses to date, including as outlined in Plaintiff's November 22 letter and below.

GEO also has failed to follow through on its commitment to (1) provide information to verify that its destruction of emails between 2019 to 2021 was done pursuant to GEO's document retention policy and any litigation holds related to the _Roman_ case or any other litigation, and (2) conduct an ESI search using the search parameters provided in Exhibit A to our October 9 letter, including for emails after 2021.

For these reasons, if GEO fails to correct these deficiencies, as further outlined below, by January 12, 2024, Plaintiff will prepare the Local Rule 37 Joint Stipulation and proceed to file a motion to compel.

  I.  **GEO's Failure to Respond to Deficiencies Identified in Plaintiff's November 22 Letter**

  A. **Death Response Plan [GEO00362-00369; 06501-6508]:**

While GEO has produced a version of this plan in effect on and after 2/3/21 and 1/20/2022, this does not cover the relevant time period in this case. GEO must produce the version of this plan that was in effect at least since January 2020.  Please produce it by January 12, 2024.

  B. **Missing Medical Records**:

GEO has failed to address the deficiencies regarding these documents referenced in Plaintiff's November 22, 2023 letter. As stated there: "While GEO appears to have produced Mr. Vargas Arellano's medical

file, still missing from these documents are all documentation from Mr. Vargas Arellano's Adelanto infirmary stay between November 28 to December 1, 2020. Further, we made clear on October 19 that we are not asking GEO to simply re-produce the medical records already produced by Wellpath, which we explained also omitted documents related to the referenced infirmary stay. In addition to producing these missing documents, please let us know whether GEO's production of Mr. Vargas Arellano's medical file contains documents above and beyond those produced by Wellpath, and if so the bates ranges of those documents." Please produce these records by January 12, 2024.

**C.   Performance Evaluations Related to Compliance with Covid-19 Protocols**:

GEO has failed to address the deficiencies regarding these documents referenced in Plaintiff's November 22, 2023 letter. As stated there: "GEO committed to search for and produce this information, including any write-up of any staff who failed to follow the protocols. To facilitate the search, we provided in Exhibit B to our October 9 letter a list of GEO staff who interfaced with Mr. Vargas Arellano, whose files should be searched to obtain this information. While you stated you thought this list comprised only Wellpath staff, you agreed to verify this."

It is now clear based on GEO's responses to Rogs Set 2 that most of the staff identified in Exhibit B to Plaintiff's November 22 letter are GEO employees.  Please search their employee files, as well as any email or other communications related to any issues with their compliance with applicable Covid-19 policies and protocols, including but not limited to the spread of Covid-19 (e.g. related to PPE compliance, screening of symptomatic staff and detainees, testing to identify positive cases, and contact tracing). Please produce these records by January 12, 2024.

**D.      GEO Contracts with Wellpath and USA**:

GEO has failed to address the deficiencies regarding these documents referenced in Plaintiff's November 22, 2023 letter. As stated there:

- o   Regarding contracts with Wellpath, you agreed to verify whether the contracts that Wellpath produced in this litigation constitute all responsive documents in this category.
- o   Regarding contracts with USA, we asked that GEO produce copies of the following documents missing from USA's production:
  (1) the Quality Assurance Surveillance Plan (QASP), listed as Attachment 2 to the contract;
  (2) all Contract Discrepancy Reports (CDR);
  (3) all Quality Assurance Surveillance Forms (QASF) for the relevant time period.
  (4) From the ERO Covid-19 Pandemic Response Requirements (PRR) [GEO 00372-399]:
      (a) all annual inspection reports, and
      (b) all evidence of bi-weekly spot checks as required under the PRR at the Adelanto facility.

Please produce these records by January 12, 2024.

**E.      Covid-19 Testing Documents**:

GEO has failed to address the deficiencies regarding these documents referenced in Plaintiff's November 22, 2023 letter. As stated there: "GEO agreed to confirm that Wellpath conducted testing of all

individuals at Adelanto, including GEO, Wellpath and USA staff, as well as detainees, and maintains the records regarding the results of this training that was included in reports to the *Roman* court. *See* October 9, 2023 Letter at Exh. C."

To the extent GEO has possession, custody or control of these documents, please produce them to us by January 12, 2024.

###### F. Covid-19 Contact Tracing Documents:

GEO has failed to address the deficiencies regarding these documents referenced in Plaintiff's November 22, 2023 letter. As stated there: "GEO committed to determine whether it or Wellpath conducted this tracing, including the tracing related to a Wellpath nurse named Norma Penaloza. *See* October 9, 2023 Letter at Exh. D."

To the extent GEO has possession, custody or control of these documents, please produce them to us by January 12, 2024.

###### G. GEO's Insurance Policy and Correspondence:

GEO has failed to address the deficiencies regarding these documents referenced in Plaintiff's November 22, 2023 letter. As stated there: "While GEO has now produced a copy of the policy, we also asked GEO to produce correspondence related to the applicability of this policy to this case, including and reservation of rights letters and GEO's responses.

Please produce these records by January 12, 2024.

###### II. Additional Responsive Documents Missing from GEO's Production to Date

In addition to the outstanding documents referenced above, based on discovery produced to date, Plaintiff also identifies the following documents that are responsive to Plaintiff's pending discovery requests to GEO must produce.

- Adelanto ICE Processing Center – Supervisor Shift Summary (*see, e.g.* USA045481-45483, 45755): Please produce these documents for the period January 2020 to the present.
- Facility Entrance - Employee Wellness Screening Tool  (*see, e.g.,* GEO 6497): Please produce completed versions of these documents for the time screening was instituted to December 10, 2020
- Daily Movement Sheets (see, e.g. USA015890) referencing to Mr. Vargas Arellano
- Deposition testimony of GEO employees staff taken in the *Roman* litigation, or any other proceedings, related to GEO's policies and protocols related to Covid-19, including but not limited to measures to contain the spread Covid-19 (e.g. related to PPE compliance, screening of symptomatic staff and detainees, testing to identify positive cases, and contact tracing)
- All Covid-19 reporting related to the Adelanto Processing Center that GEO, Wellpath or USA provided to any government agency or in connection with any official proceeding for the period

January 2020 to December 2020, including but not limited to reports of positive Covid-19 test results.

Regarding GEO's response to Plaintiff's RFPs – Set Two and Rogs – Set Two, while we appreciate that GEO has committed to producing documents and updating its current responses, GEO needs to do so in a timely manner.  Without waiving Plaintiff's right to pursue other information responsive to these requests that GEO has thus far refused to provide, we ask that GEO provide the following information no later than January 12, 2024.

- Rog 11/RFP 24: Updated list of GEO staff who were monitoring Mr. Vargas Arellano  while he was in the Adelanto infirmary during the specified time period
- Rogs 12, 19:  GEO employees who tested positive during the specified time period, including identification of the individuals who had contact with Mr. Vargas Arellano
- Rog 14: housing history for Mr. Vargas Arellano for the specified time period
- Rog 16, 17/ RFPs 25, 26, 27, 28: GEO's contact tracing for its staff who had symptoms and/or tested positive for Covid-19 for the specific time period

Further, in response to a number of the RFPs and Rogs, *e.g.* Rog 21/RFP 28 related to GEO, Wellpath and USA staff use of PPE, GEO represents that it has destroyed relevant video surveillance tapes.  We remind you that during the time period relevant to this case, GEO was subject to a number of litigation hold requirements, including in the *Roman* litigation and related to this case.  *See* Plaintiff's October 9 and November 22, 2023 letters. As such, in addition to providing further substantive responses to Plaintiff's pending discovery requests, GEO must provide facts and circumstances justifying its destruction of the highly video surveillance tapes.

Finally, please provide GEO's verification for Rog-Set Two as soon as possible, but no later than January 12, 2024.

Laboni A. Hoq

cc:    Shiana St. John
       Jemma Parker Saunders
       Stacy Tolchin
       Megan Brewer
       Khaled Alrabe
       Amber Qureshi
       Matthew Vogel

# EXHIBIT D



January 26, 2024

Susan E. Coleman
E-mail: scoleman@bwslaw.com

*Via Email*

  Re: *Martin Vargas v. United States of America et al.*
     C.D. Cal. Case No. 5:23-cv-00380-JWH-SP

Dear Susan:

This letter follows up on Plaintiff's January 4, 2024 letter regarding Defendant GEO's deficient responses to Plaintiff's Interrogatories, Set One ("Rogs Set 1") and Requests for Production of Documents ("RFPs Set 1") (collectively, Plaintiff's Written Discovery (Set One)), as well as GEO's deficient responses to Plaintiff's Interrogatories, Set Two ("Rogs Set Two) and Requests for Production of Documents, Set Two ("RFPs Set 2") (collectively, Plaintiff's Written Discovery (Set Two)" .

Regarding Plaintiff's Written Discovery (Set One), GEO never responded to Plaintiff's January 4, 2024 letter.  As such, following the Parties Rule 37-1 Prefiling Conference of Counsel on October 19, 2023, Plaintiff will proceed to prepare the Joint Stipulation in support of its Motion to Compel to address GEO's deficient discovery responses, as set forth in Plaintiff's letters dated October 9, 2023, November 22, 2023, and January 4, 2024.  In their Motion, Plaintiff will seek an order requiring GEO to (1) produce amended and supplemental discovery responses pursuant to Fed. R. Civ. P. 37(a)(3)(B)(iii) and (iv), and (2) pay Plaintiff's expenses for bringing the Motion pursuant to Fed. R. Civ. P. 37(a)(5). As a reminder, pursuant to Local Rule 37-2.2, once Plaintiff provides its portion of the Joint Stipulation, GEO shall have 7 days to provide its responding positions.

Regarding Plaintiff's Written Discovery (Set Two), Plaintiff writes to schedule the Local Rule 37-1 Prefiling Conference of Counsel to address GEO's deficient discovery responses.  Please see Plaintiff's January 4, 2024 letter addressing the issues and/or discovery requests in dispute, and Plaintiff's position regarding them. If the Parties cannot resolve their disputes, Plaintiff will seek an order requiring GEO to (1) produce amended and supplemental discovery responses pursuant to Fed. R. Civ. P. 37(a)(3)(B)(iii) and (iv), and (2) pay Plaintiff's expenses for bringing the Motion pursuant to Fed. R. Civ. P. 37(a)(5).

**Plaintiff's counsel are available for this Local Rule 37-1 conference on Monday February 7, 2024 after 12 PST, and Wednesday January 8, 2024 after 10 PST.** If you are not available at these times, please propose alternative times within 10 days of the date of this letter.

Laboni A. Hoq

cc:     Shaina St. John
        Peter Bertling
        Jemma Parker Saunders
        Stacy Tolchin
        Megan Brewer
        Khaled Alrabe
        Amber Qureshi
        Matthew Vogel

# EXHIBIT E



Laboni Hoq <lhoq@hoqlaw.com>

---

## Arrellano Vargas v. USA et al.

---

**Coleman, Susan E.** <SColeman@bwslaw.com>                                      Wed, Feb 14, 2024 at 12:39 PM
To: Laboni Hoq <laboni@hoqlaw.com>
Cc: Stephanie Aguiniga <stephanie@bertlinglawgroup.com>, Amber Qureshi <amber@nipnlg.org>, Cyndi Sierra <cyndi@bertlinglawgroup.com>, Jemma Parker Saunders <jemma@bertlinglawgroup.com>, Peter Bertling <peter@bertlinglawgroup.com>, Khaled Alrabe <khaled@nipnlg.org>, Matthew Vogel <matt@nipnlg.org>, Megan Brewer <Megan@tolchinimmigration.com>, "St John, Shaina (USACAC)" <Shaina.StJohn@usdoj.gov>, Stacy Tolchin <Stacy@tolchinimmigration.com>

I disagree with your position but I have asked the facility to provide me the shift summaries for your requested date range.

**Susan E. Coleman | Partner**
444 South Flower Street, Suite 2400 | Los Angeles, CA  90071-2953
d - 213.236.2831 | t - 213.236.0600 | f - 213.236.2700
scoleman@bwslaw.com | vCard | bwslaw.com



The information contained in this e-mail message is intended only for the CONFIDENTIAL use of the designated addressee named above. The information transmitted is subject to the attorney-client privilege and/or represents confidential attorney work product. Recipients should not file copies of this email with publicly accessible records. If you are not the designated addressee named above or the authorized agent responsible for delivering it to the designated addressee, you received this document through inadvertent error and any further review, dissemination, distribution or copying of this communication by you or anyone else is strictly prohibited. IF YOU RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONING THE SENDER NAMED ABOVE AT 800.333.4297. Thank you.

---

**From:** Laboni Hoq <laboni@hoqlaw.com>
**Sent:** Wednesday, February 14, 2024 12:37 PM
**To:** Coleman, Susan E. <SColeman@bwslaw.com>
**Cc:** Stephanie Aguiniga <stephanie@bertlinglawgroup.com>; Amber Qureshi <amber@nipnlg.org>; Cyndi Sierra <cyndi@bertlinglawgroup.com>; Jemma Parker Saunders <jemma@bertlinglawgroup.com>; Peter Bertling <peter@bertlinglawgroup.com>; Khaled Alrabe <khaled@nipnlg.org>; Matthew Vogel <matt@nipnlg.org>; Megan Brewer <Megan@tolchinimmigration.com>; St John, Shaina (USACAC) <Shaina.StJohn@usdoj.gov>; Stacy Tolchin <Stacy@tolchinimmigration.com>
**Subject:** Re: Arrellano Vargas v. USA et al.

---

[EXTERNAL]

---

Susan, we've stated our position on why we are entitled to the shift summaries.  As is clear from the complaint, this case is about more than "medical issues" particularly as it relates to GEO. Plaintiff's negligence and detentions standards claims against GEO allege GEO failed to carry out its duties under the governing policies and procedures, and the shift summaries go directly to these issues.

Please let us know if you are refusing to produce the shift summaries. If so, we'll need to submit the issue to the Court.

On Wed, Feb 14, 2024 at 10:19AM Coleman, Susan E. <SColeman@bwslaw.com> wrote:

Laboni - The shift supervisor reports are done by custody staff. They would not have medical issues reflected.

What policies do you contend would or should have been changed following a covid death of a person with co-morbidities?

And for which dates did the USA provide shift summaries?  There is a lot of duplicative discovery occurring here.

Susan

**Susan E. Coleman | Partner**
444 South Flower Street, Suite 2400 | Los Angeles, CA  90071-2953
d - 213.236.2831 | t - 213.236.0600 | f - 213.236.2700
scoleman@bwslaw.com | vCard | bwslaw.com

The information contained in this e-mail message is intended only for the CONFIDENTIAL use of the designated addressee named above. The information transmitted is subject to the attorney-client privilege and/or represents confidential attorney work product. Recipients should not file copies of this email with publicly accessible records. If you are not the designated addressee named above or the authorized agent responsible for delivering it to the designated addressee, you received this document through inadvertent error and any further review, dissemination, distribution or copying of this communication by you or anyone else is strictly prohibited. IF YOU RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONING THE SENDER NAMED ABOVE AT 800.333.4297. Thank you.

**From:** Laboni Hoq <laboni@hoqlaw.com>
**Sent:** Wednesday, February 14, 2024 8:45 AM
**To:** Coleman, Susan E. <SColeman@bwslaw.com>
**Cc:** Stephanie Aguiniga <stephanie@bertlinglawgroup.com>; Amber Qureshi <amber@nipnlg.org>; Cyndi Sierra <cyndi@bertlinglawgroup.com>; Jemma Parker Saunders <jemma@bertlinglawgroup.com>; Peter Bertling <peter@bertlinglawgroup.com>; Khaled Alrabe <khaled@nipnlg.org>; Matthew Vogel <matt@nipnlg.org>; Megan Brewer <Megan@tolchinimmigration.com>; St John, Shaina (USACAC) <Shaina.StJohn@usdoj.gov>; Stacy Tolchin <Stacy@tolchinimmigration.com>
**Subject:** Re: Arrellano Vargas v. USA et al.

[EXTERNAL]

Yes, we have seen them and we maintain their relevance. They do demonstrate policies and practices, even in the exemplar you attach. In the "Briefing Topics" section it references "Maintaining cleaning and sanitation. Proper training of new officers and being a role model." USA produced several of these as well, including at USA 45481-483, and 45755, also confirming their relevance to this case.

Regardless of whether we can obtain information about Defendants' policies and practices using other discovery tools, which we do not necessarily agree is the better method here, GEO is obligated to produce the shift summaries for the period we request. Please let us know asap whether it will produce them.

On Tue, Feb 13, 2024 at 5:55 PM Coleman, Susan E. <SColeman@bwslaw.com> wrote:

Laboni – have you ever seen these summaries? I am attaching one for your reference. They would not reflect any policies or practices. They primarily note times of events and counts.

I am not aware of any change to policy or practice as a result of this Covid-19 related death. But the question would be better addressed in an interrogatory, or a request for practices and/or policies changed as a result.

Susan

**Susan E. Coleman | Partner**
444 South Flower Street, Suite 2400 | Los Angeles, CA  90071-2953
d - 213.236.2831 | t - 213.236.0600 | f - 213.236.2700
scoleman@bwslaw.com | vCard | bwslaw.com

The information contained in this e-mail message is intended only for the CONFIDENTIAL use of the designated addressee named above. The information transmitted is subject to the attorney-client privilege and/or represents confidential attorney work product. Recipients should not file copies of this email with publicly accessible records. If you are not the designated addressee named above or the authorized agent responsible for delivering it to the designated addressee, you received this document through inadvertent error and any further review, dissemination, distribution or copying of this communication by you or anyone else is strictly prohibited. IF YOU RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONING THE SENDER NAMED ABOVE AT 800.333.4297. Thank you.

**From:** Laboni Hoq <laboni@hoqlaw.com>
**Sent:** Tuesday, February 13, 2024 3:57 PM
**To:** Coleman, Susan E. <SColeman@bwslaw.com>
**Cc:** Stephanie Aguiniga <stephanie@bertlinglawgroup.com>; Amber Qureshi <amber@nipnlg.org>; Cyndi Sierra <cyndi@bertlinglawgroup.com>; Jemma Parker Saunders <jemma@bertlinglawgroup.com>; Peter Bertling <peter@bertlinglawgroup.com>; Khaled Alrabe <khaled@nipnlg.org>; Matthew Vogel <matt@nipnlg.org>; Megan Brewer <Megan@tolchinimmigration.com>; St John, Shaina (USACAC) <Shaina.StJohn@usdoj.gov>; Stacy Tolchin <Stacy@tolchinimmigration.com>
**Subject:** Re: Arrellano Vargas v. USA et al.

[EXTERNAL]

The shift summaries after Mr. Vargas Arellano's death are relevant to the case. We are entitled to see how Defendants' policies and practices changed after his death.

On Tue, Feb 13, 2024 at 3:29 PM Coleman, Susan E. <SColeman@bwslaw.com> wrote:

He was released 3/05/21 – why do you need the shift supervisor summaries after his release?

Please let me know.

Thanks,

Susan

**Susan E. Coleman | Partner**
444 South Flower Street, Suite 2400 | Los Angeles, CA  90071-2953
d - 213.236.2831 | t - 213.236.0600 | f - 213.236.2700
scoleman@bwslaw.com | vCard | bwslaw.com

The information contained in this e-mail message is intended only for the CONFIDENTIAL use of the designated addressee named above. The information transmitted is subject to the attorney-client privilege and/or represents confidential attorney work product. Recipients should not file copies of this email with publicly accessible records. If you are not the designated addressee named above or the authorized agent responsible for delivering it to the designated addressee, you received this document through inadvertent error and any further review, dissemination, distribution or copying of this communication by you or anyone else is strictly prohibited. IF YOU RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONING THE SENDER NAMED ABOVE AT 800.333.4297. Thank you.

**From:** Laboni Hoq <laboni@hoqlaw.com>
**Sent:** Tuesday, February 13, 2024 11:22 AM
**To:** Coleman, Susan E. <SColeman@bwslaw.com>
**Cc:** Stephanie Aguiniga <stephanie@bertlinglawgroup.com>; Amber Qureshi <amber@nipnlg.org>; Cyndi Sierra <cyndi@bertlinglawgroup.com>; Jemma Parker Saunders <jemma@bertlinglawgroup.com>; Peter Bertling <peter@bertlinglawgroup.com>; Khaled Alrabe <khaled@nipnlg.org>; Matthew Vogel <matt@nipnlg.org>; Megan Brewer <Megan@tolchinimmigration.com>; St John, Shaina (USACAC) <Shaina.StJohn@usdoj.gov>; Stacy Tolchin <Stacy@tolchinimmigration.com>
**Subject:** Re: Arrellano Vargas v. USA et al.

[EXTERNAL]

Regarding the shift summaries, we are seeking those from June 1, 2020 to December 31, 2021 at this time.

Thank you.

On Tue, Feb 13, 2024 at 10:37 AM Coleman, Susan E. <SColeman@bwslaw.com> wrote:

> Please clarify the specific dates you want for the shift summaries.

I should be receiving this week additional documents including contact tracing and testing for GEO persons. (GEO does not have access to Wellpath and ICE tests and contact tracing.)  To be clear, I have not refused to produce any documents in GEO's possession and have been working on obtaining these.


Susan


**Susan E. Coleman | Partner**
444 South Flower Street, Suite 2400 | Los Angeles, CA  90071-2953
d - 213.236.2831 | t - 213.236.0600 | f - 213.236.2700
scoleman@bwslaw.com | vCard | bwslaw.com


The information contained in this e-mail message is intended only for the CONFIDENTIAL use of the designated addressee named above. The information transmitted is subject to the attorney-client privilege and/or represents confidential attorney work product. Recipients should not file copies of this email with publicly accessible records. If you are not the designated addressee named above or the authorized agent responsible for delivering it to the designated addressee, you received this document through inadvertent error and any further review, dissemination, distribution or copying of this communication by you or anyone else is strictly prohibited. IF YOU RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONING THE SENDER NAMED ABOVE AT 800.333.4297. Thank you.


**From:** Laboni Hoq <laboni@hoqlaw.com>
**Sent:** Tuesday, February 13, 2024 10:29 AM
**To:** Coleman, Susan E. <SColeman@bwslaw.com>
**Cc:** Stephanie Aguiniga <stephanie@bertlinglawgroup.com>; Amber Qureshi <amber@nipnlg.org>; Cyndi Sierra <cyndi@bertlinglawgroup.com>; Jemma Parker Saunders <jemma@bertlinglawgroup.com>; Peter Bertling <peter@bertlinglawgroup.com>; Khaled Alrabe <khaled@nipnlg.org>; Matthew Vogel <matt@nipnlg.org>; Megan Brewer <Megan@tolchinimmigration.com>; St John, Shaina (USACAC) <Shaina.StJohn@usdoj.gov>; Stacy Tolchin <Stacy@tolchinimmigration.com>
**Subject:** Re: Arrellano Vargas v. USA et al.


[EXTERNAL]

Dear Susan,


This follows up on the Parties' February 9, 2024 Rule 37-1 conference regarding Plaintiff's second set of discovery requests, and the Parties' subsequent email communication.


We are disappointed that GEO was not willing to meaningfully engage with us on February 9 regarding the specific discovery deficiencies we outlined in our January 4, 2024 letter, so the Parties could attempt to narrow the issues in dispute. Regarding the few issues we discussed, GEO failed to provide adequate justification for its continued refusal to produce key documents. Regarding GEO's claim that it does not have access to documents maintained by Wellpath related to its contractual duties at Adelanto, including Covid-19 testing and contact tracing, GEO failed to identify any basis for that claim. Nor did it provide any basis for not having access to the deposition transcripts of its own witnesses in the Roman litigation. Contrary to GEO's position, the fact that GEO was not a party to the Roman litigation is irrelevant to whether the requested documents are in its possession, custody and control, and therefore subject to production in this litigation.

As we discussed, because of GEO's lengthy delay in correcting these and other discovery deficiencies, we will need to move forward with our motion to compel, as we made clear in each of our prior discovery correspondence. However, we welcome GEO's further discovery responses in hopes that we can limit the need for Court intervention on these matters.

Finally, regarding the shift summaries GEO intends to produce as referenced in your email yesterday, Plaintiff is willing to limit GEO's production of these documents to the time period June 2020 to the end of 2021 at this time, without waiving our right to seek documents from a broader timeframe as originally requested if it appears they may be relevant to the case.

Thank you.

On Mon, Feb 12, 2024 at 6:09 PM Coleman, Susan E. <SColeman@bwslaw.com> wrote:

> Laboni – I wanted to make sure this is what you're seeking before I ask staff to retrieve and scan 1,287 of these for 2020.  There are three of these shift summaries for each day.

> It is not clear how these bear on any issues in the case.

> Thanks for your input.

> Best,

> Susan

> **Susan E. Coleman | Partner**
> 444 South Flower Street, Suite 2400 | Los Angeles, CA  90071-2953
> d - 213.236.2831 | t - 213.236.0600 | f - 213.236.2700
> scoleman@bwslaw.com | vCard | bwslaw.com

The information contained in this e-mail message is intended only for the CONFIDENTIAL use of the designated addressee named above. The information transmitted is subject to the attorney-client privilege and/or represents confidential attorney work product. Recipients should not file copies of this email with publicly accessible records. If you are not the designated addressee named above or the authorized agent responsible for delivering it to the designated addressee, you received this document through inadvertent error and any further review, dissemination, distribution or copying of this communication by you or anyone else is strictly prohibited. IF YOU RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONING THE SENDER NAMED ABOVE AT 800.333.4297. Thank you.

--

**Laboni A. Hoq**

Hoq Law APC

P.O. Box 753

South Pasadena, CA 91030

Telephone: 213-973-9004

www.hoqlaw.com

--

**Laboni A. Hoq**

Hoq Law APC

P.O. Box 753

South Pasadena, CA 91030

Telephone: 213-973-9004

www.hoqlaw.com

--

**Laboni A. Hoq**

Hoq Law APC

P.O. Box 753

South Pasadena, CA 91030

Telephone: 213-973-9004

www.hoqlaw.com

--

**Laboni A. Hoq**

Hoq Law APC

P.O. Box 753

South Pasadena, CA 91030

Telephone: 213-973-9004

www.hoqlaw.com


--

**Laboni A. Hoq**

Hoq Law APC

P.O. Box 753

South Pasadena, CA 91030

Telephone: 213-973-9004

www.hoqlaw.com

# EXHIBIT F

**UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MARTIN VARGAS. | Case No. 5:23-cv-00380-JWH-SP |
|        Plaintiff(s), | **CIVIL TRIAL SCHEDULING ORDER** |
|    v. | Last Day to Move to Amend Pleadings or to Add New Parties: in accordance with Fed. R. Civ. P. 15(a) & Fed. R. Civ. P. 16(b)(4) |
| UNITED STATES OF AMERICA, ET AL. | |
|        Defendant(s). | Deadline for Initial Designation of Expert Witnesses: 6/28/24 |
| | Deadline for Designation of Rebuttal Expert Witnesses: 7/10/24 |
| | All Discovery Cut-Off (including hearing of discovery motions): 7/26/24 |
| | Last day to Conduct Settlement Conference: 8/23/24 |
| | Dispositive Motion Hearing Cut-Off: 10/04/24 |
| | Deadline for Hearing on Motions *in Limine*: 11/15/24 at 9:00 a.m. |
| | Final Pretrial Conference: 11/22/24 at 1:00 p.m. |
| | Jury Trial: 12/09/24 at 9:00 a.m. |
| | Final Pretrial Conference for Bench Trial: 1/10/25 at 1:00 p.m. |

1

2 _____

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Bench Trial: 1/24/25 at 9:00 a.m.

Trial Estimate: *3* days

This case is set for trial before the Honorable John W. Holcomb in Courtroom 9D, Ronald Reagan Federal Building and U.S. Courthouse, 411 W. 4th Street, Santa Ana, California.

## I. AMENDING PLEADINGS AND ADDING PARTIES

There is no separate deadline for the parties to amend their pleadings or to add parties. Parties who wish to amend pleadings or to add parties shall comply with Rule 15(a) and, if applicable, Rule 16(b)(4) of the Federal Rules of Civil Procedure, as well as L.R. 15-1 through L.R. 15-3 and L.R. 16-14.

## II. MOTIONS

### A. Schedule and Procedures

Judge Holcomb hears motions in civil cases, through in-person appearances, on Fridays at 9:00 a.m. The cut-off date for hearing motions is the last day on which motions will be heard; *i.e.*, the motion must be filed at least 28 days before the deadline in accordance with the requirements of L.R. 6-1. *A copy of every motion-related document filed (including documents pertaining to claim construction hearings in patent cases) must be delivered to the chambers drop box outside Courtroom 9D or transmitted to chambers via FedEx, UPS, or other overnight delivery service (the "Mandatory Chambers Copy").* The cut-off date applies to all non-discovery motions except motions directly related to the conduct of trial (*e.g.*, motions *in limine* and motions to sever parties or to bifurcate issues for trial).

The parties are also reminded about their obligation to comply with L.R. 7-3, which requires a Conference of Counsel at least seven days before a party files most types of motions. The Court may deny a motion *sua sponte* if the moving party fails to comply strictly with L.R. 7-3.

### B. Motions for Summary Judgment

The Court employs special procedures for summary judgment motions, including the parties' preparation of a mandatory ***Joint Exhibit*** and ***Joint***

1     ***Statement of Undisputed Facts and Genuine Disputes***.  The parties and their

2 counsel are directed to the Standing Order for a full explanation.

3         The Court reminds the parties that the cut-off date for hearing dispositive

4 motions (*i.e.*, summary judgment motions) is the last day on which motions will

5 be ***heard***, not ***filed***.  The Court encourages parties to confer early and often

6 regarding anticipated summary judgment motions and, when appropriate, to file

7 a stipulation and proposed order to set a briefing schedule that provides the

8 parties with more time between filing and opposition, and between opposition

9 and reply, than the one week that is provided under L.R. 6-1, 7-9, and 7-10.

10 **C.    Motions *in Limine***

11         All motions *in limine* (including *Daubert* motions) and other trial-related

12 motions must be filed at least 28 days before the Final Pretrial Conference and

13 properly noticed for hearing ***one week before the date of the Final Pretrial***

14 ***Conference***.  Oppositions to motions *in limine* are due 21 days before the Final

15 Pretrial Conference (*i.e.*, 14 days before the hearing on motions *in limine*).

16 Replies will not be accepted.

17         Counsel shall meet and confer thoroughly, in accordance with L.R. 7-3,  in

18 an effort to limit or eliminate the need for such trial-related motions.

19 Memoranda of Points and Authorities in support of or in opposition to motions

20 *in limine* shall not exceed 10 pages.  Motions shall not be compound; *i.e.*, each

21 motion shall address only one item of evidence or witness.  If common grounds

22 for exclusion or admission apply to multiple items of evidence or witnesses, each

23 motion shall address only one category of evidence or witnesses.  Motions *in*

24 *limine* should not be disguised motions for summary judgment or summary

25 adjudication.

26 **D.    Withdrawal and Non-Opposition of Motions**

27         All parties and counsel must comply with L.R. 7-16, which provides as

28 follows:

1       Any moving party who intends to withdraw the motion before the
2       hearing date shall file and serve a withdrawal of the motion, not later
3       than seven (7) days preceding the hearing. Any opposing party who
4       no longer intends to oppose the motion, shall file and serve a
5       withdrawal of the opposition, not later than seven (7) days preceding
6       the hearing.

7 Failure to comply with this notification requirement may result in the imposition
8 of sanctions on the offending counsel or party.

9       If a defendant files a motion to dismiss a complaint and the plaintiff
10 subsequently amends that complaint, then the defendant shall file a Notice of
11 Withdrawal of its motion to dismiss in accordance with L.R. 7-16, without
12 waiting for the plaintiff or the Court to take action on the motion.

13 **III. DISCOVERY**

14       Counsel shall initiate all discovery other than depositions at least ***45 days***
15 before the cut-off date. The Court will not approve stipulations between
16 counsel that permit responses to be served after the cut-off date except in
17 unusual circumstances and for good cause shown.

18       All depositions must be completed by the discovery cut-off deadline.
19 Counsel shall lodge all original depositions that will be used in trial with the
20 Courtroom Deputy Clerk on the first day of trial.

21       Counsel are expected to resolve discovery problems without the
22 assistance of the Court. Discovery disputes have been referred to the Magistrate
23 Judge assigned to this case. The discovery cut-off is the last date to ***complete***
24 discovery, including expert discovery. It is also the last day for hearing any
25 discovery motion.

26       If not separately set forth above, the required expert disclosures shall be
27 made ***70 days*** before the discovery cut-off date.

28

## IV.  SETTLEMENT PROCEDURES

Counsel must complete a settlement conference under the Court-Directed ADR Program (L.R. 16-15.4) no later than the date set by the Court above.  If the parties desire to participate in an ADR procedure other than that elected in the Rule 26(f) Scheduling Report and Order, they shall file a stipulation with the Court.  This request will not necessarily be granted.

Counsel shall include in the proposed Pretrial Conference Order a status report detailing what procedure has been followed and the status of settlement efforts.  The case may not proceed to trial unless all parties, including the principals of all corporate parties, have appeared personally at a settlement conference and have complied with L.R. 16-15.5.

If a settlement is reached, it shall be reported immediately to this Court as required by L.R. 16-15.7.  ***In all cases set for jury trial, the parties must notify the Court, no later than the Wednesday preceding the Monday trial date, of any settlement, so that the necessary arrangements can be made to bring in a different case for trial or to notify the members of the public who would otherwise be reporting for jury duty that their services are not needed that date. Failure to comply with this notification requirement may result in the imposition of sanctions on counsel for one or more parties, or their clients, or both.***

## V.  FINAL PRETRIAL CONFERENCE

The Court will conduct a Final Pretrial Conference pursuant to Rule 16 of the Federal Rules of Civil Procedure and L.R. 16-1 on the date and time listed above.  Each party appearing in this action shall be represented at the Final Pretrial Conference and at all pretrial meetings by its lead trial counsel.  Counsel should be prepared to discuss streamlining the trial, including the presentation of testimony by deposition excerpts, time limits, stipulations regarding undisputed facts, and the qualification of experts by admitted resumes.  In rare

cases where the Pretrial Conference is waived by the Court, counsel must follow L.R. 16-11. This Court does not exempt *pro per* parties from the requirements of L.R. 16.

## VI. MATTERS TO BE DISCUSSED AT THE FINAL PRETRIAL CONFERENCE

Counsel shall be prepared to discuss the following matters with the Court at the Pretrial Conference:

- the witnesses all parties intend to call during their respective cases, and the amount of time necessary for direct and cross examination of each witness;
- any anticipated problems in scheduling witnesses;
- any evidentiary issues, including anticipated objections under Rule 403 of the Federal Rules of Evidence, and objections to exhibits;
- jury selection procedures;
- all pretrial motions, including motions *in limine* and motions to bifurcate and to sever (which, as noted above, must be set for hearing at least one week before the Pretrial Conference);
- any disputed jury instructions, and the form of the instructions that will be given to the jury at the outset of the case, i.e., before opening statements and presentation of evidence;
- whether any counsel intends to use any evidence or demonstrative aid in opening statement; and
- motions to exclude witnesses from the courtroom during trial testimony.

If counsel for any party needs to arrange for the installation of their own equipment, such as video monitors, notebooks, or projection equipment, counsel shall notify the Courtroom Deputy Clerk no later than 4:00 p.m. on the Wednesday before trial so that the necessary arrangements can be made.

# VII. PRETRIAL FILINGS

Counsel shall submit carefully prepared Memoranda of Contentions of Fact and Law (which may also serve as the trial briefs) and proposed Pretrial Conference Orders in accordance with the provisions of L.R. 16-4 through 16-7. The form of the proposed Pretrial Conference Order shall be in conformity with the form set forth in Appendix A to the Local Rules.

The filing schedule for pretrial documents is as follows:

**A.   At Least 28 Days before Final Pretrial Conference**

- Motions *in limine* (which, as noted above, must be set for hearing at least one week before the Pretrial Conference)[1]

**B.   At Least 21 Days before Final Pretrial Conference**

- Memorandum of contentions of fact and law
- Witness lists
- Joint exhibit list
- Oppositions to motions *in limine* (which, as noted above, must be set for hearing at least one week before the Pretrial Conference)

**C.   At Least 14 Days before Final Pretrial Conference**

- Proposed Final Pretrial Conference Order
- Proposed jury instructions and any objections thereto
- Proposed verdict forms
- Statement of the case
- Proposed *voir dire* questions, if desired

**D.   At Least 7 Days before Trial:**

- Trial briefs, if desired.

---

[1]   In rare instances, the Court will set the deadline for hearing motions *in limine* for a date other than one week before the Final Pretrial Conference.  In those instances, motions *in limine* are due no later than 21 days before the hearing, and oppositions are due no later than 14 days before the hearing.

In drafting the Proposed Final Pretrial Conference Order, counsel shall make a good faith effort to agree on, and to set forth, as many uncontested facts as possible. The Court may read the uncontested facts to the jury at the start of the trial.

In drafting the factual issues in dispute for the Proposed Final Pretrial Conference Order, the issues of fact should track the elements of a claim or defense upon which the jury would be required to make findings. Counsel should attempt to state issues in ultimate fact form, not in the form of evidentiary fact issues (*i.e.*, "was the defendant negligent?"; "was such negligence the proximate cause of injury to the plaintiff?"; "was the plaintiff negligent?"; *not*, "was the plaintiff standing on the corner of 5th Street and Spring Avenue at 10:00 a.m. on May 3?"). Counsel may list sub-issues under the headings of ultimate fact issues, but shall not use this as a device to list disputes over evidentiary matters.

Issues of law should state legal issues upon which the Court will be required to rule after the Pretrial Conference, including during the trial, and should not list ultimate fact issues to be submitted to the trier of fact.

Each party shall list and identify its respective expert witnesses, if any. Failure of a party to list and identify an expert witness in the Proposed Final Pretrial Conference Order shall preclude a party from calling that expert witness at trial.

**E.  Exhibit and Witness Lists**

Counsel are directed to prepare their exhibits by placing them in three-ring binders that are tabbed down the right side with exhibit numbers. The spine portion of the binder shall indicate the volume number and shall contain an index of each exhibit included in the volume. The binders are to be prepared with an original for the Courtroom Deputy Clerk, which shall be tagged with the appropriate exhibit tags in the upper right-hand corner of the first page of each

exhibit, and two copies for the Court (the "Judge's binders"). Each binder shall contain an index of the included exhibits. The exhibits are to be numbered in accordance with L.R. 26-3.

The Court requires the following to be submitted to the Courtroom Deputy Clerk on the first day of trial:

- The original exhibits with the Court's exhibit tags. The parties shall use yellow tags for Plaintiff and blue tags for Defendant, which shall be stapled to the front of the exhibit on the upper right corner with the case number, case name, and exhibit number placed on each tag. Counsel can obtain exhibit tags at the Clerk's Office. Exhibit Tags (Plaintiff & Defendant, form G-014) are also available on the Court's website, under "Court Procedures," "Forms."

- Two Judge's binders with a copy of each exhibit for use by the Court, tabbed with numbers as described above. (Court's exhibit tags not necessary.)

- Four copies of the exhibit index.

The exhibit index shall be in the following form:

| Case No. | Case Name: | | |
|----------|------------|--|--|
| Exhibit No. | Description | Date Identified | Date Admitted |
| 3 | 1/30/2005 Letter from Doe to Roe | | |

- Four copies of witness lists in the order in which the witnesses may be called to testify.

The witness lists shall be in the following form:

| Case No. | Case Name: |
|---|---|
| Witness Name | Date Called to Testify |
| 1.  John Doe | |
| 2.  Jane Roe | |

All counsel shall meet no later than ***10 calendar days*** before trial and shall stipulate to the extent possible regarding foundation, waiver of the best evidence rule, and admission into evidence of exhibits at the start of trial.  The exhibits to be received will be noted on the extra copies of the exhibit lists.

### VIII.  COURT REPORTER

At least seven days before the commencement of trial, counsel for the parties shall provide the court reporter with a list of unusual words, phrases, and spellings that may come up during trial.  This information should be emailed to Court Reporter Services at ReportersCACD@cacd.uscourts.gov.

### IX.  JURY INSTRUCTIONS

***Fourteen calendar days*** prior to the L.R. 16-2 Meeting of Counsel, counsel shall exchange proposed jury instructions and special verdict forms (if applicable).  ***Seven calendar days*** prior to the L.R. 16-2 meeting, counsel shall exchange any objections to the instructions and special verdict forms.  Prior to or at the time of the L.R. 16-2 meeting, counsel shall meet and confer with the goal of reaching agreement regarding one set of joint, undisputed jury instructions and one special verdict form.

The parties shall file proposed jury instructions ***fourteen calendar days*** before the Final Pretrial Conference.  As always, the parties must submit Mandatory Chambers Copies to the Court.  In addition, the parties must submit electronic versions (in Word format) to the Court at the following e-mail address: JWH_Chambers@cacd.uscourts.gov.

1   As noted above, the parties must act jointly to submit proposed jury
2   instructions.  The parties must submit one set of agreed upon jury instructions.
3   At the same time, the parties must submit another set of jury instructions
4   containing the instructions upon which the parties disagree and the objections to
5   those instructions.  Where the parties disagree on an instruction, the party
6   opposing the instruction must attach a short (*i.e.*, one to two paragraphs)
7   statement supporting the objection and the party submitting the instruction
8   must attach a short statement supporting the instruction.  Each statement
9   should be on a separate page and should follow directly after the disputed
10  instruction.

11  Accordingly, the parties ultimately will submit one document or, if the
12  parties disagree over any proposed jury instructions, two documents.  If the
13  parties submit two documents, those documents should consist of:  (1) a set of
14  agreed upon jury instructions; and (2) a set of disputed jury instructions along
15  with reasons supporting and opposing each disputed instruction.

16  Where the ***Manual of Model Civil Jury Instructions for the Ninth***
17  ***Circuit*** provides a version of a requested instruction, the parties should submit
18  the Model instruction.  Where California law applies, the Court prefers counsel
19  to use JUDICIAL COUNCIL OF CALIFORNIA, CIVIL INSTRUCTIONS—("CACI").  If
20  neither of the above sources has an instruction on the subject, counsel are
21  directed to consult the current edition of O'Malley, et al., FEDERAL JURY
22  PRACTICE AND INSTRUCTIONS.  Each requested instruction (a) shall cite the
23  authority or source of the instruction; (b) shall be set forth in full; (c) shall be on
24  a separate page; (d) shall be numbered; (e) shall cover only one subject or
25  principle of law; and (f) shall not repeat principles of law contained in any other
26  requested instruction.

27  The Court will send a copy of the jury instructions into the jury room for
28  use by the jury during deliberations.  Accordingly, in addition to the file copies

described above, the parties shall file with the Courtroom Deputy Clerk and shall email to chambers on the first day of the trial a "clean set" of joint and/or proposed jury instructions that contain only the text of each instruction set forth in full on each page, with the caption "Court's Instruction Number ___" (eliminating titles, supporting authority, indication of party proposing, etc.). This version will be referred to as the "Jury Copy" of the jury instructions.

An index page shall accompany all jury instructions submitted. The index page shall indicate the following:

- The number of the instruction;
- A brief title of the instruction;
- The source of the instruction and any relevant case citations; and
- The page number of the instruction.

EXAMPLE:

| Number | Title | Source | Page |
|--------|-------|--------|------|
| 1 | Burden of Proof | 9th Cir. 12.02 | 7 |

## X. JOINT STATEMENT OF THE CASE

Counsel shall prepare a joint statement of the case which will be read by the Court to the prospective panel of jurors prior to the commencement of *voir dire*. The statement should not be longer than three paragraphs. The statement shall be filed with the Court fourteen calendar days before the Final Pretrial Conference.

## XI. TRIAL

The Court sets firm trial dates. Counsel shall arrive at the Courtroom ***not later than 8:30 a.m.*** each day of trial. The Court reserves the time from ***8:30 to 9:00 a.m.*** to handle legal and administrative matters outside the presence of the jury. The trial will commence promptly at 9:00 a.m. Counsel shall anticipate

1    matters that may need discussion or hearing outside the presence of the jury and

2    to raise them during this period.

3        The Court is in session with the jury on ***Mondays through Thursdays,***

4    ***9:00 a.m. to 5:00 p.m., with a morning and an afternoon break and a lunch***

5    ***recess from approximately 12:00 noon to 1:00 p.m.*** In most instances, jury

6    selection is completed on the first morning of trial, and counsel should be

7    prepared to give opening statements and to begin their presentation of evidence

8    immediately thereafter.

9        All counsel shall observe the following practices during trial:

10   - All counsel and parties shall rise when the jury enters and leaves the

11       courtroom.

12   - Counsel shall stand when addressing the Court, including when objecting

13       to opposing counsel's questions.

14   - When objecting, counsel shall state only "objection" and the legal ground

15       for the objection (*e.g.*, hearsay, irrelevant, etc.). Counsel shall refrain

16       from arguing the legal basis for the objection unless and until permission

17       is granted to do so. Counsel shall instruct their witnesses to refrain from

18       answering a question while an objection is pending.

19   - Counsel must seek leave to approach the Courtroom Deputy Clerk or the

20       witness and shall question witnesses while standing at the lectern.

21   - Counsel shall not address or refer to witnesses or parties by first names

22       alone, with the exception of witnesses under 14 years old.

23   - Counsel shall not discuss the law or argue the case in opening statements.

24   - Counsel shall address all remarks to the Court and shall not directly

25       address the Courtroom Deputy Clerk, the Court Reporter, opposing

26       counsel, or the jury (except in opening statement and closing argument).

27       Counsel must ask the Court for permission to talk off the record in order

28       to speak with opposing counsel.

- Counsel shall not make an offer of stipulation unless he or she has conferred with opposing counsel and believes that the stipulation will be accepted.
- While Court is in session, counsel may not leave the counsel table to confer with witnesses, colleagues, or assistants elsewhere in the courtroom unless the Court grants permission to do so in advance.
- Where a party has more than one lawyer, only one may conduct the direct or cross-examination of a particular witness or make objections with respect to that witness.
- If a witness was on the stand before a recess or adjournment, counsel shall have the witness back on the stand and ready to proceed when Court resumes.
- If there is more than a brief delay between witnesses, the Court may deem that the party has rested.
- The Court attempts to cooperate with witnesses and will, except in extraordinary circumstances, accommodate them by permitting them to be examined out of sequence. Counsel should discuss any scheduling issues with opposing counsel. If there is an objection, counsel shall confer with the Court in advance.

## XII. BENCH TRIALS

*Twenty-one calendar days* before the trial date, each party shall prepare and serve on opposing counsel copies of the proposed Findings of Fact and Conclusions of Law. Each party shall review the other party's proposed Findings and Conclusions and make such changes in the party's own proposed Findings and Conclusions as necessary following such review. *Fourteen calendar days* before the trial date, each party shall lodge two copies of its proposed Findings of Fact and Conclusions of Law with the Court, also serving other parties if changes have been made. The parties shall be prepared to submit

-15-

to the Court, and to exchange among themselves, supplemental Findings of Fact and Conclusions of Law during the course of the trial.

## XIII.  WEBSITE

Counsel are encouraged to review the Central District's website for additional information: www.cacd.uscourts.gov.

The Courtroom Deputy Clerk is ordered to serve a copy of this Order personally, electronically, or by mail on counsel for all parties to this action.

**IT IS SO ORDERED.**

Dated: September 15, 2023

John W. Holcomb
UNITED STATES DISTRICT JUDGE

# EXHIBIT G

# LAW OFFICES OF STACY TOLCHIN

IMMIGRATION AND NATIONALITY LAW

VIA OVERNIGHT MAIL
April 19, 2021

The GEO Group
World Headquarters
4955 Technology Way
Boca Raton FL, 33431



To Whom It May Concern:

Re:   Request to Preserve Evidence
      Martin Vargas Arellano, A205-718-808

    I represent Martin Vargas, the son of Martin Vargas Arrellano, who was previously detained at the Adelanto ICE Processing Center and who passed away on March 8, 2021. I write to put you on notice of a potential claims to litigation under the Federal Tort Claims Act and *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971) for negligence, wrongful death, and other actions. As soon as a potential claim is identified, a party is under a duty to preserve evidence which it knows or reasonably should know is relevant to the action. *In re Napster, Inc. Copyright Litigation*, 462 F.Supp.2d 1060, 1067 (N.D. Cal. 2006); *National Ass'n of Radiation Survivors v. Turnage*, 115 F.R.D. 543, 556-57 (N.D.Cal.1987).

    Evidence to be preserved includes, but is not limited to, letters, correspondence, contracts, drafts, studies, publications, notes, records, personnel and detainee logs, reports, papers, facsimiles, electronic mail (whether to, from, copied or blind copied), electronic mail generated from a hand held personal device including a Blackberry or iPhone, text or instant messaging, electronic mail generated from business or personal email accounts, internet relay chat, news group, group or collaboration servers, electronic bulletin boards, electronic discussion boards, dictation tapes, video recordings, audio recordings, digital recordings, memoranda, voice mail messages, notebooks, diaries, pictures, photographs, films, computer records, voice recordings, maps, surveys, minutes, data compilations, and statistical compilations.

    This preservation request includes all evidence regardless of the form of storage (including, but not limited to, paper, microfiche, magnetic tape, magnetic disk (hard disk or floppy disk), CD-ROM, DVD, optical disk, or electronic storage device). This preservation request includes, but is not limited to, documents generated by or maintained in the E3 Tracking System, official ICE papers, and any other networks, databases, or other electronic stored information ("ESI").

    We request that you ensure ICE immediately halt all routine business practices that destroy potential evidence, including but not limited to document destruction, email deletion, server back-up tape rotation, electronic data shredding, scheduled destruction of back-up media, re-imaging of drives, drive hardware exchanges, and sale, disposal, or destruction of computer hardware or systems. We additionally request that you confirm with us that these practices have been halted.

    Finally, we request that you promptly communicate the preservation obligation to all ICE employees and contractors. *See Czuchaj v. Conair Corp.*, No. 13-cv-1901 BEN (RBB), 2016 WL

GEO 00001

4161818, at *3 (S.D. Cal. Apr. 1, 2016), *report and recommendation adopted,* No. 13-CV-1901-BEN (RBB), 2016 WL 4130946 (S.D. Cal. May 3, 2016) (citing *Zubulake v. UBS Warburg LLC,* 229 F.R.D. 422, 433-34 (S.D.N.Y. 2004)); *In re Napster, Inc. Copyright Litig.,* 462 F. Supp. 2d 1060, 1070 (N.D. Cal. 2006). This communication must be periodically repeated until this litigation is concluded, to ensure continued compliance by existing employees and contractors, and to inform those who subsequently begin working at ICE. *Zubulake,* 229 F.R.D. at 433.

If you have any questions or concerns, I can be reached at 213 622 7450 or Stacy@tolchinimmigration.com.

Sincerely,

Stacy Tolchin

# EXHIBIT H

# MEMORANDUM



**The GEO Group, Inc.®**
**Corporate Headquarters**
4955 Technology Way
Boca Raton, Florida 33431

www.geogroup.com

**Date: April 23, 2021**

**To:**  **James Janecka, Facility Administrator**

**cc:**  **Joanne Crowder, Administrative Secretary**

**From:**  **Judy Donato, Legal Review Coordinator**

**RE:**  **DEATH RECORDS**

---

GEO is in receipt of the attached attorney preservation letter for detainee Martin Vargas Arrellano. We believe the detainee died off-site and not while in custody.  Below is a list for you to review to see if you have any records that you might be able to find:

- SIR
- Prison Records
- Medical Records
- Video Footage
- Death Summary Report / Custodial Death Report
- Witness Statements
- Incident Report
- Photos
- Disciplinary Records
- Staff Roster
- Alpha Security Roster
- Intake Property
- GEO Track Inmate Info
- Central Control Log
- Post Orders Housing Security Officer Policy
- Post Orders Housing Unit Control Officer Policy
- Death Certificate
- Autopsy

***If you do find records to send, please send them to my attention in PDF format, if possible. I do not need hard copies. My computer cannot read any video footage, so I will need that sent to me by mail.***

Thank you very much for your consideration.

/jd

**GEO 00004**

# EXHIBIT I



| | CORPORATE POLICY & PROCEDURE MANUAL | **NUMBER:** |
|---|---|---|
| | | 1.1.7 |
| | | **SUPERSEDES:** |
| | **CHAPTER: 01 - General Administration** | 2/7/17 |
| | | **EFFECTIVE:** |
| | **TITLE: 1.1.7 Records Retention** | 10/25/19 |

**POLICY**

Records of the GEO Group, Inc. (GEO) will be organized, maintained, and destroyed in accordance with this policy and the Records Retention Schedule. Client Records will be maintained, transferred or destroyed in accordance with contractual requirements in conjunction with the Records Retention Schedule as applicable.

**DEFINITIONS**

**Active Records** are records that are needed or referenced frequently in day-to-day operations.

**Client Records** are records that GEO creates or receives, and maintains on behalf of GEO clients pursuant to contracts.

**GEO Records** are records GEO creates or receives and maintains for GEO operations and/or to document GEO business transactions.

**Custodian** is a department at the corporate offices, division, region, facility or other location that holds the official record of a GEO or Client Records Series.

**Electronic Records** includes information stored in a form read/processed by an electronic device including a computer or smart phone.

**Inactive Records** are records that are no longer required for day-to-day operations but must be retained for administrative, historical, or legal purposes.

**Non-Records** are documents that do not meet the criteria of a record; i.e. do not have enduring value. Examples include incomplete, redundant, or duplicate copies of documents (convenience copies). This also includes documents not related to business (non-work documents).

**Physical Records** are records including paper, x-rays, photographs, drawings and charts. These records do not require a computer to read.

**Records** are broadly defined as any written, photographic, machine-readable, or other recorded information regardless of format, created or received by or on behalf of an organization or person that controls, supports or documents its activities and transactions. Records include both electronic records and physical records.



| | CORPORATE POLICY & PROCEDURE MANUAL | NUMBER:<br>1.1.7 |
|---|---|---|

**Records Retention Individual (RRI)** is an individual in a corporate office department, division, region, facility or other location that has been assigned the principal responsibility for ensuring compliance with Records and Information Management (R&IM) policies and procedures. (R&IM maintains a list of the RRIs).

**Record Series** – records, grouped according to a filing system, or kept together because they relate to a particular subject or function, result from the same activity or document a certain type of transaction.  See the Records Retention Schedule for the listing of approved Record Series.

**Vital Records** are those records necessary for the continuity and resumption of operations during and following a disaster.  These records are necessary to protect the assets, obligations, and resources of the organization as well as the employees, individuals in our custody and the interests of the Client(s).

**GUIDELINES**

1.  Responsibilities

    a.  **Each GEO employee** is responsible for the security, organization and retention of records in accordance with this policy.

    b.  **Each department** in the corporate office, division, region, facility or location is responsible for:

        i.  the safety and security of records stored at the site and within their department and to prevent the unauthorized or inappropriate viewing of the record contents.
        ii.  documenting the location, and the organization and indexing of records for timely retrieval and destruction when required.
        iii.  the compliance with this policy, the Records Retention Schedule, and supporting procedures, client contract terms and instructions.
        iv.  the identification of a Records Retention Individual (RRI) and to notify R&IM in writing of changes to the RRI for their facility or department.  Notification of changes should be sent to the records@geogroup.com email box.
        v.  obtaining documented training on current R&IM policies and procedures.
        vi.  performing or coordinating the destruction of records with R&IM upon appropriate approval.

    c.  **Designated RRIs** will be responsible:



| | CORPORATE POLICY & PROCEDURE MANUAL | NUMBER: 1.1.7 |
|---|---|---|

     i.   to ensure that the identification, indexing, filing, Legal Hold (See Policy 1.1.11) and disposition of GEO records is carried out in accordance with this policy, the Records Retention Schedule and supporting procedures.

     ii.   to ensure, if applicable, that Client records are maintained, transferred, returned, and/or destroyed consistent with client contract terms and instructions.

  d.  R&IM is responsible for:

     i.   the on-going  administration and interpretation of this policy, the Records Retention Schedule and supporting procedures.

     ii.   the approval of off-site storage and shredding vendors, facilities, and processes.

     iii.   the training on Records Management policies and procedures.

     iv.   the review and approval of the destruction of records in compliance with the Records Retention Schedule and any Legal Holds in effect.

  e.  **Corporate Legal** shall approve the Records Retention Schedule, maintain current Legal Hold notification information and distribute notifications and suspensions to R&IM in a timely manner.

  f.  **Contract Compliance** shall perform periodic audits to ensure departmental compliance with the R&IM Policy, Records Retention Schedule and supporting procedures.

2.  Organization, Retention and Disposal

  a.  All GEO records will be assigned a retention period and will be organized, maintained and destroyed according to the Records Retention Schedule and applicable GEO policy and procedures.

  b.  The location, organization and indexing of all records will be documented in such a manner to provide for the timely retrieval and destruction of records.

  c.  Each department at the corporate offices, division, region, facility or location shall perform records destruction on an annual basis.  The transfer, organization and indexing of inactive records to off-site facilities shall be approved and facilitated by R&IM.  Off-site, and automated systems and repositories shall be approved by the Director, Information Privacy.



| | CORPORATE POLICY & PROCEDURE MANUAL | NUMBER: 1.1.7 |
|---|---|---|

d.  Records and Non-Records should be destroyed at the end of their useful life using an approved process. Destruction service providers (including Shredding Services) shall be approved by the Director, Information Privacy to ensure confidential and cost-effective shredding and destruction services.

e.  R&IM shall be notified as soon as practical of any record(s) damaged by water, fire or other disaster.  R&IM will assist in the recovery of records if applicable. Where records are deemed not recoverable, an account of the incident, record series title(s), date(s), number of boxes, box identification number (if possible), etc., shall be completed by the facility/department.  One copy of this document shall be retained at the facility/department, and one copy shall be provided to the Director, Information Privacy.

APPROVED: _____
               Corporate Officer

EFFECTIVE: _____10/25/2019_____

**POLICY OWNER:** Louis Carrillo, Executive Vice President Corporate Counsel

# EXHIBIT J

FILED UNDER SEAL

# EXHIBIT K

FILED UNDER SEAL

# EXHIBIT L

1 BRIAN M. BOYNTON
Acting Assistant Attorney General
2 U.S. Department of Justice
Civil Division
3 WILLIAM C. PEACHEY
Director
4 Office of Immigration Litigation
District Court Section
5 JEFFREY S. ROBINS
Deputy Director
6 450 5th Street, N.W.,
Washington, D.C. 20530
7 Telephone: (202) 616-1246
Facsimile: (202) 305-7000
8 jeffrey.robins@usdoj.gov
HANS H. CHEN
9 VICTOR M. MERCADO-SANTANA
Trial Attorneys
10

11 Attorneys for Defendants-Respondents

12 UNITED STATES DISTRICT COURT

13 FOR THE CENTRAL DISTRICT OF CALIFORNIA

14 EASTERN DIVISION

15 KELVIN HERNANDEZ ROMAN,                    No. 5:20-cv-00768-TJH-PVC
   BEATRIZ ANDREA FORERO
16 CHAVEZ, MIGUEL AGUILAR                     **RESPONDENTS' RESPONSES**
   ESTRADA, on behalf of themselves and      **TO PETITIONER'S FIFTH SET**
17 all others similarly situated,             **OF INTERROGATORIES**
18           Petitioners-Petitioners,        Honorable Terry J. Hatter
19 v.                                         United States District Judge
20 ALEJANDRO MAYORKAS, Secretary,
   U.S. Department of Homeland Security;
21 TAE D. JOHNSON, Acting Director, U.S.
   Immigration and Customs Enforcement;
22 JOHN E. CANTU, Acting Director of the
   Los Angeles Field Office, Enforcement
23 and Removal Operations, U.S.
   Immigration and Customs Enforcement;
24 and JAMES JANECKA, Warden,
   Adelanto ICE Processing Center,
25
26           Defendants-Respondents.
27
28

USA008619

Respondents, by undersigned counsel, hereby respond and object to Petitioner's Second Set of Requests for Production ("RFPs") to all Defendants as follows:

**<u>GENERAL OBJECTIONS AND PREFATORY STATEMENT</u>**

Respondents continue to search for relevant and responsive information and will continue to produce relevant, responsive non-privileged information as Respondents identify such information.    By responding to Petitioner's interrogatories, Respondents do not waive their rights to rely on other facts or documents at any subsequent proceeding in this action.  Additionally, by responding to Petitioner's interrogatories, Respondents do not waive the right to assert any and all objections to the admissibility of any documents into evidence at any subsequent proceeding in this action.

To the extent not specifically set forth in response to each request, Respondents hereby incorporate by reference each and every General Objection below into each and every response.

The General Objections include:

1.    Respondents object to each and every request to the extent it is vague, ambiguous, overly broad, and seeks information protected from disclosure by the attorney-client privilege, law enforcement privilege, deliberative process privilege, attorney work product protection, or any statutory or legal basis precluding disclosure.

2.    Respondents object to Petitioner's requests to the extent that they call for Respondents to produce information or documents to which Petitioner has equal or greater access than Respondents.

3.    Respondents object to Petitioner's requests to the extent that they require Respondents to obtain information from third parties that is not in Respondents' possession, custody, or control.

1

4.    Respondents provide responses herein pursuant to the Special Master's March 31, 2021 Order sustaining in part Respondents' objections to Petitioners' requests.

## INTERROGATORIES

## INTERROGATORY NO. 52.

Identify all People with the authority to release Adelanto Detainees between April 13, 2020 and the present, including but not limited to each Person involved, directly or indirectly, in the decision to release Martin Vargas Arellano.

**SPECIFIC OBJECTIONS TO INTERROGATORY NO. 52**

Respondent object to this interrogatory to the extent it requests information prior to December 1, 2020, which is beyond the scope of the Special Master's investigation.  SM Order 1-2.  Respondents further object to this Interrogatory to the extent that it calls for information protected from production by the attorney-client privilege, law enforcement privilege, deliberative process privilege, attorney work product protection, or any statutory or legal basis precluding disclosure. Respondents further object to his Interrogatory to the extent it is overly burdensome and not proportional to the needs of the Special Master investigation.

**RESPONSE**

The authority to release a detainee under the parameters set forth above rests with many programs and individuals. For all detained cases within a specific Field Office, the Field Office Director (FOD) has authority to release with some limitations. For instance, in most circumstances, at day 180 of post-order custody, the authority to continue detention or release transfers to HQ ERO under the process described for Post Order Custody Review. There are exceptions to this process that will allow release authority to remain with the FOD. HQ ERO leadership could also direct a FOD to release a detainee for reasons that HQ ERO determines are appropriate. The FOD may delegate release authority to those the FOD determines

2

USA008621

necessary. Currently, with some limitations, DFODs, AFODs and SDDOs assigned with duty responsibilities at the Adelanto ICE Processing Center (APC) have authority in varying degrees to release detainees held at the APC. In the Los Angeles Field Office, the FOD may concur with or override any release decision made by any subordinate.

The people involved in the decision to release were Acting FOD Ernesto Santacruz, Jr., Acting DFOD Art Cortez, Officer in Charge (OIC) Gabriel Valdez, Assistant Officer in Charge David Gomez, and ICE Health Services Corps Field Medical Coordinator Nicole Knight-Glass.

**INTERROGATORY NO. 53.**

Describe with particularity when and how Defendants, including Mr. Vargas's Deportation Officer, Sergio Guzman, learned of the death of Martin Vargas Arellano. This includes who in Enforcement and Removal Operations ("ERO") was first notified by the Orange County Coroner's Office of Mr. Vargas's death and how that information was subsequently shared within ERO.

**SPECIFIC OBJECTIONS TO INTERROGATORY NO. 53**

Respondents object to this Interrogatory to the extent that it calls for information protected from production by the attorney-client privilege, law enforcement privilege, deliberative process privilege, attorney work product protection, or any statutory or legal basis precluding disclosure.

**RESPONSE**

OIC Gabriel Valdez was notified of the passing of Mr. Vargas on March 9, 2021 through an email forwarded from Acting DFOD Art Cortez. The email originated from Deportation Officer (DO) Edmundo Torres who is assigned to the ERO Los Angeles, Alternatives to Detention program at the Santa Maria sub-office. DO Sergio Guzman was also notified of the passing of Mr. Vargas on March 9, 2021 through the same email forwarded to DO Guzman by SDDO Gil Montes. According

3

USA008622

1  to the information contained in the email, DO Edmundo Torres was notified on

2  March 9, 2021 by the Orange County Coroner's Office of Mr. Vargas' passing.

3

4  **INTERROGATORY NO. 54.**

5  Describe with particularity how Mr. Vargas contracted COVID-19. This

6  response should include but not be limited to (1) when Mr. Vargas was first known

7  to have symptoms of COVID-19; (2) when Mr. Vargas first tested positive for

8  COVID-19; (3) where Mr. Vargas was housed on each date identified in response to

9  (1) and (2); (4) whether Mr. Vargas had any close contacts with suspected or known

10  positive cases of COVID-19; and (5) the results of any contact tracing concerning

11  Mr. Vargas.

12  **SPECIFIC OBJECTIONS TO INTERROGATORY NO. 54**

13  Respondents object to this Interrogatory to the extent that it calls for

14  information protected from production by the attorney-client privilege, law

15  enforcement privilege, deliberative process privilege, attorney work product

16  protection, or any statutory or legal basis precluding disclosure.

17  **RESPONSE**

18  Mr. Vargas was first known to have symptoms of COVID-19 on or about

19  December 11, 2020.  Mr. Vargas first tested positive for COVID-19 on or about

20  December 10, 2020.  Mr. Vargas was housed in the infirmary on December 10 and

21  11, 2020.  Mr. Vargas was housed alone in the infirmary. Contact tracing was

22  performed.  The results indicated that, on November 29, 2020, Mr. Vargas had

23  contact during a medical exam with a WellPath employee. The employee was

24  wearing Personal Protective Equipment during the visit with Mr. Vargas. The

25  WellPath employee was tested for COVID-19 on December 3, 2020. This was also

26  the WellPath employee's last day reporting to work.  On December 7, 2020, the

27  result of the COVID-19 test for the WellPath employee returned positive.  This is

28  Vargas' only known contact to a COVID positive individual.

4

USA008623

1    **INTERROGATORY NO. 55.**

2        Identify all Adelanto Detainees who have been released to a hospital between

3    April 13, 2020 and the present. This response should include the reason for

4    hospitalization and whether any such Detainees have subsequently died.

5    **SPECIFIC OBJECTIONS TO INTERROGATORY NO. 55**

6        Respondent object to this interrogatory to the extent it requests information

7    prior to December 1, 2020, which is beyond the scope of the Special Master's

8    investigation.   SM Order 2.  Respondents further object to this interrogatory to the

9    extent it seeks information regarding other individuals and issues unrelated to Mr.

10   Vargas Arellano death. Respondents further object to this Interrogatory to the

11   extent that it calls for information protected from production by the attorney-client

12   privilege, law enforcement privilege, deliberative process privilege, attorney work

13   product protection, or any statutory or legal basis precluding disclosure.

14   Respondents further object to his Interrogatory to the extent it is overly

15   burdensome and not proportional to the needs of the Special Master investigation.

16   **RESPONSE**

17       On February 17, 2021, Mr. Vargas was transported to Victor Valley Global

18   Medical Center (VVGMC) in Victorville, CA and was admitted to the VVGMC

19   due to having a shortness of breath and to rule out pneumonia. Mr. Vargas was

20   later transferred to St. Mary Medical Center (SMMC) in Apple Valley, CA on

21   February 20, 2021 for a higher level of care and for treatment of pericardial

22   effusion (fluid around the heart). While at SMMC, Mr. Vargas was tested for

23   COVID-19 and results returned negative. On February 22, 2021, Mr. Vargas

24   underwent a procedure to address the pericardia effusion, which Mr. Vargas

25   tolerated. On February 26, 2021, Mr. Vargas developed a stroke causing him

26   complete paralysis of the left side of his body. He was immediately airlifted to a

27   specialized Stroke Center at the St. Jude Medical Center (SJMC), in Fullerton, CA.

28   On February 28, 2021, Mr. Vargas underwent a procedure due to brain swelling

5

USA008624

related to the stroke. Since that time, Mr. Vargas remained in the Intensive Care Unit on mechanical ventilation and sedation. On March 5, 2021, ERO granted Mr. Vargas release on his own recognizance but he remained admitted to SJMC for ongoing medical care.   On or about March 9, 2021, ERO was notified by the Orange County Coroner's Office that Mr. Vargas had died the previous day at the SJMC in Fullerton, CA. No other detainees were released from ICE custody while admitted to a hospital during the time period from December 1, 2020 to present.

## INTERROGATORY NO. 56.

Describe with particularity Defendants' reasons for determining that, as of January 4, 2021, Mr. Vargas was no longer in the West Medical Unit "for COVID-19 related reasons." *See* ECF No. 903. This response should include, but not be limited to, any policies, practices, and/or procedures concerning the determination of when a Detainee was recovered from COVID-19 that were taken into account for Defendants' determination regarding Mr. Vargas.

**SPECIFIC OBJECTIONS TO INTERROGATORY NO. 56**

Respondents object to this interrogatory to the extent it seeks information regarding other individuals and issues unrelated to Mr. Vargas Arellano death. Respondents further object to this Interrogatory to the extent that it calls for information protected from production by the attorney-client privilege, law enforcement privilege, deliberative process privilege, attorney work product protection, or any statutory or legal basis precluding disclosure.  Respondents further object to his Interrogatory to the extent it is overly burdensome and not proportional to the needs of the Special Master investigation.

**RESPONSE**

Respondents rely upon the medical providers' assessments who in turn rely upon their medical training as well as Centers for Disease Control and Prevention (CDC) guidance. At the time, CDC criteria to be deemed recovered/non-infectious

6

USA008625

from severe to critical illness or who are severely immunocompromised were: at least 10 days and up to 20 days have passed since symptoms first appeared, at least 24 hours have passed since the last fever without the use of fever-reducing medications, and symptoms (e.g., cough, shortness of breath) have improved.

On December 31, 2020, Mr. Vargas was at day 21 after his initial positive COVID-19 test. According to the medical provider, on that day, he was afebrile greater than 24 hours and his symptoms had improved. The medical provider seeing Mr. Vargas that day also noted that Mr. Vargas had tested positive for COVID-19 on December 10, 2020, had completed 20 days of isolation, and had been asymptomatic for more than 24 hours. On January 4, 2021, the medical provider noted that Mr. Vargas was doing well, denied shortness of breath, chest pain, cough, and fever, and was resting in bed without distress. The medical provider reviewed labs with the Mr. Vargas at this time.  When patient went to the hospital on December 11, 2020 and December 12, 2020, the result of the December 10, 2020 test was not yet available so he was tested again in the hospital. He had a positive test at St. Mary Hospital on December 13, 2020.  He was not tested prior to being moved to recovered status as it is not recommended by the CDC nor a requirement for discharge from isolation. Wellpath clinical providers are aware that COVID symptoms could continue beyond the infectious period or even have new symptoms occur after an initial recovery, generally known as "long COVID". This is taken into account when treating patients that have or had COVID infection. In the case of Mr. Vargas, his clinical evaluations always took into account his prior COVID infection.

7

USA008626

1    Date: April 14, 2021                    Respectfully Submitted,

2

3                                            BRIAN M. BOYNTON
                                             Acting Assistant Attorney General
4                                            U.S. Department of Justice
                                             Civil Division
5

6                                            WILLIAM C. PEACHEY
7                                            Director
                                             Office of Immigration Litigation
8                                            District Court Section

9

10                                           JEFFREY S. ROBINS
                                             Deputy Director
11

12                                           HANS H. CHEN
13                                           Trial Attorney

14                                           /s/ Victor M. Mercado-Santana
                                             VICTOR M. MERCADO-SANTANA
15                                           Trial Attorney
                                             United States Department of Justice
16                                           Civil Division, Office of Immigration
                                             Litigation
17                                           District Court Section
                                             P.O. Box 868, Ben Franklin Station
18                                           Washington, DC 20044
                                             Telephone:  (202) 305-7001
19                                           Facsimile:  (202) 616 -8962
20                                           victor.m.mercado-santana@usdoj.gov

21
                                             Attorneys for Defendants-Respondents
22

23

24

25

26

27

28

8

USA008627

**VERIFICATION OF INTERROGATORY ANSWERS**

      I, Gabriel Valdez, am an Assistant Field Office Director of Enforcement and Removal Operations, U.S. Immigration and Customs Enforcement, in the Los Angeles, California Field Office. I believe, based on reasonable inquiry, that the foregoing answers are true and correct to the best of my knowledge, information and belief.

      I verify under penalty of perjury that the foregoing is true and correct.

Dated: April 14, 2020

Gabriel Valdez
Assistant Field Office Director
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement

9

1

## VERIFICATION OF INTERROGATORY ANSWERS

2      I, Gabriel Valdez, am an Assistant Field Office Director of Enforcement and

3 Removal Operations, U.S. Immigration and Customs Enforcement, in the Los

4 Angeles, California Field Office. I believe, based on reasonable inquiry, that the

5 foregoing answers are true and correct to the best of my knowledge, information and

6 belief.

7      I verify under penalty of perjury that the foregoing is true and correct.

8

9 Dated: April 14, 2020

10      Gabriel Valdez

11      Assistant Field Office Director

     Enforcement and Removal Operations

12      U.S. Immigration and Customs Enforcement

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

9

USA008629

**CERTIFICATE OF SERVICE**

I hereby certify that on this date, I served the foregoing document and any exhibits and attachments thereto via email upon the following:

SAMIR DEGER-SEN
samir.deger-sen@lw.com

AHILAN ARULANANTHAM
aarulanantham@aclusocal.org

WILLIAM M. FRIEDMAN
william.friedman@lw.com

MICHAEL KAUFMAN
mkaufman@aclusocal.org

AMANDA BARNETT
Amanda.Barnett@lw.com

JESSICA KARP BANSAL
jbansal@aclusocal.org

JESSIE CAMMACK
Jessie.Cammack@lw.com

MICHELLE (MINJU) CHO
mcho@aclusocal.org

Dated:  April 14, 2021

/s/ Victor M. Mercado-Santana
VICTOR M. MERCADO-SANTANA
Trial Attorney
United States Department of Justice
Civil Division, Office of Immigration
Litigation
District Court Section
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Telephone:  (202) 305-7001
Facsimile:  (202) 616 -8962
victor.m.mercado-santana@usdoj.gov

ATTORNEYS FOR RESPONDENTS

USA008630

# EXHIBIT M

**AMENDMENT #3**

**TO THE**

**<u>MASTER SERVICE AGREEMENT</u>**

THIS THIRD AMENDMENT to the Master Service Agreement is by and between **California CCS, PC** ("**CCS**"), a California professional corporation, with offices located at 1101 Marina Village Parkway, Suite 201, Alameda, CA 94501, and **The GEO Group, Inc. and its affiliates**, a Florida limited liability company, with offices located at One Park Place, Suite 700, 621 NW 53rd Street, Boca Raton, FL 33487 ("**GEO**").

WHEREAS, **GEO** seeks to provide comprehensive health care services for detainees and inmates housed at specified facilities (each a "<u>Facility</u>", and collectively the "<u>Facilities</u>");

WHEREAS **CCS** and **GEO** previously entered into a Master Service Agreement, effective July 1, 2016 (the "**<u>Agreement</u>**"), which is hereby amended and replaced in its entirety; and

WHEREAS, **CCS** is duly licensed and qualified, and has the resources, professional staff, and expertise to provide, or arrange or cause to be provided, comprehensive health care services at **GEO's** Facilities, and desires to provide, arrange or caused to be provided, such services.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, **CCS** and **GEO** (collectively, the "<u>Parties</u>", and each, individually, a "<u>Party</u>") agree as follows:

1. <u>Definitions</u>.

    a. <u>Client</u>: The government entity or agency which has entered into a particular Master Contract with **GEO**.

    b. <u>Detainee/Inmate</u>: An individual detained and in lawful custody at a Facility.

    c. <u>Health Services</u>: The health care services provided hereunder as required by this Agreement and any Master Contract.

    d. <u>Health Services Administrator</u>: A **CCS** employee or contractor, as permitted by Clients and applicable Standards, with supervisory authority over the Health Services Unit at a Facility.

    e. <u>Health Services Unit</u>: The physical area in a Facility set aside for Health Services.

    f. <u>Master Contract</u>: A Service Contract between **GEO** and a Client for the provision, operation, and management of a Facility, and as it relates to the health service requirements.

**WELLPATH-MVA 005898**

g. <u>Medical Director</u>: The **CCS** employee or the contractor designated by **CCS** to have the principal responsibility for supervision of the Health Services provided or arranged by **CCS** at a Facility, as required by the Standards.

h. <u>Midnight Count Report</u>: The official numerical count of the number of Detainees/Inmates present at a Facility at the end of each day.

i. <u>Per Diem Rate</u>: The rate per Detainee/Inmate per day as mutually agreed to by the Parties in writing.

j. <u>Standards</u>: Applicable Standards include legislative, regulatory, and industry standards, and include: the most current editions of the American Correctional Association (ACA) Standards for Adult Correctional Institutions, National Commission on Correctional Health Care (NCCHC), Joint Commission Accreditation, Performance Based National Detention Standards (PBNDS); the written policies and procedures of the Client that is a party to a particular Master Contract; applicable federal, state, and local laws and regulations, including but not limited to Occupational Safety and Health Administration (OSHA) regulations and the Prison Rape Elimination Act (PREA); and accepted correctional health care standards for the area in which a particular Facility is located, as specified in each Statement of Work and in accordance with the requirements of the Master Contract.

k. <u>Statement of Work</u>: The agreement detailing additional terms and requirements for the provision of Health Services at specific Facilities pursuant to a Master Contract, as set forth in Section 2, below.

l. <u>Warden/Facility Administrator</u>: The individual designated by **GEO** to administer the entire Facility.

2. <u>Scope of Health Services</u>.

a. **GEO** and **CCS** intend during the Term of this Agreement to execute one or more Statements of Work ("Statement of Work"), according to which **CCS** shall provide certain health services at specific Facilities. The Health Services applicable to each of the various Master Contracts and Facilities will be set forth in one or more Statements of Work to be issued by **GEO** and accepted by **CCS**. The scope of work to be performed and the Health Services to be provided shall be determined in each Statement of Work, including all exhibits, schedules, and attachments to the Statement of Work. Each Statement of Work that refers to this Agreement shall be deemed a separate agreement that incorporates the terms and conditions of this Agreement by reference. All references in this Agreement to a Statement of Work shall refer to such documents.

b. Statements of Work shall be deemed accepted only if signed by an authorized representative of each of the Parties. **CCS** shall provide the Health Services in accordance with the Standards and each applicable Master Contract. In the event of a conflict, the

**WELLPATH-MVA 005899**

Master Contract shall be the prevailing document controlling which Standards are in effect.

    c.   The Parties recognize this Agreement and Statement of Work may not reflect the full breadth of the services desired or present all minor activities needed to complete **CCS'** work in order to comply with the terms and conditions of the Master Contract. **CCS** therefore agrees that it shall perform the work set forth in this Agreement, the Statement of Work, as well as such intermediate, ancillary, or other activities as necessary or appropriate to complete such work.

3.  <u>Compensation</u>. For the Health Services to be performed hereunder, **GEO** will pay to **CCS** a Per Diem Rate determined in accordance with the schedule set out in each Statement of Work.

    a.   Within three (3) business days following the end of each calendar month, **GEO** shall provide **CCS** with the sum of the daily Midnight Count Reports for the previous calendar month for each Facility.

    b.   Within ten (10) business days following the end of each calendar month, **CCS** shall submit a monthly invoice to **GEO**, in a format approved by **GEO**.

    c.   **GEO** will pay **CCS** within thirty (30) days of receipt of each invoice. Failure of **CCS** to submit appropriate information on an invoice will result in the withholding of any disputed portion of such invoice until the required information is received by **GEO**. If any amounts to be paid pursuant to an invoice are disputed by **GEO**, then **GEO**, on or before the date the payment is due, shall advise **CCS** of the basis for the dispute and pay the portion of the invoice which is not in dispute.

    d.   Unless otherwise agreed by the Parties, **CCS** shall not receive a Consumer Price Index increase during the term of this Agreement.

    e.   In the event that **GEO** receives a monetary award and deductions or charges are made against the award based on the provision and/or performance of Health Services by **CCS**, **CCS** shall promptly pay or credit **GEO** for any and all such deductions related to the Health Services administered hereunder.

4.  <u>Protection of Information and Records</u>.

    a.   <u>Confidential Information</u>. The Parties shall protect the confidentiality of proprietary business information, including but not limited to corporate and financial information, specifications, samples, patterns, designs, plans, drawings, documents, data, and business operations, inmate information, including but not limited to inmate personal and medical information, fees contained in this Agreement and any other confidential information (collectively, "<u>Confidential Information</u>") disclosed to it by the other Party under this Agreement, orally, in writing, or by any other form of communication and whether or not marked, designated or otherwise identified as "confidential. The Parties shall maintain all such Confidential Information in a confidential manner and shall comply with all applicable state and federal laws and regulations relating to the use and disclosure of

3

inmate health information, including but not limited to the Health Insurance Portability and Accountability Act ("HIPAA"), and shall use and disclose such information only in accordance with the terms of this Agreement. The Parties shall not disclose Confidential Information to any person, firm or entity other than to its own employees or representatives who have a need-to-know and each of whom the Parties agree shall be bound by these provisions on the same terms and conditions as if specifically named a Party hereto. Notwithstanding the foregoing, nothing herein shall prohibit the Parties from using, disclosing or transmitting information to the extent necessary under the terms of this Agreement or as required by law. This provision shall not apply to any information which is now in, or subsequently enters the public domain, provided that the Parties have not, in violation of this provision, disclosed or caused to be disclosed such information so as to make it public or enter the public domain. Upon termination of this Agreement, or upon request by either Party, the Parties shall promptly return all documents and other materials received from the requesting Party. The Parties shall be entitled to injunctive relief for any violation of this Section.

b.  HIPAA Compliance. Both Parties agree to comply with the applicable provisions of the Administrative Simplification section of the Health Insurance Portability and Accountability Act of 1996, as amended ("HIPAA"), the requirements of any regulations promulgated thereunder, including, without limitation, the federal privacy regulations as contained in 45 CFR Part 164 (the "Federal Privacy Regulations"), and the Health Information Technology for Economic and Clinical Health Act ("HITECH").

c.  The Parties recognize that **CCS** may have access to or otherwise receive Personal Information about **GEO** employees or agents, or the Client or its representatives in connection with this Agreement. "Personal Information" means any information relating, directly or indirectly, to an identified natural person or entity, or that could be used, directly or indirectly, to identify any natural person or entity (including names, addresses, telephone numbers, account numbers, customer lists, and demographic, financial or transaction information). **CCS** agrees that, as long as it has access to or maintains copies of Personal Information of **GEO** employees or agents or Client or its representatives, it will: (a) comply with all applicable federal and state security and privacy laws with respect to Personal Information; (b) promptly notify **GEO** of any suspected or actual data breach involving Personal Information; and (c) fully cooperate with **GEO** to investigate and remediate any suspected or actual data breach involving Personal Information. **CCS** also agrees that it will comply with its own security standards applicable to the protection of Personal Information or Protected Health Information under HIPAA.

d.  The Parties recognize that **GEO** may have access to or otherwise receive Personal Information about **CCS** employees or agents, or the Client or its representatives in connection with this Agreement. "Personal Information" means any information relating, directly or indirectly, to an identified natural person or entity, or that could be used, directly or indirectly, to identify any natural person or entity (including names, addresses, telephone numbers, account numbers, customer lists, and demographic, financial or transaction information). **GEO** agrees that, as long as it has access to or maintains copies of Personal Information of **CCS** employees or agents or Client or its representatives, it will:

4

WELLPATH-MVA 005901

(a) comply with all applicable federal and state security and privacy laws with respect to Personal Information; (b) promptly notify **CCS** of any suspected or actual data breach involving Personal Information; and (c) fully cooperate with **CCS** to investigate and remediate any suspected or actual data breach involving Personal Information. **GEO** also agrees that it will comply with its own security standards applicable to the protection of Personal Information or Protected Health Information under HIPAA.

e.  The introduction of removable media into a **GEO** facility and/or use of removable media within **GEO's** network and devices without prior approval from the "Chief Information Security Officer" are strictly prohibited. Removable media consists of portable devices that can be used to copy, save, store and/or move data from one system to another. Media devices come in various forms that include, but are not limited to, USB drives, flash drives or cards, read/write CDs, memory cards, external hard drives.

f.  The provisions of this Section 4 shall survive termination of this Agreement.

5.  <u>Term of the Agreement.</u>

a.  This Agreement shall commence as of the Effective Date, and shall continue for so long as any Statement of Work remains active, unless sooner terminated as provided herein.

b.  Upon expiration or termination of this Agreement for any reason, **CCS** shall promptly:

i.   Deliver to **GEO** all information and data including Confidential and Personal Information as identified above, and any work product or other materials, whether or not complete, prepared by or on behalf of **CCS** in the course of performing the Services for which **GEO** has paid;

ii.  Return to **GEO** all **GEO**-owned and/or Client-owned property, equipment, or materials in its possession or control;

iii. Cooperate with **GEO** in a joint inventory of supplies and equipment, and arrange for the purchase or removal of any **CCS**-owned property, equipment, or materials located at **GEO's** Facilities;

iv.  Satisfy all of **CCS'** debts and obligations incurred at **GEO's** Facilities;

v.   Deliver to **GEO**, all documents, information, data and tangible materials (and any copies) containing, reflecting, incorporating or based on **GEO's** Confidential Information;

vi.  On a pro rata basis, repay all fees and expenses paid in advance for any Health Services which have not been provided;

vii. Certify in writing to **GEO** that it has complied with the requirements of this Section;

**WELLPATH-MVA 005902**

c. The rights and obligations of the Parties set forth in this Section, and any right or obligation of the Parties in this Agreement which, by its nature, should survive termination or expiration of this Agreement, will survive any such termination or expiration of this Agreement.

6. <u>Termination</u>.

a. In addition to any other right of termination set forth herein, each Party shall have the right to cancel, terminate, or suspend this Agreement, in whole or in part, including any particular Statement of Work, with or without cause or further liability, by providing the other Party sixty (60) days' written notice of termination; provided, however, **GEO** may not exercise its right to terminate this Agreement under this paragraph during the first six months of the initial term of this Agreement. Upon the termination of this Agreement, all Statements of Work between the Parties will contemporaneously terminate.

b. If a Party breaches this Agreement, the non-breaching Party shall give the breaching Party written notice as soon as practical, but no less than ten (10) days' written notice of the breach. If **GEO** asserts that **CCS** is in breach and such breach could reasonably result in immediate harm to a Detainee/Inmate, then **GEO** shall have the authority to immediately utilize other providers or contractors to provide the Health Services and any other medical services necessary under the applicable Master Contract and the Standards. If the breaching Party does not cure the breach within the twenty (20) days of receiving written notice as described above, the non-breaching Party may terminate this Agreement immediately without further notice. As an exception to the aforementioned right to cure, in the event **GEO** is in breach of this Agreement for failure to pay **CCS** the compensation it's due and owed for the services provided under this Agreement and/or any Statement of Work resulting therefrom, **CCS** may immediately discontinue its provision of services hereunder.

c. In the event that:

i. **GEO** ceases to operate a particular Facility; or

ii. A Client gives notice of its intent to remove the Detainees/Inmates from a Facility, either **CCS** or **GEO** may terminate the related Statement of Work upon no less than seventy-two (72) hours' notice in writing to the other Party. Said notice shall be delivered by nationally recognized overnight delivery service, by certified mail, return receipt requested, or in person with proof of delivery.

7. <u>Independent Contractor</u>. In **CCS'** performance of its duties and responsibilities under this Agreement, it is mutually understood and agreed that **CCS** is at all times acting and performing as an independent contractor. **GEO** shall neither have nor exercise any control or direction over the methods by which **CCS** shall perform its work and functions other than as provided herein. Nothing in this Agreement is intended to or shall be deemed to constitute a partnership or a joint venture between the Parties.

**WELLPATH-MVA 005903**

8. <u>Third Party Rights.</u> The provisions of this Agreement are for the sole benefit of **CCS** and **GEO** hereto and will not be construed as conferring any rights on any other person.

9. <u>Compliance with IRCA.</u>

   a. **CCS** agrees at all times to remain in strict compliance with all terms, provisions, regulations, and rulings relative to the Immigration Reform and Control Act of 1986 ("IRCA"). All **CCS** personnel assigned to the Facility(s) will have had their identity and eligibility for work within the United States properly verified. Within three (3) days of receipt of a written request from **GEO**, **CCS** shall provide copies of the I-9 form or such other documentation as may be appropriate to satisfy **GEO** as to **CCS's** compliance with IRCA.

   b. **CCS** agrees to defend and indemnify the **GEO** Parties from and against any claims, actions, suits or proceedings of any type whatsoever arising out of or in any way connected with **CCS's** breach of the terms of the paragraph immediately above.

10. <u>Compliance with Safety Regulations.</u> **CCS** shall plan for and ensure that its personnel comply with the basic provisions of OSHA Safety and Health Standards as such federal regulations are applicable to the Health Services (if any). The responsibility for the implementation and enforcement of health and safety requirements relating to Health Services lies with **CCS** and its safety support staff.

11. <u>CCS Duties.</u>

   a. <u>Administrative</u>.

      i. **CCS** will provide and deliver Health Services to Detainees/Inmates at **GEO's** Facilities pursuant to and in compliance with this Agreement, the various Master Contracts and related Statements of Work, and the Standards. **CCS** shall be solely responsible for all costs associated with the provision of Health Services, subject to any capitation or similar type provision set forth in Statements of Work and excluding any costs associated with security or non-emergency transportation required in connection with the provision of Health Services.

      ii. **CCS** will plan, implement, direct, and control all clinical, therapeutic and administrative aspects of the Health Services.

      iii. **CCS** will achieve and maintain accreditation through ACA (PBHC-ACI) and any further accreditations required by the Master Contract(s), for the duration of this Agreement. **CCS** will achieve and maintain both ACA and NCCHC at all Immigration and Custom Enforcement (ICE) facilities under this Agreement. **CCS** will provide all required documentation in preparation for audits in a timely manner. If **CCS** is not accredited as of the effective date of this Agreement, **GEO** will be responsible for the application for the initial NCCHC accreditation fees and any unusual or extraordinary fees or expenses related to the initial accreditation. **CCS** will be responsible for all

**WELLPATH-MVA 005904**

reaccreditation fees throughout the term of this Agreement.

iv. **CCS** will work with **GEO** to obtain and maintain ACA accreditation and support all required efforts to prepare for ACA audits in a timely fashion.

v. For each Facility, **CCS** shall provide written policies for the provision of Health Services to **GEO** for review within thirty (30) days of the Effective Date. These policies shall be compliant and supportive of all Standards. Any policies found non-compliant by GEO or Client shall be corrected within no less than thirty (30) days. GEO reserves the right to review these policies and procedures upon request while this Agreement remains effective.

vi. While **CCS** acknowledges that it is obligated to medically monitor Detainees/Inmates who are receiving Health Services hereunder, this Agreement does not impose upon **CCS** any obligation or duty, of any nature, to provide security supervision services for any Detainees/Inmates at any time. Notwithstanding the foregoing, **CCS** staff is required to maintain vigilance consistent with a correctional setting, maintain a secure environment, and follow all applicable security policies and procedures.

vii. No amendment or modification to the Master Contract, including a material change to the scope of services, that becomes effective after the execution of this Agreement by **CCS** will be binding upon or obligate **CCS** to provide any goods or services of any nature, unless and until: (i) **GEO** has provided **CCS** with a full and complete description of such amendment or modification; (ii) **CCS** has had a reasonable time to evaluate the financial impact upon **CCS** of such amendment or modification; and (iii) **GEO** has discussed with **CCS** and received **CCS's** requested change in the compensation to be paid to **CCS**, if any, as a result of the proposed amendment or modification. In the event that any change in compensation requested by **CCS** described herein is not agreed to by **GEO**, then notwithstanding any other provision of this Agreement, either **CCS** or **GEO** shall have the right to terminate this Agreement with respect to the Facility(s) upon sixty (60) days' written notice to the other Party.

viii. **CCS** will plan, implement, direct, and control all clinical and administrative aspects of the Health Services program.

b. <u>Personnel.</u>

i. **CCS** will provide only Health Services personnel, including both employees and independent contractors, who meet the minimum qualifications required by each Master Contract and corresponding Statement of Work. **CCS** is responsible for maintaining the minimum staffing levels indicated in each Statement of Work; however, if **GEO** determines that staffing levels need to be enhanced, **GEO** will give notice to **CCS** immediately.

ii. **CCS**, at its sole cost, will be responsible for any required pre-employment background checks on **CCS** personnel during the term of this Agreement. **CCS** will submit for

**WELLPATH-MVA 005905**

processing by **GEO** and/or the Client all required materials as per each Master Contract. **CCS** shall be responsible for contacting such personnel regarding such results, and ensuring that appropriate disclosures and any discrepancies in results are addressed in compliance with applicable federal and state law and related policies and procedures specifically including the Fair Credit Reporting Act.

iii.    **CCS** shall provide to the Warden/Facility Administrators all necessary and proper personnel documentation and shall coordinate with the Warden/Facility Administrators to make certain such personnel meet the minimum qualifications set forth above. At **CCS'** option, the Warden/Facility Administrator of a particular Facility may be involved or consulted regarding the interviewing process for the Health Services Administrator and any other **CCS** personnel who will work at that Facility, but shall have no authority to hire, accept, train, or reject any applicant for employment with **CCS**.

iv.    **CCS** shall provide only licensed or certified personnel who are eligible and authorized to work in and to provide Health Services in accordance with the laws of the State applicable to each Master Contract and corresponding Statement of Work.

v.    **CCS** will provide to each person it engages to provide Health Services a written job description that clearly delineates such person's assigned responsibilities. **CCS** will monitor personnel performance to verify that such performance is in accordance with these job descriptions, other provisions of this Agreement, the applicable Master Contract and the Standards. **GEO** retains the right to review all medical services job descriptions, including revisions, throughout the term of this Agreement. **CCS** shall, if required by a Client, submit all applicable job descriptions to the Client or its designee for review and approval. At all times, **CCS** shall comply or assure compliance with **GEO**'s Quality Assurance Program and requirements of all vital functions related to Health Services as specified by the Master Contracts and Standards.

vi.    **CCS** shall require all Health Services staff to clock into and out of **GEO's** Kronos system at the point of entering and exiting a secure facility in order to validate accountability. Use of the Kronos system does not establish an employer-employee relationship between **GEO** and **CCS'** employees and contractors.

vii.    **GEO** and the Client of each Master Contract, in their sole discretion, reserve the right to deny admittance to a Facility to any **CCS** personnel after first providing **CCS** with a reasonable basis for such denial. In the event **CCS** personnel are denied admittance, **CCS** shall provide alternate personnel that have been pre-qualified and meet all credentialing requirements prior to admittance to the Facility to supply the Health Services. Admittance to the Facility of such alternate personnel is also subject to **GEO** and Client approval, which shall not be unreasonably withheld.

viii.    Credentials for all **CCS** personnel performing Health Services shall remain on file at the Health Services Unit of each Facility and shall be made available upon request to the Warden/Facility Administrator or the Warden/Facility Administrator's designee

WELLPATH-MVA 005906

and compliance auditors. These files shall include copies of the following:

Section I
A. Health Care Staff Appointment/Reappointment Application
    1. Application
    2. Practitioner Data Record/Authorization and Identity Release Form
    3. Professional liability claims history
B. Curriculum Vitae
C. Picture ID

Section II
A. Health Status Statement
B. Request for Clinical Privileges

Section III
A. State Issued Professional license with primary source verification
B. Current malpractice insurance certificate (if applicable)
C. DEA License (if applicable) with primary source verification
D. State Controlled license (if applicable) with primary source verification
E. Evidence of certification of Basic Life Support
F. AMA, AOA, National student clearing house or other education certification report

Section IV
A. Provisional/Temporary/Appointment/Re-Appointment Memo
B. Three (three) current, signed Peer References letters/forms

Section V
A. NPDB Report
B. OIG or GSA Report

Section VI
A. Continuing Professional Education (CPE)
B. Medical degrees/certificates/diplomas
C. Job Description

ix.    **GEO** and its Clients retain the right to review all credentials, licenses, peer reviews, internal and external compliance audits, and disciplinary actions upon providing reasonable notice to **CCS**, excluding any information that may be subject to the attorney/client/work product privilege or similar legal privilege.

x.    **CCS** shall account for all forms of Government-provided identification issued to **CCS** employees in connection with performance under this Agreement and any Statement of Work. **CCS** shall return such identification to **GEO** upon the earliest of any of the following, unless otherwise determined by the Client:

    1.  When no longer needed for contract performance;

**WELLPATH-MVA 005907**

2. Upon completion of the employee's employment;
3. Upon contract completion or termination.

**GEO** may delay payment if **CCS** fails to comply with these requirements.

xi. **CCS** shall be solely responsible for its personnel including all taxes, employment withholding, social security, or other wages. **CCS** will indemnify **GEO** for any such taxes, costs or fees that **GEO** incurs related to **CCS** personnel.

xii. **CCS** will ensure that its personnel comply with operational procedures of the **GEO** Facilities, including, but not limited to, sign-in and sign-out procedures, and search procedures prior to entering and leaving a Facility.

xiii. **CCS** personnel shall not be used to collect urine samples from Detainees/Inmates for the purposes of a Facility's drug monitoring and surveillance program.

xiv. **CCS** personnel shall be made available for any investigation, whether undertaken by **GEO**, the Client, or any governmental agency or authority, and **CCS,** its employees and contractors shall provide its full cooperation with any such investigations.

xv. <u>Employee Care</u>. **CCS** shall provide, arrange, and administer Hepatitis (B) Inoculations and Tuberculosis skin testing to **GEO** employees. Costs incurred by **CCS** for said inoculations will be reconciled on the monthly invoice to **GEO**. **CCS** will provide a separate line item charge on the monthly invoice to **GEO** delineating the number of **GEO** staff that received the inoculation, charge per inoculation, and total cost of supplies. Labor involved with administering the inoculation will not be billable.

c. <u>Staffing</u>.

i. **CCS** shall provide <u>no less than the minimum staffing requirements</u> at the Facility, as set forth in applicable Statements of Work. **CCS** shall provide the medical staffing for the provision of the Health Services and ensure staff providing the Health Services are, throughout the term of this Agreement, appropriately trained, qualified, and licensed.

ii. **CCS** shall fill any staffing vacancies existing at the time the Health Services commence under each Statement of Work, and shall endeavor to fill any vacancy as expeditiously as possible and in accordance with the corresponding Master Contract. Any **CCS** staffing vacancy may be temporarily filled by overtime or temporary **CCS** employees with appropriate clearance and qualifications that meet or exceed job requirements for the filled position; however, no **CCS** employee assigned to a **GEO**-contracted facility may be used to fill temporary positions at any other **GEO**-contracted facility without prior written approval from **GEO**.

iii. If staffing penalties or deductions are assessed on **GEO** due to Health Services staffing being at levels below the minimum staffing level of a Statement of Work or other personnel non-conformance issues, **CCS** will bear sole financial responsibility for all

11

**WELLPATH-MVA 005908**

Health Services staffing penalties assessed against **GEO**, which penalties may be subsequently deducted from monthly payments by **GEO**.

iv.     **CCS,** at its own cost, shall require health service personnel to have uniforms/medical scrubs that are like-color and professional in appearance.

v.      **GEO** may assess liquidated damages if **CCS** fails to maintain minimum staffing for mandatory health care posts or positions (85% staffing levels identified in **Exhibit A** of the Statement of Work for Health Services staff). **GEO** shall assess staffing penalties in accordance with the following Matrix:

| Average Monthly Staffing Level | Percentage Value Deducted from Total Monthly Invoice (based a 30-day month) |
|---|---|
| 85 – 100% | 0% |
| 84% | 7% |
| 83% | 9% |
| 82% | 11% |

vi.     **CCS** will exercise due diligence in filling staffing vacancies and, to the fullest extent possible, the duties of the vacant posts and positions will be performed through the use of overtime, temporary and/or contracted employment utilized to meet the 85% staffing levels and will be credited towards the overall percentage.

vii.    All **CCS** employees must utilize the facility Kronos for time keeping purposes.

viii.   **CCS** will track the date each position is vacated, the days, the work hours, and salaries and benefits of each vacancy and submit a corresponding staffing deduction report delineating each position with the monthly invoice. If staffing levels fall below 82% for more than thirty (30) days **GEO** may terminate the contract upon immediate notice.

ix.     In the event of performance deductions, charges or back charges to **GEO** relating to the provision of Health Services hereunder, **CCS** shall promptly pay or credit **GEO** for any such costs that are attributable to **CCS**'s responsibilities under this Agreement as reasonably determined by **GEO**. **CCS** shall not be responsible for payment of any assessments or back charges under this paragraph relating to time periods prior to the effective date of this Agreement.

x.      In the event **GEO** resources are utilized to correct any contract deficiencies that are directly attributable to **CCS, CCS** shall be responsible for the reasonable costs associated with said resources to include staff salaries and travel reimbursements.

d.   Personnel Training and Orientation.

i.      **CCS** will provide Health Services Unit-related orientation and training for all of its

**WELLPATH-MVA 005909**

personnel providing Health Services, as may be required by a Client. **CCS** shall provide sufficient training to Health Services personnel and others at the Facility to ensure compliance with the applicable Master Contract and the Standards.

ii.  **CCS** will establish a medical library at each Facility for use by the Health Services personnel, to include basic reference texts as well as a current medical dictionary, a Physician's Desk Reference, and current Nursing Practice textbook.

iii.  In addition to other training that may be required, **CCS** shall present health-related **GEO** training modules of the **GEO** Facility training program, which will be available to all **CCS** and **GEO** personnel.

e.  <u>Space, Equipment, and Commodities</u>.

i.  **CCS** shall, at its sole cost and expense, provide all consumable or disposable medical supplies required to provide Health Services pursuant to the terms of this Agreement and all Statements of Work. **CCS** agrees to inventory and review the medical supplies and medications at the Facility at the time of transitioning services under this Agreement. To the extent any usable supplies are on hand at a Facility at the initiation of **CCS'** provision of services under this Agreement that are the property of **GEO**, **CCS** may acquire such supplies from **GEO** at a mutually agreed upon price. Upon termination of this Agreement or a particular Statement of Work, **CCS** may remove such supplies from the Facility or sell such supplies to **GEO** or its successor at a mutually agreed upon price.

ii.  **CCS** shall be responsible for the maintenance, repair, and replacement of that equipment that is purchased or supplied by **CCS**. Additionally, **CCS** shall be responsible for any damages to the Facilities, including damages to any equipment, caused by **CCS** personnel. **CCS** will be responsible for long distance telephone charges, and consumable supplies for the **GEO**-supplied copier. **CCS** shall also be responsible for the maintenance, repair, and replacement (only if unsafe for patient or staff use or the item is un-repairable) of any **GEO**-owned equipment.

iii.  Except when the applicable Master Contract allocates such costs to the Client, **CCS** shall be responsible for any and all charges related to telemedicine services to include charges for transmission lines and installation if **CCS** chooses to utilize telemedicine services at a Facility and such use is consistent with the Statement of Work, Master Contract and Standards.

iv.  Pursuant to **CCS'** obligations to provide Health Services at the various Facilities, and in connection with all of **CCS'** obligations pursuant to this Agreement, during the term of this Agreement, **CCS** shall have the right, at its own expense, to install items of movable machinery and equipment in the Facilities, which items shall be identified by tags or other symbols affixed thereto as property of **CCS**. All such items so identified shall remain the sole property of **CCS**, in which **GEO** shall have no interest, and all such items may be modified or removed by **CCS** at any time, provided that **CCS** shall

13

repair any and all damage to the Facilities resulting from the installation, modification, or removal of any such items and provided such items do not interfere with the operation of the Facility or the purpose of the Master Contract. All items of movable machinery and equipment in or upon a Facility that are not so identified and claimed by **CCS** as required herein shall be deemed to be the sole property of **GEO**. Nothing in this Agreement shall prevent **CCS** from purchasing or leasing items to be installed in the Facility, under a conditional sale or lease with option to purchase contract, or subject to a vendor's lien or security agreement as security for the unpaid portion of the purchase price thereof, provided that no such lien or security interest shall attach to any part of such Facility. At the termination of **CCS'** services under this Agreement, **GEO** shall have the right, before any other purchasers, to purchase from **CCS** any equipment used in the Facility and owned by **CCS** at a price to be mutually agreed upon by the Parties. **CCS** acknowledges that its right to bring machinery and equipment upon the premises of the Facility is subject to the reasonable security requirements of the Facility and the Warden/Facility Administrator's approval, which shall not be unreasonably withheld.

f.   <u>Financial Records</u>.

   i.   **CCS** shall maintain books, records, and documents relating to the services provided at the Facility hereunder, in accordance with generally accepted accounting procedures and practices and the Master Contracts, which books, records, and documents **GEO** or Client may review and/or audit upon reasonable request. Said items shall be maintained for a period of time sufficient to comply with the Standards.

  ii.   Copies of all records, documents, reports, notes or other written material, either prepared or maintained by **CCS** for the administration and management of this Agreement, **CCS** staff and Detainees/Inmates, will be turned over to **GEO** upon expiration, cancellation, or termination of this Agreement.

 iii.   Until the expiration of six (6) years after the termination of this Agreement, **CCS** shall, upon request, make available to **GEO**, Client or any of their duly authorized representatives, this Agreement and all other books, documents, and records necessary to certify the nature and extent of the costs incurred and services provided under this Agreement.

g.   <u>Health Care Records</u>.

   i.   **CCS** shall provide and maintain (or utilize, if already implemented and in use) the Electronic Health Record (EHR) and/or comply with all other health record requirements as set forth in each Master Contract and corresponding Statement of Work. Any hard copy of Detainee/Inmate health care records and other health care related files are the property of the Client, and **CCS** shall maintain the confidentiality of such records at all times, including during any **GEO** or outside agency review. Health care records shall be maintained in a secure, locked area. **GEO** staff, with the appropriate security clearance and approval, shall have access to medical records

**WELLPATH-MVA 005911**

during the term of this Agreement.

ii.    The Parties acknowledge that all information relating to the Health Services provided pursuant to this Agreement shall be subject to, and protected by, the provisions of the Health Information Portability and Accountability Act ("HIPAA"). To ensure such confidentiality, the Parties have executed the Business Associate Agreement attached as **Appendix A** which is hereby made a part of this Agreement.

iii.    **CCS** will utilize all applicable forms and training necessary for **CCS** to document a Detainee/Inmate's health record and comply with applicable federal and state laws and health services policies for all reporting and accountability of medical data.

iv.    Upon the reassignment of the Detainee/Inmate to another institution, the original copy of a Detainee/Inmate's health records shall be immediately returned to the Customer or, if required by the Master Contract, forwarded to the new institution. Within thirty (30) days of the release of a Detainee/Inmate, the original copy of the Detainee/Inmate's health records shall be forwarded to the appropriate health record repository, if required by the Master Contract.

v.    Upon reassignment or release of a Detainee/Inmate, CCS shall preserve a copy of the Detainee/Inmate's health records, and shall also forward a copy of such records to **GEO**. **CCS** shall retain such copies for a period of seven (7) years from the date of reassignment/release, or, if the Detainee/Inmate is a juvenile, for a period of seven (7) years from the date the Detainee/Inmate reaches the age of majority.

vi.    **CCS** shall comply with applicable Client policies and the Standards for all Detainee/Inmate transfers and medical designations.

h.    <u>Detainee/Inmate Health Care</u>.

i.    Individuals in positions that require credentials, including but not limited to Physicians, Advanced Nurse Practitioners (ARNPs), Psychologists, and Psychological Specialists, will be subject to a credentials review by the Client and/or **GEO.**

ii.    **CCS** will provide Health Services to Detainees/Inmates twenty-four (24) hours per day, seven (7) days per week, in accordance with the scheduling set forth in **Exhibit A** of the Statement of Work. **CCS** will provide on-call physician availability twenty-four (24) hours per day.

**WELLPATH-MVA 005912**

iii.    Subject to the terms and conditions of this Agreement, Health Services for Detainees/Inmates include, but are not limited to: routine care, nursing care, emergency care, physician care and dental care, care for all acute and chronic conditions which can be managed on-site, intake health screenings, tuberculosis ("TB") testing, physical examinations, the Standards, and the Master Contract. Health Services will be provided either at the Facility(s), Client-approved designated facilities, or within the local community by Client-approved health care providers

iv.    **CCS** nursing personnel shall make a referral for treatment after triaging sick call requests. Sick call, the system by which non-emergency care and treatment is accessed, shall be provided. Detainees/Inmates shall have access to non-emergency care seven (7) days per week twenty-four (24) hours a day.

v.    If, in the opinion of the Chief Health Officer (CHO), Health Services Administrator or his/her designee, a Detainee/Inmate cannot be properly treated at the Facility(s), the Detainee/Inmate may be referred to a licensed Facility(s) in the community that can provide the necessary treatment and which has been mutually agreed upon by the Client and **CCS** for provision of such services. Admissions that arise from emergency situations are to be reviewed by the Health Services Administrator or his/her designee within twenty-four (24) hours of admission. **CCS** shall comply with all written Client policies and **GEO** requirements for notification and documentation relating to Detainee/Inmate care.

vi.    In the event of unusual or extraordinary occurrences, **CCS** will assist **GEO** and/or the Client in the collection of any necessary information related to the occurrence that is required for an investigation.

vii.    **GEO** reserves the right to request re-designation of Detainee/Inmate medical cases. **CCS** shall comply with all notification procedures required by Client policy and the Master Contract regarding the transfer of Detainees/Inmates from the Facility(s).

viii.    **CCS** will have at least thirty (30) days' (or such lower amount as provided for in the Master Contract) supply of medical supplies upon its assumption of responsibility for providing Health Services at the Facility(s).

i.    <u>Detainee/Inmate Intake Medical Screening Services.</u>

i.    As a part of the intake process, **CCS** personnel will screen all Detainees/Inmates received at the Facility(s) in accordance with applicable Standards, and will enter the findings into each Detainee's/Inmate's health record. The preliminary screening shall include all areas of concern and shall be conducted in compliance with the Master Contract.

ii.    **CCS** shall review intake medical records of new Detainees/Inmates arriving at the Facility(s). **CCS** shall review each Detainee's/Inmate's prescribed medications and

16

**WELLPATH-MVA 005913**

shall provide continuity of clinically appropriate medications upon arrival at the Facility(s). **CCS** shall perform any or all tests or procedures necessary to ensure all required health screening/tests in the intake battery are complete.

iii.    Medically necessary tests and services (laboratory, nursing, and dental) are to be provided in accordance with the Master Contract, and may include, but are not limited to:

    1.  Laboratory services (blood count, syphilis test, tuberculosis skin test ("<u>TB test</u>"), x-ray and other applicable tests;

    2.  Chart review performed by a registered nurse, to include obtaining and reading lab results and recording results in the health record;

    3.  Dental examination screening x-rays, dental history, treatment plan; and

    4.  Mental assessment (psychiatric evaluation).

iv.    Each Detainee's/Inmate's medical prior health records will be provided by the Client, including certification of TB screening and treatment. If evidence of TB testing within the previous year is not documented in a Detainee's health record, the Detainee/Inmate shall be screened for TB.

v.    **CCS** will orient Detainees regarding the procedures for gaining access to Health Services, in accordance with Standards.

j.  <u>Health Assessments.</u>

Within 14 days of arrival at the Facility(s), **CCS** shall complete a health assessment upon each Detainee's/Inmate's admission, in accordance with applicable Standards, and shall maintain a copy in the Detainee's/Inmate's health record. **CCS** shall develop an individual treatment plan for each Detainee/Inmate who requires ongoing care based on an assessment of the Detainee's/Inmate's needs.

k.  <u>Referrals, Hospitalization, and Outpatient Care.</u>

i.    **CCS** will provide referrals and/or off-site health care providers that are consistent with the Master Contract and applicable Standards. Offsite services shall be provided at the nearest appropriate and available health care Facility(s).

ii.    All referrals, procedures, hospitalization or outpatient care requiring preauthorization by the Client will be managed by **CCS** according to the Master Contract. All routine referrals to health care providers for care outside the Facility(s) shall be approved by the **CCS** corporate office and designated personnel prior to scheduling.

iii.    If **CCS** fails to comply with the appropriate authorization, precertification, notification and/or documentation requirements for any of the services described in this Agreement, **CCS** shall be responsible for all related costs that are not paid or reimbursed by the Client under the Master Contract due to **CCS**'s failure to comply

**WELLPATH-MVA 005914**

with the requirements. **CCS** agrees to indemnify **GEO** with respect to such costs.

   iv.   *Transportation*: **CCS** will follow the client requirement associated with off-site emergency transport.

l.   <u>Dental Care.</u>

   i.   **CCS** will arrange for off-site routine and emergency dental care to Detainees/Inmates in accordance with the Master Contract and applicable Standards, unless the Master Contract states there is on-site routine dental care provided at which time **CCS** will be responsible for any on-site dental care.

   ii.   **CCS** will arrange for treatment of off-site dental emergencies in accordance with the Master Contract and Standards but shall not be financially responsible for the costs of the same.

m.   <u>Mental Health Services.</u>

   i.   **CCS** will arrange for routine and non-routine mental health services, if required, to Detainees/Inmates in compliance with the Master Contract and applicable Standards.

   ii.   Mental health services shall be provided by a licensed mental health provider in compliance with Client policy and the applicable Master Contract.

n.   <u>Optical Services.</u>

**CCS** will provide and schedule optical services as needed, according to criteria outlined in the Master Contract and applicable Standards.

o.   <u>Emergency Medical Care.</u>

**CCS** will arrange for emergency medical services in compliance with the Master Contract and applicable Standards, including the following: written policies and procedures concerning emergency transfer and transportation of Detainees/Inmates; arrangements for emergency twenty-four (24) hour on-call physician coverage; coordination with **GEO** security personnel for transportation when the immediate transfer of an Detainee/Inmate is indicated; emergency treatment for visitors and staff consisting of stabilization and referral to personal physician, local hospital, and physician care when appropriate.

p.   <u>Pharmacy Services.</u>

   i.   **CCS** shall obtain and maintain, throughout the term of this Agreement, any necessary and proper licenses required to provide pharmacy services at the Facility(s).

   ii.   **CCS** shall provide personnel for medication distribution and to meet Detainee/Inmate pharmaceutical needs.

**WELLPATH-MVA 005915**

iii.   Upon a Detainee's/Inmate's release or transfer from the Facility(s), a supply of any necessary medications will be provided to the Detainee/Inmate to ensure continuity of care.

iv.   **CCS** shall provide and distribute all medications in compliance with applicable state and federal regulations and Client policy.

v.   **CCS** shall provide hypodermic supplies, including needles, syringes, and disposal containers that meet Occupational Safety and Health Act (OSHA) requirements.

vi.   **CCS** shall be responsible for appropriate disposal and/or destruction of needles and syringes, as well as all medical hazardous waste. **CCS**'s medical waste disposal subcontractor will prepare all documentation required by the Standards, and such documentation will be maintained by **CCS** and made available to **GEO** and Client upon request. **CCS** shall indemnify **GEO** for any costs, fees, or expenses that **GEO** incurs due to **CCS**'s breach of the obligation set forth in this paragraph.

vii.   **CCS** shall complete a medication administration record for each Detainee/Inmate receiving medication. The record shall be maintained in accordance with State law, and shall include all information required by the Master Contract.

viii.   **CCS** shall ensure that Detainees/Inmates do not have unauthorized access to the pharmacy, and will indemnify **GEO** for any damages **GEO** incurs if Detainees/Inmates gain such unauthorized access as a result of **CCS**'s negligence or willful misconduct.

q.   Laboratory and Diagnostic Services. All laboratory and diagnostic services provided to Detainees/Inmates housed at the Facility(s), including court-ordered testing, shall be the sole financial responsibility of **CCS**. **CCS** shall provide Clinical Laboratory Improvement Amendments ("CLIA") waived on-site diagnostic tests in the event of laboratory and diagnostic services relative to hospitalization.

r.   Radiology Services. Where applicable, routine and special radiological studies or services performed on-site for Detainees/Inmates are the sole financial responsibility of **CCS**. In the event of laboratory and diagnostic services relative to hospitalization, **CCS** shall comply with all Client and **GEO** requirements for notification and documentation relating to such treatment.

s.   Medical Disaster Plan. **CCS** shall, in compliance with the Master Contract and with the assistance and approval of the Facility Administrator, develop procedures for delivery of Health Services in the event of a disaster such as fire, tornado, hurricane, epidemic, riot, strike or mass arrest. **CCS** will participate in Facility Mass Casualty Drills.

t.   Quality Assurance. Within thirty (30) days of the Effective Date of each Statement of Work, **CCS** will implement a quality improvement program commensurate with

**WELLPATH-MVA 005916**

community standards applicable to each Facility, and shall maintain such program for the duration of each Statement of Work.

i.   **CCS** will comply, or assure compliance, with the **GEO** Quality Assurance Program, including, but not limited to, the timely provision of statistical data, including, but not limited to, data required by **GEO** and in a format specified by **GEO**. **GEO** may request additional reports and documentation related to the Health Services, in a format agreed upon by **GEO** and **CCS**. Such reports may include, but shall not be limited to, meeting minutes, quality assurance and quality improvement initiatives and audits, Detainee/Inmate medical grievances, chronic care, peer reviews, mortality reviews, credentialing, corrective action plans, and sick-call statistics. **GEO** will provide reasonable notice for such requests.

ii.   **CCS** will comply with the requirements of all vital functions related to Health Services specified by the Master Contracts, Statements of Work, and Standards.

u.  Audits and Surveys.

i.   **CCS** agrees to allow **GEO**, Clients, accrediting authorities, government agencies, or their duly authorized designees to perform scheduled compliance audits throughout the term of this Agreement. **GEO** shall provide to **CCS**, in advance, a current copy of all scheduled compliance audits. **CCS** shall cooperate with all reasonable requests related to such audits. Responses to **GEO** compliance audits shall be submitted within a reasonable time frame as determined by **GEO**.

ii.   **GEO** shall neither have nor exercise any control or direction over the methods or manner by which **CCS** performs its services other than as provided herein.

iii.   **CCS** agrees to notify **GEO** of any scheduled or unscheduled compliance audits by Clients or other government entities and agencies. **CCS** shall cooperate with all reasonable requests related to such audits. Client and external agency requests for corrective action plans, reports, or correspondence shall be submitted to **GEO** for review and approval prior to distribution to other parties.

v.  Insurance.  With regard to each Facility in which **CCS** provides Health Services under this Agreement, **CCS** agrees to provide and keep in force during the term of this Agreement the following minimum insurance coverages. The minimum coverages specified herein are subject to increase pursuant to the terms of each Facility's Master Contract and associated Statement of Work, the terms of which are controlling. **CCS** shall, at all times, carry coverage for no less than the amounts specified in each Master Contract. **CCS** agrees to add **GEO** as an "additional insured" on all policies listed in Sections i and ii below, evidenced through endorsement. **CCS'** insurance shall be primary and non-contributory to **GEO's** policies.

i.   Commercial General Liability Insurance.  Minimum limits of five million dollars ($5,000,000) per occurrence and in the aggregate. Coverage shall apply to officers,

**WELLPATH-MVA 005917**

directors and employees performing work or providing Health Services for or on behalf of **CCS**. **CCS** shall assure that any subcontractors performing work or providing Health Services for or on behalf of **CCS** maintain coverage with at least the same limit.

ii.   <u>Medical Professional Liability Insurance</u>.  Minimum limits of five million dollars ($5,000,000) per occurrence or per claim and five million dollars ($5,000,000) aggregate limit of liability. Coverage shall apply to officers, directors, employees, agents or subcontractors performing work or providing Health Services for or on behalf of **CCS**. **CCS** shall endeavor to keep the limits of liability unimpaired at all times, ensuring that the limits are not exhausted and available to protect **GEO**. In the event the annual aggregate limit becomes exhausted, and the insurance carrier will not provide reinstatement of the aggregate limit, **CCS** will provide prompt notification to **GEO**. Upon notification from the insurance carrier of the increased premium for reinstating the aggregate limit, **CCS** will provide prompt notification to **GEO**.

If a claims-made policy form is used to meet this Professional Liability Insurance requirement, the retroactive date must be no later than the date services were first provided by **CCS** under this or preceding contracts for Health Services at the Facility. **CCS** further agrees to provide an extended claims reporting period for a period of no less than three years following the termination of this Agreement or cancellation or non-renewal of any Medical Professional Liability Insurance policy.

Evidence of insurability in any state-required Patients Compensation Fund is mandatory for individual physicians.

iii.   <u>Workers' Compensation and Employers' Liability Insurance</u>. Workers' compensation shall provide for statutory limits and benefits in each State where the Health Services will be performed. Employers' Liability shall be provided with limits of at least five hundred thousand dollars ($500,000) for each illness or injury.

iv.   <u>Automobile Liability Insurance</u>.  Minimum limits of one million dollars ($1,000,000) per occurrence and in the aggregate shall apply specifically to any owned, non-owned or hired vehicles used in the course of performing work under this Agreement.

v.   <u>Cyber-security Liability Insurance</u>.  **CCS**, and its vendors and contractors who are provided with use of or access to Client and/or **GEO** information systems or who maintain Client's or **GEO's** Confidential or Personal Information, shall carry insurance coverage responding to privacy and network security liability claims with limits of liability not less than five million dollars ($5,000,000) per claim.

This coverage shall extend protection for, at a minimum, the following:
1. Liability arising from theft, dissemination, and/or use of Confidential Information or Personal Information;
2. Liability arising from the unauthorized access to, use of, or tampering with computer systems, including hackers and attacks;

**WELLPATH-MVA 005918**

3. Liability arising from the introduction of a computer virus into, or otherwise causing damage to third party's computer system or network;
4. Business interruption;
5. Cyber extortion;
6. Crisis management; and
7. Legal fees and costs.

vi.  <u>General Insurance Specifications</u>. Additionally, all insurance policies shall contain or comply with the following:

1. At least (thirty) 30 days' advance written notice to **GEO** of any notice of cancellation, non-renewal, material change or impairments of limits.
2. A waiver of subrogation in favor of **The GEO Group, Inc.**, and its subsidiaries, officers, directors, employees, agents, successors, assigns, or subcontractors.
3. All coverages other than Workers Compensation must be Primary and Non-Contributory.
4. AM Best Rating Minimum of A-VII.
5. For all coverages other than Workers Compensation, **The GEO Group, Inc**. and its subsidiaries, officers, directors, employees, agents, successors, assigns, or subcontractors must be added as Additional Insureds.
6. Commercial General Liability and Medical Professional Liability must not have exclusion for discrimination, and shall evidence same on certificate of insurance.
7. Commercial General Liability and Medical Professional Liability must not have exclusion for sexual misconduct as long as the insured did not know about the sexual misconduct or the perpetrator's propensity to commit such acts.

vii.  Failure to provide any insurance policies or coverage provisions required under this Agreement shall be considered a material breach of contract. Prior to commencing any work under this Agreement, **CCS** shall submit satisfactory evidence of coverage (including any subcontractor's insurance) to **GEO**. **CCS** shall provide, upon **GEO's** request, certified copies of the actual policies in order to confirm that all insurance requirements have been met. **GEO** reserves the right to reject any insurance that is considered non-compliant.

w.  <u>Non-Discrimination</u>. During the term of this Agreement, **CCS** will comply with all local, state and federal requirements relevant to employment practices and procedures, including, but not limited to:

i.  Not discriminating against any employee or applicant for employment because of race, color, religion, sex, national origin, or any other protected category.

ii.  Taking affirmative action to ensure that applicants are employed, and that employees are treated during employment, without regard to their race, color, religion, sex, or national origin. This shall include, but not be limited to, (i) employment, (ii) upgrading, (iii) demotion, (iv) transfer, (v) recruitment or recruitment advertising, (vi) layoff or

**WELLPATH-MVA 005919**

termination, (vii) rates of pay or other forms of compensation, and (viii) selection for training, including apprenticeship.

iii.    Posting notices which explain these requirements, to be provided by **GEO**, in conspicuous places available to employees and applicants for employment.

iv.    In all solicitations or advertisement for employees placed by or on behalf of **CCS**, stating that all qualified applicants will receive consideration for employment without regard to race, color, religion, sex, or national origin.

12. <u>GEO Duties</u>.

a.    **GEO** shall provide and maintain the original equipment, space, furniture, and fixtures required for the operation of the Health Services Units, including equipment necessary to meet the management information systems requirements of the Master Contracts (computers, lines, software, and training) to ensure the Health Services Units have access to the Detainee/Inmate management systems and electronic records management systems. **GEO** will provide to **CCS** a copier, internet access, telephone, and fax services for each Health Services Unit.

b.    **GEO** shall provide private areas within each Facility where medical and mental health treatment can be conducted in a manner permitting confidential communication between the Detainee/Inmate patient and the health professional.

c.    **GEO** shall provide security for **CCS'** personnel sufficient to enable them to perform their job responsibilities and to assure their safety at the Facility. Such services shall include, but are not limited to, **GEO** providing a corrections officer at the Health Services Unit whenever a Detainee/Inmate is being seen, evaluated, or treated by **CCS** personnel or while a Detainee/Inmate is housed in the Health Services Unit. **GEO** is solely responsible for providing security services with respect to Detainees/Inmates at all times that they are in the Health Services Unit. **GEO** shall provide security services during Detainee/Inmate off-site, inpatient or outpatient medical treatment.

d.    **GEO** shall provide transportation of Detainees/Inmates for non-emergency Health Services.

e.    **GEO** shall provide or make available to **CCS** the applicable Master Contract, position descriptions, forms, logs, and/or other documentation referenced in the Master Contract as required to operate the Health Services Units in compliance with the Standards. **GEO** shall provide all **CCS** personnel with the appropriate Facility orientation as required, and any related annual operational training as required.

f.    **GEO** agrees that during the term of this Agreement (and any corresponding Statement of Work) and for a period of twelve (12) months after the termination thereof, irrespective of the reason for the termination, it will not directly or indirectly, on its behalf or the behalf of another legal entity or an affiliate (of **GEO** or another legal entity), recruit, solicit, induce,

**WELLPATH-MVA 005920**

or attempt to recruit, solicit, or induce, any non-clerical **CCS** employee (including but not limited to **CCS'** Health Service Administrators and non-clerical clinicians) with whom **GEO** had personal contract with, and/or exposure to as a result of the services provided under this Agreement and/or a corresponding Statement of Work, to terminate their employment relationship with **CCS**.

13. <u>Meetings</u>. Meetings will be held regularly between **CCS** and **GEO** at each Facility. Participating will be the Warden/Facility Administrator, members of **CCS** staff (and/or other representative selected by **CCS**) and other representatives as reasonably requested by the Parties. The location of the meetings shall be determined by the Parties, but may be held electronically or in person. **CCS** will also attend any required meetings with Client representatives.

14. <u>Indemnification</u>.

   a. **CCS** shall hold harmless, indemnify, and defend **GEO**, its affiliated entities and subsidiaries, and each of their respective directors, officers, employees, agents, other contractors, successors, and assigns (collectively, "<u>GEO Parties</u>") from and against any and all losses, damages, penalties, expenses (including reasonable attorney's fees), suits, actions, or claims of any character whatsoever which may be asserted against or incurred by **GEO Parties** and which are based upon, arise out of or relate to (i) the negligent performance by **CCS** of any of the services to be provided by **CCS** under this Agreement or any other act or omission committed or omitted by **CCS** or any of **CCS'** personnel in the course of performing such services, (ii) HIPAA or HITECH violations due to the acts or omissions of **CCS** or its agents, (iii)the inaccuracy of any representation or warranty made by **CCS** herein, or (iv) the failure of **CCS** to observe or comply with any of the provisions hereof. Such indemnification obligations include any and all damages, costs or expenses (including reasonable attorney's fees, court costs and expenses of attorneys) incurred by **GEO** in defending against any such indemnified matter or in seeking to enforce this indemnity against **CCS**.

   b. **GEO** shall hold harmless, indemnify, and defend **CCS**, its affiliated entities and subsidiaries, and each of their respective directors, officers, employees, agents, other contractors, successors, and assigns (collectively, the "<u>CCS Parties</u>") from and against any and all losses, damages, penalties, expenses (including reasonable attorney's fees), suits, actions, or claims of any character whatsoever which may be asserted against or incurred by **CCS Parties** and which are based upon, arise out of or relate to (i) the negligent performance by **GEO** of any of the services to be provided by **GEO** under this Agreement or any other act or omission committed or omitted by **GEO** or any of **GEO's** personnel in the course of performing such services, (ii) the inaccuracy of any representation or warranty made by **GEO** herein, (iii) HIPAA or HITECH violations due to the acts or omissions of **GEO** or its agents, or (iv) the failure of **GEO** to observe or comply with any of the provisions hereof. Such indemnification obligations include any and all damages, costs or expenses (including reasonable attorney's fees, court costs and expenses of attorneys) incurred by **CCS** in defending against any such indemnified matter or in seeking to enforce this indemnity against **GEO**.

**WELLPATH-MVA 005921**

c.  **GEO** and **CCS** shall immediately notify the other of any claim or suit made or filed against them that may be the subject of indemnification obligations under this Section. Irrespective of whether a suit, action, or claim is subject to the indemnification obligations under this Section, **CCS** shall immediately notify **GEO** of any suit, action or claim premised upon the delivery of contracted services under this Agreement. The provisions of this Section shall survive the termination of this Agreement. Upon acceptance of its indemnifying obligations under this Section, the indemnifying Party ("Indemnitor") shall provide a defense required hereunder with qualified counsel of its choosing, and may settle or compromise any claim without the consent or approval of the Party being indemnified ("Indemnitee"), so long as the Indemnitee is wholly released from any obligation or liability relating to the claim being defended. An Indemnitee that approves the settlement of a claim shall have no right of contribution, or other claim against the Indemnitor relating to the claim that is settled.

15. <u>Remedies</u>.

a.  If **CCS** violates any provision of this Agreement, **GEO** shall, in addition to any damages to which it is entitled, be entitled to seek immediate injunctive relief against **CCS** prohibiting further actions inconsistent with **CCS'** obligations under this Agreement.

b.  If **GEO** violates any provision of this Agreement, **CCS** shall, in addition to any damages to which it is entitled, be entitled to seek immediate injunctive relief against **GEO** prohibiting further actions inconsistent with **GEO's** obligations under this Agreement.

c.  To the extent a Party is required to seek enforcement of this Agreement or otherwise defend against an unsuccessful claim that it breached the Agreement, the prevailing Party shall be entitled to recover all of its attorney's fees and costs incurred to enforce the provisions of this Agreement or to defend itself.

d.  All rights and remedies provided in this Agreement are cumulative and not exclusive, and the exercise by either Party of any right or remedy does not preclude the exercise of any other rights or remedies that may now or subsequently be available at law, in equity, by statute, in any other agreement between the Parties or otherwise.

16. <u>Compliance</u>.  **CCS** is in compliance with and shall comply with all applicable laws, regulations and ordinances. **CCS** has and shall maintain in effect all the licenses, permissions, authorizations, consents and permits that it needs to carry out its obligations under this Agreement.

17. <u>FAR Clauses</u>.  See **Appendix B**, attached and incorporated by reference herein. In the event of a conflict between a Clause included in **Appendix B** and a Clause included in a Statement of Work, the Statement of Work shall control.

18. <u>Notices</u>.  All notices, requests, consents, claims, demands, waivers and other communications under this Agreement (each, a "Notice", and with the correlative meaning "Notify") must be in

**WELLPATH-MVA 005922**

writing and addressed to the other Party at its address set forth below (or to such other address that the receiving Party may designate from time to time in accordance with this Section). Unless otherwise agreed herein, all Notices must be delivered by personal delivery, nationally recognized overnight courier or certified or registered mail (in each case, return receipt requested, postage prepaid). Except as otherwise provided in this Agreement, a Notice is effective only on receipt by the receiving Party and if the Party giving the Notice has complied with the requirements of this Section.

To CCS
    Don Houston
    1283 Murfreesboro Road, Suite 500
    Nashville, TN 37217
    With a copy to:
    Chief Legal Officer
    Correct Care Solutions, LLC
    1283 Murfreesboro Road, Suite 500
    Nashville, TN 37217

To GEO
    Amber Martin
    Executive Vice President, Contract Administration
    GEO Corrections and Detention, LLC
    One Park Place, Suite 700
    621 Northwest 53rd Street
    Boca Raton, FL 33487

    With a copy to:
    Dr. Ernesto Alvarez
    GEO Corrections and Detention, LLC
    One Park Place, Suite 700
    621 Northwest 53rd Street
    Boca Raton, FL 33487

19. <u>Severability</u>.  If any term or provision of this Agreement is found by a court of competent jurisdiction to be invalid, illegal or otherwise unenforceable, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon a determination that any term or provision is invalid, illegal or unenforceable, the Parties shall negotiate in good faith to modify this Agreement to effect the original intent of the Parties as closely as possible in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

20. <u>Amendments</u>. No amendment to or modification of this Agreement is effective unless it is in writing and signed by an authorized representative of each Party.

**WELLPATH-MVA 005923**

21. <u>Disputes</u>. Any dispute between **CCS** and **GEO** relating directly or indirectly to this Agreement or the relationships or duties contemplated by this Agreement (including the viability or enforceability of this Section) shall be resolved pursuant to good faith negotiations between the Parties. If the dispute cannot be resolved by negotiations, the Parties shall submit the dispute to mediation and complete mediation before filing any litigation. The Parties shall agree to a mutually acceptable mediator, and in the event that the Parties cannot agree upon a mediator, the Parties agree to use a mediator appointed by JAMS and to split the costs of the mediation equally.

However, notwithstanding the provisions and terms set forth above, either Party may apply to any court of competent jurisdiction solely for emergency extraordinary relief, including but not limited to temporary restraining orders and temporary or preliminary injunctions, in order to prevent or remedy injuries that will be caused, or have been caused, by the opposing Party, pending resolution of the dispute pursuant to this Section.

22. <u>Waiver</u>. No waiver by any Party of any of the provisions of this Agreement shall be effective unless explicitly set forth in writing and signed by the Party so waiving. Except as otherwise set forth in this Agreement, no failure to exercise, or delay in exercising, any right, remedy, power, or privilege arising from this Agreement shall operate or be construed as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege.

23. <u>Assignment</u>. Neither Party may assign any portion of this Agreement without the other Party's written consent, which shall not be unreasonably withheld. Any assignment without such written consent shall be null and void.

24. <u>Successors and Assigns</u>. This Agreement is binding on and inures to the benefit of the Parties and their respective successors and permitted assigns.

25. <u>Choice of Law</u>. This Agreement, including all exhibits, schedules, attachments, and appendices attached to this Agreement and thereto, and all matters arising out of or relating to this Agreement, is governed by, and is to be construed in accordance with, the laws of the State of Florida, without regard to the conflict of laws provisions thereof to the extent such principles or rules would require or permit the application of the laws of any jurisdiction other than those of the State of Florida.

26. <u>Choice of Forum</u>. Each Party irrevocably and unconditionally agrees that it will not commence any action, litigation or proceeding of any kind whatsoever against the other Party in any way arising from or relating to this Agreement, including all exhibits, schedules, attachments, and appendices attached to this Agreement, and all contemplated transactions, in any forum other than the courts of the State of Florida sitting in Palm Beach County, or any appellate court with jurisdiction over decisions of such courts. Each Party irrevocably and unconditionally submits to the exclusive jurisdiction of such courts and agrees to bring any such action, litigation, or proceeding only in the courts of the State of Florida sitting in Palm Beach County. Each Party agrees that a final judgment in any such action, litigation or proceeding is conclusive and may

**WELLPATH-MVA 005924**

be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

27. <u>Force Majeure</u>.   In case performance of any terms or provisions herein shall be delayed or prevented because of compliance with any law, decree, or order of any governmental agency or authority, either local, state, or federal, or because of Acts of God, acts of the public enemy, war, riot, public disturbances, strikes, mobilization, labor disputes, civil disorders, fire, flood, lockouts, or failures or refusals to act by government authority, or any other reason whatsoever which is not within the control of the Party whose performance is interfered with and which, by the exercise of reasonable diligence said Party is unable to prevent, the Party so suffering may at its option suspend, without liability, the performance of its obligations hereunder during the period such cause continues, and extend the term of this Agreement for the period of such suspension of the performance of duties hereunder; provided, however, the Party whose performance is delayed shall make all commercially reasonable efforts to avoid and/or mitigate the delay. In the event such delay exceeds forty-five (45) days, the other Party shall have the option to continue or immediately terminate the Agreement without further penalty.

28. <u>Counterparts</u>.   This Agreement may be executed in counterparts, each of which is deemed an original, but all of which together are deemed to be one and the same agreement. Notwithstanding anything to the contrary in Section 15, a signed copy of this Agreement delivered by facsimile, email or other means of electronic transmission is deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

29. <u>Authority</u>.   Each Party represents and warrants that the individual signing this Agreement on its behalf is fully authorized to execute this Agreement and to bind the Party to the obligations created by this Agreement.

30. <u>Entire Agreement and Amendment</u>. This Agreement, including the exhibits hereto, constitute the entire agreement between the Parties with respect to the baseline level of Services to be provided at the various Facilities, and wholly supersedes any and all prior or contemporaneous drafts, discussions, negotiations, communications, proposals or agreements, of every nature, relating to any of the issues or subjects addressed in this Agreement. In the event of a conflict between the terms of this Agreement, any Statement of Work incorporating the terms herein, and/or a Master Contract, the most stringent terms shall apply. This Agreement, including its attachments, amendments, and addenda, may not be amended except by a writing signed by **GEO** and **CCS** that references this Agreement.

*[Signature Page Follows]*

**WELLPATH-MVA 005925**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the last date below (the "Effective Date") by their respective officers thereunto duly authorized.

<u>**California CCS, PC**</u>                              <u>**The GEO Group, Inc. (and affiliates)**</u>

**By:** _____          **By:** _____

**Name:** ___Dean Rieger_____          **Name:** _____Amber D. Martin_____

**Title:** ___President_____          **Title:** ___EVP, Contract Administration___

**Date:** ___April 3, 2017_____          **Date:** _____March 24, 2017_____

**WELLPATH-MVA 005926**

# EXHIBIT N

**GEO**
The GEO Group, Inc. ®

# FACILITY ENTRANCE – EMPLOYEE WELLNESS SCREENING TOOL

**Employee Name:** _____

**Employee Department:** _____

**Screen Performed by:** _____

**Date:** _____

| | |
|---|---|
| **1. Have you had today or in the past 24 hours…………** | |
| ☐ Yes ☐ No | Fever, Chills, Cough or Difficulty Breathing |
| **2. Have you in the past 14 days…….** | |
| ☐ Yes ☐ No | a. Had close contact with **anyone diagnosed with** the COVID-19 illness? *Asymptomatic employees shall be allowed to enter the facility if they wear a face mask at all times while in the workplace for 14 days after last exposure and they practice social distancing as work duties permit.* |
| ☐ Yes ☐ No | b. Traveled to the greater New York City Metropolitan area? *This question does not apply to facilities in NY, NJ and PA.* |
| **3. Perform a temperature check _____ ˚F Method: oral / forehead (temporal) / tympanic** | |
| ***Front Desk Officer or designee will follow post order instructions** | |

**Action Taken:**

☐ **Stop entrance and notify Shift Commander and/or Institution Duty Officer, for further direction**

☐ **Entrance granted** _____

**Shift Commander and/or Institution Duty Officer:** _____

*4-10-20*

**GEO 06497**

# EXHIBIT O

# U.S. Department of Homeland Security
# Immigration and Customs Enforcement



## Section C
## Performance Work Statement
## Detention Services
**(California-Wide)**
**(October 25 2019)**

1

USA008296

# TABLE OF CONTENTS

TABLE OF CONTENTS ....................................................................................2
I. EXPLANATION OF TERMS/ACRONYMS ................................................4
II.  PERFORMANCE WORK STATEMENT ...................................................12
    A.    Objective ...........................................................................................12
    B.    Background and Mission....................................................................12
    C.    Scope of Work ...................................................................................12
    D.    Facilities ............................................................................................14
    E.    Armed Transportation Services:........................................................16
    F.    On-Call Guard Services ....................................................................19
    G.    Notice to Proceed..............................................................................20
III. GENERAL ..................................................................................................21
    A.    Notification and Public Disclosures .................................................21
    B.    Records ..............................................................................................21
    C.    Right of Refusal ................................................................................22
    D.    Hold Harmless...................................................................................22
    E.    Quality Control..................................................................................22
    F.    Quality Assurance Surveillance Plan (QASP) ..................................23
    G.    Contractor's Failure to Perform Required Services ..........................24
    H.    Inspection by Regulatory Agencies...................................................24
    I.    Performance Evaluation Meetings ....................................................24
IV. PERSONNEL AND STAFFING .................................................................24
    A.    General ..............................................................................................25
    B.    Preliminary Fitness Determination....................................................25
    C.    Background Investigations .................................................................26
    D.    Transfers from Other DHS Contracts:...............................................28
    E.    Continued Eligibility.........................................................................28
    F.    Required Reports ..............................................................................28
    G.    Security Management ........................................................................29
    H.    Information Technology Security Clearance .....................................30
    I.    Information Technology Security Training and Oversite ...................30
    J.    Facility Staffing Plan, Floor Plan and Key Personnel......................31
    K.    Employee Health ..............................................................................33
    L.    Contractor's Employee Rules............................................................35
    M.    Minimum Standards of Employee Conduct ......................................35
    N.    Removal from Duty...........................................................................36
    O.    Tour of Duty Restrictions .................................................................37
    P.    Dual Positions ...................................................................................38
    Q.    Post Relief .........................................................................................38
    R.    Personnel Files ..................................................................................38
    S.    Uniform Requirements ......................................................................38
    T.    Permits and Licenses ........................................................................39
    U.    Encroachment....................................................................................39
    V.    Work Schedules.................................................................................40
    W.    Training .............................................................................................41
V.  DETENTION SERVICES ...........................................................................45
    A.    Detention Site Standards ...................................................................45

2

USA008297

B.    Language Access ........................................................................................................45
C.    Health and Medical Care Policies ..............................................................................46
D.    Medical Services .........................................................................................................46
E.    Detainee Voluntary Work Program (if applicable) ....................................................57
VI. REQUIRED ADMINISTRATION AND MANAGEMENT SERVICES .................................57
A.    Manage the Receiving and Discharge of Detainees ...................................................57
B.    Manage and Account for Detainee Assets (Funds, Property) ....................................59
C.    Securely Operate the Facility .....................................................................................59
D.    Establish and Maintain a Program for the Prevention of Sexual Abuse/Assault ......59
E.    Collect and Disseminate Intelligence Information .....................................................60
F.    ICE Notifications ........................................................................................................60
G.    Maintain Institutional Emergency Readiness .............................................................60
H.    Manage Computer Equipment and Services in Accordance with all Operational Security
Requirements ...............................................................................................................61
I.    Manage and Maintain a Commissary ..........................................................................61
J.    Manage and Maintain a Detainee Telephone System (DTS) ......................................62
VII.   FACILITY SECURITY AND CONTROL ...........................................................................63
A.    Security and Control (General) ...................................................................................63
B.    Detainee Rights ...........................................................................................................63
C.    Unauthorized Access ..................................................................................................64
D.    Direct Supervision of Detainees .................................................................................64
E.    Maintain a Video Surveillance Program .....................................................................64
F.    Log Books ...................................................................................................................64
G.    Reports ........................................................................................................................65
H.    Detainee Counts ..........................................................................................................65
I.    Daily Inspections .........................................................................................................65
J.    Deviation from Prescribed Schedule Assignments .....................................................66
K.    Use of Force and Restraints ........................................................................................66
L.    Escapes ........................................................................................................................66
M.    Evacuation Plan ..........................................................................................................67
N.    Sanitation and Hygienic Living Conditions ...............................................................67
O.    Physical Plant ..............................................................................................................67
P.    Environmental Policy Procedures: ..............................................................................68
VIII. FOOD SERVICE ...................................................................................................................70
IX. PROPERTY ACCOUNTABILITY .........................................................................................70
A.    General ........................................................................................................................70
B.    Use of Government Wireless Communication Devices ..............................................71
X. FIREARMS / BODY ARMOR .................................................................................................71
A.    Firearms Requirements ...............................................................................................71
B.    Body Armor Requirements .........................................................................................73
XI. Transition ...............................................................................................................................73
A.    Transition-In ...............................................................................................................73
B.    Transition-Out .............................................................................................................74

3

USA008298

## I.    EXPLANATION OF TERMS/ACRONYMS

1. <u>ADMINISTRATIVE SEGREGATION</u>:  A form of separation from the general population used when the continued presence of the detainee in the general population would pose a threat to life, property, self, staff, or other detainees or to the security or orderly running of the facility. This housing status also includes detainees who require protective custody, those who cannot be placed in the local population because they are in route to another facility (holdovers), those who are awaiting a hearing before a disciplinary panel, and those requiring separation for medical reasons.

2. <u>ADULT LOCAL DETENTION FACILITY (ALDF)</u>:  A facility which detains persons over the age of 18.

3. <u>ALIEN</u>:  Any person who is not a citizen or national of the United States.

4. <u>AMERICAN CORRECTIONAL ASSOCIATION (ACA)</u>:  The American Correctional Association is the oldest and largest international correctional association in the world. ACA serves all disciplines within the corrections profession and is dedicated to excellence in every aspect of the field.

5. <u>BED-DAY</u>:  The total billable cost to the Government to maintain and house one detainee for one day. Bed-day means a detainee that is referred to a contractor for detention. The bed days are calculated by subtracting the date booked into custody from the date released from custody. The contractor may charge for day of arrival, but not day of departure.

6. <u>BED-DAY RATE</u>:  The rate charged for each individual detainee per day. Bed-day rate is an all-inclusive burdened rate including direct costs, indirect costs, overhead, and profit necessary to provide the detention, and food service requirements as described in the PWS.

7. <u>BOOKING</u>:  A procedure for the admission of an ICE detainee, which includes searching, fingerprinting, photographing, medical screening, and collecting personal history data. Booking also includes the inventory and storage of the individual's accompanying personal property. The Contractor may be responsible for booking the detainee into ICE systems upon receiving the detainee.

8. <u>BUREAU OF PRISONS (BOP)</u>:  The U.S. Federal Bureau of Prisons protects society by confining offenders in the controlled environments of prisons and community-based facilities that are safe, humane, cost-efficient, and appropriately secure, and that provide work and other self-improvement opportunities to assist offenders in becoming law-abiding citizens.

9. <u>CATEGORICAL EXCLUSION (CATEX)</u>: A determination that a particular activity that does not need to undergo detailed environmental analysis in an Environmental Assessment (EA) or Environmental Impact Statement (EIS) because it has been found to normally not have the potential, individually or cumulatively, to have a significant effect on the human environment.

10. <u>CLASSIFICATION</u>:  A process for determining the needs and requirements of aliens for whom detention has been ordered and for assigning them to housing units and programs according to their needs, security risk level, and existing resources of the facility.

11. <u>CONTRABAND</u>:  Items that pose a threat to the security of people or property. A contraband item fits into either the category of hard or soft contraband as defined below:

4

USA008299

a) Hard Contraband: Any item that is inherently dangerous as a weapon or tool of violence, e.g., knife, explosives, "zipgun," brass knuckles. Because hard contraband presents an immediate physical threat in or to the facility, a detainee found in possession of hard contraband could face disciplinary action or criminal prosecution.

b) Soft Contraband: Any item that presents a nuisance, which does not pose a direct and immediate threat to an individual's safety. None-the-less, soft contraband has the potential to create dangerous or unsanitary conditions in the facility, such as excess papers that create a fire hazard, food items that are spoiled or retained beyond the point of safe consumption, etc.

12. <u>CONTRACTING OFFICER (CO)</u>:  An employee of the Government responsible for the complete conduct and integrity of the contracting process, including administration after award. The only individual authorized to issue changes to this contract.

13. <u>CONTRACTING OFFICER'S REPRESENTATIVE (COR)</u>:  Employees of the Government responsible for monitoring all technical aspects and assisting in administering the contract.

14. <u>CONTRACTOR</u>:  The entity, which provides the services, described in this Performance Work Statement (PWS).

15. <u>CONTRACTOR EMPLOYEE</u>:  An employee of a private Contractor hired to perform a variety of detailed services under this contract.

16. <u>CONTROL ROOM</u>:  Integrates all internal and external security communications networks within a secure room. Activities conducted within the control room have a critical impact on the institution's orderly and secure operation.

17. <u>CREDENTIALS</u>:  Document providing primary source verification including education, training, licensure, experience, board certification, and expertise of an employee.

18. <u>DEPARTMENT OF HOMELAND SECURITY (DHS)</u>:  A department of the United States Government, which includes U.S. Immigration and Customs Enforcement (ICE).

19. <u>DEPARTMENT OF JUSTICE (DOJ)</u>:  A department of the United States Government, which includes the Executive Office of Immigration Review (EOIR), the Federal Bureau of Investigation (FBI), the Federal Bureau of Prisons (BOP), and the U.S. Marshals Service (USMS).

20. <u>DESIGNATED SERVICE OFFICIAL</u>:  An employee of U.S. Immigration and Customs Enforcement designated in writing by the ICE Field Office Director (FOD) to represent ICE on matters pertaining to the operation of the facility.

21. <u>DETAINEE</u>:  Any person confined under the auspices and the authority of any Federal agency. Many of those being detained may have substantial and varied criminal histories.

22. <u>DETAINEE RECORDS</u>:  Information concerning the individual's personal, criminal and medical history, behavior, and activities while in custody, including, but not limited to:

a) Detainee, Personal Property
b) Receipts, Visitors List, Photographs
c) Fingerprints, Disciplinary Infractions
d) Actions Taken, Grievance Reports, Medical
e) Records, Work Assignments, Program Participation
f) Miscellaneous Correspondence, etc.

23. <u>DETENTION OFFICERS</u>:  Contractor's uniformed staff members responsible for the security, care, transportation, and supervision of detainees during all phases of activity in

USA008300

a detention facility. The officer is also responsible for the safety and security of the facility.

24. <u>DETENTION STANDARDS COMPLIANCE UNIT (DSCU)</u>:  The purpose of the DSCU is to develop and prescribe policies, standards, and procedures for ICE detention operations and to ensure detention facilities are operated in a safe, secure, and humane condition for both detainees and staff.

25. <u>DIRECT SUPERVISION</u>:  A method of detainee management that ensures continuing direct contact between detainees and staff by posting an officer(s) inside each housing unit. Officers in general housing units are not separated from detainees by a physical barrier. Officers provide frequent, non-scheduled observation of and personal interaction with detainees.

26. <u>DIRECTIVE</u>:  A document issued by the U.S. Government and signed by the President, Departmental Secretary, or an Assistant Secretary that establishes policy, delegates' authority, and/or assigns responsibilities.

27. <u>DISCIPLINARY SEGREGATION</u>:  A unit housing detainees who commit serious rule violations.

28. <u>EMERGENCY</u>:  Any significant disruption of normal facility procedure, policy, or activity caused by riot, strike, escape, fire, medical exigency, natural disaster, or other serious incident.

29. <u>EMERGENCY CARE</u>:  Care for an acute illness or unexpected serious health care need that cannot be deferred until the next scheduled sick call.

30. <u>ENFORCEMENT AND REMOVAL OPERATIONS (ERO)</u>:  A division within ICE, whose mission is the planning, management, and direction of broad programs relating to the supervision, detention, and removal of detainees who are in the United States illegally.

31. <u>ENTRY ON DUTY (EOD)</u>:  The first day the employee begins performance at a designated duty station on this contract.

32. <u>ENVIRONMENTAL ASSESSMENT (EA)</u>:  A concise public document for which a Federal agency is responsible that serves to: briefly provide sufficient evidence and analysis for determining whether to prepare an EIS or a Finding of No Significant Impact (FONSI), aid an agency's compliance with the National Environmental Policy Act (NEPA) when no EIS is necessary, and facilitate preparation of an EIS when one is necessary.

33. <u>ENVIRONMENTAL IMPACT EVALUATION:</u> The process of determining the level of significance of a potential impact on the human environment.  It includes all necessary information needed to analyze the potential for environmental impact of a proposed action, assign a value to the level of impact (e.g., minor, moderate, or major), consider mitigation, and determine the level of significance; whether significant or not.  An environmental impact evaluation results in either the application of a CATEX, documentation in the form of an EA and FONSI or a final EIS and Record of Decision (ROD).

34. <u>ENVIRONMENTAL IMPACT STATEMENT (EIS)</u>:  A detailed written statement as required by section 102(2)(C) of the NEPA.  It is a comprehensive document that provides full and fair discussion of significant environmental impacts caused by the proposed action(s).  It also states the reasonable alternatives, and which of those would

USA008301

avoid or minimize the adverse impact(s) or enhance the quality of the human environment.

35. EXECUTIVE OFFICE OF IMMIGRATION REVIEW (EOIR):  An agency of DOJ. The primary mission of the Executive Office for Immigration Review (EOIR) is to adjudicate immigration cases by fairly, expeditiously, and uniformly interpreting and administering the Nation's immigration laws. Under delegated authority from the Attorney General, EOIR conducts immigration court proceedings, appellate reviews, and administrative hearings.

36. EXTRAORDINARY CIRCUMSTANCES: When evaluating whether or not to apply a CATEX to a proposed action, these are circumstances associated with the proposed action that might give rise to significant environmental effects requiring further analysis and documentation in an EA or EIS.

37. FACILITY:  The physical plant and grounds in which the Contractor's services are operated.

38. FACILITY ADMINISTRATOR:  The official, regardless of local title (e.g., jail administrator, Warden, Facility Director, superintendent), who has the ultimate responsibility for managing and operating the contracted detention facility. The qualifications for the holder of this office shall be consistent with ACA standards.

39. FINDING OF NO SIGNIFICANT IMPACT (FONSI): A document by a Federal agency briefly presenting the reasons why an action, not otherwise excluded, will not have a significant effect on the human environment, and for which an EIS therefore will not be prepared.

40. FIRST AID:  Health care for a condition that requires immediate assistance from an individual trained in first aid care and the use of the facility's first aid kits.

41. FLIGHT OPERATIONS UNIT (FOU):  The FOU is the principal mass air transportation and manages government and contract flights.

42. GOVERNMENT:  Refers to the United States Government.

43. GRIEVANCE:  A written complaint filed by a detainee with the facility administrator concerning personal health/welfare or the operations and services of the facility.

44. HEALTH AUTHORITY:  The physician, health administrator, or agency on-site that is responsible for health care services pursuant to a written agreement, contract, or job description.

45. HEALTH CARE:  The action taken, preventive and therapeutic. To provide for the physical and mental well-being of the detainee population. Health care may include medical services, dental services, mental health services, nursing, personal hygiene, dietary services, and environmental conditions at the facility.

46. HEALTH CARE PERSONNEL:  Duly licensed individuals whose primary duties are to provide health services to detainees in keeping with their respective levels of health care training or experience.

47. HEALTH UNIT (HU):  The physical area in the facility and organizational unit set-aside for routine health care and sick call. The HU is the designated part of the facility for the delivery of care to detainees on an ambulatory or observation basis.

48. ICE Designee- ICE personnel designated by the COR.

49. ICE HEALTH SERVICES CORP (IHSC):  The ICE Health Service Corps serves as the medical authority for ICE on a wide range of medical issues, including the agency's comprehensive detainee health care program.

7

USA008302

50. ICE Vehicle Control Officer – ICE personnel responsible for fleet management of government vehicles.

51. IMMEDIATE RELATIVES:  Spouses, children (including stepchildren and adopted children) and their spouses, parents (including stepparents), brothers and sisters (including stepbrothers and sisters and half-brothers and sisters) and their spouses.

52. IMMIGRATION AND CUSTOMS ENFORCEMENT (ICE):  A law enforcement agency within the U.S. Department of Homeland Security.

53. INCIDENT REPORT:  A written document reporting an event, such as minor disturbances, officer misconduct, any detainee rule infraction, etc.

54. JUVENILE DETAINEE:  Any detainee under the age of eighteen (18) years.

55. KEY PERSONNEL:  Any one of the following positions employed by the Contractor; Warden or Facility Director, Assistant Warden or Assistant Facility Director, Supervisory Detention Officer, Training Officers, Quality Assurance Manager.

56. LIFE SAFETY CODE:  A manual published by The National Fire Protection Association specifying minimum standards for fire safety necessary in the public interest.

57. LOG BOOK:  The official record of post operations and inspections.

58. MAN-HOUR:  Man-hour means productive hours when the required services are performed. Only productive hours can be billed and invoiced.

59. MEDICAL RECORDS:  Separate records of medical examinations and diagnosis maintained by the responsible physician or nurse. The following information from these records shall be transferred to the detainee record: date and time of all medical examinations; and, copies of standing or direct medical orders from the physician to the facility staff.

60. MEDICAL SCREENING:  A system of structured observation and/or initial health assessment to identify newly-arrived detainees who could pose a health or safety threat to themselves or others.

61. MILEAGE RATE:  A fully burdened rate inclusive of the mileage rate in accordance with General Service Administration Federal Travel Regulation, vehicle equipment, maintenance, and fuel costs.

62. NEPA-COMPLIANCE DOCUMENT: A document by a Federal agency that records how the agency meets the requirements of NEPA through the evaluation of the proposed action. This document could be a CATEX, EA and FONSI, or EIS and ROD.

63. NON-CONTACT VISITATION:  Visitation that restricts detainees from having physical contact with visitors using physical barriers such as screens and/or glass. Voice communications between the parties are typically accomplished with telephones or speakers.

64. NON-DEADLY FORCE:  The force a person uses with the purpose of not causing or which would not create a substantial risk of causing death or serious bodily harm.

65. NOTICE TO PROCEED (NTP):  Written notification from the Government to the Contractor stating the date that the Contractor may begin work, subject to the conditions of the contract.

66. OFFICE OF PROFESSIONAL RESPONSIBILITY, PERSONNEL SECURITY UNIT (OPR-PSU):  The ICE office which implements a component-wide personnel security program.

67. ON CALL/REMOTE CUSTODY OFFICER POST:  Posts operated as requested by the COR, or other ICE designee, and including, but not limited to, escorting and custody of

8

USA008303

detainees for hearings, ICE interviews, medical watches, and any other location requested by the COR.

68. <u>PAT DOWN SEARCH</u>:  A quick patting of the detainee's outer clothing to determine the presence of contraband.

69. <u>PERFORMANCE WORK STATEMENT (PWS)</u>:  That portion of the contract, which describes the services to be performed under the contract.

70. <u>PHASE I ENVIRONMENTAL SITE ASSESSMENT (PHASE I ESA)</u>:  An evaluation and report prepared to identify potential or existing environmental contamination liabilities associated with real property. Phase I ESAs must be carried out in accordance with the standard promulgated in ASTM 1527-13.

71. <u>POLICY</u>:  A definite written course or method of action, which guides and determines present and future decisions and actions.

72. <u>POST ORDERS</u>:  Written orders that specify the duties of each position, hour-by-hour, and the procedures the post officer will follow in carrying out those duties.

73. <u>PREVENTIVE MAINTENANCE</u>:  A system designed to enhance the longevity and/or usefulness of buildings and equipment in accordance with a planned schedule.

74. <u>PROCEDURE</u>:  The detailed and sequential actions that must be executed to ensure that a policy is implemented. It is the method of performing an operation or a manner of proceeding on a course of action. It differs from a policy in that it directs action required to perform a specific task within the guidelines of that policy.

75. <u>PRODUCTIVE HOURS</u>:  These are hours when the required services are performed and can be billed.

76. <u>PROJECT MANAGER</u>:  Contractor employee responsible for on-site supervision of all Contractor employees, with the authority to act on behalf of the Contractor. The Project Manager cannot simultaneously serve in the role of manager and Detention Officer or Supervisory Detention Officer.

77. <u>PROPERTY</u>:  Refers to personal belongings of a detainee.

78. <u>PROPOSAL</u>:  The written plan submitted by the Contractor for consideration by ICE in response to the Request for Proposal (RFP).

79. <u>QUALIFIED HEALTH PROFESSIONAL</u>:  Physicians, dentists, and other professional and technical workers who by state law engage in activities that support, complement, or supplement the functions of physicians and/or dentists who are licensed, registered, or certified, as appropriate to their qualifications, to practice.

80. <u>QUALITY ASSURANCE</u>:  The actions taken by the Government to assure requirements of the PWS are met.

81. <u>QUALITY ASSURANCE SURVEILLANCE PLAN (QASP)</u>:  A Government-produced document that is based on the premise that the Contractor, and not the Government, is responsible for the day-to-day operation of the facility and all the management and quality control actions required to meet the terms of the contract. The role of the Government in quality assurance is to ensure performance standards are achieved and maintained. The QASP validates that the Contractor is complying with ERO-mandated quality standards in operating, maintaining, and repairing detention facilities.

82. <u>QUALITY CONTROL (QC)</u>:  The Contractor's inspection system which covers all the services to be performed under the contract. The actions that a Contractor takes to control the production of services so that they meet the requirements stated in the contract.

USA008304

83. QUALITY CONTROL PLAN (QCP):  A Contractor-produced document that addresses critical operational performance standards for services provided.

84. RECORD OF DECISION (ROD):  A document that explains an agency's decision, describes the alternative the agency considered, and discusses the agency's plans for mitigation and monitoring, if necessary.

85. RELIEF FACTOR:  Indicates how many persons it takes to fill a single job position for a single shift, taking into account vacation, sick leave, training days, and other types of leave.

86. RESPONSIBLE PHYSICIAN:  A person licensed to practice medicine with whom the facility enters into a contractual agreement to plan for and provide health care services to the detainee population of the facility.

87. RESTRAINT EQUIPMENT:  This includes but is not limited to:  handcuffs, belly chains, leg irons, strait-jackets, flexi cuffs, soft (leather) cuffs, and leg weights.

88. SAFETY EQUIPMENT:  This includes but is not limited to firefighting equipment, i.e., chemical extinguisher, hoses, nozzles, water supplies, alarm systems, portable breathing devices, gas masks, fans, first aid kits, stretchers, and emergency alarms.

89. SALLYPORT:  An enclosure situated either in the perimeter wall or fence to the facility or within the interior of the facility, containing gates or doors at both ends, only one of which opens at a time. This method of entry and exit helps to ensure that there shall be no breach in the perimeter or interior security of the facility.

90. SECURITY DEVICES:  Locks, gates, doors, bars, fences, screens, hardened ceilings, floors, walls, and barriers used to confine and control detainees. In addition, electronic monitoring equipment, security alarm systems, security light units, auxiliary power supply, and other equipment used to maintain facility security.

91. SECURITY PERIMETER:  The outer portions of a facility, which provide for secure confinement of detainees.

92. SECURITY RISK – HIGH, MEDIUM, LOW:

**High Risk Level** – (Level 3) Detainees exhibit behavioral problems, or manifest a pattern of such behavior, or have a history of violent and/or criminal activity. These detainees may not be co-mingled with low custody detainees.

**Medium High Risk Level** – (Level 2) Detainees exhibit minor behavioral problems or have a history of nonviolent criminal behavior. These detainees have a history of violent or assaultive charges, convictions, institutional misconduct, or those with gang affiliation.

**Medium Low Risk Level –** (1.5) Detainees with no history of violent or assaultive charges or convictions, no institutional misconduct, and no gang affiliation.

**Low Risk Level** – (Level 1) Detainees exhibit no behavioral problems and have no history of violent criminal behavior. This level may not include any detainee with a felony conviction that included an act of physical violence. Low risk level detainees may not be co-mingled with high custody detainees.

93. SENSITIVE INFORMATION:  Any information which could affect the national interest, law enforcement activities, the conduct of federal programs, or the privacy to which individuals are entitled under Title 5, U.S. Code, Section 552a. All Detainee records are considered sensitive information.

USA008305

94. SIGNIFICANT EVENT NOTIFICATION REPORT (SEN): A written document reporting a special event (e.g., the use of force, use of chemical agents, discharge of firearms).

95. SPECIAL MANAGEMENT UNIT (SMU): A housing unit for detainees in administrative or disciplinary segregation.

96. STANDING MEDICAL ORDERS: Written orders, by a physician, to medical personnel for the definitive treatment of identified minor, self-limiting conditions and for on-site treatment of emergency conditions.

97. STRIP SEARCH: An examination of a detainee's naked body for weapons, contraband, and physical abnormalities. This also includes a thorough search of all of the individual's clothing while not being worn.

98. SUITABILITY CHECK: Security clearance process for Contractor and all Contractor Employees to determine favorable suitability to work on a Government contract.

99. TOUR OF DUTY: No more than 12 hours in any 24-hour period with a minimum of eight hours off between shifts, except as directed by state or local law.

100. TRAINING: An organized, planned, and evaluated activity designed to achieve specific learning objectives. Training may occur on site, at an academy of training center, at an institution of higher learning, through contract service, at professional meetings or through closely supervised on-the-job training. Meetings of professional associations are considered training when there is clear evidence of the above elements. All trainers must be certified, and certification shall be approved by the COR.

101. TRANSPORTATION COSTS: The cost of all materials, equipment, and labor necessary to respond to requests by designated officials for secure movement of detainees from place to place necessary for processing, hearings, interviews, etc.

102. TRAVEL COST: Cost inclusive of lodging and meals and incidental expenses (MI&E) for Transportation Officers exceeding the standard working hours. Contractor tour of duties will comply with all current federal, state, and local laws. This includes, but is not limited to, the Federal Motor Carrier Safety Administration, CFR 395.5 - Maximum driving time for passenger-carrying vehicles. Cost is based on actual charges per occurrence, not to exceed the allowable Federal Travel Regulation rates/costs in effect on the dates of travel.

103. WEAPONS: This includes but is not limited to firearms, ammunition, knives, slappers, billy clubs, electronic defense modules, chemical weapons (mace), and nightsticks.

11

USA008306

## II.    PERFORMANCE WORK STATEMENT

### A.  Objective

The objective of this contract is to obtain comprehensive detention services as detailed below for various levels as described within this document.

### B.  Background and Mission

The United States Department of Homeland Security (DHS), U.S. Immigration and Customs Enforcement (ICE) is responsible for the detention, health, welfare, transportation, and deportation of detainees in removal proceedings, and those subject to a final order of removal from the United States.

The mission of ICE Enforcement and Removal Operations (ERO) is to identify, arrest, and remove aliens, who present a danger to national security or are a risk to public safety, as well as those who enter the United States illegally or otherwise undermine the integrity of immigration laws and border control efforts.

In implementing its mission, ERO is responsible for carrying out all orders for the securing and departure activities of detainees who are designated in removal proceedings and for arranging for the detention of detainees when such becomes necessary and prescribed by law.

### C.  Scope of Work

A Contractor-owned/Contractor-operated detention facility to house detainees on a 24 hour per-day, seven day per week, 365 day per-year basis.

The detention center shall provide safe and secure conditions of confinement based on the individual characteristics of a diverse population, including: threat to the community, risk of flight, type and status of immigration proceeding, community ties, medical and mental health issues. The detention center shall provide easy access to legal services; abundant natural light throughout the facility; ample indoor and outdoor recreation that allows for vigorous aerobic exercise with extended hours of availability - a minimum of four hours per day of outdoor recreation; private showers and restrooms (where practicable); cafeteria style meal service; non-institutional detainee clothing; contact visitation, including special arrangements for visiting families, with extended hours including nights and weekends; private areas for attorney-client visits, with video teleconferencing capabilities; noise control; enhanced, but controlled freedom of movement (although the manner and degree of implementation may vary based on security levels); enhanced law library and legal resources; and enhanced programming, including religious services and social programs and dedicated space for religious services.

Detention services shall be preformed in accordance with optimal level of the most current version of the ICE Performance-Based National Detention Standards (PBNDS) 2011. The current version is PBNDS 2011 revised in 2016 available at www.ice.gov/detention-

12

USA008307

standards/2011. The contractor shall also abide by the March 7, 2014, DHS regulation under the Prison Rape Elimination Act of 2003 (PREA; P.L. 108-79), *Standards to Prevent, Detect, and Respond to Sexual Abuse and Assault in Confinement Facilities* (DHS PREA Standards) available at https://www.gpo.gov/fdsys/pkg/FR-2014-03-07/pdf/2014-04675.pdf.

The Contractor shall be responsible for obtaining and maintaining American Correctional Association (ACA) accreditation under the most current version of the Adult Local Detention Facilities (ALDF) Standards to include any supplement. Conformance with the ACA ALDF Standards is required on the first day of contract performance and accreditation shall be obtained within one year of contract award.

The Contractor shall be responsible for obtaining and maintaining accreditation under the National Commission on Correctional Health Care (NCCHC) within one year of contract performance.

In cases where there is a conflict in standards, the most stringent shall apply. If the Contractor is unable to determine which standard is more stringent, the COR shall determine the appropriate standard.

The COR does not have the authority to modify the stated terms of the contract or approve any action that would result in additional charges to the Government beyond what is stated in the CLIN schedule. The CO shall make all modifications in writing.

The Contractor shall furnish all personnel, management, equipment, supplies, training, certification, accreditation, and services necessary for performance of all aspects of the contract. Unless explicitly stated otherwise, the Contractor is responsible for all costs associated with and incurred as part of providing the services outlined in this contract.

DHS, ICE, federal entities, and third-party inspectors will conduct periodic and unscheduled audits and inspections of contract performance and the facility to ensure contract compliance. All inspectors shall have full access to the facility at all times and in all areas of performance. The Contractor shall provide full and complete cooperation for any request or investigation conducted by the Government.

Detainees are classified as High (Level 3), Medium High (Level 2), Medium Low (Level 1.5) or Low Risk (Level 1). Upon discovery that a detainee may be a juvenile, the Contractor shall immediately notify the COR and/or ICE-designee and follow the instructions of the COR or ICE-designee.

The Contractor shall not add any non-ICE detainee population to the facility from any other entity without the expressed prior written approval of the COR and/or ICE-designee.

The Contractor agrees to accept and provide for the secure custody, care, and safekeeping of detainees in accordance with the State and local laws, standards, policies, procedures for firearms requirements, or court orders applicable to the operations of the facility.

13

USA008308

D. **Facilities**

1. **Detention Space**

   The facility shall meet at a minimum all ACA and PBNDS 2011 revised 2016 requirements. Though not binding on existing detention space, the Contractor can also review the ICE Contract Detention Facility (CDF) Design Standards available as Addendum A.

   The Contractor is encouraged to go beyond any minimum requirements to provide optimal detention services.

   <u>Business Permits and Licenses</u>

   The Contractor shall obtain all required permits and licenses by the date of contract award. The Contractor must (depending on the state's requirements) be licensed as a qualified security service company in accordance with the requirements of the district, municipality, county, and state in which the ICE work site is located. Throughout the term of this contract, the Contractor shall maintain current permits/business licenses and make copies available for Government inspection. The Contractor shall comply with all applicable federal, state, and local laws and all applicable Occupational Safety and Health Administration (OSHA) standards.

   ICE will review and approve all design documents and maintain approval of final inspection of the facility before occupancy.

   *See PWS Addendums for site-specific requirements.*

2. **USCIS Space**

   *See PWS Addendums for specific requirements.*

3. **Executive Office for Immigration Review (EOIR) Space (in accordance with Addendum B – ICE EOIR Design Standards).**

   *See PWS Addendums for specific requirements.*

4. **ICE Administrative Space**

   *See PWS Addendums for specific requirements.*

   The Contractor is required to provide ICE Office and Support Space at or immediately adjacent to the Contractor provided detention facility.

USA008309

All office, administrative, support and multiple use space shall be complete with appropriate electrical, communication, and phone/fax/VTC connections. VTC connections shall use a PRI (T1) connection at a minimum.

All furniture and case goods shall be furnished by the Contractor.

*See PWS Addendums for specific requirements.*

The ICE Administrative space shall be clean, free from mold, climate controlled, with an HVAC thermostat located outside a private office (within open space) controlling no more than 2,000 square feet. The ICE Administrative space shall be separate from, but accessible to, detainee housing units and the centralized visiting area. The ICE Administrative space shall also be secure and inaccessible to Contractor staff, except when specific permission is granted by on-site ICE staff. The Contractor shall be responsible for all maintenance, security, and janitorial costs associated with the ICE Administrative space. All janitorial and maintenance within the ICE administrative and support space is the responsibility of the contractor. All ICE administrative and support space shall be cleaned daily (between the hours of 8 a.m. and 4 p.m.) by Government cleared contractor janitorial staff. Contractor is responsible for coordinating clearance activities for their janitorial staff with the Government and for costs associated with clearance.

a) Additional Requirements for ICE Administrative Office Space

   1) Furniture

      All furniture and case goods shall be furnished by the Contractor. Any systems furniture, such as cubicles, shall be electrically hardwired to the building electrical support by the contractor, and have bottom raceways for data and telecommunications. The systems furniture must have knockouts within the bottoms raceways as well as numerous grommets within the work surface. The system furniture must have some universal requirements for a workspace to include; a desk, chair, desk storage, overhead storage (with locking flipper doors) and lighting capacity under the overhead storage.

      Cubicles should be a standard size of a minimum of 190 usable square feet, unless otherwise authorized by the COR.

      *See PWS Addendums for specific requirements.*

   2) ICE Information Technology (IT) Equipment

      ICE will provide and install IT equipment in office spaces for ICE personnel only, to include CPUs, screens, printers, and fax machines.

      *See PWS Addendums for specific requirements*

USA008310

3) Communication and VTC

The Contractor is responsible for providing phone/fax/Internet/VTC services through their local provider and responsible for the costs for such services.

**5. Parking Spaces at the Contracted Detention Facility:**

The Contractor shall provide hard surface (concrete) parking for all ICE employees and visitors at no additional cost. The Contractor must provide ICE Employee parking in a secure surface (concrete) striped parking lot. The ICE employee parking shall be well lit and shall drain well. The ICE employee parking shall be striped and have reserved spaces painted as directed by the COR. The ICE employee parking shall have an automated entrance and exit gate, operated by the contractor provided building access badge system.

The Contractor shall provide an on-site hard surface (concrete) parking lot for visitors. Street parking for ICE visitors is not acceptable.

*See PWS Addendums for specific requirements*

**E. Armed Transportation Services:**

1. The Contractor shall provide all such ground transportation services as may be required to transport detainees securely, in a timely manner, to locations as directed by the COR or designated ICE official, including the transportation of detainees to various appointments. Regular transportation to key sites shall be provided as necessary and additional transportation requirements as requested by the COR or ICE designee. When officers are not providing transportation services, the Contactor shall assign the employees to supplement security duties within the facility. However, the primary function of these officers is transportation. Duties performed by these officers shall not incur any additional expenses to the Government.

   The Contractor shall assign, at a minimum, two-person teams of transportation officers whenever necessary throughout a 24-hour period, 7 days a week, including weekends and holidays.   When transporting detainees of the opposite gender, assigned transportation staff shall call in their time of departure and odometer reading; and then do so again upon arrival, to account for their time. Except in emergency situations, a single transportation staff member may not transport a single detainee of the opposite gender. Further, if there is an expectation that a pat down will occur during transport, an assigned transportation staff member of the same gender as the detainee(s) must be present.

2. The Contractor shall furnish suitable vehicles in good condition, approved by the Government and in-line with the PBNDS 2011 requirements, to safely provide the required transportation services per facility as listed below. The Contractor shall comply with all federal and state laws with regard to inspections, licensing, and registration for

16

USA008311

all vehicles used for transportation. The Contractor shall provide parking spaces for the required vehicles at the facility.

Nothing in this contract shall restrict the Contractor from acquiring additional vehicles as deemed necessary by the Contractor at no cost to the Government. The Contractor shall not allow employees to use their privately-owned vehicles to transport detainees. The Contractor shall furnish vehicles equipped with interior security features in accordance with PBNDS 2011. The Contractor shall provide the interior security specification of the vehicles to ICE for review and approval prior to installation. Vehicles furnished by the Contractor shall be equipped with interior security features such as, but not limited to: door lock controls, window locks, a wire cage with acrylic panel between the driver seat and the rear passenger seats and provide physical separation of detainees from Detention Officers.

*See PWS Addendums for specific requirements.*

3.  If ICE authorizes the Contractor to use Government furnished vehicles, the following requirements apply to this agreement.

    a)  The Government will provide the Contractor with Government Vehicles and Government Fleet Cards (for the purchase of fuel) for the purpose of transporting detainees to and from ICE designated facilities (see Route List or Analysis specific to each Requirement), or alternative transportation sites, in support of ERO transportation needs under this Agreement. The vehicles assigned for this purpose will remain the property of the Federal Government, and all costs associated with the operation and use of the vehicles, such as, but not limited to, vehicle maintenance and fuel, will be covered through the Government's Fleet Management Program.

    b)  The Contractor agrees to be responsible for reimbursement to ICE for any damages sustained by the vehicles as a result of any act or omission on the part of the Contractor, its employees and or persons acting on behalf of the Contractor. The Contractor shall be responsible to promptly report any accidents or damage to the Government Vehicles in accordance with the ICE Management Directives listed below and any other ICE policies that pertain to reporting such damage. The Contractor agrees to fully cooperate and assist ICE in making any claims against a third party at fault for causing the property damage to the Government Vehicles.

    c)  In addition, the Contractor agrees to hold harmless, indemnify, and assume financial responsibility for any claims or litigations filed by persons sustaining personal injuries or property damage for incidents or accidents caused by the negligent acts or omissions of the Contractor, agents, or other persons acting on behalf of the Contractor. The Contractor agrees to fully cooperate and assist ICE in the defense of any claims made against ICE, and in the event of a settlement or judgment entered against ICE for the negligent acts or omissions of the Contractor employees or agents, the Contractor agrees to reimburse ICE for said settlement or adverse judgment.

USA008312

d) In order for ICE to maintain accurate fleet records of the transportation services, the Contractor officers utilizing the vehicles shall complete specific documentation that will be provided by ICE, to record the times of vehicle usage for proper hourly guard reimbursement, and to record the inspection of the vehicles for damage each time the vehicles are used.

e) The COR or ICE Vehicle Control Officer will provide forms to the Contractor to request and authorize routine maintenance of vehicles.

f) The Contractor shall be responsible for any costs or expenses associated with the return of the vehicles, to include, towing charges, title replacement fees, or licensing expenses made necessary by the loss of any paperwork associated with the vehicles.

4. The Contractor personnel provided for transportation services shall be of the same qualifications, receive the same training, complete the same security clearances, and wear the same uniforms as those Contractor personnel provided in the other areas of this contract. Transportation officers shall have the required state licenses for commercial drivers with the proper endorsement limited to vehicles with Automatic Transmission and meet the federal and state licensing requirements.

5. All transportation Detention Officers shall be armed in the performance of these duties. The Contractor shall supply and maintain restraining equipment, per PBNDS 2011 Standard 1.3 "Transportation (by Land)." ICE personnel reserve the right to approve such restraining equipment, as well as the right to inspect such restraining equipment.

6. The Contractor shall comply with ICE transportation standards related to the number of hours the Contractor employee may operate a vehicle. Overnight lodging resulting from transportation services shall be approved in advance by the COR or ICE designee; overnight lodging expenses shall be billed at rates not to exceed the applicable GSA per diem rates. Transportation shall be accomplished in the most economical manner and in accordance with the applicable GSA per diem rates.

7. The Contractor shall, upon order of the COR, or upon his or her own decision in an urgent medical situation, transport a detainee to a hospital location. An officer, or officers, shall keep the detainee under constant supervision 24 hours per day until the detainee is ordered released from the hospital, or at the order of the COR. The Contractor shall then transport the detainee to the detention site.

8. The COR may direct the Contractor to transport detainees to unspecified, miscellaneous locations, within a 250-mile radius of the facility.

9. When the COR or ICE- designee provides documents to the Contractor concerning the detainee(s) to be transported and/or escorted, the Contractor shall deliver these documents only to the named authorized recipients or his or her designee. The Contractor shall ensure the material is kept confidential and not viewed by any person other than the authorized recipient.

USA008313

10. The Contractor shall establish a fully operational communication system compatible with ICE communication equipment that has direct and immediate contact with all transportation vehicles and post assignments. Upon demand, the COR shall be provided with the current status of all vehicles and post assignment employees.

11. Failure of the Contractor to comply fully with the detainee(s) departure as pre-scheduled may result in the Contractor having deductions made for non-performance.

12. ICE anticipates normal transportation requirements other than hospital visits and local needs. In addition to unspecified or miscellaneous locations, the contract facility must support transportation to and from locations as directed by ICE COR or designee. All transportation reports must be submitted to the COR within two business days of trip completion.

    *See PWS Addendums for specific requirements.*

13. Monthly Status Report: The report will include, at a minimum, the information required by a G-391 for every trip as indicated in the G-391 attachments (see Attachments 1A & 1B). A breakdown of hours and personnel will also be provided and divided into Transportation Guard Hours and Stationary Guard Hours.  A breakdown of vehicles used (year, model, and capacity) will also be required if the contractor is using contractor owned vehicles. This information will be available electronically to government users and submitted in addition to the invoice each month.

## F.  On-Call Guard Services

1. The Contractor shall provide on call guard services as requested by the COR or ICE-designated official and shall include, but is not limited to, escorting and guarding detainees to medical or doctor appointments; hearings; ICE interviews; and any other remote location requested by the COR or ICE designee. Qualified guard personnel employed by the Contractor under its policies, procedures, and practices will perform such services. The Contractor agrees to augment such practices as may be requested by ICE to enhance specific requirements for security, detainee monitoring, visitation, and contraband control. Upon the order of the COR or ICE designee or in an emergency, the contractor shall provide an officer to safeguard the detainee(s) at a medical facility while undergoing medical examination or treatment as either inpatient or outpatient care. Such assignments may include but are not restricted to medical appointments of detainees. The detainee shall be kept under constant supervision. Public contact is prohibited unless authorized in advance by the COR.

2. The numbers and frequency of these services shall vary, but to the extent possible, the COR or ICE designee shall notify the contractor four hours in advance of such need and of a schedule for the remote post to be manned. One guard shall be authorized for such post unless the COR specifies additional guards are required.

3. The following notes are applicable to the above posts:

19

USA008314

a) All on call posts require at least one guard that is of the same sex as the detainee.

b) Additional officers for each post assignment may be required at the direction of the COR when operationally necessary.

c) All necessary meals shall be provided by the contractor when the detainees(s) are in the custody of the contractor.

d) The contractor remains responsible for providing security and preventing escapes.

The itemized monthly invoice for such on-call guard services shall state the number of hours being billed, the duration of the billing (times and dates to include travel to and from location being guarded) and the names and "A" numbers of the detainees who were guarded. Such services shall be denoted as a separate item on submitted invoices. ICE agrees to reimburse the Contractor for actual on call guard services provided at the negotiated rate.

## G. Notice to Proceed

It is essential that the Contractor be fully prepared to accept responsibility for performing the requirements of the contract. Therefore, ICE may perform required assessments to ensure contract compliance prior to issuance of the Notice to Proceed (NTP).

If ICE determines that the Contractor is capable of accepting detainees, the NTP will be issued by the Contracting Officer. The Contractor shall be prepared to begin performance and accept detainees immediately upon issuance of the NTP. Performance may begin with staged capacity or open with full capacity, as stated in the NTP. Performance includes, but is not limited to, preliminary fitness determination and training documentation for an adequate number of facility staff. Preliminary fitness determinations may take up to 30 days on average to be adjudicated and depend upon the facility providing proper initiation documentation and individuals completing the required application and fingerprints once initiated.

The contractor shall submit in writing a Quality Control Plan (QCP) and all other plans, policies, and procedures, including those identified in the PBNDS 2011 and ACA standards to the COR for review and concurrence prior to issuance of the NTP. Once written concurrence has been granted by the COR, these plans, policies, and procedures shall not be modified without the prior written approval of the COR. The Contractor's operational and/or corporate policies that do not impact ICE operations (i.e. policies on employee sick days, vacation days, etc.) do not have to be reviewed or approved by ICE.

USA008315

## III.    GENERAL

### A.  Notification and Public Disclosures

There shall be no public disclosures regarding this contract made by the Contractor (or any subcontractors) without review and approval of such disclosure by ICE Public Affairs and express permission granted by the ICE Contracting Officer. The Government considers such information privileged or confidential.

### B.  Records

All records related to contract performance shall be retained in a retrievable format for three years. Except as otherwise expressly provided in this PWS, the Contractor shall, upon completion or termination of the resulting contract, transmit to the Government any records related to performance of the contract, in a format acceptable to the CO and COR.

The Contractor shall comply with all statutes, regulations, and guidelines from the National Archives and Records Administration. Records and information management functions are required and mandated by the following laws and regulations: Chapters 21, 29, 31, and 33 of Title 44, United States Code; 36 CFR 12; 41 CFR 201 subchapters A and B; OMB Circular A-130; and DOJ Order 2710.8A, *Removal and Maintenance of Documents*. Criminal penalties for unlawfully destroying, damaging, removing, or improperly handling or releasing federal records are addressed in Chapters 37 and 101 of Title 18, United States Code.

The Contractor shall notify the COR and ICE designee when a member of the United States Congress or any media outlet requests information or makes a request to visit the facility. All such visits shall be in compliance with PBNDS 2011, Standard 7.2 "Interviews and Tours." The Contractor shall coordinate all public information related issues with the CO. All press statements and releases shall be cleared, in advance, with the ICE Office of Public Affairs, which can be reached through the Internet website: http://www.ice.gov/about/news/contact.htm.

The Contractor shall ensure employees agree to use appropriate disclaimers clearly stating the employees' opinions do not necessarily reflect the position of the United States Government in any public presentations they make or articles they write that relate to any aspect of contract performance or the facility operations.

All detainee files are to be prepared, maintained, retired, and disposed of in accordance with ICE policy. Policy and procedures shall be developed to ensure the confidentiality and security of all detainee files. The Contractor shall be responsible for detainee record keeping services and personal property. See Part 2 of 2011 PBNDS at www.ice.gov/detention-standards/2011

The Contractor shall safeguard all records related to the operation of the facility. All records will remain the property of the U.S. Government.

USA008316

## C. Right of Refusal

The Contractor retains the right to refuse acceptance of any detainee if such refusal is supported by a valid justification. Examples of such justification are: any detainee found to have a medical condition that requires medical care beyond the scope of the Contractor's health care provider. In the case of a detainee already in custody, the Contractor shall notify ICE and request such removal of the detainee from the Facility. The Contractor shall allow ICE reasonable time to make alternative arrangements for the detainee.

## D. Hold Harmless

The Contractor shall protect, defend, indemnify, save, and hold harmless the United States Government and its employees or agents, from and against any and all claims, demands, expenses, causes of action, judgments and liability arising out of, or in connection with, any negligent acts or omissions of the Contractor, its agents, sub-contractors, employees, assignees, or anyone for whom the Contractor may be responsible. The Contractor shall also be liable for any and all costs, expenses, and attorney's fees incurred as a result of any such claim, demand, cause of action, judgment, or liability, including those costs, expenses, and attorneys' fees incurred by the United States Government and its employees or agents. The Contractor's liability shall not be limited by any provision or limits of insurance set forth in the resulting contract.

In awarding the contract, the Government does not assume any liability to third parties, nor will the Government reimburse the Contractor for its liabilities to third parties, with respect to loss due to death, bodily injury, or damage to property resulting in any way from the performance of the contract or any subcontract under this contract.

The Contractor shall be responsible for all litigation, including the cost of litigation, brought against it, its employees, or agents for alleged acts or omissions. The CO shall be notified in writing of all litigation pertaining to this contract and provided copies of any pleadings filed or said litigation within five working days of receipt. The Contractor shall cooperate with Government legal staff and/or the United States Attorney regarding any requests pertaining to federal or Contractor litigation.

Policy and procedures shall be developed which ensure a positive relationship is maintained with all levels of the federal judiciary. The Contractor's procedures shall ensure a tracking system is established which mandates that all judicial inquiries and program recommendations are responded to in a timely and accurate manner. All judicial inquiries and Contractor responses, specifically related to a detainee, shall be made part of the detainee's file.

## E. Quality Control

The Contractor is responsible for management and quality control actions necessary to meet the quality standards set forth in the contract. The Contractor shall provide a Quality Control

22

USA008317

Plan (QCP) to the CO for concurrence not later than the post award conference (or as directed by the CO). The CO will notify the Contractor of concurrence or required modifications to the plan before the contract start date. The Contractor must make appropriate modifications and obtain concurrence of the plan by the CO before the contract start date. The Contractor shall provide an overall QCP that addresses critical operational performance standards for the services required under this contract. The QCP shall ensure that services will be maintained at a uniform and acceptable level. At a minimum, the Contractor shall review and update the QCP policies and procedures on an annual basis. The Contractor shall audit facility operations monthly for compliance with the QCP. The Contractor shall notify the Government 48 hours in advance of the audit to ensure the COR is available to participate. The Contractor's QCP shall identify deficiencies, appropriate corrective action(s), and timely implementation plan(s) to the COR.

If the Contractor proposes changes in the QCP after contract award, the Contractor shall submit them to the COR for review. If the COR concurs with the changes, the COR shall submit the changes to the CO for review and approval. The CO may modify the contract to include these changes.

## F. Quality Assurance Surveillance Plan (QASP)

ICE has developed a Quality Assurance Surveillance Plan (QASP), Attachment 2, pursuant to the requirements of the PWS. It will present the financial values and mechanisms for applying adjustments to the Contractor's invoices as dictated by work performance measured to the desired level of accomplishment.

1. The purpose of the QASP is to:

   a) Define the roles and responsibilities of participating Government officials.
   b) Define the types of work to be performed.
   c) Describe the evaluation methods that will be employed by the Government in assessing the Contractor's performance.
   d) Describe the process of performance documentation.

2. Roles and Responsibilities of Participating Government Officials

   a) The COR(s) will be responsible for monitoring, assessing, recording, and reporting on the technical performance of the Contractor on a day-to-day basis. The COR(s) will have primary responsibility for completing "Quality Assurance Surveillance Forms" to document their inspection and evaluation of the Contractor's work performance.
   b) The Contracting Officer (CO) or designee has overall responsibility for evaluating the Contractor's performance in areas of contract compliance, contract administration, cost and property control. The CO shall review the COR's evaluation of the Contractor's performance and invoices. If applicable, deductions or withholdings will be assessed in accordance with the evaluation of the Contractor's performance, e.g., monetary adjustments for inadequate performance.

23

USA008318

**G. Contractor's Failure to Perform Required Services**

The rights of the Government and remedies described in this section are in addition to all other rights and remedies set forth in the contract. Specifically, the Government reserves its rights under the Inspection of Services and Termination clauses. Any reductions in the Contractor's invoice shall reflect the contract's reduced value resulting from the Contractor's failure to perform required services. The Contractor shall not be relieved of full performance of the services hereunder and may be terminated for default based upon inadequate performance of services, even if a reduction was previously taken for any inadequate performance.

**H. Inspection by Regulatory Agencies**

Work described in the contract is subject to inspection by other Government agencies. The Contractor shall participate in responding to all requests for information and inspection or review findings by regulatory agencies.

**I. Performance Evaluation Meetings**

The Contractor's representatives shall meet with the COR(s) on a monthly basis or as deemed necessary by either party. These meetings will provide a management level review and assessment of Contractor performance, and a discussion and resolution of problems.

**IV. PERSONNEL AND STAFFING**

**REQUIRED SECURITY LANGUAGE FOR
SENSITIVE /BUT UNCLASSIFED (SBU) CONTRACT DETENTION FACILITY**

SECURITY REQUIREMENTS

General:  Performance under this Contract Detention Facility agreement (will) require(s) access to sensitive DHS information and will involve direct contact with ICE Detainees. The Service Provider shall adhere to the following.

Contractor Employee Fitness Screening:   Screening criteria under DHS Instruction 121-01-007-001 (Personnel Security, Suitability and Fitness Program), or successor thereto, that may exclude contractor employees from consideration to perform under this agreement includes:

- Misconduct or negligence in employment;
- Criminal or dishonest conduct;
- Material, intentional false statement or deception of fraud in examination or appointment;
- Refusal to furnish testimony as required by 5 CFR § 5.4 (i.e., a refusal to provide testimony to the Merit Systems Protection Board or the Office of Special Counsel);
- Illegal use of narcotics, drugs, or other controlled substances without evidence of substantial rehabilitation.

24

USA008319

- Alcohol abuse, without evidence of substantial rehabilitation, of a nature and duration that suggests that the applicant or appointee would be prevented from performing the duties of the position in question, or would constitute a direct threat to the property or safety of the applicant or appointee or others;
- Illegal use of narcotics, drugs, or other controlled substances, without evidence of substantial rehabilitation;
- Knowing and willful engagement in acts or activities designed to overthrow the U.S. Government by force;
- Any statutory or regulatory bar which prevents the lawful employment of the person involved in the position in question (for Excepted Service employees); and
- Any other nondiscriminatory reason that an individual's employment (or work on a contract) would not protect the integrity of promote the efficiency of the service.

Contractor Employee Fitness Screening:_Screening criteria under 6 CFR § 115.117 (Sexual Abuse and Assault Prevention Standards) implemented pursuant to Public Law 108-79 (Prison Rape Elimination Act (PREA) of 2003) or successor thereto, that WILL exclude contractor employees from consideration to perform under this agreement includes:

- Engaged in Sexual Abuse in a Prison, Jail, Holding Facility, Community Confinement Facility, Juvenile Facility, or other Institution as defined under 42 USC 1997;
- Convicted of engaging or attempting to engage in sexual activity facilitated by force, overt or implied threats of force, or coercion, or if the victim did not consent or was unable to consent or refuse;
- Civilly or administratively adjudicated to have in engaged in such activity.

Subject to existing law, regulations and/or other provisions of this Agreement, illegal or undocumented aliens shall not be employed by the Service Provider.


### A.  General

The United States Immigration and Customs Enforcement (ICE) has determined that performance of the tasks as described in the resultant contract agreements require that the Contractor, subcontractor(s), vendor(s), etc. (herein known as Contractor) have access to sensitive DHS information and ICE Detainees, and that the Contractor will adhere to the following:

### B.  Preliminary Fitness Determination

ICE will exercise full control over granting, denying, withholding or terminating unescorted government facility and/or sensitive Government information access for contractor employees, based upon the results of a Fitness screening process.  ICE may, as it deems appropriate, authorize and make a favorable expedited preliminary Fitness determination based on preliminary security checks.  The preliminary Fitness determination will allow the contractor employee to commence work temporarily prior to the completion of a Full Field Background Investigation.  The granting of a favorable preliminary Fitness shall not be

USA008320

considered as assurance that a favorable final Fitness determination will follow as a result thereof. The granting of preliminary Fitness or final Fitness shall in no way prevent, preclude, or bar the withdrawal or termination of any such access by ICE, at any time during the term of the contract.  No employee of the Contractor shall be allowed to enter on duty and/or access sensitive information or systems without a favorable preliminary Fitness determination or final Fitness determination by the Office of Professional Responsibility, Personnel Security Unit (OPR-PSU).  No employee of the Contractor shall be allowed unescorted access to a Government facility without a favorable preliminary Fitness determination or final Fitness determination by OPR-PSU.  Contract employees are processed under DHS Instruction 121-01-007-001 (Personnel Security, Suitability and Fitness Program), or successor thereto; those having direct contact with Detainees will also have 6 CFR § 115.117 considerations made as part of the Fitness screening process.

## C. Background Investigations

Contractor employees (to include applicants, temporaries, part-time and replacement employees) under the contract, needing access to sensitive information and/or ICE Detainees, shall undergo a position sensitivity analysis based on the duties each individual will perform on the contract.  The results of the position sensitivity analysis shall identify the appropriate background investigation to be conducted. Background investigations will be processed through the Personnel Security Unit. Contractor employees nominated by a Contracting Officer Representative for consideration to support this contract shall submit the following security vetting documentation to OPR-PSU, through the Contracting Officer Representative (COR), within 10 days of notification by OPR-PSU of nomination by the COR and initiation of an Electronic Questionnaire for Investigation Processing (e-QIP) in the Office of Personnel Management (OPM) automated on-line system.

1. Standard Form 85P (Standard Form 85PS (With supplement to 85P required for armed positions)), "Questionnaire for Public Trust Positions" Form completed on-line and archived by the contractor employee in their OPM e-QIP account.

2. Signature Release Forms (Three total) generated by OPM e-QIP upon completion of Questionnaire (e-signature recommended/acceptable – instructions provided to applicant by OPR-PSU.  Completed on-line and archived by the contractor employee in their OPM e-QIP account.

3. Two (2) SF 87 (Rev. December 2017) Fingerprint Cards. **(Two Original Cards sent via COR to OPR-PSU)**

4. Foreign National Relatives or Associates Statement.  (This document sent as an attachment in an e-mail to contractor employee from OPR-PSU – must be signed and archived into contractor employee's OPM e-QIP account prior to electronic "Release" of data via on-line account)

5. DHS 11000-9, "Disclosure and Authorization Pertaining to Consumer Reports Pursuant to the Fair Credit Reporting Act" (This document sent as an attachment

USA008321

in an e-mail to contractor employee from OPR-PSU – must be signed and archived into contractor employee's OPM e-QIP account prior to electronic "Release" of data via on-line account)

6.      Optional Form 306 Declaration for Federal Employment (This document sent as an attachment in an e-mail to contractor employee from OPR-PSU – must be signed and archived into contractor employee's OPM e-QIP account prior to electronic "Release" of data via on-line account)

7.      Questionnaire regarding conduct defined under 6 CFR § 115.117 (Sexual Abuse and Assault Prevention Standards) (This document sent as an attachment in an e-mail to contractor employee from OPR-PSU – must be signed and archived into contractor employee's OPM e-QIP account prior to electronic "Release" of data via on-line account)

8.      One additional document may be applicable if contractor employee was born abroad.  If applicable, additional form and instructions will be provided to contractor employee.  (If applicable, the document will be sent as an attachment in an e-mail to contractor employee from OPR-PSU – must be signed and archived into contractor employee's OPM e-QIP account prior to electronic "Release" of data via on-line account)

Contractor employees who have an adequate, current investigation by another Federal Agency may not be required to submit complete security packages; the investigation may be accepted under reciprocity.  The questionnaire related to 6 CFR § 115.117 listed above in item 7 will be required for positions designated under PREA.

An adequate and current investigation is one where the investigation is not more than five years old, meets the contract risk level requirement, and applicant has not had a break in service of more than two years.  (Executive Order 13488 amended under Executive Order 13764/DHS Instruction 121-01-007-01)

Required information for submission of security packet will be provided by OPR-PSU at the time of award of the contract.  Only complete packages will be accepted by the OPR-PSU as notified by the COR.

To ensure adequate background investigative coverage, contractor employees must currently reside in the United States or its Territories.  Additionally, contractor employees are required to have resided within the Unites States or its Territories for three or more years out of the last five (ICE retains the right to deem a contractor employee ineligible due to insufficient background coverage).  This time-line is assessed based on the signature date of the standard form questionnaire submitted for the applied position.  Contractor employees falling under the following situations may be exempt from the residency requirement: 1) work or worked for the U.S. Government in foreign countries in federal civilian or military capacities; 2) were or are dependents accompanying a federal civilian or a military employee serving in foreign countries so long as they were or are authorized by the U.S. Government to

27

USA008322

accompany their federal civilian or military sponsor in the foreign location; 3) worked as a contractor employee, volunteer, consultant or intern on behalf of the federal government overseas, where stateside coverage can be obtained to complete the background investigation; 4) studied abroad at a U.S. affiliated college or university; or 5) have a current and adequate background investigation (commensurate with the position risk/sensitivity levels) completed for a  federal or contractor employee position, barring any break in federal employment or federal sponsorship.

Only U.S. Citizens and Legal Permanent Residents are eligible for employment on contracts requiring access to DHS sensitive information unless an exception is granted as outlined under DHS Instruction 121-01-007-001.  Per DHS Sensitive Systems Policy Directive 4300A, only U.S. citizens are eligible for positions requiring access to DHS Information Technology (IT) systems or positions that are involved in the development, operation, management, or maintenance of DHS IT systems, unless an exception is granted as outlined under DHS Instruction 121-01-007-001.

**D. Transfers from Other DHS Contracts:**

Contractor employees may be eligible for transfer from other DHS Component contracts provided they have an adequate and current investigation meeting the new assignment requirement.  If the contractor employee does not meet the new assignment requirement a DHS 11000-25 with ICE supplemental page will be submitted to OPR-PSU to initiate a new investigation.

Transfers will be accomplished by submitting a DHS 11000-25 with ICE supplemental page indicating "Contract Change."  The questionnaire related to 6 CFR § 115.117 listed above in item 7 will be required for positions designated under PREA.

**E. Continued Eligibility**

ICE reserves the right and prerogative to deny and/or restrict facility and information access of any contractor employee whose actions conflict with Fitness standards contained in DHS Instruction 121-01-007-01, Chapter 3, paragraph 6.B or who violate standards of conduct under 6 CFR § 115.117.  The Contracting Officer or their representative can determine if a risk of compromising sensitive Government information exists or if the efficiency of service is at risk and may direct immediate removal of a contractor employee from contract support. The OPR-PSU will conduct periodic reinvestigations every 5 years, or when derogatory information is received, to evaluate continued Fitness of contractor employees.

**F. Required Reports**

The Contractor will notify OPR-PSU, via the COR, of all terminations/resignations of contractor employees under the contract within five days of occurrence.  The Contractor will return any expired ICE issued identification cards and building passes of terminated/resigned employees to the COR.  If an identification card or building pass is not available to be returned, a report must be submitted to the COR referencing the pass or card number, name

28

USA008323

of individual to whom issued, the last known location and disposition of the pass or card. The COR will return the identification cards and building passes to the responsible ID Unit.

The Contractor will report any adverse information coming to their attention concerning contractor employees under the contract to the OPR-PSU, via the COR, as soon as possible. Reports based on rumor or innuendo should not be made. The subsequent termination of employment of an employee does not obviate the requirement to submit this report. The report shall include the contractor employees' name and social security number, along with the adverse information being reported.

The Contractor will provide, through the COR a Quarterly Report containing the names of contractor employees who are active, pending hire, have departed within the quarter or have had a legal name change (Submitted with documentation).  The list shall include the Name, Position and SSN (Last Four) and should be derived from system(s) used for contractor payroll/voucher processing to ensure accuracy.

CORs will submit reports to psu-industrial-security@ice.dhs.gov

Contractors, who are involved with management and/or use of information/data deemed "sensitive" to include 'law enforcement sensitive" are required to complete the DHS Form 11000-6-Sensitive but Unclassified Information NDA for contractor access to sensitive information. The NDA will be administered by the COR to the all contract personnel within 10 calendar days of the entry on duty date.   The completed form shall remain on file with the COR for purpose of administration and inspection.

Sensitive information as defined under the Computer Security Act of 1987, Public Law 100-235 is information not otherwise categorized by statute or regulation that if disclosed could have an adverse impact on the welfare or privacy of individuals or on the welfare or conduct of Federal programs or other programs or operations essential to the national interest. Examples of sensitive information include personal data such as Social Security numbers; trade secrets; system vulnerability information; pre-solicitation procurement documents, such as statements of work; and information pertaining to law enforcement investigative methods; similarly, detailed reports related to computer security deficiencies in internal controls are also sensitive information because of the potential damage that could be caused by the misuse of this information.   All sensitive information must be protected from loss, misuse, modification, and unauthorized access in accordance with DHS Management Directive 11042.1, *DHS Policy for Sensitive Information* and ICE Policy 4003, *Safeguarding Law Enforcement Sensitive Information*."

Any unauthorized disclosure of information should be reported to ICE.ADSEC@ICE.dhs.gov.

**G.  Security Management**

The Contractor shall appoint a senior official to act as the Corporate Security Officer.  The individual will interface with the OPR-PSU through the COR on all security matters, to

USA008324

include physical, personnel, and protection of all Government information and data accessed by the Contractor.

The COR and the OPR-PSU shall have the right to inspect the procedures, methods, and facilities utilized by the Contractor in complying with the security requirements under this contract. Should the COR determine that the Contractor is not complying with the security requirements of this contract, the Contractor will be informed in writing by the Contracting Officer of the proper action to be taken in order to effect compliance with such requirements.

## H. Information Technology Security Clearance

When sensitive government information is processed on Department telecommunications and automated information systems, the Contractor agrees to provide for the administrative control of sensitive data being processed and to adhere to the procedures governing such data as outlined in DHS MD 4300.1, *Information Technology Systems Security*. or its replacement. Contractor employees must have favorably adjudicated background investigations commensurate with the defined sensitivity level.

Contractor employees who fail to comply with Department security policy are subject to having their access to Department IT systems and facilities terminated, whether or not the failure results in criminal prosecution. Any person who improperly discloses sensitive information is subject to criminal and civil penalties and sanctions under a variety of laws (e.g., Privacy Act).

## I. Information Technology Security Training and Oversite

In accordance with Chief Information Office requirements and provisions, all contractor employees accessing Department IT systems or processing DHS sensitive data via an IT system will require an ICE issued/provisioned Personal Identity Verification (PIV) card. Additionally, Information Assurance Awareness Training (IAAT) will be required upon initial access and annually thereafter. IAAT training will be provided by the appropriate component agency of DHS.

Contractor employees, who are involved with management, use, or operation of any IT systems that handle sensitive information within or under the supervision of the Department, shall receive periodic training at least annually in security awareness and accepted security practices, systems rules of behavior, to include Unauthorized Disclosure Training, available on PALMS or by contacting ICE.ADSEC@ICE.dhs.gov. Department contractor employees, with significant security responsibilities, shall receive specialized training specific to their security responsibilities annually. The level of training shall be commensurate with the individual's duties and responsibilities and is intended to promote a consistent understanding of the principles and concepts of telecommunications and IT systems security.

All personnel who access Department information systems will be continually evaluated while performing these duties. System Administrators should be aware of any unusual or

USA008325

inappropriate behavior by personnel accessing systems. Any unauthorized access, sharing of passwords, or other questionable security procedures should be reported to the local Security Office or Information System Security Officer (ISSO).

## J. Facility Staffing Plan, Floor Plan and Key Personnel

The Contractor shall provide a staffing plan that addresses at a minimum the staffing requirements and key personnel to be employed in connection with this contract as outlined in the PWS. The Contractor shall staff the post positions in accordance with the Contractor-submitted and Government-acknowledged Contractor Staffing Plan to include relief factors and the agreed upon detainee ramp schedule. The number, type, and distribution of staff as described in the contract-staffing plan shall be maintained throughout the term of the contract. Written requests to change the number, type, and/or distribution of staff described in the staffing plan must be submitted to the CO, through the COR, for approval prior to implementation. Staffing levels shall not fall below a monthly average of 95% of the total ICE-approved staffing plan. The approved staffing levels for detention/correctional officers shall not fall below a monthly average of 95%. Each month, the Contractor shall submit to the COR the current average monthly vacancy rate and indicate any individual positions that have been vacant more than 60 days. Failure to fill any individual position within ~~60~~ 90 ~~60~~ days of the vacancy may result in a deduction by the CO from the monthly invoice if the vacancy in combination with other vacancies regardless of duration brings staffing levels below 95%. The deduction shall be based on the daily salary and benefits of the vacant position. ICE may calculate the deduction retroactive to day one of the vacancy, excluding the days for ICE's conditional approval process, starting on the day of receipt and concluding on the day Contractor conditional approval is granted. No deduction shall apply during any period the Contractor documents that a vacant position was covered through the use of overtime, contract staff or otherwise. Each month, the Contractor shall submit to the COR any Key Personnel that will be absent from the facility for over five working days. If the Key Personnel will be absent for over five working days and the contractor will not provide an "acting" position to backfill that Key Personnel position during the absence, the CO has the right to make a deduction based on the daily salary and benefits of the absent Key Personnel position.

### 1. Minimum Staffing Requirements

Exclusive of the agreed upon ramp periods, the Contractor shall fully staff the facility to secure, control, and supervise detainees in custody regardless of the detainee population. The Contractor shall ensure daily Detention Officer Assignment rosters, by shift, for the duration of the contract. The assignment rosters shall indicate the number of staff, job titles, names, hours, and days of work for each post. The daily roster shall be posted 24 hours in advance. Shift rosters must be provided to the COR on a daily basis.

### 2. Supervisory Staffing

The Contractor is responsible for the satisfactory supervision of its employees at all times. Satisfactory supervision includes verifying attendance at all posts and positions

31

USA008326

and upholding the work requirements of all personnel assigned under the contract. The Contractor shall provide the COR with the names of Supervisory Detention Officers designated by the Contractor before commencement of services.

In the absence of the approved Warden, another qualified person who meets the Warden position and security clearance requirements shall temporarily fill that position. This individual shall perform only job duties of the Warden in providing oversight and direction to contract Detention Officers and interfacing with ICE CORs and/or designated ICE Officers and the Contracting Officer on all contract-related matters.

**3. Key Personnel**

The Contracting Officer shall provide written approval before any employee is assigned as key personnel to perform duties under this contract. The Contractor shall have key personnel employed and available for duty before the Contractor can begin contract performance. Any subsequent changes to key personnel must meet these criteria and be approved in writing by the Contracting Officer. The following are considered key personnel for the contract. The Contractor may use other titles.

a) **Facility Administrator** - The Facility Administrator shall hold an accredited bachelor's degree in an appropriate discipline, or significant military or corrections experience of a minimum 15 years, and have at least five years of related administrative experience, and have knowledge of program objectives, policies, procedures, and requirements for managing a secure detention/correctional facility. The degree requirement may be satisfied by completion of a career development program that includes work-related experience, training, or college credits at a level of achievement equivalent to the bachelor's degree, as practiced in the federal hiring process. The official holding this position, even in an acting capacity, shall meet ACA requirements.

b) **Assistant Facility Administrator -** The Assistant Warden/Facility Director shall hold an accredited bachelor's degree in an appropriate discipline or have a minimum of three years of related industry experience, and have knowledge of program objectives, policies, procedures, and requirements for managing a secure detention/correctional facility. The official holding this position, even in an acting capacity, shall meet ACA requirements.

c) **Supervisory Detention Officers**. Supervisors must have a minimum of one year of experience as a detention officer and two years of successful experience in field supervision (e.g., civilian community law enforcement, commercial or industrial guard service, or security service supervisory positions). The two-year requirement may be satisfied by completion of a career development program that includes work-related experience, training, or college credits at a level of achievement equivalent to the basic requirement, as practiced in the federal hiring process.

USA008327

**d) Training Officers**. Certified instructors shall conduct all instruction and testing of Contractor personnel. A state or national level recognized institution certification of instructors is mandatory unless otherwise approved in writing by the COR. Certification of instructors may be established by documentation of past experience in teaching positions or by successful completion of a course of training for qualifying personnel as instructors. The COR must approve the instructor prior to any training.

**e) Quality Assurance Manager**. The Quality Assurance Manager shall hold an accredited bachelor's degree in an appropriate discipline or have a minimum of three years of related industry experience, and have knowledge of program objectives, policies, procedures, and requirements for managing a secure detention/correctional facility.

4. **Facility Floor Plan and Guard Post Map**

The Contractor shall provide a facility floor plan which clearly identifies all recommended detention guard posts and corresponding guard shift requirements (e.g. 24/7, 8 hours M – F, weekend-only, etc.).  The floor plan shall be submitted with the facility staffing plan and shall be approved by ICE technical expert prior to commencement of services under this contract.  Changes to the guard posts or shift requirements shall be approved by the CO/COR.

5. **Organizational Chart**

The Contractor shall provide an organizational chart that describes the structure of authority, responsibility, and accountability within the facilities. The Contractor shall update this chart as necessary. The Contractor shall make the chart available for review by the CO or COR upon request.

**K. Employee Health**

https://www.osha.gov/law-regs.html
https://www.osha.gov/Publications/QandA/osha3160.htm

Employee health files for all Offeror's Medical Service Providers employees must be maintained on-site. Health files are maintained in accordance with DHS and ICE Privacy Policies and the Privacy Act of 1974 and contain the following documents:

1. Initial and annual TB infection screening results;
2. Vaccination records including results, titers, and Immunization Declination Form(s);
3. OSHA 301 Incident forms;
4. Blood borne pathogen exposure documentation;
5. Respirator medical clearance;
6. Respirator fit test results; and
7. Other employee health documents.

33

The Medical Service Provider may initiate employment of an individual who has initiated the required vaccines schedule, and the individual hired may begin work on the contract as long as they meet all subsequent vaccine schedule requirements until fully vaccinated.

All Medical Service Providers' personnel must provide documentation regarding the following:

1. History of testing for tuberculosis (TB) within the last 12 months:

   a) Chest x-ray if employee has a history of latent TB infection (LTBI), treatment history for LTBI or TB disease, if applicable; and

   b) Additionally, on an annual basis and at own expense, Medical Service Provider shall provide a current TST or IGRA test result if the employee previously tested negative for LTBI, evaluation for TB symptoms if the employee previously tested positive for LTBI, and follow up as appropriate in accordance with Centers for Disease Control and Prevention (CDC) guidelines.

2. Recommended Immunizations

   Individuals employed by the Medical Service Provider in a custody or detention environment are at significant risk for acquiring or transmitting Hepatitis B, measles, mumps, rubella, varicella and seasonal influenza. These diseases are vaccine-preventable. Therefore, the following vaccinations are highly recommended for the Medical Service Provider's personnel. If staff decline or refuse any of these recommended vaccines, an Immunization Declination Form is required, and the Contracting Officer Representative must be notified of the refusal. ICE reserves the right to refuse Medical Service Provider employees that refuse vaccines.

   a) Hepatitis A;

   b) Hepatitis B;
      (Note: The U.S. Occupational Safety and Health Administration (OSHA) Blood-borne Pathogens (BBP) Standard requires employers to provide employees at risk of occupational exposure to blood and other potentially infectious material (OPIM) with the Hepatitis B vaccination series. Refer to OSHA regulations
      https://www.osha.gov/OshDoc/data_BloodborneFacts/bbfact05.html

   c) Varicella;

   d) Measles, Mumps, Rubella (MMR);

   e) Diphtheria, tetanus, a-cellular pertussis (DTAP); and

   f) Annual seasonal influenza.

The Medical Service Provider's personnel will provide immunization documentation or titer results to the Health Services Administrator or the employer's designee for placement in the employee health file. It is recommended that the CDCs Immunization of Health- Care Workers: Recommendations of the Advisory Committee on

34

USA008329

Immunization Practices (ACIP) and the Hospital Infection Control Practices Advisory Committee (HICPAC) be used as a reference for employee health immunization issues.

## L.  Contractor's Employee Rules

The Contractor shall provide employee rules or policies, which, at a minimum, address the following:

1.  Organization
2.  Recruiting procedures
3.  Opportunities for Equal Employment
4.  Qualifying for jobs, job descriptions, responsibilities, salaries, and fringe benefits
5.  Screening employees for illegal drug use
6.  Holidays, leave, and work hours
7.  Personnel records, employee evaluations, promotion, and retirement
8.  Training
9.  Standards of conduct, disciplinary procedures, and grievance procedures
10. Resignation and termination
11. Employee-management relations
12. Security, safety, health, welfare, and injury incidents

The Contractor shall provide a copy of the rules or policies to the Contractor's employees at the facility. Upon request by the COR, the Contractor shall document to the Government that all employees have reviewed a copy of the rules or policies.

## M. Minimum Standards of Employee Conduct

The Contractor shall develop standards of employee conduct and corresponding disciplinary actions that are consistent with the following standards of conduct. All employees shall certify in writing that they have read and understand the standards. A record of this certificate must be provided to the COR prior to the employees beginning work under this contract. The Contractor shall hold employees accountable for their conduct based on these standards, which are not restricted to, but must include:

1.  Employees shall not display favoritism or preferential treatment to one detainee, or group of detainees, over another.
2.  Employees shall not discuss or disclose information from detainee files or immigration cases, except when necessary in the performance of duties under this contract.
3.  The employee may not interact with any detainee except in a relationship that supports the approved goals of the facility. Specifically, employees shall not receive nor accept any personal (tangible or intangible) gift, favor, or service, from any detainee, any detainee's family, or associate no matter how trivial the gift, favor, or service may seem, for themselves or any members of their family. In addition, the employee shall not give any gift, favor, or service to detainees, detainee's family, or associates.
4.  The employee shall not enter into any business relationship with detainees or their families (e.g., selling, buying, or trading personal property).

35

USA008330

5. The employee shall not have any outside or social contact with any detainee, his or her family, or associates, except for those activities which are part of the facility program and a part of the employee's job description.
6. All employees are required to immediately report to the Warden/Facility Director or ICE Supervisor any criminal or non-criminal violation or attempted violation of these standards.
7. The Contractor shall report all violations or attempted violations of the standards of conduct or any criminal activity immediately to the COR. Violations may result in employee removal from the facility. Failure on the part of the Contractor either to report a known violation or to take appropriate disciplinary action against an offending employee or employees shall subject the Contractor to appropriate action including possible termination of the contract for default.
8. The Contractor shall not employ any person whose employment would present an actual or apparent conflict of interest. The Contractor is specifically prohibited from hiring active duty military personnel and civilians employed by the Government to perform work under this contract.

## N.  Removal from Duty

If the COR or the Contractor receives and confirms disqualifying information concerning a Contractor employee, the Contractor shall, upon notification by the COR, immediately remove the employee from performing duties under this contract. The Contractor shall revoke the employee's identification credentials and complete any required dispositions. The Contractor shall immediately notify the COR when the employee is removed from duty. Disqualifying information includes but is not limited to the following:

1. Conviction of a felony, a crime of violence, domestic violence, or a serious misdemeanor within the last five (5) years.
2. Possessing a record of arrests for continuing offenses.
3. Falsification of information entered on suitability forms.
4. Non-payment of court ordered payments (child support, liens, etc.) or excessive delinquent debt as determined by credit check.
5. Misconduct or negligence in prior employment, which would have a bearing on efficient service in the position in question or would interfere with or prevent effective accomplishment by the employing agency of its duties and responsibilities.
6. Alcohol abuse of a nature and duration which suggests that the applicant or appointee would be prevented from performing the duties of the position in question or would constitute a direct threat to the property or safety of others.
7. Illegal use of narcotics, drugs, or other controlled substances, without evidence of substantial rehabilitation.
8. Introduction of contraband into or unto the facility.

ICE may direct the Contractor to remove any employee who has been disqualified either for security reasons or for being unfit to perform his/her duties as determined by the COR or the Contracting Officer. The Contractor shall take action immediately and notify the COR when

USA008331

the employee is removed from duty. A determination of being unfit for duty may be made from, but is not limited to, incidents of delinquency set forth below:

1. Violation of the Rules and Regulations Governing Detention facilities set forth in ICE Publications entitled "Detention Officer Handbook;"
2. Violation of the Rules and Regulations Governing Public Buildings and Grounds, 41 CFR 101-20.3;
3. Neglect of duty, including sleeping while on duty, loafing, unreasonable delays or failures to carry out assigned tasks, conducting personal affairs during official time, leaving post without relief, and refusing to render assistance or cooperation in upholding the integrity of the security program at the work sites;
4. Falsification or unlawful concealment, removal, mutilation, or destruction of any official documents or records, or concealment of material facts by willful omissions from official documents or records;
5. Theft, vandalism, immoral conduct, or any other criminal actions;
6. Possessing, selling, consuming, or being under the influence of intoxicants, drugs, contraband, or substances which produce similar effects;
7. Unethical or improper use of official authority or credentials;
8. Unauthorized use of communication equipment or government property;
9. Misuse of equipment or weapons;
10. Violations of security procedures or regulations;
11. Recurring tardiness;
12. Undue fraternization with detainees as determined by the COR;
13. Repeated failure to comply with visitor procedures as determined by the COR;
14. Performance, as determined by investigation by the Contracting Officer, involving acquiescence, negligence, misconduct, lack of diligence, good judgment, and/or good common sense resulting in, or contributing to, a detainee escape;
15. Failure to maintain acceptable levels of proficiency or to fulfill training requirements;
16. Changes in an employee's ability to meet the physical and/or mental health requirements of this contract;
17. Contractor employee who is under investigation by any law enforcement agency will be removed from duties pending outcome of the disposition.

At the direction of the COR, the Contractor shall reassign contract employees who have been arrested or who have alleged misconduct to duties that do not permit direct contact with detainees pending the disposition of the charges. Any alleged misconduct shall be reported immediately to the COR. If such reassignments are not available, the Contractor shall remove the employee from work under this contract and other ICE contracts.

**O. Tour of Duty Restrictions**

The Contractor shall not utilize any uniformed contractor employee to perform duties under this contract for more than 12 hours in any 24-hour period and shall ensure that such employees have a minimum of eight hours off between shifts. Authorization is required from the COR prior to an employee performing services that exceed 12 hours. If an employee is

USA008332

performing other duties for either the Contractor or another employer, those hours shall count against the 12-hour limitation.

**P.  Dual Positions**

In the event that a supervisory detention officer is not available for duty the Contractor shall provide a full-time supervisor as a replacement. A contract employee shall not hold the position of Detention Officer and Supervisory Detention Officer simultaneously. The COR will document and refer to the Contracting Officer the failure of the Contractor to provide necessary personnel to cover positions.

**Q.  Post Relief**

As indicated in the post orders, the Detention Officer shall not leave his or her post until relieved by another Detention Officer. The Contractor or Contractor's Supervisors authorize rest or relief periods, the Contractor shall assign undesignated officers to perform the duties of the Detention Officers on break.

**R.  Personnel Files**

The Contractor shall maintain a system of personnel files and make all personnel files available to the CO and the COR upon request. These files shall be maintained and current for the duration of the employee's tenure under the contract. The files shall contain verification of training and experience and credentials for all the staff.

**S.  Uniform Requirements**

These requirements apply to Supervisory Detention Officers and Detention Officers who perform work under the contract.

**1.  Uniforms**

The Contractor shall provide uniforms to its employees. The design and color of the Contractor's uniforms, patches, badges, and other identifiable markings shall not be similar in color or style to those worn by ICE officers. All officers performing under this contract shall wear uniforms of the same style and color while on duty. The rank of authority must be prominently displayed as part of each uniform. A shoulder patch should distinctly identify the Contractor. Uniforms and equipment do not have to be new but shall be in good condition and meet the standards at start of duty. Officers not in proper uniform shall be considered "not ready for duty/not on duty" until properly uniformed. All uniforms shall be clean, neat, and in good order. Uniforms that are frayed, stained, faded, or considered too worn by the COR shall be replaced by the Contractor.

The complete uniform consists of seasonal attire that includes appropriate shirt, pants, belt, jacket, shoes or boots (mandatory), duty belt, mini-mag flashlight and holder,

USA008333

handheld radio, handcuff holder, and key-holder. The Contractor shall ensure that each officer has a complete uniform while performing assignments under this contract.

Prior to the contract performance date, the Contractor shall document to the COR the uniform and equipment items that have been issued to each employee. The COR shall approve or disapprove any uniform apparel. The Contractor shall provide a submittal of the uniform or any uniform changes to the COR for approval.

**2. Identification Credentials**

The Contractor shall ensure that all employees, both uniformed and non-uniformed (if applicable), have the required identification credentials in their possession while on the premises. The Contractor identification credential document shall contain the following:

a) A photograph that is at least one-inch square that shows the full face and shoulders of the employee and is no more than 30 days old when the Contractor issues the credential.
b) A printed document that contains personal data and description consisting of the employee's name, gender, birth date, height, weight, hair color and eye color, as well as the date of issuance, the signature of the employee, and the signature of project manager or designated Contractor personnel.
c) To avoid the appearance of having Government issued badges, the contractor shall not possess wallet type badges or credentials. All credentials shall be approved by the COR.

**T.  Permits and Licenses**

**1. Licensing of Employees**

The Contractor shall ensure each employee has registrations, commissions, permits, and licenses as required by the district, municipality, county, and state in which ICE work site is performed prior to EOD. The Contractor shall verify all licenses and certifications. If applicable, all Contractor staff shall possess a current license/registration, in the state in which they are practicing.

**2. Jurisdiction**

The Contractor's authority under this contract is limited to space or posts that are under the charge and control of ICE. The Contractor shall not extend its services into any other areas.

**U.  Encroachment**

Contractor employees shall not have access to Government equipment, documents, materials, or telephones for any purpose other than as authorized by ICE. Contractor employees shall

USA008334

not enter any restricted areas of the detention centers unless necessary for the performance of their duties.

## V. Work Schedules

The Contractor shall follow the criteria described below when establishing work schedules, contact relief, rest periods, and starting and stopping work.

### 1. Post Work Schedules

One week in advance, the Contractor shall prepare supervisory and Detention Officer work schedules, for a two-week period, and shall post them in work areas or locker rooms. A manpower report shall be submitted to the COR on a monthly basis. Schedules shall be prepared on a form designated by ICE. Changes in duty hours shall also be posted on this form in sufficient time to ensure 24-hour advance notice. At the completion of each shift, the Contractor shall, upon request of the COR, also provide an employment report listing (copies of the sign-in sheets [GSA Form 139, Record of Arrival and Departure from Buildings during Security Hours] for each shift) for each employee who actually worked, work classification, post assignments, and hours worked, as well as total hours worked by supervisory and non-supervisory employees. A Contractor Supervisor shall conduct regular post checks to ensure personnel are on duty. When a contract employee is not being utilized at a given post, the Contractor at the direction of the COR or ICE designee may reassign him/her to another post.

### 2. Starting and Stopping Work

The Contractor is responsible for all employees to be dressed in full uniform and ready to begin work promptly at the beginning of each shift. Each employee shall remain at the duty locations until the shift is completed.

#### a) Recording Presence

The Contractor shall direct its employees to sign in when reporting for work and to sign out when leaving at the end of their period of duty. The Contractor's supervisory and regular personnel are required to register at the applicable work site(s) and shall use GSA Form 139. The Government shall specify the registration points, which will be at the protected premises, and the Contractor shall utilize those points for this purpose.

Officers, working as supervisors, shall make the designation "Supervisor" in the rank column on GSA Form 139; all others will enter "On Duty." The applicable post or position numbers may be entered in the "relief" column after mutual concurrence between ICE and the Contractor.

Each line on GSA Form 139, or other forms designated by ICE must be completed in chronological order, without exception. Lines may not be left blank between

40

signatures. If an entire line is used to enter a calendar date to separate individual workdays, a one-line limit for each date entered will be followed. Erasures, obliterations, superimposed, or double entries of any type on any one line are unacceptable and will not be processed for payment. If errors are made in signatures, times, post numbers, or duty status on this form, the next line immediately following the line containing such errors, will be used to record all corrected information. A single line will be drawn through the entire line on which such mistakes appear. The Contractor must attach a detailed memorandum explaining the reasons for the mistakes to each form containing erroneous entries.

**b) Rest Periods**

When the Contractor or a contractor supervisor authorizes rest and relief periods for the contract employees, a substitute officer shall be assigned to the duty location.

**c) Work Relief**

When the work assignments require that the Contractor's employees do not leave the assigned duty locations until a substitute officer has provided relief, this condition shall be explicitly stated on GSA Form 2580, Guard Post Assignment Record, or other forms designated by ICE COR. The Contractor shall enforce the procedure without exceptions.

## W. Training

All training shall be conducted in accordance with PBNDS 2011, Standard 7.3 "Staff Training." Detention Officers shall not perform duties under this contract until they have successfully completed all initial training and the COR receives written certification from the Contractor. Any remuneration or pay due to the Contractor employee in accordance with U.S. Department of Labor regulations for any training time is the responsibility of the Contractor. Alternative or E-training techniques, unless approved in writing by the CO via the COR, shall not be used. The training site shall be provided at no additional cost to the Government.

**1) General Training Requirements**

All Officers must have the training described in the ACA Standards and in this sub-section. The Contractor shall provide the required refresher courses or have an institution acceptable to the COR to provide the training. Failure of any employee to complete training successfully is sufficient reason to disqualify him or her from duty.

All new Detention Officers will receive 60 hours of basic training, not to include firearms, prior to EOD and 40 hours of on-the-job training within the first month of employment. The Contractor's Training Officer will be responsible for administering an on-the-job training program for new employees. A senior Detention Officer, at all times during this latter 40-hour period, must accompany the Detention Officers. The

USA008336

Contractor's Training Officer shall send a copy of the documentation to the COR upon successful completion of the employee's on-the-job training.

In addition, after completion of the first 100 hours of training, the Contractor has 60 days to complete an additional 40 hours of training for each employee. During the remainder of the first year on duty, the Contractor shall cause the employee to have an additional 40 hours of training for a total of 180 hours within the first year of employment. The training program must directly relate to the employee's assigned position and afford application of necessary job skills.

a) **Basic Training Subjects**

Officers must complete the training required in accordance with the ACA and PBNDS 2011. Required training may include but not be limited to the following:

| | | |
|---|---|---|
| 1) | In-service Orientation/Social Diversity | 2 HRS |
| 2) | Counseling Techniques/Suicide Prevention and Intervention* | 2 HRS |
| 3) | Conduct/Duties/Ethics and Courtroom Demeanor | 2 HRS |
| 4) | Bomb Defense and Threats | 1 HR |
| 5) | Telephone Communications/Radio Procedures | 1 HR |
| 6) | Annual IT Security Training | 1 HR |
| 7) | Fire and other Emergency Procedures | 2 HRS |
| 8) | Treatment and Supervision of Detainees | 2 HRS |
| 9) | ICE Use of Force Policy | 2 HRS |
| 10) | Security Methods/Key Control/Count | 1 HR |
| 11) | Procedures/Observational Techniques | 4 HRS |
| 12) | EEO/Sexual Harassment | 2 HRS |
| 13) | Detainee Escort Techniques | 1 HR |
| 14) | ICE Paperwork/Report Writing | 2 HRS |
| 15) | Detainee Searches/Detainee Personal Property | 4 HRS |
| 16) | Property/Contraband | 2 HRS |
| 17) | Detainee Rules and Regulations | 2 HRS |
| 18) | First Aid* | 4 HRS |
| 19) | Cardiopulmonary Resuscitation (CPR)* | 4 HRS |
| 20) | Blood-borne Pathogens* | 2 HRS |
| 21) | Self Defense | 8 HRS |
| 22) | Use of Restraints | 5 HRS |
| 23) | Firearms Training** | |
| 24) | Sexual Abuse/Assault Prevention and Intervention* | 2 HRS |
| 25) | ICE National Detention Standards | 2 HRS |

*All training shall be conducted in a classroom or on-the-job training environment and shall be in accordance with the ACA Standards and PBNDS 2011. On-line training is specifically prohibited to meet these requirements, unless approved in writing by the COR.*
*\* Critical Training Subjects*

42

USA008337

*\*\* Firearm Training for Detention Officers who are required to provide Armed Transportation shall be in accordance with state licensing requirements. The Contractor shall certify proficiency semi-annually.*

**b) Refresher Training**

Every year the Contractor shall conduct 40 hours of Refresher Training for all Detention Officers including Supervisory Detention Officers. Refresher training shall consist of these critical subjects listed above and a review of basic training subjects and others as approved by ICE.

The Contractor shall coordinate recertification in CPR and First Aid with the ICE training staff. This training shall be provided at no cost to the Government. Annually, upon completion, the Contractor shall provide documentation of refresher training to the COR.

In addition to the refresher training requirements for all Detention Officers, supervisors must receive refresher training relating to supervisory duties.

**c) On-the-Job Training**

After completion of the minimum of 60 hours basic training, all Detention Officers will receive an additional 40 hours of on-the-job training at specific post positions to be completed within a month of employment.
This training includes:

1) Authority of supervisors and organizational code of conduct.
2) General information and special orders.
3) Security systems operational procedures.
4) Facility self-protection plan or emergency operational procedures.
5) Disturbance Control Team training.

**d) Training During Initial 60 Day Period**

The Contractor shall provide an additional 40 hours of training for Detention Officers within 60 days after completion of first 100 hours of training. The Contractor shall provide the training format and subjects, for approval by the COR and/or CO, prior to the commencement of training.

**e) Basic First Aid and CPR Training**

All Contractor employees shall be trained in basic first aid and CPR. They must be able to:

1) Respond to emergency situations within four minutes.
2) Perform cardiopulmonary resuscitation (CPR).

43

USA008338

3) Recognize warning signs of impending medical emergencies.
4) Know how to obtain medical assistance.
5) Recognize signs and symptoms of mental illness.
6) Administer medication.
7) Know the universal precautions for protection against blood-borne diseases.

**2) Supervisory Training**

All new Supervisory Detention Officers assigned to perform work under this contract must successfully complete a minimum of 40 hours of formal supervisory training provided by the Contractor prior to assuming duties. This training is in addition to mandatory training requirements for Detention Officers. Supervisory training must include at a minimum, the following management areas (in addition to 20 more hours of training):

| | | |
|---|---|---|
| a) | Techniques for issuing written and verbal orders | 2 HRS |
| b) | Uniform clothing and grooming standards | 1 HR |
| c) | Security Post Inspection procedures | 2 HRS |
| d) | Employee motivation | 1 HR |
| e) | Scheduling and overtime controls | 2 HRS |
| f) | Managerial public relations | 4 HRS |
| g) | Supervision of detainees | 4 HRS |
| h) | Other company policies | 4 HRS |

Additional classes are at the discretion of the Contractor with the approval of the COR.

The Contractor shall submit documentation to the COR, to confirm that each supervisor has received basic training as specified in the basic training curriculum.

3) Proficiency Testing

The Contractor shall give each Detention Officer a written examination following each training class to display proficiency. The Contractor may give practical exercises when appropriate.

4) Certified Instructors

Certified instructors shall conduct all instruction and testing. A state or nationally recognized institution shall certify instructors unless otherwise approved in writing by the COR. Certifications of instructors may be established by documentation of past experience in teaching positions or by successful completion of a course of training for qualifying personnel as instructors. The COR must approve the instructor prior to the training course.

5) Training Documentation

44

USA008339

The Contractor shall submit a training forecast and lesson plans to the COR or ICE designee at least 30 days prior to all training. The training forecast shall provide date, time, and location of scheduled training and afford the COR observation/evaluation opportunity.

The Contractor shall certify and submit the training hours, type of training, date and location of training, and name of the instructor monthly for each employee to the COR or ICE designee.

## V.  DETENTION SERVICES

### A.  Detention Site Standards

The Contractor shall ensure that detention sites conform to PBNDS 2011. A fire and emergency plan shall exist and shall be aggressively managed. The Contractor shall ensure facilities conformance to the following:

1.  Be clean and vermin/pest free.
2.  Have a suitable waste disposal program.
3.  The Contractor shall provide and distribute suitable linens (sheets, pillow cases, towels, etc.). The Contractor shall launder and change linens per PBNDS 2011 4.5 Personal Hygiene.
4.  The Contractor shall provide and distribute appropriate clean blankets.
5.  The Contractor shall ensure fire and emergency exits remain unimpeded to permit prompt evacuation of detainees and staff members in an emergency.
6.  The Contractor shall provide and distribute articles of personal hygiene (e.g., soap, personal deodorant, toothbrush, toothpaste, comb, toilet paper, and shaving equipment).

For safety, security, and sanitation purposes, an inspection of the detainee housing areas shall be conducted by a supervisor at a minimum of once per shift. The inspection shall be logged into the security logbook and be available for review by the COR or ICE designee.

All locks, windows, walls, floors, ventilators, covers, access panels, and doors shall be checked daily for operational wear and detainee tampering. The Contractor shall take immediate action to repair all defective equipment.

The facility shall be subject to periodic and random inspections by the COR, ICE designee, or other officials to insure compliance with ICE Standards. Deficiencies shall be immediately rectified or a plan for correction submitted by the Contractor to the COR for approval.

### B.  Language Access

The Contractor is responsible for providing meaningful access to all programs and services (e.g. medical, intake, classification, sexual assault reporting) for individuals with limited English proficiency. This should be accomplished through professional interpretation and

USA008340

translation or bilingual personnel for necessary communication with detainees who do not speak or understand English. Oral interpretation should be provided for detainees who are illiterate. Other than in emergencies, and even then, only for that period of time before appropriate language services can be procured, detainees shall not be used for interpretation or translation services. The Contractor should utilize commercial phone language interpretive services to ensure fulfillment of this requirement. All written materials provided to detainees shall generally be translated into Spanish. Where practicable, provisions for written translation shall be made for other significant segments of the ICE population with limited English proficiency.

## C. Health and Medical Care Policies

The Contractor shall comply with written policies and procedures for appropriately addressing the health needs of detainees in ICE custody. Written policies and procedures shall include, but not be limited to, the following:

1. Policies and procedures for accessing 24-hour emergency medical care for ICE detainees.
2. Policies and procedures for prompt summoning of emergency medical personnel.
3. Policies and procedures for evacuation of detainees, if deemed necessary by qualified medical personnel.
4. Policies, procedures, and post procedures for duty officers to ensure that medical emergencies are recognized and promptly attended to.
5. The Contractor shall notify the COR and/or ICE designee of all detainee requests for the need of medical treatment. These requests shall be addressed with urgency.

## D. Medical Services

The Contractor must provide adequate space for health services, to include office and support space within the medical clinic.

The Medical Service Provider shall be responsible for providing health care services for ICE detainees at the Facility in accordance with the current PBNDS 2011, NCCHC and/or the ACA standards that are in place at the time of this agreement, including but not limited to intake arrival screening, infectious disease screening and treatment, emergent, acute and chronic care, on-site sick call, dental services, and mental health services. Also required is over-the-counter and prescription medications per the FY 2019 ICE Health Service Corps (IHSC) National Formulary (Attachment 3) and IHSC Form 067 Request for approval of non-formulary medications (Attachment 4) or equivalent. Elicitation of a history and provision of required vaccinations per the Centers for Disease Control and Prevention (CDC) and the Advisory Committee for Immunization Practices (ACIP) recommendations is a requirement of all contractors providing health care services for ICE detainees, at a minimum to address the population that are the highest risk (i.e. Diabetics, HIV, Cancer, Seizure, Heart Disease, Asthma, Cancer and over the age of 50, pregnant females and other special populations), as well as those necessary to address pandemic events according to guidance provided by the IHSC Field Medical Coordinator (FMC). On-site routine labs and CLIA waived testing will be a requirement of the Medical Service Provider.  Off-site labs

USA008341

must be approved through the Medical Payment Authorization Request (MedPAR) system and will be paid for by IHSC.  All routine medical supplies will be provided at no additional cost to the government or the ICE detainee. All of the above costs except off site specialty care, emergent care, hospitalizations and approved formulary and non-formulary retail purchases of medications and durable medical equipment will be included in the bed day rate for this contract.

One  exception, as noted above, would be any approved prescription medications that must be filled at a retail pharmacy location, to include: approved non-formulary medications, or any approved newly marketed medication not currently available at the on-site pharmacy, as well as durable medical equipment identified as necessary by a medical provider. The mechanism for approval of retail purchases of medications is required of the clinical medical authority, as designated through the position description submitted by the Medical Service Provider, and durable medical equipment will be made available through the MedPAR system with assistance of the IHSC Field Medical Coordinator (FMC) or designee as needed.

1. In the event of a medical emergency, the Medical Service Provider shall proceed immediately to provide necessary emergency medical treatment, including initial on-site stabilization and off-site transport to an appropriate emergent care facility, as needed. The Medical Service Provider shall notify ICE immediately regarding the nature of the transferred detainee's illness or injury and the type of treatment provided. The cost of all emergency medical services provided off-site will be the responsibility of ICE Health Service Corps (IHSC). At no time shall the Medical Service Provider or detainee incur any financial liability related to such services.  All such services are submitted for approval through the MedPAR system. The primary point of contact for obtaining pre-approval for non-emergent care as well as the post-approval for emergent care will be the IHSC FMC assigned to this location.

2. The Medical Service Provider shall furnish a twenty-four (24) hours/seven days per week emergency medical/dental/mental health care contact list which must include local hospitals and other off-site specialty care providers. The Medical Service Provider shall ensure they have access to an off-site emergency medical provider at all times.

3. The Medical Service Provider must make available a facility emergency evacuation procedure guide that includes any patients currently housed in a medical/mental health housing area, including any isolation rooms as well as other special housing areas within the facility. The Medical Service Provider must provide training on all emergency plans to the on-site medical staff, both initially and annually after hire.

4. A separate medical record, apart from the resident's social record/or alien file, is to be maintained by the authorized Medical Service Provider. Medical records will be created and maintained by the responsible authorized Medical Service Provider and/or the ICE contracted vendor. IHSC will have full and open access to all detainee medical records during custody and up through the record retention timeframe, and as stipulated by state and local regulations. These documents will be maintained and stored per the following:

USA008342

a) ICE Health Service Corps uses the following retention requirement to maintain detainee health records for 10 years after release from custody for adults; the records for minors will be maintained until the minor reaches the age of 27 years. Records will be maintained in a format that is easily accessed and, in a location, that is secure, pest and vermin free environment, protected from fire, flood, humidity, dust, mildew, mold, and preferably climate controlled.

b) A copy of a detainee's medical records shall be transferred with the detainee upon request of the detainee. Otherwise a medical transfer summary shall accompany each detainee outlining necessary care during transit and initial period of detention entry into another facility, including current medications, medical precautions, tuberculosis testing and evaluation status, equipment needed, and appropriately authorized methods of travel. It is preferred that the Medical Service Provider seek to provide an Office of the National Coordinator (ONC) certified electronic health record for recording all detainee encounters. If a paper record is used, the record format must adhere to the NCCHC and/or other National Health Record format.

5. The Medical Service Provider shall furnish on-site health care under this Agreement as defined by the Facility Local Health Authority (usually the Health Administrator) and as approved by the ICE Health Authority on the effective date of this Agreement. The Medical Service Provider shall not charge any ICE detainee a fee or co-payment for medical services or treatment provided at the Facility. The Medical Service Provider shall ensure that ICE detainees receive no lower level of onsite medical care and services than those spelled out in the current PBNDS 2011 and based on community standards of care.

6. The Medical Service Provider shall ensure that all health care providers utilized for the care of ICE detainees are credentialed, to include: primary source verification, current licensure, certifications, and/or registrations within the State and/or City where they treat the detained population, and inquiry regarding sanctions or disciplinary actions (i.e. National Practitioner Data Bank). The Medical Service Provider shall retain, at a minimum, staffing levels as approved by IHSC at the time of implementation of this contract (Attachment 5). The Medical Service Provider shall ensure that all health care staff employed under this agreement to provide care to ICE Detainees shall be licensed and/or certified as required by the State in which the designated facility covered under this agreement resides. At no time will unlicensed and/or uncertified health care staff provide care to ICE Detainees.

7. The Medical Service Provider shall ensure that its healthcare system /employees solicit from each detainee requests for healthcare (sick call) daily and that this is tracked through a written system of accountability and within the health record with care delivered per current PBNDS 2011, NCCHC and/or ACA standards.

8. On-site health care personnel shall perform initial medical screening within 12 hours of arrival to the Facility. Arrival screening shall include, at a minimum, all questions captured on the PBNDS 2011 Intake Screening Form (Attachment 6) or equivalent:

48

USA008343

testing for TB infection and/or disease, and the elicitation and recording of past and present medical history (mental and physical, dental, pregnancy status, history of substance abuse, screening questions for other infectious disease, and current health status). Initial screening will also entail measurement of height, weight, and a complete set of vital signs (BP, P, R, and T). Blood sugar and O2 readings may be necessary dependent upon specified diagnosis or current medical concern exhibited or verbalized by the detainee and observed by medical provider.

    a) **A full health assessment to include a history and physical examination shall be completed within the first 14 days of an adult detainee arrival unless the clinical situation dictates an earlier evaluation. Detainees with chronic medical, dental, and/or mental health conditions shall receive prescribed treatment and follow-up care with the appropriate level of provider and in accordance with the current PBNDS 2011, NCCHC and/or ACA standards.**

    b) **Pregnancy Screening. Initial health screening will ensure that all female detainees/residents ages 10-56 complete a pregnancy test. The Field Operations Director (FOD) will be notified immediately regarding females determined to be pregnant, but no later than 72 hours after such determination. The field medical coordinator (FMC) and other IHSC personnel will coordinate with the Assistant FOD and /or FOD in ensuring that detention facility staff are aware of these notification requirements.**

9. The Medical Service Provider must provide detainees with access to medical services, preferably on-site, or with minimal wait times for community providers. Services provided shall include sick call coverage, provision of over-the-counter and prescription medications, treatment of minor injuries, treatment of special needs, mental health and dental health assessments. All travel medications must be provided per the current PBNDS 2011 requirement. The facility mental health program shall include appropriate group counseling, individual talk therapy, peer-support groups, and psychiatric services to meet the needs of the population.

10. The Medical Service Provider shall furnish mental health evaluations as determined by the Facility Local Health Authority and in accordance with the current PBNDS 2011, NCCHC and/or ACA standards.

11. If the Medical Service Provider determines that an ICE detainee has a medical condition which renders that person unacceptable for detention under this Agreement (for example, condition needing life support, uncontrollable violence, or serious mental health condition), the Medical Service Provider shall notify their FMC and ICE. Upon such notification, the Medical Service Provider shall allow ICE reasonable time to make the proper arrangements for further disposition of that detainee. The Medical Service Provider should expect to be requested and attest to ICE that the detainee is medically cleared for transportation and advise ICE of the necessary precautions and equipment

USA008344

required for such transportation.  IHSC FMC consultation regarding these matters is available at any time.

12. Hospitalization of Detainees

Upon order of the COR or designated ICE officer, or in an emergency situation, the Contractor shall take custody of and safeguard detainee(s) at a hospital or clinic when the detainee(s) are undergoing medical examination. The contract employee will remain until relieved by another contract employee. Twenty-four-hour custody shall be maintained, with constant visual observation when practicable. The detainees shall not use the telephones unless the Contractor receives prior approval from the COR or other ICE designee. The contract employees shall not fraternize with clinic/hospital staff or with casual visitors to the clinic/hospital. Detainee visitation is not permitted at the hospital. To prevent any situation which could result in a breach of security, requests for visitation while the detainee is in detention, including hospital detention shall be pre-approved by the COR(s) or other ICE designee prior to allowing access to the detainee. The Contractor is obligated to relay messages as requested by the detainee to the COR or other ICE designee.

13. Manage a Detainee Death

The Contractor shall comply with PBNDS 2011, Standard 4.7 Terminal Illness, Advanced Directives, and Death, in the event of a detainee injury or death. In the event of a detainee death, the Contractor shall immediately notify the COR or ICE designee and submit a written report within 24 hours. The Contractor shall fingerprint the deceased. Staff members performing the fingerprinting shall date and sign the fingerprint card to ensure that a positive identification has been made and file the card in the detainee's file. Personal property of the deceased shall be inventoried, and release coordinated with ICE to the designated family member, the nearest of kin, or the Consular Officer of the detainee's country of legal residence.

If death is due to violence, accident surrounded by unusual or questionable circumstances, or is sudden and the deceased has not been under immediate medical supervision, the Contractor shall notify the coroner of the local jurisdiction to request a review of the case, and if necessary, examination of the body.

The Contractor shall establish coroner notification procedures outlining such issues as performance of an autopsy, who will perform the autopsy, obtaining state-approved death certificates, and local transportation of the body.

The Contractor, in coordination with the COR or ICE-designee, shall ensure the body is turned over to the designated family member, the nearest of kin, or the Consular Officer of the detainee's country of legal residence.

14. The Medical Service Provider shall release any and all medical information for ICE detainees to IHSC representatives upon request.

50

USA008345

15. The Medical Service Provider shall submit a Medical Payment Authorization (MedPAR) to IHSC for payment for off-site medical care (e.g. off-site lab testing, eyeglasses, prosthetics, specialty care, hospitalizations, emergency visits). The Medical Service Provider shall enter payment authorization requests electronically as outlined in the MedPAR User Guide: https://medpar.ehr-icehealth.org/.

16. The Health Authority of the Medical Service Provider shall notify ICE and the FMC as soon as possible if emergency off site care will be or was required; and in no case more than 72 hours after the detainee received such care. Authorized payment for all off-site medical and/or mental health services beyond the initial emergency situation will be made by the Veterans Administration Financial Service Center (VA FSC) on behalf of IHSC directly to the medical provider(s).

> IHSC VA Financial Services Center
> PO Box 149345
> Austin, TX 78714-9345
> Phone:  (800) 479-0523
> Fax:  (512) 460-5538

17. The Medical Service Provider shall allow IHSC and ICE personnel access to its facility and ICE detainees' medical records for healthcare review, complaint investigations, and liaison activities with the local contract Health Authority and associated Medical Service Provider departments in accordance with HIPAA privacy exception at 45 CFR §§ 164.512 (k)(5)(i).

18. The Medical Service Provider shall provide ICE detainee medical records to ICE whether created by the Medical Service Provider or a sub-Medical Service Provider/vendor upon request from the Contracting Officer's Representative or Contracting Officer in accordance with HIPAA privacy exception at 45 C.F.R. §§ 164.512 (k)(5)(i).  This privacy exception allows disclosure without consent to a correctional institution or a law enforcement official having lawful custody of an inmate or other individual if the correctional institution or such law enforcement official represents that such protected health information is necessary for:

a)  The provision of health care to such individuals;
b)  The health and safety of such individual or other inmates;
c)  The health and safety of the officers or employees of or others at the correctional institution;
d)  The health and safety of such individuals and officers or other persons responsible for the transporting of inmates or their transfer from one institution, facility, or setting to another;
e)  Law enforcement on the premises of the correctional institution;
f)  The administration and maintenance of the safety, security, and good order of  the correctional institution; and

USA008346

g) Conducting a quality improvement / quality of care review consistent with an established quality improvement (medical quality management) program and interfacing with the IHSC quality improvement program consistent with federal, state, and local laws.

19. The VA Financial Services Center provides prescription drug reimbursement for individuals in the custody of ICE. Prescriptions are filled at local pharmacies which are part of the Script Care Network (or other designated Pharmacy Benefits Manager). Below is the process for obtaining prescriptions for ICE detainees:

a) The Medical Service Provider shall request a group number which should be used at the pharmacy in conjunction with the BIN# 004410 and Processor Control # assigned by Script Care Network to designate the pharmacy benefit is for an ICE detainee. The custodial facility should either fax or take a copy of the prescription to their participating pharmacy and indicate that the prescription is for an ICE detainee.

b) The pharmacy shall run the prescription through the Script Care network for processing.

c) Formulary prescriptions will be dispensed; however, there will be no need for an exchange of cash between the pharmacy and custodial facility as the pharmacy will receive payment directly from Script Care.

d) Non-Formulary prescriptions will follow the same procedure as formulary prescriptions; however, non-formulary medications will require prior authorization. The custodial facility will fax the Drug Prior Authorization Request Form to Script Care to 409-833-7435. The authorization will be loaded into the Script Care network and the pharmacy will receive a call indicating that the prescription has been approved. Non-Formulary urgent requests must be submitted in the above manner except an X should be placed on the form marked for URGENT REQUEST and faxed to 409-923-7391. The authorization shall be loaded into the Script Care network and the pharmacy shall receive a call indicating the prescription has been approved.

For further information regarding the Script Care Network please contact the VA Financial Services Center at 800-479-0523 or Script Care directly at 800-880-9988.

20. Facility Requirements for Infectious Disease Screening

The Medical Service Provider will ensure that there is adequate space and equipment to provide medical intake screening including tuberculosis (TB) screening within the intake processing area.

a) Tuberculosis Screening

The Medical Service Provider will perform TB screening as part of the routine intake screening, which must be completed within 12 hours of detainee admission. TB screening will include, at a minimum, TB symptom screening and testing for TB

52

USA008347

infection and/or disease using any Food and Drug Administration (FDA) approved method. Detainees who have symptoms suggestive of TB disease will be immediately placed in an airborne infection isolation room and promptly evaluated for suspected TB disease. Detainees who are initially tested using a test for TB infection [TB skin test (TST) or interferon gamma release assay (IGRA)], and the results are positive according to criteria, but have no symptoms suggestive of TB disease, must be evaluated with a chest radiograph within 5 days of the notification of a positive result.

Detainees who are identified with confirmed or suspected active TB (e.g., symptoms or chest radiograph suggestive of TB) will be placed in a functional airborne infection isolation room and managed in accordance with the current PBNDS 2011 and all applicable CDC guidelines: http://www.cdc.gov/tb/publications/guidelines/default.htm. If there is no clinical or radiographic evidence suggestive of TB disease the detainee can be housed with the general population. Only a trained and qualified health care provider can perform chest radiography if the site has this capability, and only a credentialed radiologist can interpret these radiographs. The facility will have an alternative non-punitive process in place for detainees who refuse the TB screening assessment.

The Medical Service Provider will notify IHSC and the local health department of all detainees with confirmed or suspected TB disease, including detainees with clinical or radiographic evidence suggestive of TB. Notification shall occur within one working day of identifying a detainee with confirmed or suspected TB disease. Notification to local health departments shall identify the detainee as being in ICE custody and shall include the ICE detainee number and other identifying information. For detainees with confirmed or suspected TB disease, the Medical Service Provider will coordinate with IHSC and the local health department to facilitate release planning and referrals for continuity of care prior to release. The Medical Service Provider will evaluate detainees annually for symptoms consistent with TB within one year of the previously documented TB evaluation. For detainees initially screened with a TST or IGRA with a negative result, annual evaluation will include testing with the same method as previously used. For detainees initially evaluated with a chest radiograph interpreted as not suggestive of TB disease, routine annual chest radiograph is not recommended.

b) Radiology Service Provider

If the Medical Service Provider utilizes radiology for TB screening, the requirement should be built into the established bed day rate for this contract. The cost of equipment, maintenance, staff training, interpretation of the radiographs by credentialed radiologists, and the transmission of data to and from the detention facility will be charged directly to the facility.

USA008348

21. Airborne Precautions

In order to prevent the spread of airborne infectious disease or cross contamination of zones within the facility, it is preferred that the HVAC system in the intake screening area be designed to exhaust to the exterior and prevent air exchange between the intake screening area and any other area within the facility (see CDC guidelines http://www.cdc.gov/tb/publications/guidelines/Correctional.htm

22. Language Access

The Medical Service Provider is responsible for providing meaningful access to all programs and services (e.g. medical, intake, classification, sexual assault reporting) for individuals with limited English proficiency. This should be accomplished for necessary communication with residents who do not speak or understand English through professional interpretation and translation or qualified bilingual personnel. Oral interpretation should be provided for residents who are illiterate. Only during emergencies, and even then, only for that period of time and until appropriate language services can be procured, can facility residents be used for interpretation or translation services. The Medical Service Provider should utilize commercial phone language interpretive services to ensure fulfillment of this requirement. Telephones that can be used for this purpose must be available in each classroom. In addition, deaf detainees or residents shall have access to a TTY telephone.

23. Standards of Medical Care

The Medical Service Provider is responsible for providing resources for evidence-based standards of medical care which can be used as a guide for treatment of most diagnosed health care concerns.  See examples of resources below.

   a) Asthma
      IHSC Sample Clinical Practice Guidelines (Attachment 7)
   b) Chemical dependence/ Intoxication/ Withdrawal
      Federal Bureau of Prisons Clinical Practice Guideline: Detoxification of the Chemically Dependent Inmate.  See IHSC Operations Memorandum 11-004 dated June 9, 2011 for reference.
      http://www.bop.gov/resources/health_care_mngmt.jsp
   c) Diabetes
      Standards of Medical Care in Diabetes—2015 American Diabetes Association
      http://care.diabetesjournals.org/content/38/Supplement_1
   d) Epilepsy
      American Epilepsy Society
      https://www.aesnet.org/clinical_resource_s/guidelines
   e) Gender Dysphoria
      IHSC Sample Clinical Practice Guidelines (Attachment 7)
   f) Hepatitis A and B

54

USA008349

Federal Bureau of Prisons Clinical Practice Guidelines for Hepatitis A, Hepatitis B and Cirrhosis.
http://www.bop.gov/resources/health_care_mngmt.jsp

g) Hepatitis C
IHSC Sample Clinical Practice Guidelines (Attachment 7)

h) HIV
NIH Guidelines for the Use of Antiretroviral Agents in HIV-1 Infected Adults and  Adolescents
http://www.aidsinfo.nih.gov/guidelines

i) Hypertension
IHSC Sample Clinical Practice Guidelines (Attachment 7)

j) Lipids
2013 American College of Cardiology/American Heart Association Blood Cholesterol Guideline
2011 American Heart Association Scientific Statement:  Triglycerides and Cardiovascular Disease
https://circ.ahajournals.org/content/123/20/2292.full.pdf

k) Sickle Cell Disease
IHSC Sample Clinical Practice Guidelines (Attachment 7)

l) Tuberculosis
Tuberculosis Management Control Guide for IHSC Medical Clinics
Centers for Disease Control and Prevention
http://www.cdc.gov/tb/publications/guidelines/default.htm

m) Depression
Federal Bureau of Prisons Clinical Practice Guideline: Management of Major Depressive Disorder
http://www.bop.gov/resources/health_care_mngmt.jsp

n) Schizophrenia
Federal Bureau of Prisons Clinical Practice Guideline: Pharmacological Management of Schizophrenia
http://www.bop.gov/resources/health_care_mngmt.jsp

24. Quality Assurance (QA) Program

The Medical Service Provider shall implement an internal review and quality assurance program for the purposes of maintaining operations in accordance with the current PBNDS 2011, NCCHC and/or ACA.

The minimum data inputs for trending, analysis, planning, executing, and assessing the effectiveness of QA- and quality improvement (QI)-related activities and corrective actions will derive from data collected by means of formal incident reports (see below) and the IHSC electronic Quality Medical Care (QMC) Audit tool (Attachment 8).  IHSC encourages facilities to collect additional data unique to the facility and its environment for use in their QA program.

55

USA008350

The Medical Service Provider must complete and forward to the designated IHSC FMC the QMC tool report and an analysis of incident reports (Attachment 9) on a quarterly basis on the 10th of the month following the end of each fiscal year quarter (1st quarter –Oct, Nov, Dec; 2nd quarter-Jan, Feb, Mar; 3rd quarter-Apr, May, Jun;4th quarter-Jul, Aug, Sept).

The clinical operation will be audited by IHSC every 6 months. This audit will be conducted by a designated IHSC Healthcare professional.  In addition to the audit mentioned above the facility will be assessed for maintaining compliance with the NCCHC, ACA, and the current PBNDS 2011 requirements.

The QA program shall include:

a)  Participation in a multidisciplinary QI committee;
b)  Collection, trending analysis, and evaluation of data, along with planning, interventions and reassessments;
c)  Analysis of the need for ongoing education and training;
d)  On-site monitoring of health service outcomes on a regular basis through:

   1)  Chart reviews (including investigation of complaints and quality of health)
   2)  Review of practices for prescribing and administering medication;
   3)  Investigation of complaints and grievances;
   4)  Monitoring of corrective action plans;
   5)  Reviewing all deaths, suicide attempts and illness outbreaks;
   6)  Developing and implementing QI activities or corrective actions plans to address and resolve identified problems and concerns;
   7)  Reevaluating problems or concerns to determine whether QI activities or corrective actions implemented achieved and sustained desired results;
   8)  Incorporating findings of internal review activities into the organization's educational and training activities;
   9)  Ensuring records of internal review activities comply with legal requirements on confidentiality of records.
   10) External peer review on an annual basis for all independently licensed medical professionals.

The Medical Service Provider will achieve full NCCHC (Adult) accreditation within twelve months of the contract award. The service provided will maintain accreditation compliance at all times for the life of the contract.

25. Environmental Health

The Medical Service Provider shall implement all requirements of the Environmental Health and Safety sections of the current PBNDS 2011 in the health services areas, to include all areas where medical, dental, mental health, and intake medical screening services are performed.  The Medical Service Provider shall implement all general housekeeping and environmental cleaning and disinfection in all areas where medical,

USA008351

dental, mental health, and intake medical screening services are rendered, including routine and terminal cleaning of medical housing and medical isolation units.

26. Electronic Health Record (eHR)

The Medical Service Provider will be responsible to purchase and maintain an ONC-CCHIT commercial-off-the-shelf (COTS) eHR that is compatible with ICE Health Service Corps (IHSC) within 30 days of contract award. The Medical Service Provider shall procure and maintain their data in a GSA FedRAMP certified environment. The Government will provide the Medical Service Provider with the Government Furnished Information document for the Electronic Health Record (eHR). The Requirements Traceable Matrix (RTM) document (Attachment 10) will provide the Medical Service Provider with requirements and configurations for the eHR. The Medical Service Provider shall replicate all eHR configurations at their own expense, if an alternative and compatible product is proposed.

**E.  Detainee Voluntary Work Program (if applicable)**

The Contractor shall develop a detainee work program plan with the approval of the CO prior to receipt of the Notice to Proceed. Detainee labor shall be used in accordance with the approved detainee work plan and will shall be paid $1 day. The detainee work plan must be voluntary, and may include work assignments for industrial, maintenance, custodial, service, or other jobs. The detainee work program shall not conflict with any other requirements of the contract and must comply with all applicable laws and regulations.

Detainees shall not be used to perform the responsibilities or duties of an employee of the Contractor. Detainees shall not be used to perform work in areas where sensitive documents are maintained such as designated ICE workspace. Appropriate safety/protective clothing and equipment shall be provided to detainee workers. Detainees shall not be assigned work that is considered hazardous or dangerous. This includes, but is not limited to, areas or assignments requiring great heights, extreme temperatures, use of toxic substances, and unusual physical demands.

The Contractor shall supply sufficient Detention Officers to monitor and control detainee work details. Unless approved by the COR, these work details must be within the security perimeter.

It will be the sole responsibility of ICE to determine whether a detainee will be allowed to perform on voluntary work details and at what classification level. All detainees shall be searched when they are returned from work details.

**VI.   REQUIRED ADMINISTRATION AND MANAGEMENT SERVICES**

**A.  Manage the Receiving and Discharge of Detainees**

USA008352

1. In accordance with PBNDS 2011, the Contractor will provide for the admitting and releasing of detainees to protect the health, safety, and welfare of each individual. During the admissions process, detainees undergo screening for medical purposes, have their files reviewed for classification purposes, submit to a standard body search, and are personally observed and certified regarding the examination, categorization, inventorying, and safeguarding of all personal belongings. This shall include fingerprinting of detainees.

   The Contractor shall provide a detainee classification system that adheres to the requirements of PBNDS 2011, Standard 2.2 "Custody Classification System," and ensures detainees are classified appropriately using objective criteria. Detainees will be classified upon arrival, before being admitted to the general detainee population. The Contractor will periodically re-classify detainees, in accordance with the PBNDS 2011.

   The Contractor may be required to access and utilize ICE detention booking system to properly book detainees in and out of ICE custody.

2. The Contractor shall effectuate departures. Effectuating departure requires Contractor employees to perform detainee-related activity including but not limited to:  positive identification, documentation preparation and review, provision of any sack lunches required, transportation, escorting and returning all DHS documentation to the appropriate DHS supervisor upon completing the escort assignment. In addition, Contractor employees shall, when required by proper authority, affirm, swear, and witness to all actions of effectuating departure that were accomplished, performed, carried-out, and done and in transactions involving the detainee(s), when required in a legal setting, deposition, or court of law.

   The time, point, and manner of release from a facility shall be consistent with safety considerations and shall take into account special vulnerabilities. Facilities that are not within a reasonable walking distance of, or that are more than one mile from, public transportation shall transport detainees to local bus/train/subway stations prior to the time the last bus/train leaves such stations for the day. If public transportation is within walking distance of the detention facility, detainees shall be provided with an information sheet that gives directions to and describes the types of transportation services available. However, facilities must provide transportation for any detainee who is not reasonably able to walk to public transportation due to age, disability, illness, mental health or other vulnerability, or as a result of weather or other environmental conditions at the time of release that may endanger the or safety of the detainee. Upon release, detainees shall also be provided with a list of shelter services available in the immediate area along with directions to each shelter. Prior to their release, detainees shall be given the opportunity to make a free phone call to a friend or relative to arrange for pick up from the facility. As practicable, detainees shall be provided with a laundered set of their own clothing, or one set of non-institutional clothing and footwear, weather appropriate, for their final destination.

USA008353

**B. Manage and Account for Detainee Assets (Funds, Property)**

The Contractor is solely responsible for all detainee personal property (i.e. stolen/misplaced goods due to Contractor negligence and/or mishandling of detainee personal property). The Contractor shall provide written policies and procedures in managing the detainee's personal property.

The safeguarding of detainees' personal property will include: the secure storage and return of funds, valuables, baggage, and other personal property; a procedure for documentation and receipting of surrendered property; and the initial and regularly scheduled inventories of all funds, valuables, and other property. In accordance with the PBNDS 2011, every housing area shall include a designated storage area. This area shall contain a lockable or other securable space for storing detainees' authorized personal property.

Written procedures shall be established for returning funds, valuables, and personal property to a detainee being transferred or released that adheres to the requirements of ICE policy. The Contractor shall ensure that all detainees who are scheduled for either transfer or release are given all funds (in cash or check, whichever is deemed appropriate by the ICE COR or ICE designee immediately prior to leaving the facility. Confiscated foreign currency funds are to be returned to the detainee. This includes the out-processing of detainees on all removal flights. For such removal flights, the Contractor will provide all necessary items for removal processing.

**C. Securely Operate the Facility**

Policy and procedures for the maintenance and security of keys and locking mechanisms shall be developed, in accordance with the PBNDS 2011, 2.7 Key and Lock Control. The procedures shall include, but are not limited to: method of inspection to expose compromised locks or locking mechanisms; method of replacement for all damaged keys and/or locks; a preventive maintenance schedule for servicing locks and locking mechanisms and method of logging all work performed on locks and locking mechanisms; policy for restricting security keys from 24 hour issue or removal from the institution; and method of issuing emergency keys.

Staff responsible for lock maintenance shall receive training and be certified from a Government-approved training program specializing in the operation of locks and locking mechanisms.

The Contractor shall provide constant armed perimeter surveillance of the facility.

**D. Establish and Maintain a Program for the Prevention of Sexual Abuse/Assault**

The Contractor shall develop and implement a comprehensive sexual abuse/assault prevention and intervention program in accordance with PBNDS 2011, Standard 2.11, "Sexual Abuse and Assault Prevention and Intervention," and all facility requirements of DHS PREA ("Standards to Prevent, Detect, and Respond to Sexual Abuse and Assault in

59

USA008354

Confinement Facilities," 79 Fed. Reg. 13100 (Mar. 7, 2014), as outlined https://www.govinfo.gov/content/pkg/FR-2014-03-07/pdf/2014-04675.pdf. This program shall include training and/or information that is given separately to both staff and detainees.

### E. Collect and Disseminate Intelligence Information

Policy and procedures for collecting, analyzing, and disseminating intelligence information regarding issues affecting safety, security, and the orderly running of the facility shall be developed. This information shall include, but not be limited to: gang affiliations; domestic terrorist groups; tracking of detainees having advanced skills in areas of concern (locksmiths, gunsmiths, explosives, and computers, etc.); narcotics trafficking; mail and correspondences; detainee financial information; detainee telephone calls; visiting room activity; and actions of high-profile detainees. The Contractor shall share all intelligence information with the Government.

### F. ICE Notifications

The Contractor shall immediately report all serious incidents as outlined in the detention standards to the Field Office Director or ICE designee and the COR. Serious incidents include, but are not limited to the following: activation of disturbance control team(s); disturbances (including gang activities, group demonstrations, food boycotts, work strikes, work place violence, civil disturbances/protests); staff uses of force including use of lethal and less-lethal force (includes detainees in restraints more than eight hours); assaults on staff/detainees resulting in injuries that require medical attention (does not include routine medical evaluation after the incident); fires; fights resulting in injuries requiring medical attention; full or partial lock-down of the facility; escape; weapons discharge; suicide attempts; deaths; declared or non-declared hunger strikes; adverse incidents that attract unusual interest or significant publicity; adverse weather; fence damage; power outages; bomb threats; high profile detainee cases admitted to a hospital; significant environmental problems that impact the facility operations; transportation accidents (e.g., airlift, bus) resulting in injuries, death or property damage; and sexual assaults.

Pursuant to ICE instructions, the Contractor shall counteract civil disturbances, attempts to commit espionage or sabotage, and other acts that adversely affect the normal site conditions, the security and safety of personnel, property, detainees, and the general public.

The Contractor will complete all notifications to ICE/ERO as outlined in the PBNDS 2011.

### G. Maintain Institutional Emergency Readiness

The Contractor shall submit an institutional emergency plan that will be operational prior to issuance of the NTP, in accordance with PBNDS 2011, Standard 1.1 Emergency Plans.  The plan shall receive the concurrence of the COR prior to implementation and shall not be modified without the further written concurrence of the CO.

USA008355

The Contractor shall have written agreements with appropriate state and local authorities that will allow the Contractor to make requests for assistance in the event of any emergency incident that would adversely affect the community.

Any decision by ICE or other federal agencies to provide and/or direct emergency assistance will be at the discretion of the Government. The Contractor shall reimburse the Government for any and all expenses incurred in providing such assistance.

The Contractor shall submit to the COR a proposed inventory of intervention equipment (e.g., weapons, munitions, chemical agents) intended for use during performance of this contract. The COR, prior to issuance of the NTP, shall provide concurrence of the intervention equipment. The approved intervention equipment inventory shall not be modified without prior written concurrence of the CO.

The Contractor shall obtain the appropriate authority from state or local law enforcement agencies to use force as necessary to maintain the security of the facility. The use of force by the Contractor shall at all times be consistent with all applicable policies of PBNDS 2011, Standard 2.15 Use of Force and Restraints.

## H. Manage Computer Equipment and Services in Accordance with all Operational Security Requirements

The Contractor shall comply with all federal security and privacy laws and regulations established to protect federal systems and data. The Contractor shall inform all personnel of the confidential nature of ICE detainee information.

The Contractor shall restrict access to data information pertaining to ICE detainees to authorized employees with the appropriate clearance who require this information in the course of their official duties.

The Contractor may not disclose information pertaining to ICE detainees to a third party without written permission from the COR.

The Contractor shall develop a procedural system to identify and record unauthorized access or attempts to access ICE detainee information. The Contractor shall notify the COR or ICE-designee within four hours of a security incident.

## I. Manage and Maintain a Commissary

A commissary shall be operated by the Contractor as a privilege to detainees who will have the opportunity to purchase from the commissary at least once per week. These items will not include those items prohibited by the Warden/Facility Director. All items available at the commissary must be approved by the COR or ICE-designee. The commissary inventory shall be provided to the COR upon request. Notice of any price increases must be provided to the COR. The Contractor may assess sales tax to the price of items, if state sales tax is applicable.

USA008356

Revenues shall be maintained in the facility commissary account and not commingled with any other funds. If funds are placed in an interest-bearing account, the interest earned shall be credited to the detainees. Any expenditure of funds from the account shall only be made with the approval of the Contracting Officer. Any revenues earned in excess of those needed for commissary operations shall be used solely to benefit detainees at the facility. Using these funds for any expense for which the Contractor is required to pay is prohibited. The Contractor shall provide independent auditor certification of the funds to the COR every 90 days.

At the end of the contract period, or as directed by the Contracting Officer, a check for any profits remaining in this account associated with detainee commissary purchases shall be made payable to the Treasury General Trust Fund and given/transmitted to the Contracting Officer.

Detainees are permitted to receive funds from outside sources (i.e., from family, friends, bank accounts). Outside funds or those generated from work may be used to pay for products and services from the commissary.

**J.  Manage and Maintain a Detainee Telephone System (DTS)**

1. The Contractor shall provide detainees with reasonable and equitable access to telephones as specified in PBNDS 2011, Standard 5.6 Telephone Access.  Telephones shall be located in an area that provides for a reasonable degree of privacy and a minimal amount of environmental noise during phone calls.

2. If authorized to do so under applicable law, the Contractor shall monitor and record detainee conversations.  If detainee telephone conversations can be monitored under applicable law, the Contractor shall provide notice to detainees of the potential for monitoring.  However, the Contractor shall also provide procedures at the facility for detainees to be able to place unmonitored telephone calls to their attorneys.

3. Telephone rates shall not exceed the Federal Communications Commission (FCC) rates for inmate telephone service, as well as State established rates where applicable, and shall conform to all applicable federal, state, and local telephone regulations.

4. Video phones, portable electronics or other enhanced telecommunications features provided by the DTS Contractor to ICE detainees, based upon concurrence between ICE and the Contractor, may be added in the future subject to negotiation at no cost to ICE. These features may not in any way compromise the safety and security of the detainees, staff or the facility.  Any new or enhanced telecommunications features must be integrated within the DTS service and can NOT be a separate system or software from the DTS service. Such capabilities may now or in the future include; video visitation, limited web access for law library, email, kites, commissary ordering, educational tools, news, sports, and video games. Pricing for the use of these technologies will be set by the

USA008357

DTS provider, subject to negotiations with ICE, and shall be negotiated at a future time and date if required.

5.  The ICE designated DTS Contractor shall be the exclusive provider of detainee telephones for this facility. This will occur at the expiration of any current contract with a Telecommunications Company. Notwithstanding any existing Telecommunications contract, the Contractor shall require the Telecommunications Company to provide connectivity to the DTS Contractor for detainee pro bono telephone calls. The Contractor shall make all arrangements with the DTS Contractor per the DTS Contract.  The DTS Contractor shall be allowed to install vending debit machines and shall receive 100 percent of all revenues collected by sale of prepaid debit services.  The DTS Contractor shall be responsible for furnishing all inventory and supply of all DTS calling services to the Contractor.  The DTS Contractor shall be responsible for the costs incurred for installation of the equipment, any monthly telephone charges incurred from the operation of DTS, and the maintenance and operation of the system.  The Contractor shall not be entitled to any commissions, fees, or revenues generated by the use of the DTS or the detainee telephones.

*See PWS Addendums for specific requirements.*

## VII.    FACILITY SECURITY AND CONTROL

### A.  Security and Control (General)

The Contractor shall maintain a copy of facility post orders for employee review within the areas of assignment, and shall initiate responses to any incidents as outlined in the post orders. Contractor employees shall write reports of incidents as outlined in the post orders.

The Contractor shall operate and control all designated points of access and egress on the site; such as, detainee housing units, pods, barracks, courtrooms, medical facilities, and hold rooms. The Contractor shall inspect all packages carried in or out of site in accordance with ICE procedures. The Contractor shall comply with ICE security plans.

The Contractor shall comply with all of the PBNDS 2011 pertaining to the security and control of the detention facilities. The Contractor shall adhere to local operating procedures within each facility.

The Contractor shall provide, install, and maintain a building access control system in all ICE and/or DOJ administrative space. The Contractor shall provide the Government administrative access and oversight role for system. The Contractor shall comply with ICE security plans.

### B.  Detainee Rights

The Contractor shall supervise, observe, and protect detainees from sexual abuse, discrimination, corporal punishment, personal injury, property damage, harassment, or violation of detainees' civil rights. Contract personnel shall have a zero-tolerance policy for

USA008358

incidents of sexual abuse or assault that may occur in the facility. Contract personnel shall adhere to ICE policies, procedures, and detention standards.

Detainees have the right to be free from discrimination for any reason, including race, religion, national origin, sex, sexual orientation, gender identity, physical ability, mental ability, or political beliefs.

**C. Unauthorized Access**

The Contractor shall detect and detain persons attempting to gain unauthorized access to the site(s) identified in this contract.

**D. Direct Supervision of Detainees**

The Contractor shall provide supervision of all detainees in all areas, including supervision in detainee housing and activity areas, to permit Detention Officers to hear and respond promptly to emergencies. The Contractor shall have direct supervision monitoring each occupied housing unit. This direct supervision position or positions (determined by the size of the housing unit) is separate from the housing control post.

The Contractor shall comply with the requirements applicable to detention facilities contained in Subpart A of DHS PREA, specifically §115.13, including the development of detainee supervision guidelines that are reviewed annually, as outlined at https://www.govinfo.gov/content/pkg/FR-2014-03-07/pdf/2014-04675.pdf.

**E. Maintain a Video Surveillance Program**

The Contractor shall ensure video surveillance of hallways, exits, and common areas. Additionally, surveillance systems shall be installed and updated in accordance with DHS PREA §115.18(b). A qualified individual shall be responsible for monitoring this system inside and outside the building. Considering that the videos will be recordings of residents who may be seeking asylum or other considerations under U.S. immigration law, the Contractor is required to maintain the recordings and may not release them to anyone, unless approved by ICE. The Contractor shall retain recordings for a minimum of 90 days, or for the duration of any investigation as necessary for use by local law enforcement, ICE, or the Contractor

**F. Log Books**

The Contractor shall be responsible for completion and documentation of, for each shift, the following information in the logbooks:

1. Activities that have an impact on the detainee population (e.g., detainee counts, shakedowns, detainee movement in and out of the site, and escorts to and from court).
2. Shift activities (e.g., security checks, meals, recreation, religious services, property lockers, medical visits).

64

USA008359

3. Entry and exit of vehicles and persons other than detainees, ICE staff, or Contractor staff (e.g., attorneys and other visitors).
4. Fire drills and unusual occurrences.

## G. Reports

The Contractor shall furnish, on a daily basis, a manifest of all detainees currently detained in the facility. The manifest shall contain the following information for each detainee: "A" File Number (system of numbering supplied by ICE); office received from; name; date of birth; gender; nationality; date of arrival; number of days the detainee has been in the facility; and type of release, if applicable. The manifest shall be transmitted in a Microsoft Excel format. Contractor shall conduct a daily reconciliation of ICE detention manifest and the Contractor manifest to ensure accuracy. Any discrepancies in the reports shall be the responsibility of the Contractor to immediately rectify and brought to the attention of ICE.

The Contractor shall provide monthly status reports to the COR or ICE designee. Such reports shall include a monthly key indicator report, which indicates the key personnel positions of the facility (e.g., position title, name of the employee, vacancies and length of vacancies, dates of service, additional comments). These monthly reports shall be submitted to the COR or ICE designee by the fifth of each month for the previous month's activities and staffing.

The Contractor shall prepare required orders, instructions, and reports of accidents, security violations, fires, and bomb threats. The reports shall be maintained on file, concerning all activities in connection with duties and responsibilities for the services performed under this contract. All such records shall be kept using a system with a written policy, which allows the reports to be made available to the Government for inspection.

The Contractor shall, at the request of ICE, prepare any special or other reports, or issue further orders and instruction as may be required in support of work within the scope of this contract. The distribution, format, and time elements for these reports shall be directed by Government requirements.

## H. Detainee Counts

The Contractor shall monitor detainee movement and physically count detainees as directed in PBNDS 2011 2.8 Population Counts.

## I. Daily Inspections

The Detention Officers shall conduct daily inspections of all security aspects of the site, consistent with PBNDS 2011, Standard 2.4 "Facility Security and Control." They shall check all bars, locks, windows, walls, floors, ventilation covers, glass panels, access plates, protective screens, doors, lights, and equipment for operational wear and detainee tampering. The Detention Officers shall also report slippery floor surfaces. This documentation shall be

USA008360

made daily in a logbook. Problems discovered during these inspections shall be clearly identified in the documentation.

The Contractor shall also notify the COR of any abnormalities or problems. The Contractor shall immediately notify the COR or ICE designee on duty of any physical facility damage. Written documentation of any problem areas shall be submitted to the COR by the end of the shift.

**J. Deviation from Prescribed Schedule Assignments**

The Contractor is authorized to deviate from the scheduled assignment when unusual conditions or circumstances so demand, and if prior approval is received from the COR. All deviations shall be recorded in the daily logbook. When the COR is not available, the Contractor shall notify the ICE-designee immediately or as soon as is practically possible.

**K. Use of Force and Restraints**

ICE restricts the use of physical force and restraints by Detention Officers. Any use of force or restraints must be in compliance with PBNDS 2011, Standard 2.15 "Use of Use of Force and Restraints."

**L. Escapes**

The Contractor shall take all appropriate measures to prevent escapes. The Contractor shall notify the COR or ICE-designee immediately if an escape or an attempted escape has occurred. The Contractor shall provide the COR and ICE-designee with a written report prior to the end of the shift. The Contractor shall be held to the following standards concerning escapes:

1. The Contractor assumes absolute liability for the escape of any detainee in its control.
2. The Contractor shall provide written policies and procedures regarding the actions to be taken in the event of an escape. This document must include reporting requirements for all contract employees, escorts, supervisors, and management personnel. These procedures shall meet the approval of the COR, be reviewed at least annually, and updated as necessary.
3. Escapes shall be grounds for removing the responsible Contractor Employee(s) from duty if the Contractor Employee(s) is/are determined by the Contractor or the COR to be negligent, reckless, or intentionally responsible for the escape. Notice of removal shall be provided to the Contracting Officer.
4. Corrective actions to prevent future escapes or attempted escapes shall be taken immediately and communicated to the COR for approval. A written report of the remedial action shall be due to the COR within 24 hours of an escape or attempted escape.
5. An escape is deemed an egregious incident and subject to an expedited processing of a Contract Discrepancy Report resulting in a deduction or withholding for any applicable standards violations.

66

USA008361

**M. Evacuation Plan**

The Contractor shall furnish 24-hour emergency evacuation procedures. The Contractor shall develop a written evacuation and alternate staging plan for use in the event of a fire or major emergency, in accordance with PBNDS 2011, Standard 1.1 "Emergency Plans."

**N. Sanitation and Hygienic Living Conditions**

The Contractor shall comply with the requirements of the Occupational Safety and Health Act of 1970 and all codes and regulations associated with 29 CFR 1910 and 1926. The Contractor shall comply with all applicable ICE, federal, state and local laws, statutes, regulations, and codes. In the event there is more than one reference to a safety, health, or environment requirement in an applicable, law, standard, code, regulation, or ICE policy, the most stringent requirement shall apply.

**O. Physical Plant**

The facility operation and maintenance shall ensure that detainees are housed in a safe, secure, and humane manner. All equipment, supplies, and services shall be Contractor-furnished and in operating condition, except as otherwise noted.

The facility, whether new construction, expansion, or an existing physical plant, shall be operated, and maintained in accordance with all applicable federal, state, and local laws, regulations, codes, guidelines, and policies. In the event of a conflict between federal, state, or local codes, regulations, or requirements, the most stringent shall apply. In the event there is more than one reference to a safety, health, or environmental requirement in an applicable law, standard, code, regulation, or Government policy, the most stringent requirement shall apply.

The facility shall provide housing configurations commensurate with the security needs of the population.

The facility, whether new construction, expansion, or existing physical plant, shall comply with the building codes under which it was permitted at the time of original construction. Whether the facility is new construction, or an expansion of an existing physical plant fire protection and life safety issues shall be governed by the building and life safety codes under which the facility was permitted at the time of original construction.

The facility, whether new construction, expansion, or existing physical plant, shall comply with the requirements in effect at the time of the original facility construction of the *Architectural Barriers Act of 1968* as amended and the *Rehabilitation Act of 1973* as amended. The standards for facility accessibility by physically handicapped persons as set forth in "Uniform Federal Accessibility Standards/Fed Std. - 795 4/01/88 Edition" (UFAS) shall apply. All areas of the buildings and site shall meet these requirements.

USA008362

A safety program shall be maintained in compliance with all applicable Federal, state and local laws, statutes, regulations, and codes. The Contractor shall comply with the requirements of the *Occupational Safety and Health Act of 1970* and all codes and regulations associated with  29 CFR 1910 and 1926.

Fire Alarm Systems and Equipment – All fire detection, communication, alarm, annunciation, suppression, and related equipment shall be operated, inspected, maintained, and tested in accordance with the edition of the applicable NEC and Life Safety Codes under which the facility was permitted at the time of original construction.

The Contractor shall provide outside lighting sufficient to illuminate the entire facility and secure perimeter, subject to ICE's visual inspection and approval.

For new construction, expansion, or existing physical plant, final and completed, the Contractor prior to issuance of the NTP shall submit design/construction documents to the COR. For all new construction or expansion, the construction schedule shall be updated to reflect current progress and submitted to the COR on a monthly basis. Government staff will make periodic visits during construction to verify Contractor progress and compliance with contract requirements. As-built drawings and current drawings of the buildings and site utilities shall be maintained in a secure location during construction and contract performance. These updates shall be provided to the COR within 30 days of any changes made. Site utilities include, but are not limited to: water and sewer lines; gas lines; tunnels; steam lines; chilled water lines; recording layouts; elevations; modifications; additions; etc. Two copies of the as-built drawings shall be provided to the COR in AUTOCAD release 14.0 on a CD-ROM no later than 90 days after issuance of the NTP.

Promptly after the occurrence of any physical damage to the facility (including disturbances), the Contractor shall report such damage to the COR or ICE designated official. It shall be the responsibility of the Contractor to repair such damage, to rebuild or restore the institution.

Government staff will be on-site to monitor contract performance and manage other Government interests associated with operation of the facility. Government staff will have full access to all areas of the facility. Contractor access to Government required space must be pre-approved by the COR. In cases of emergency the Contractor shall notify the COR promptly.

**P. Environmental Policy Procedures:**

1.  National Environmental Policy Act (NEPA)

    Any action funded in whole or in part by a Federal Agency, or requiring approval by a Federal Agency, must be evaluated in accordance with NEPA (42 U.S.C. § 4321) and related environmental laws and executive orders.  Therefore, ICE requires the following deliverables from an offeror so that ICE may use the provided information to fulfill its obligations related to NEPA:

USA008363

a) The offeror must provide an Environmental Impact Evaluation, which shall include all necessary information for the agency to analyze the potential for environmental impact of a proposed action, assign a value to the level of impact (e.g., minor, moderate, or major), consider mitigation, and determine the level of significance; whether significant or not.  An environmental impact evaluation is used by ICE to make a decision regarding the application of a CATEX, documentation in the form of an EA and FONSI, or a final EIS and ROD.

b) ICE advises all offerors that, as part of the solicitation process, the offeror must provide information related to the environmental conditions of the proposed facility location(s). The offeror must provide a Phase I ESA conducted and reported in compliance with the ASTM International (ASTM) Designation E 1527-13, "Standard Practice for Environmental Site Assessment: Phase I Environmental Site Assessment Process." For more information on how this report will figure into any evaluation for award, reference Section L and M of this solicitation.

2. Other Requirements

The successful awardee of any contract for detention space will remain in compliance with federal statutes during performance of the contract including, but not limited to, the following Acts: *Clean Air, Clean Water, Endangered Species, Resource Conservation and Recovery*; and other applicable laws, regulations and requirements.  The successful awardee of any contract for detention space will also comply with all applicable limitations and mitigation measures identified in any document prepared in conjunction with the contract pursuant to NEPA.

The successful awardee of any contract for detention space shall be responsible for and will indemnify and hold the Government harmless for any and all spills, releases, emissions, disposal, and discharges of any toxic or hazardous substance, any pollutant, or any waste, whether sudden or gradual, caused by or arising under the performance of the contract or any substance, material, equipment, or facility utilized.  For the purposes of any environmental statute or regulation, the successful awardee will be considered the "owner and operator" for any facility utilized in the performance of the contract and shall indemnify and hold the Government harmless for the failure to adhere to any applicable law or regulation established to protect the human or physical environment.  The successful awardee shall be responsible in the same manner as above regardless of whether activities leading to or causing a spill, release, emission or discharge are performed by the successful awardee, its agent or designee, a detainee, visitors, or any third party.

If any spills or releases of any toxic or hazardous substance, any pollutant, or any waste into the environment occur, the successful awardee of any contract for detention space will immediately report the incident to the Contracting Officer's Representative (COR), or other ICE-designated

USA008364

official as set out in the contract. The liability for any spill or release of such regulated substances rests solely with the successful awardee and its agent.

## VIII.    FOOD SERVICE

**Manage Food Service Program in a Safe and Sanitary Environment**

The Contractor shall provide detainees with nutritious, adequately varied meals, prepared in a sanitary manner while identifying, developing, and managing resources to meet the operational needs of the food service program.

The Contractor shall provide a sack meal for detainees in custody and those who are absent during any meal or planning for departure, or meals for detainees on certain travel routes (upon order by the ICE COR or ICE designee). Further, the Contractor shall provide detainee sack meals as requested by ICE staff. The contents of the sack meals must be approved by COR or ICE designee.

At the COR's request, the Contractor shall provide sack meals for detainees in ICE custody, but not yet on the Contractor's premises.

The Contractor shall identify, develop, and manage food service program policy, procedures, and practices in accordance with PBNDS 2011, Standard 4.1 "Food Service."

All food service preparation resources (appliances, freezers, food preparation tables, coolers) must be in operating condition. Additionally, the Contractor's kitchen will be in operating condition at the commencement of the contract.

## IX.    PROPERTY ACCOUNTABILITY

### A.  General

The Contractor personnel shall not permit any Government property to be taken away or removed from the premises.

The Contractor shall enact practices to safeguard and protect Government property against abuse, loss, or any other such incidents. Government property shall be used only for official business.

All Government property furnished under this contract shall remain property of the Government throughout the contract term. ICE shall maintain a written inventory of all Government property issued to the Contractor for performance hereunder. Upon expiration or termination of this contract, the Contractor shall render a written accounting to the COR of all such property. The Contractor shall assume all risk, and shall be responsible for any

70

USA008365

damage to or loss of Government furnished property used by Contractor employees. Normal wear and tear will be allowed.

The Contractor, upon expiration or termination of services, shall immediately transfer to the COR, any and all Government property in its possession or in the possession of any individuals or organizations under its control, except as otherwise provided for in this contract. The Contractor shall cooperate fully in transferring property to the successor Contractor. The Government shall withhold final payment until adjustments are made for any lost property.

## B. Use of Government Wireless Communication Devices

All personnel that have been issued a Federal Government owned wireless communication device, including but not limited to, cellular telephones, pagers or wireless Internet devices, are authorized to possess and use those items in all areas of the facility in which ICE detainees are present. Cellular, telephone, and wireless boosters shall be provided, installed, and maintained by the Contractor to ensure optimal service throughout the facility and ICE and/or DOJ administrative areas.

## X.   FIREARMS / BODY ARMOR

## A. Firearms Requirements

The Contractor shall provide well maintained or new firearms and maintain sufficient licensed firearms and ammunition to equip each armed Detention Officer and armed supervisor(s) with a licensed weapon while on duty. Firearms may be re-issued to replacement employees throughout the life of the contract as long as the firearm is in serviceable condition. See ICE Firearms Policy Attachment 11.

Personal firearms shall not be used. A licensed gunsmith, in writing, shall certify all firearms safe and accurate.

Firearms shall be standard police service-type, semi-automatic capable of firing hollow-point ammunition that meets the recommendations of the firearms manufacturer. Ammunition will be factory load only – no reloads. The Contractor shall adhere to the manufacturer's specifications regarding ammunition retention, e.g., ammunition shall be properly rotated and older ammunition utilized prior to utilization of newer ammunition.

The Contractor shall provide sufficient ammunition for each armed Detention Officer, including uniformed contract supervisor(s); they shall be issued three full magazines.

The Contractor shall account for all firearms and ammunition daily.
If any weapons or ammunition are missing from the inventory, the COR shall be notified immediately.

All firearms shall be licensed by the State.

USA008366

Firearms shall be inspected. This shall be documented by the Warden/Facility Director.

Loading, unloading, and cleaning of the firearms shall only take place in designated areas.

The firearms shall be cleaned and oiled as appropriate to ensure optimum operating conditions.

Firearms shall be carried with the safety on, if applicable, with a round in the chamber.

The Contractor shall maintain appropriate and ample supplies of firearms' upkeep and maintenance equipment (cleaning solvents, lubricating oil, rods, brushes, patches, and other normal maintenance tools).

The Contractor shall provide a complete listing of licensed firearms by serial numbers and by each safe location to the COR prior to beginning performance under this contract.

These lists shall be kept current through the terms of the contract and posted within each firearm's safe.

The Contractor shall obtain and maintain on file appropriate State and municipality permits and weapons permits for each officer.

A copy of this permit shall be provided to the COR at least three working days prior to the anticipated assignment date of any individual.

The Contractor shall ensure that its employees have all permits and licenses in their possession at all times while in performance of this contract.

The Contractor shall provide safes/vaults for storage of firearms and ammunition, for each location where firearms are issued or exchanged, which meet agency requirements and are approved for the storage of firearms and ammunition.

The COR is responsible for receiving the proposed safes/vaults prior to usage and vetting them through the appropriate ICE officials. Contract supervisors and guards shall make accurate receipt and return entries on a Firearms and Equipment Control Register.

Except when issuing or returning ammunition or firearms, each safe/vault shall remain locked at all times.

The Contractor shall be responsible for having the combination of each safe/vault changed at least once every six months, or more often if circumstances warrant.

The Contractor shall certify firearms training to the COR.

The Contractor shall certify proficiency in accordance with State requirements.

72

The Contractor shall provide an ICE approved intermediate weapon(s).

The Contractor shall assign one or more contractor staff to the positions of:

1. Ammunition Control Officer, and
2. Firearms Control Officer, per PBNDS 2011.

## B. Body Armor Requirements

The Contractor shall provide body armor to all armed Detention Officers and armed supervisor(s). Body armor shall be worn while on armed duty. The body armor shall meet all requirements as set forth in the ICE Body Armor Policy. See ICE Body Armor Policy, Attachment 12.

The Contractor shall procure replacement body armor if the body armor becomes unserviceable, ill-fitting, worn/damaged, or at the expiration of service life.

All armed Detention Officers and armed supervisors need to be made aware of the health risks associated with the wearing of body armor in high heat/high humidity conditions and/or during strenuous exertion. When Detention Officers and supervisors are required to wear body armor, they shall be provided opportunities to re-hydrate and remove the body armor as necessary.

The use of personally-owned body armor is not authorized.

## XI.    TRANSITION

### A. Transition-In

The Contractor shall be responsible for the transition of all activities identified in this PWS. The Contractor's transition-in shall be accomplished as expeditiously as possible, with a maximum transition-in period of 60 days after contract award. The transition-in process shall not adversely impact the work being done by the outgoing Contractor. It shall be conducted in a manner consistent with safe operation requirements. The Contractor shall submit a final Transition-in Plan for approval by the Contracting Officer's Representative (COR) within two (2) weeks after award reflecting input from the COR as well as all necessary activities to facilitate the transition of services to the Contractor and expected completion dates of those activities. All activities must be completed during transition periods. The Transition-In Plan shall address, at a minimum, the following areas:

- Inventory and orderly transfer of all Government Furnished Equipment and Property (GFE/GFP);
- Transfer of documentation;
- Transfer of current project activities;
- Workplace logistics and staffing plan: Identification of the key personnel transition team members by name, position, EOD, clearance, start date, and responsibilities;

73

USA008368

- Coordination of knowledge transfer sessions with the incumbent Contractor;
- Favorable EOD for all Contractor staff from the ICE Personnel Security Unit (PSU);
- Coordination of transition with COR;
- Any additional information required by other clauses contained in this contract.

The Transition-in Plan shall be approved by the COR and describe the Contractor's process for transitioning from the incumbent with no disruption in operational services.

## B. Transition-Out

The Contractor shall be responsible for the transition-out of all technical activities identified in this PWS during the final, awarded period of performance. The Contractor shall submit the Transition-out Plan two (2) months prior to the completion of the period of performance of this contract. The Contractor's Transition-out Plan shall be approved by the COR. The Contractor shall complete the transition by the end of the period of performance of this Task Order. The Transition-Out Plan shall address, at a minimum, the following areas:

- Inventory and orderly transfer of all GFE/GFP
- Briefing on all in-progress and committed items.
- Any additional information required by other clauses contained in this contract.

The Contractor shall fully support the transition of all requirements to any successor to ensure no disruption in operational services.

▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪

USA008369

# EXHIBIT P



## I. Demonstrated Technical/Management Capabilities
## 1. Technical Management Approach
## B. UNDERSTANDING OF THE PERFORMANCE WORK STATEMENT

> **The GEO Group, Inc. (GEO) will operate and manage the Centers proposed under this Requirement on behalf of ICE, providing for the detention, health, welfare and transportation of detainees in accordance with the 2011 Performance-Based National Detention Standards, with 2016 revisions (PBNDS).**

GEO has read, understands, and will comply with the requirements of RFP Section C. Performance Work Statement. This section provides our specific plans for helping ERO achieve its mission and meet the requirements of the PWS through our technical solution. Our understanding and approach to implementing the PWS is described in the following paragraphs.

## II. PERFORMANCE WORK STATEMENT

### A. Objective

GEO is an expert in meeting the unique needs and operational requirements of federal immigration processing standards and practices. Our extensive expertise in dealing with all security levels of immigration detainees was developed through our three-decade relationship with U.S. Immigration and Customs Enforcement (ICE) and refined through our current operation of 17 ICE Centers totaling approximately 17,600 beds.

Our three-decade relationship with ICE has led to multiple successive awards of our existing contracts, new awards for the development of new state-of-the-art Centers, and new contracts for the use of existing GEO Centers repurposed to meet the needs of ICE. In 2015, GEO was awarded a new seven-year ICE contract at the 700-bed Broward Transitional Center, which we have successfully operated since 2002. In 2015, we were awarded a new 10-year contract with ICE for our 1,575 bed Northwest ICE Processing Center, which we have successfully operated since 2005. In 2017, we were awarded a contract for the design, construction, and operation of the new Montgomery Processing Center located in Conroe, Texas. The Center was opened in September 2018 with 1,000 beds and it has since been expanded to provide 1,314 beds. This year, we worked with ICE to activate our South Louisiana ICE Processing Center to provide 1,000 additional beds. GEO is a proven, reliable, and operationally excellent partner for ICE.

USA008423



## B. Background and Mission

As the current largest service provider to ICE, GEO has superior experience supporting ICE and the Enforcement and Removal Operations (ERO) mission. GEO provides a means for ERO to implement its mission by providing housing, transportation, and all required administrative support services as ERO carries out all orders for the securing and departure activities of detainees who are designated in removal proceedings and for arranging for the detention of detainees when such becomes necessary and prescribed by law.

GEO's proposed Centers will support this mission by providing a safe, secure, and humane Center that meets or exceeds all required standards, for persons in ERO custody as they move through the immigration process.

## C. Scope of Work

GEO will provide all personnel, management, equipment, supplies, training, certification, accreditation, and services necessary for performance of all aspects of the contract 24 hours a day, seven days a week, 365 days per year. GEO's proposed pricing includes all costs associated with providing the services in this contract. GEO will be responsible for the transition of all activities identified in this PWS. Facilities that are currently active under contract with ICE will require only minimal start-up activities. For Facilities with delayed availability, GEO's transition-in will be accomplished as expeditiously as possible, with a maximum transition-in period of 60 days from Facility availability. Our team of Corporate and Regional resources will maintain contact with CO to ensure open lines of communication are established and potential roadblocks to the timely implementation of this contract are avoided. GEO is prepared to build upon the experience gained during our three-decades of partnership with ICE to guide the implementation of this new contract.

Each Center proposed under this requirement will provide safe and secure conditions of detention with consideration given for the management of a diverse population, including threat to the community, risk of flight, type and status of immigration proceeding, community ties, and medical and mental health issues. While under this contract, the Center will not house any non-ICE detainee population without prior written approval of the COR or ICE-designee.

Typically, Centers will provide easy access to legal services; natural light throughout the Center; ample indoor and outdoor recreation that allows for vigorous aerobic exercise with extended hours of availability, ideally a minimum of four hours per day of outdoor recreation; and private showers and restrooms (where practicable).



Detainees will receive cafeteria style meal service (where possible); clothing and hygiene items; contact visitation, including special arrangements for visiting families, including nights and weekends; private areas for attorney-client visits, with video teleconferencing capabilities; noise control; enhanced, but controlled freedom of movement, consistent with safety requirements based on detainee security levels; enhanced law library and legal resources; and enhanced programming, and dedicated space for religious services and social programs.

Each Center's design includes special management units for administrative and disciplinary restrictive housing.

Operations at each Center will be performed in accordance with the ICE Performance-Based National Detention Standards 2011 with 2016 revisions (PBNDS). Where GEO references PBNDS throughout our response, it designates ICE PBNDS 2011 with 2016 revisions. GEO will also abide by the March 7,2014, DHS regulation under the Prison Rape Elimination Act of 2003 (PREA; P.L. 108-79), *Standards to Prevent, Detect, and Respond to Sexual Abuse and Assault in Confinement Facilities* (DHS PREA Standards).

GEO understands in cases where there is a conflict in standards, the most stringent applies. In case of our inability to determine which standard is more stringent, GEO will follow the guidance of the COR who will determine the appropriate standard.

GEO will obtain and maintain American Correctional Association (ACA) accreditation under the most current version of the Adult Local Detention Facilities (ALDF) Standards to include any supplement. It is GEO's standard practice to pursue ACA accreditation at all of our secure services facilities. As such, ICE can expect operations at the Center to conform with the ACA ALDF Standards on the first day of contract performance. GEO will obtain full ACA accreditation within one year of contract award.

GEO will obtain and maintain accreditation under the National Commission on Correctional Health Care (NCCHC) within one year of contract performance.

Our confidence in our ability to obtain the required accreditation is supported by our investment in contract monitoring, performance management resources, and the Centers offered under this solicitation are currently ACA accredited. GEO has a 46-member Contract Compliance Division comprised of subject matter experts in security, medical, ACA accreditation, PREA, Joint Commission, NCCHC, PBNDS, FPBDS, and multiple agency standards. Contract Compliance personnel are located at GEO's Corporate Office, at each of GEO's Regional Offices, and on-site at all major facilities. This staff will be

USA008425



deployed to ensure GEO meets the accreditation requirements established under this contract.

GEO understands that ICE inspectors or Government-contracted staff will conduct periodic and unscheduled inspections of contract performance and the Center to ensure contract compliance. GEO will provide full and complete cooperation for any request or investigation conducted by the Government.

Virtual Attorney Visitation
GEO will offer virtual attorney visitation at each of its proposed sites. Although spatial considerations could impact its full capability, limited space could be repurposed for this new opportunity. GEO and ICE would need to work closely on logistics associated with this process. GEO proposes the use of "Skype for Business" from "Microsoft Office 365" platform to provide detainees with secure virtual attorney visitation, both video and audio. This solution provides flexibility and mobility while delivering secure encrypted communication. Skype is a proven solution as it is currently in use at other GEO facilities around the country.

This feature for Virtual Attorney Visitation will be implemented during the Operations Transition Period.


## D. Processing Centers


### *Processing Space*

Each proposed Center will support and deliver all of the environmental and physical requirements to ensure acceptable compliance with ACA standards and ICE PBNDS.

All required permits and licenses will be obtained by the date of contract award. GEO is licensed as a qualified security service company in accordance with the requirements of the district, municipality, county, and state in which the ICE work site is located. GEO will ensure all required permits and licensure are maintained throughout the duration of the contract and available for Government inspection upon request. GEO will comply with all applicable federal, state, and local laws and all applicable Occupational Safety and Health Administration (OSHA) standards.

Site-specific details for each of the Centers proposed under this Requirement have been provided as attachments to this Volume:

- USCIS space



- Executive Office for Immigration Review (EOIR) space
- ICE administrative space
- Parking spaces at the contracted Processing Center

GEO has worked closely with ICE, USCIS, EOIR and other interested agencies to properly account for and provide the necessary office space within our Centers. Our corporate experts in project development and design will be responsible for coordinating with ICE to ensure the specified administrative support areas are provided in accordance with requirements.

## E. Armed Transportation Services

Due to the growing demands of our clients' needs, in 2007, GEO created its transportation subsidiary GEO Transport Inc. (GTI), DOT License #1705757. GTI will provide the transportation service requirements under this contract. GTI has earned the reputation of a premier and preferred provider of secure transportation services, operating a current fleet of more than 350 specially designed, secure transportation vehicles with 500 licensed transportation officers, serving 30 federal contracts in 19 states. Since its inception, GTI has successfully transported over 2.7 million detainees while driving over 47.1 million miles without an escape. GTI provides exceptional armed transportation services to 12 ICE sites across the United States.

In 2018, GTI transported more than 133,261 ICE detainees, driving nearly 3 million miles without an escape or serious incident.

In the first three quarters of 2019 (Jan-Sep), GTI has transported more than 120,269 ICE detainees and driven more than 2.6 million miles.

GTI provides transportation for our Adelanto ICE Processing Center in Adelanto, CA. Through our first 3 quarters in 2019 (Jan.-Sept.), we have driven over 167,000 miles and transported over 8,000 detainees without an escape or serious incident.

In 2010, GTI teamed in a joint venture with a UK company Amey (GEOamey) to bid on a 10-year secure Transportation and Court Security services for the United Kingdom's Ministry of Justice. We were awarded the contract in 2011 covering all of Scotland and 80% of the England and Wales, requiring the need to build 570 new specialty vehicles and transfer over 3,300 licensed escort and transportation officers. GTI's proven record in secure transportation and the program management tools currently deployed both in the U.S. and Internationally will serve as the foundation for GTI's unmatched support to ICE in the identified California Areas of Responsibility.

USA008427



The GTI operation has undergone U.S. Department of Transportation (USDOT) audits, state audits, and several ICE audits and has successfully passed each audit with outstanding ratings and comments in compliance with ACA standards, PBNDS, and the terms of each contract. GTI has undergone four U.S. Department of Transportation audits and will continue to be audited every three years. These audits consist of a USDOT inspector thoroughly reviewing all Driver Qualification Files, all Vehicle Maintenance Files, Driver Hours of Service, Compliance with drug and alcohol testing, and preforming a complete physical/visual inspection of a select number of vehicles.  The most recent audit in February 2018 lasted seven days and at the end of the audit GTI received a "Satisfactory" Rating, the highest attainable grade given by DOT.

GTI will provide all ground transportation in a secure timely manner as required by the COR or designated ICE official. All transportation will be performed in accordance with the terms of this contract, post orders, ACA Standards and the PBNDS. When Transportation Officers are not performing transport duties, they will supplement security duties within the Center as approved by the COR.

GTI has an industry certified security air operations team consisting of 30 members. Each member has completed a 24-hour course in security flight operations in addition to their 4-week Officer and Driver training certification. This training includes but is not limited to; de-escalation techniques, CPR, less than lethal intermediate weapons training, onboard detainee handling techniques, and emergency response training. Each Air Operations Officer has had prior experience in air missions and retains their certification through annual refresher training. Should the need arise, and at the client's request, GTI's Air Transport Team is highly qualified and capable of conducting Air Transport Missions.

GTI will assign at a minimum two-person teams of Transportation Officers whenever necessary throughout a 24-hour period, seven days a week, to include holidays, to meet the needs of ICE transportation requirements. The exact number of teams on duty on any shift will be approved by the COR or his/her designee.

At our corporate headquarters, GEO has a dedicated Fleet Manager with 28 years of large service vehicle professional credentials. The corporate Fleet Manager provides oversight for the purchasing and maintenance/repair policies for GTI's national fleet of specialized secure transportation vehicles.

GEO/GTI understands it may acquire additional vehicles as necessary. At no time will employees use their personal vehicles to transport detainees. As mandated, all GTI

USA008428



provided vehicles will be equipped with interior security features to include separation of detainees and officers in accordance with PBNDS.

Prior to hiring and training, Transportation Officers will pass initial drug screening, motor vehicle record checks and background investigations. GTI also exceeds the mandatory testing percentage standard for drug and alcohol on a quarterly basis as set forth by the U.S. Department of Transportation.  In addition to quarterly drug and alcohol testing each Transportation Officer will have his/her motor vehicle records checked on a semi-annual basis. Any Transportation Officer or staff member who receives 2 or more moving traffic violation, or is arrested, will be suspended from all transportation duties pending an internal investigation and administrative review.

GTI personnel will have the same qualifications, training, security clearances, and uniforms as those GEO personnel provided in the other areas of this contract. GTI drivers adhere to USDOT rules to include hours of service regulations. Transportation Officers will obtain and will maintain proper required clearances, commercial driver licenses with proper endorsements and all required Federal and State licenses. In addition to the mandatory training for security personnel on this contract, Transportation Officers will receive 80 hours of specific transportation driver's training prior to being assigned transportation duties.

| Transportation-Specific Training Course Title | Course Duration |
|---|---|
| DOT Entry Level Training | 2 Hours |
| Driver Requirements | 2 Hours |
| Driver Training | 2 Hours |
| Hours of Service & Driver's Log | 6 Hours |
| Accident Investigation & Reporting Procedures | 2 Hours |
| Pre-Trip Inspections | 2 Hours |
| Roadside Inspections | 2 Hours |
| Drug and Alcohol Program | 2 Hours |
| Driver's Road Test and Certification | 2 Hours |
| Pre-, Mid-, and Post-Trip Inspections | 4 Hours |
| Engine, Body and Tires | 2 Hours |
| Backing, Spotting and Parking | 2 Hours |
| Emergency Procedures and Safety Equipment | 4 Hours |
| Operating in Traffic, Passing, and Turning | 4 Hours |



| Transportation-Specific Training Course Title | Course Duration |
|---|---|
| Adverse Driving Conditions | 4 Hours |
| Speed and Proper Following Distances | 2 Hours |
| Clearances and Sallyports | 4 Hours |
| Maintaining Records of Duty Status | 4 Hours |
| Day and Night Driving Conditions | 4 Hours |
| Commercial and Charter Airline Operations | 8 Hours |
| Off-Site Assignments | 4 Hours |
| Driver Safety Awareness (Handcuffing, Firearms Retention, etc.) | 8 Hours |
| Final Road Test with Commentary | 4 Hours |
| **Total** | **80 Hours** |

Transportation Officers will complete an additional eight hours of Officer Safety Awareness Training. Each Transportation Officer will also be observed and evaluated by using GTI's firearms simulator system. Similar to those used by government agencies, GTI has developed real-life practical exercise scenarios that range from regular law enforcement high-threat response situations, to custom made scenarios specifically developed from actual GEO transportation situations.

Additionally, transportation staff are also provided training throughout the year covering transportation-specific duties. All Transportation Officers are given a yearly road test to ensure maintenance of their driving skills and are observed while on duty by a certified driver instructor to identify potential areas of improvement. GTI's in-house staff trainers have graduated from a certified transportation training course developed in conjunction with the Department of Transportation. GTI currently employs over 100 Driver Trainers nationwide. The Driver Trainers each have completed a 40-hour, Train the Trainer course taught by the Regional Operations Managers, including strenuous classroom exercises, backing and spotting exercises, and a certified driving course.

All Transportation Officers will be armed in the performance of their duties. The Transportation Officers will be properly trained in safe, effective procedures for handling weapons and weapons qualifications in accordance with the state licensing requirements and will certify proficiency semiannually as stated in the PWS. GTI will supply and maintain restraining equipment in accordance with PBNDS on Transportation (by Land). All firearm training and re-certification will be conducted by a certified firearms instructor and the process will be managed by former ICE senior managers (retired) who are currently employed by GEO. All equipment will be available for inspection by ICE personnel upon request.



GTI will comply with ICE PBNDS 2011 and DOT regulations related to the number of hours each Transportation Officer may operate a vehicle. Overnight lodging resulting from transportation services will be approved in advance by the COR or designated ICE official. Overnight lodging expenses will be billed at rates not to exceed the applicable GSA per diem rates. Transportation will be accomplished in the most economical manner and in accordance with the applicable GSA per diem rates. The Center Transportation Manager, together with the Center's Business Manager, will monitor the costs associated with transportation operations to ensure compliance with contract rates.

Upon orders of the COR, or upon GEO's decision in an urgent medical situation, Transportation Officers will provide transportation and secure physical custody of the detainee at medical facilities from the time the detainee is admitted until released from the hospital. At such time the detainee will be safely and securely transported back to the Processing Center. Transportation Officers will always ensure proper custody of detainees, and will make every effort to prevent escapes, especially when the detainee is not restricted within the confines of a medical or other outside Center.

GEO understands the COR at times may direct transportation of detainees to unspecified miscellaneous locations (within a 250-mile radius of the Center), and our submitted staffing and transportation plan provides ICE with flexibility to meet these operational demands.

GEO understands Transportation Officers may be provided documents for transport which will only be turned over to the authorized recipients. Officers will ensure these documents are kept confidential and are not viewed by anyone other than the intended recipient.

GEO will have security cameras and digital video recording (DVR) equipment on each transport vehicle. There will be a minimum of four cameras on board each small capacity van and a minimum of six on each large capacity transporter. Camera and DVR devices will be kept secure from any detainee interaction. System downloading into data archive files within each Center will occur as needed to prevent the loss of information. The system will document the status of both the driver team and detainees during daytime or nighttime operations. Video coverage and quality will be sufficient to allow for post operation review and audit of any incident.

GEO will have a fully operational communication system compatible with ICE communication equipment that has direct and immediate contact with all transportation vehicles and post assignments. Upon demand, the COR will be provided with current

USA008431



status of all vehicles and post assignments of employees. At no additional cost to the government, GTI proposes to install a monitor in a location designated by the COR which will show the mapping location, estimated arrival times, speed of vehicle, assigned staff, vehicle routing, number of detainees and destinations in real time.

GTI will provide a minimum of two forms of communication for Transportation Officers during transport operations in accordance with the PBNDS on Transportation (by Land). One form will be a cellular phone, and the second form is the satellite and/or cellular-based communication device to be installed in each vehicle, capable of sending and receiving text messages to and from the Center's base station. In addition, all transport vehicles will have an emergency button that, when depressed, will send a text message to several managers and will lock in the location of the vehicle for a rapid response.

To perform the necessary operations to accommodate the routes given, GTI utilizes GEOtrack, a proprietary, globally deployed, tested and reliable Processing and Transportation Management System designed to track the activities of detainees housed in Processing Centers, or those being transported by GTI's secure vehicles.

Since its development and installation over a decade ago, GEOtrack has grown in functionality and use, providing all the real-time information necessary to safely and securely operate and track GTI transport missions and produce Quality Assurance Surveillance Plan (QASP) and other management reports. The Monthly Status Report will be provided through GEO track along with the G-391 Upload Template Attachment.

The use of GEOtrack at the Center will include mission reporting and management capabilities, such as:

- Fully auditable electronic capture of required tasking information by transportation officers.

- Route and schedule creation, and electronic dispatching.

- Secured 'Live' mission management and vehicle satellite tracking with reporting for ICE metrics and timekeeping requirements.

- Vehicle and mission alerting notification capability for both safety and security monitoring.

- Additional features that report on driver activities to produce fuel savings by tracking route mileage, idle time, excessive speed, and maintenance alerts.

GTI Pursues efficiencies using preventative maintenance and fuel economy strategies. In addition to GEOtrack, each vehicle is equipped with Fleetmatics/Verizon Connect, a GPS

USA008432



monitoring system. GTI's vehicles will have the required services to obtain the highest EPS rating. GTI achieves fuel economy improvements through Fleetmatics by monitoring each driver's behavior. Fleetmatics has the capabilities to monitor speeding, hard braking, excessive acceleration, and any harsh driving activity. In addition, Fleetmatics provides a real time view of vehicle location, time, direction, address, speed, ignition status, and can display a live view map of its current location. This visibility of our drivers and vehicle movements will be made accessible to the ICE at no additional costs to the government.

Transportation will be provided to the locations indicated in this PWS and other locations at the direction of the COR or designated ICE official. GEO understands the routes described in the PWS are not all inclusive and that at the direction of the COR or designated ICE official, GTI will provide additional ground transportation to other locations. GTI will have a dedicated, experienced Transportation Supervisor at each Center who will respond directly to all ICE transport and fleet requirements. The GTI Transportation Supervisor will work closely with the ICE Transportation Coordinator/COR to ensure the missions are properly assigned and completed in a timely and efficient manner.

The Transportation Supervisor will ensure all trips are accounted for and coordinate billing invoices. Additional duties will include maintaining USDOT mandatory driver files and related clerical duties.

## F. On-Call Guard Services

GEO will provide guard services on demand by the COR by escorting detainees to and guarding detainees while at medical or doctor appointments, hearings, ICE interviews and any other remote location requested by the COR or designated ICE official. These services will be provided by highly trained Officers, employed by GEO who will perform these duties in accordance with our policies, procedures and practices. GEO will augment practices as may be requested by the COR to enhance specific requirements for security, detainee monitoring, visitation and contraband control. GEO understands public contact is prohibited unless authorized in advance by the COR.

GEO's standard procedures for On-Call Guard Services will include the following requirements:

- Escort and maintain custody of the detainee(s) under order of the ICE COR

- Monitor all holding rooms – log health and welfare checks

- Serving detainees prepared meals provided by the government

- Searching holding cells for weapons or contraband

- Conduct limited pat-downs

- Receive, inventory, and search detainee property

- Transfer/escort detainees between holding rooms, processing area, court, and VTC rooms.

- Apply and remove detainee restraints

- Support Intake and processing of detainees, flight and transportation operations

- Provide support in processing operations as required for the removal process of detainees.

- Provide transportation services for intake and processing purposes

- Upon notification by the COR, provide detainee medical transportation to a hospital location and shall keep the detainee under supervision 24 hours per day until the detainee is ordered released from the hospital, or at the order of the COR.

GEO will maintain operational flexibility to accommodate requests for On-Call Guards received from the COR or designated ICE official as needed. GEO understands that to the extent possible, notification will be provided four hours in advance, and one Officer will be authorized for such posts unless otherwise specified by the COR.

GEO/GTI will employ the following processes to the On-Call Guard services:

- At all times during the performance of on-call guard services, GEO will provide at least one officer of the same gender as the detainee.

- GEO will deploy two officers for remote locations, unless additional officers are required per the direction of the COR or designated ICE Officer.

- Detainee meals will be provided when detainees are in GEO custody.

- The On-Call Guard will remain on their designated post for a minimum of two hours.

- GEO will remain responsible for providing security and preventing escapes.

All submitted monthly invoices for on call guard services will be itemized and state the number of hours being billed, duration of the billing (time and dates, to include travel to and from location being guarded) and the names and "A" numbers of the detainees that were guarded. These services will be denoted as a separate item on submitted invoices



and will be submitted to ICE for reimbursement at the negotiated rate to be determined for each facility offered under this Requirement.

Pursuant to PWS Addendum 1 issued December 5, 2019, and as discussed in the Discussions Meeting between GEO and ICE on December 4, 2019, the overtime and guard service rate are both the same. Both services require overtime whether by backfilling posts or recalling an employee to duty.

## G. Notice to Proceed

GEO understands the importance of being fully prepared to accept responsibility for performing the requirements of the contract. GEO welcomes ICE personnel to perform assessments of our progress and contract compliance and will implement any necessary corrective action to obtain the Notice to Proceed (NTP). GEO understands the Government reserves the right to extend the transition period until the NTP is issued, and this extension will be at no cost to the Government. GEO has never had a contract terminated for cause related to our inability to obtain an NTP within the established timeframe.

We are confident in our ability to meet the post-award activation timeline established by ICE. As a three-decade partner with ICE and the world's leading provider of immigration processing services, GEO has developed detailed plans to guide the start-up of new Centers. Our experience allows us to continuously refine these plans and ensure our performance exceeds client expectations.

GEO has designated a project manager who will oversee the tasks necessary to successfully activate each Center. The Project Manager will be responsible for facilitating communication between all functional areas to ensure adherence to the established schedule and will provide the support necessary to complete required activities upon which the NTP is contingent.

In accordance with RFP requirements and the list of deliverables contained within Section E of the RFP, GEO will submit in writing a Quality Control Program (QCP) and all other plans, policies, and procedures, including those identified in the PBNDS and ACA standards. GEO will not modify plans, policies or procedures that impact ICE operations without approval of the COR. As the current operator of 17 ICE Centers across the United States, including two (2) that currently provide services to ICE in California, GEO will be able to utilize existing policies and procedures currently in place under those contracts as a baseline to develop the requirements under this contract.



## III. GENERAL

### A. Notification and Public Disclosures

GEO will ensure that ICE approval is attained prior to releasing any information about the Center. Public disclosure will be managed through GEO's corporate information officer and ICE's Public Affairs office. Understanding that all information relating to this contract is considered privileged and confidential, no information will be disclosed without the express permission granted by ICE.

### B. Records

All records regarding the performance of the Center will be retained in a retrievable format for three years. Unless directed otherwise, GEO will provide any records related to performance of the contract to the Government upon completion or termination of the resulting contract. All operations and services provided at the Center will comply with all statutes, regulations, and guidelines from the National Archives and Records Administration.

Records and information management functions will comply with the following laws and regulations: Chapters 21, 29, 31, and 33 of Title 44, U.S. Code; 36 CFR 12; 41 CFR 201 subchapters A and B; OMB Circular A-130; and DOJ Order 2710.8A, Removal and Maintenance of Documents. GEO understands criminal penalties for unlawfully destroying, damaging, removing, or improperly handling or releasing federal records are addressed in Chapters 37 and 101 of Title 18, U.S. Code.

GEO will notify the CO when a member of the U.S. Congress or any media outlet requests information or makes a request to visit the Center. Visits will comply with the PBNDS on Interviews and Tours. GEO will coordinate all public information related issues with the CO. All press statements and releases will be cleared, in advance, with the ICE Office of Public Affairs. GEO has coordinated multiple site visits for officials at our ICE Centers across the country with much success.

GEO will ensure employees agree to use, and do use, appropriate disclaimers clearly stating the employees' opinions do not necessarily reflect the position of the U.S. Government in any public presentations they make or articles they write that relate to any aspect of contract performance or Center operations.

All detainee files will be prepared, maintained, retired, and disposed of in accordance with ICE policy. Policy and procedures will be developed to ensure the confidentiality



and security of all detainee files and will be utilized in the provision of services under this contract.

## C. Right of Refusal

GEO retains the right to refuse acceptance of any detainee if the refusal is supported by a valid justification, such as a detainee found to have a medical condition that requires medical care beyond the scope of GEO's health care provider. In the case of a detainee already in custody, GEO will notify ICE and request removal of the detainee from the Center. GEO will work with ICE to allow reasonable time to make alternative arrangements for the detainee.

## D. Hold Harmless

GEO will protect, defend, indemnify, save, and hold harmless the United States Government and its employees or agents, from and against any and all claims, demands, expenses, causes of action, judgments and liability arising out of, or in connection with, any negligent acts or omissions of GEO, its agents, sub-contractors, employees, assignees, or anyone for whom GEO may be responsible. GEO will cover any and all costs, expenses and attorneys' fees incurred as a result of any such claim, demand, cause of action, judgment or liability, including those costs, expenses, and attorneys' fees incurred by the United States Government and its employees or agents.

In awarding the contract, GEO understands the Government will not assume any liability to third parties, nor will the Government reimburse GEO for its liabilities to third parties, with respect to loss due to death, bodily injury, or damage to property resulting in any way from the performance of the contract or any subcontract under this contract.

GEO will maintain responsibility for all litigation, including the cost of litigation, brought against it, its employees or agents for alleged acts or omissions. GEO will notify the CO in writing of any litigation pertaining to this contract and provided copies of any pleadings filed or said litigation within five working days of being served such litigation. GEO will cooperate with Government legal staff and/or the United States Attorney regarding any requests pertaining to federal or GEO litigation.

Policy and procedures will be developed for each Center which ensure a positive relationship is maintained with all levels of the federal judiciary. Additionally, procedures will ensure a tracking system is established that mandates all judicial inquiries and program recommendations are responded to in a timely and accurate manner. All judicial inquiries and GEO's respective responses, specifically related to a detainee, will be incorporated into the detainee's file.

USA008437



GEO will maintain a comprehensive Quality Control Program (QCP), which encompasses the requirements of this PWS.

GEO has dedicated considerable resources to the development of a Corporate Contract Compliance Department that is charged with the responsibility for working closely with staff at each of our Centers to monitor operations. The Contract Compliance Division operates as an independent, headquarters-based monitoring team that reviews all operational aspects of the Company's Secure Services operations.

The following information regarding Contract Compliance Department staffing and auditing methodology and frequency is proposed for initiation January 2020.

The Department includes five Directors and 17 Corporate Managers dedicated to Secure Services Facility and Processing Center oversight. In GEO's Western Regional Office, 1 Director of Contract Compliance and 3 Managers provide regional compliance oversight. Regional Contract Compliance Managers visit each Center on a periodic basis, and may participate in the Annual Corporate Audit, Follow-Up Audit, Ad Hoc Audit, and Ad Hoc Follow-up Audit when conducted, and during accreditation preparations.

At the Center level, major functional areas are audited on a regular basis. This systematic monitoring is what makes up the QCP. Each Processing Center will employ a full time Compliance Administrator (Quality Assurance Manager) with key responsibilities for achieving QCP goals.

Staff conducting self-audits and GEO corporate and regional personnel conducting annual compliance audits will inspect the following areas on both a scheduled and unscheduled basis:

- Administration and management

- Center security and control

- Detainee activities

- Safety standards

- Detainee legal resources

- Detainee care

- PREA

- Human Resources

USA008438



- Fiscal management

- Training

- Medical

- Programs

The Government has reviewed and approved the Quality Control Programs that are currently in place at our existing ICE Centers. GEO will develop a site-specific QCP for each Center proposed under this Requirement based on these approved programs. GEO's QCP for this requirement is included as Section I.2 Quality Control Plan of this Volume. GEO will update the QCP as needed in accordance with the Deliverables Chart in Section E of the RFP. Any modification requested by the CO will be incorporated into the program. GEO will obtain approval of the program inclusive of any modifications prior to contract start date. GEO continuously monitors operations at each Center we operate to foster compliance with all contract requirements, client standards, and Federal, State, and local requirements.

The QCP will address all critical operational performance standards for the services required under this contract. A combination of both internal and external audits will be conducted to verify that services are maintained at a uniform and acceptable level. In the event services need correction, GEO will develop a mitigation or corrective action plan.

GEO will provide the COR with advance notice, at least 48 hours, of any audits scheduled at the Center.

## F. Quality Assurance Surveillance Plan (QASP)

GEO's responsibilities to ICE throughout our existing contracts include the requirement to adhere to performance measures found in the Government-developed QASP.

Each location's Compliance Administrator (Quality Assurance Manager) will ensure the COR has proper access to conduct necessary monitoring, assessing, recording, and reporting on the technical performance of the contract on a day-to-day basis.

GEO will coordinate with the COR to accommodate the completion of the "Quality Assurance Surveillance Forms" which document their inspection and evaluation of GEO's work performance.

GEO understands the CO or designee has overall responsibility for evaluating GEO's performance in areas of contract compliance, contract administration, and cost and



property control. The CO will review the COR's evaluation of the GEO's performance and invoices. If applicable, deductions or withholdings may be assessed in accordance with the evaluation of GEO's performance, e.g., monetary adjustments for inadequate performance, as outlined in the Attachment 2A, Performance Requirements Summary of the PWS.

## G. Failure to Perform Required Services

GEO understands the rights of the Government and its respective remedies described in this section are in addition to all other rights and remedies set forth in the resultant contract; specifically, where the Government reserves its rights under the Inspection of Services and Termination clauses. Any reductions/deductions in GEO's invoice will reflect the contract's reduced value resulting from failure to perform required services pursuant to the contract's Quality Assurance Surveillance Plan (QASP) and/or the Performance Requirements Summary (PRS). GEO understands we will not be relieved of full performance of the services under this contract and may be terminated for default if our performance is determined to be inadequate, even if a reduction was previously taken for any inadequate performance. **In more than 30 years of operations, GEO has not had a contract terminated for default. GEO establishes partnerships that are mutually beneficial with government clients.**

## H. Inspection by Regulatory Agencies

GEO understands this contract is subject to inspection by Government agencies. These government agencies may include organizations such as:

- Occupational Safety and Health Administration (OSHA)

- Office of Inspector General (OIG)

- Department of Labor (DOL)

- Office of Management and Budget (OMB)

- Equal Employment Opportunity Commission (EEOC)

- Local health agencies

GEO will accommodate all required inspections, including but not limited to interviews, physical inspections, and requests for information. GEO will immediately inform ICE of all proposed inspections by Government or regulatory agencies. In the event GEO believes that a proposed or requested inspection is not required, it shall refer the matter to ICE and abide by ICE's determination as to whether the proposed inspection is

USA008440



considered to be required. GEO will participate in responding to all requests for information and inspection or review findings by regulatory agencies.

## I. Performance Evaluation Meetings

As part of our partnership with ICE, GEO will hold monthly meetings with the COR to aid in the resolution of any identified issues at each Center. Further, each Center Administrator will maintain an open-door culture enabling continuous and impromptu communications. Additionally, GEO maintains high level communication with ICE headquarters through regular quarterly meetings between GEO Corporate Executive Staff and ICE Headquarters Executive Staff.

## IV. Personnel and Staffing

GEO will ensure that staff comply with the requirements and provisions of RFP Section H.2 "Security Requirements - Required Security Language for Sensitive/But Unclassified (SBU) Contract Detention Facility".

### A. General:

Candidates for employment under this contract will be required to successfully pass an Employee Fitness Screening. GEO understands the potential for employees to have access to sensitive DHS information, as well as the vulnerable nature of the population to be housed under this contract. As such, GEO will take all necessary steps to properly determine the suitability of applicants for employment. The criteria set forth under DHS Instruction 121-01-007-001 (Personnel Security, Suitability and Fitness Program), or successor thereto, will be incorporated into our recruit screening requirements to exclude candidates who do not meet these standards.

### B. Preliminary Fitness Determination

GEO recognizes the authority of ICE to have full control over final decisions related to employee access to Centers and information. GEO will submit to ICE all required documentation to allow ICE to make fitness determinations for each candidate. GEO understands the granting of preliminary Fitness or final Fitness in no way prevents, precludes, or bars the withdrawal or termination of such access by ICE, at any time during the term of the contract.

### C. Background Investigations

GEO policy requires that all candidates accepting a conditional offer of employment with GEO undergo initial background screening to ensure they meet GEO, federal, state, local and client requirements, as necessary. Additionally, all employees are subject to ongoing

USA008441



periodic background screening during the course of their employment with GEO to confirm they continue to meet such requirements.

GEO employees (which include applicants, temporaries, part-time and replacement employees) under the contract, needing access to sensitive information and/or ICE detainees, will be required to undergo a position sensitivity analysis based on the duties they will be expected to perform on the contract. The results of the position sensitivity analysis determine the appropriate background investigation which must be conducted.

GEO employees nominated by a COR for consideration to support this contract will be required to submit all required security vetting documentation to the Office of Professional Responsibility, Personnel Security Unit (OPR-PSU), through the COR, within 10 days of notification by OPR-PSU of nomination by the COR and initiation of an Electronic Questionnaire for Investigation Processing (e-QIP) in the Office of Personnel Management (OPM) automated on-line system. GEO's Human Resources staff will maintain contact with applicants to guide them through this process.

While GEO recognizes that OPR-PSU works diligently on all background investigations, we are concerned with the recent ongoing delays in the completion of fitness determinations at ICE facilities across the country. The sheer volume of submissions during prior activations has resulted in OPR-PSU implementing a "Prescreen Process" to prioritize and expedite background clearances for activating facilities. Although effective, this process impacts the completion of routine fitness determinations at all other operating facilities and has resulted in an ever-increasing backlog for employee clearances. Subsequently, hiring qualified staff and keeping them engaged during the lengthy hiring process remains a challenge. GEO currently uses a 3rd party vendor, with extensive experience in the fitness determination process, to review our employee submissions to OPR-PSU to ensure all submissions are complete.

In the event of extended delays in the background clearance process, GEO may fill open positions with overtime and temporary duty staff while waiting for OPR-PSU to complete fitness determinations.  As a result of GEO's efforts to work cooperatively with OPR-PSU during background clearance delays beyond our control, GEO believes that employees who have been properly submitted to PSU pending a fitness determination should be considered within the applicable contract minimum staffing level of the facility in addition to the number of active GEO employees who have a valid fitness determination.



### D. Transfers from other DHS Contracts

GEO understands personnel may transfer from other DHS contracts provided they have an adequate and current investigation. If the prospective employee does not have an adequate and current investigation which meets the new assignment requirement, GEO will direct the employee to submit the required documentation to initiate a new investigation (the DHS 11000-25 with ICE supplemental page, indicating Contract Change) to OPR-PSU.

### E. Continued Eligibility

Only eligible employees will be permitted to work under this contract; therefore, if a prospective employee is found to be ineligible for access to Government facilities or information, the CO or COR will advise GEO that the employee cannot continue to work or to be assigned to work under the contract.

Per GEO policy, GEO will conduct drug screening for probable cause at any time during the contract and/or when GEO independently identifies circumstances where probable cause exists. GEO will post the ICE "Drug Free Workplace Policy" in all contract work areas.

The OPR-PSU will conduct periodic reinvestigations every 5 years, or when derogatory information is received, to evaluate continued Fitness of GEO employees.

### F. Required Reports

GEO will notify OPR-PSU of all terminations/resignations within five days of occurrence. GEO will return any expired DHS issued identification cards and building passes, or those of terminated employees to the COR. If an identification card or building pass is not available to return, a report will be submitted to the COR, referencing the pass or card number, name of individual to whom issued, and the last known location and disposition of the pass or card. The COR will return the identification cards and building passes to the responsible Unit. These reports will be coordinated through human resources staff at each Center.

GEO will report any adverse information coming to our attention concerning GEO employees under the contract to the OPR-PSU through the COR, avoiding any information based on traditionally unreliable sources such as rumor or innuendo. The subsequent termination of employment of an employee does not remove the requirement to submit this report. The report will include the employees' name and social security number, along with the adverse information being reported.



GEO will provide, through the COR, a Quarterly Report containing the names of personnel who are active, pending hire, have departed within the quarter or have had a legal name change with documentation. The list will include the Name, Position and last four digits of their SSN and will be retrieved from system(s) used for contractor payroll/voucher processing to ensure accuracy.

All sensitive information will be protected from loss, misuse, modification, and unauthorized access in accordance with DHS Management Directive 11042.1, DHS Policy for Sensitive Information and ICE Policy 4003, Safeguarding Law Enforcement Sensitive Information." GEO employees who are involved with management and/or use of information/data deemed "sensitive" to include 'law enforcement sensitive" will be required to complete the DHS Form 11000-6-Sensitive but Unclassified Information NDA prior to being able to access such sensitive information.

## G. Security Management

The Facility Administrator will be the senior on-site official to interface with the OPR-PSU through the COR on all security matters, to include physical, personnel, and protection of all Government information and data accessed by the Contractor. In the event GEO is notified by the COR of any finding of non-compliance with the security requirements of this contract, GEO will take the proper corrective action to ensure compliance is restored.

## H. Information Technology Security Clearance

GEO will provide for the administrative control of sensitive data being processed and to adhere to the procedures governing such data as outlined in DHS MD 4300.1, Information Technology Systems Security, or its subsequent replacement. GEO will ensure employees understand, through training, the importance of compliance with security policy, and the potential penalties associated with non-compliance.

GEO takes reasonable and appropriate steps to protect its information and information systems from a variety of threats such as error, fraud, sabotage, privacy violation, and service interruption. All users of GEO Systems and IT Resources, whether they are GEO employees, temporary employees or consultants, are responsible for protecting sensitive information from unauthorized access, modification, duplication, destruction, or disclosure. GEO endorses and implements the following security principles:

- Identification (e.g. User IDs) and authentication (through passwords and/or PINS)
- Authorization (e.g. access roles and access control)
- Confidentiality (e.g. encryption), integrity (e.g. the accuracy of system, data, and message storage and transmission), and availability (e.g. accessibility when needed)

USA008444



- Accountability (e.g. tracking and audit)

## I. Information Technology Security Training & Oversight

GEO employees using Department automated systems or processing Department sensitive data will receive Information Assurance Awareness Training (IAAT), to be provided by the appropriate component agency of DHS. GEO will ensure staff with management, use, or operation of any IT systems that handle sensitive information within or under the supervision of the Department receive periodic training at least annually in security awareness and accepted security practices and systems rules of behavior. Supervisors will be mindful of the behavior of personnel accessing systems and any unauthorized access, sharing of passwords, or other questionable security procedures will be reported to the local Security Office or Information System Security Officer (ISSO).

Cybersecurity awareness is reinforced through GEO's use of web-based training videos which are sent to staff on a monthly basis. Each video is between three to four minutes long, increasing the likelihood that employees will participate in the training and retain the information provided. These monthly video training modules are tracked to each individual user account and weekly reminders are sent to the user to ensure the module is completed. The training covers issues such as password security, phishing, privacy, HIPAA, ransomware, office hygiene, and data/information protection.

## J. Processing Center Staffing Plan, Floor Plan and Key Personnel

A staffing plan for each Center being proposed under this Requirement has been provided as an attachment to this Volume. GEO's staffing plan reflects a well-thought out and efficient strategy for staffing each Center.

### *Please see site-specific staffing plans - attached*

The approved staffing plan (number, type, and distribution of staff) will be maintained throughout the duration of the contract. Any proposed changes will be made upon approval by the CO and COR. ~~At no time throughout the contract will the approved staffing levels fall below a monthly average of 95%.~~ Staffing levels will be maintained in accordance with PWS Addendum 1 to the RFP, which requires a monthly average of 85% for custody staff, 80% for health services, and 85% for all other departments of the total ICE-approved staffing plans. A monthly vacancy report will be submitted to the COR with the current monthly average vacancy rate and a listing of all positions that have been vacant more than 60 days. GEO understands any position vacant for more than 60 days may result in a deduction by the CO from the monthly invoice.

USA008445



1. **Minimum Staffing Requirements**

   In accordance with the RFP, except for the agreed upon Transition or ramp up periods, the Center will be appropriately staffed with employees who have been screened and approved by ICE to provide for the secure care, control, and supervision of detainees. GEO has existing procedures in place under other contracts with ICE governing the creation and submission of assignment rosters, and we will utilize these procedures in the development of operations under the new contract. Assignment rosters will be maintained in the Lieutenant's office and submitted to ICE by the Facility Administrator's office. The daily roster will be posted 24 hours in advance. Any vacancies that do occur during normal operations will be quickly filled with qualified new hires. At any time, at least one officer of the same gender as the detainees will be assigned to each post.

2. **Supervisory Staffing**

   GEO will develop a full roster of supervisory staff that has been approved for employment and provide to the COR prior to service commencement. GEO Supervisory Officers will be experienced and qualified professionals who are qualified and trained to provide service to ICE under the contract.

   In the absence of the Facility Administrator, GEO will appoint another qualified person who meets the Facility Administrator and security clearance requirements to temporarily fill that position. GEO will ensure this individual only performs the job duties of the Facility Administrator in providing oversight and direction to GEO's Officers and interfacing with ICE CORs and/or designated ICE Officers and the Contracting Officer on all contract-related matters.

3. **Key Personnel**

   GEO will identify qualified, experienced candidates to fill the key personnel positions required for the Centers proposed under this requirement. Each candidate will possess the requisite knowledge, skills and abilities that will ensure the efficient, safe and secure operations. Each selected candidate will be 100% committed to the project throughout the duration of the contract, having a positive impact on GEO's performance through their dedication to meeting the operational needs of the Center. Full time commitment from our key personnel at each Center proposed under this Requirement will provide consistency and support the development of operational expertise in our employees.

4. **Processing Center Floor Plan and Guard Post Map**

   In accordance with the RFP, GEO is providing a floor plan for each Center proposed under this requirement which identifies all proposed Officer posts and corresponding



shift assignments. For ease of review, shifts are grouped by color. Post-award, floor plans updated with any required revisions will be submitted with the final Center staffing plans to depict all officer posts, to be approved by the CO/COR prior to commencement of services under this contract. GEO will submit any necessary changes to the guard posts or shift requirements to the CO/COR for approval prior to implementation.

***Please see Processing Center Deployment Plans – attached***

5. **Organizational Chart**

Additional details on each Center's staffing strategy as well as a full-size Center Organizational Chart that depicts the structure of authority, responsibility, and accountability within each Center are provided as attachments to this Volume. The standard organizational structure of the major functional areas of the Center is depicted in the figure below.



USA008447



This organizational chart will be updated as necessary throughout the duration of the contract and provided to the CO or COR as required or requested.

## K. Employee Health

Health files for each employee will be maintained on site, in a locked cabinet to prevent unauthorized access. These files will be under the supervision of the Center Human Resources (HR) Manager. Health files will be maintained in accordance with DHS and ICE Privacy Policies and the Privacy Act of 1974 and will contain the following documents:

- Initial and annual TB infection screening results
- Vaccination records including results, titers, and Immunization Declination Form(s)
- OSHA 301 Incident forms
- Blood borne pathogen exposure documentation
- Annual respirator medical clearance
- Fit test results
- Other employee health documents

GEO may initiate employment of an individual who has begun the required vaccines and the individual may be hired and work on the contract as long as they meet all subsequent vaccine schedule requirements until fully vaccinated. The Human Resources Manager will be responsible for keeping record and following up on the status of employees who must follow a vaccination schedule to ensure they meet all subsequent requirements.

All GEO personnel will be required to provide documentation regarding the following:

- History of testing for tuberculosis (TB) within the last 12 months:
    - Chest x-ray if employee has a history of LTBI, treatment history for LTBI or TB disease, if applicable.
    - Additionally, on an annual basis and at own expense, GEO will provide a current TST or IGRA test result if the employee previously tested negative for LTBI, evaluation for TB symptoms if the employee previously tested positive for LTBI and follow up as appropriate in accordance with Centers for Disease Control and Prevention (CDC) guidelines.

USA008448



The required documentation will be placed into the employee health file. HR staff will be responsible for auditing files of staff to ensure proper documentation of TB testing is included.

**Recommended Immunizations**

GEO recognizes the preventable nature of high-risk diseases that may be transmitted or acquired as a result of employment within a Processing Center environment. As vaccinations are widely available for these diseases, which include Hepatitis A, Hepatitis B, measles, mumps, rubella, varicella, diphtheria, tetanus, a-cellular pertussis and seasonal influenza, GEO will recommend security staff take these vaccines. If staff decline or refuse any of these recommended vaccines, they will be required to complete an Immunization Declination Form and the COR will be notified. GEO understands ICE reserves the right to refuse employees that refuse vaccines. GEO will follow the OSHA regulations regarding Blood-borne Pathogens for the provision of Hepatitis B vaccinations.

Security staff will be required to provide proof of immunization or titer results to the HR Manager for placement in the secure employee health file. For employee immunizations, GEO will reference the CDCs Immunization of Health Care Workers: Recommendations of the Advisory Committee on Immunization Practices (ACIP) and the Hospital Infection Control Practices Advisory Committee (HICPAC).

## L.  GEO Employee Rules

Nationwide, all GEO employees are provided with Employee Handbooks, policies, and procedures which provide them with essential information regarding their rights and responsibilities. Areas addressed by Employee Handbooks include, but are not limited to, the following:

1.  Organization
2.  Recruiting procedures
3.  Opportunities for Equal Employment
4.  Qualifying for jobs, job descriptions, responsibilities, salaries, and fringe benefits
5.  Screening employees for illegal drug use
6.  Holidays, leave, and work hours
7.  Personnel records, employee evaluations, promotion, and retirement
8.  Training
9.  Standards of conduct, disciplinary procedures, and grievance procedures

USA008449



10. Resignation and termination

11. Employee-management relations

12. Security, safety, health, welfare, and injury incidents

The GEO Employee Handbook and applicable policies and procedures are provided to each employee and are explained in detail at employee orientation. Employees are required to sign a confirmation that they have received and reviewed these documents. The documents are reviewed and revised, as needed. These documents are developed by GEO as a guideline for personnel to perform their duties and to provide a sound administrative base for dealing with personnel matters.

Policies outlined are binding for all personnel. These policies and procedures are as specific as possible. Critical incidents may occur which these documents do not address; in these cases, supervisory discretion will be exercised.

GEO will provide copy of the rules or policies to our employees at each Center proposed under this requirement. Upon request by the GEO will submit verification to the Government that all employees have reviewed a copy of the rules or policies.

## M. Minimum Standards of Employee Conduct

The employee conduct policy will be made available to every employee and each employee will sign a statement to acknowledge having read, understood and agreeing to comply with the requirements contained in the policy.

### GEO and members of GEO's staff will never:

- Display favoritism to or preferential treatment of, one detainee or group of detainees over another

- Discuss or disclose information from detainee files or cases outside of the performance of professional duties under this contract

- Display any favoritism or preferential treatment to family, friends of employees or detainee family members

- Enter any business relationship with detainees or their families (i.e., selling, buying or trading personal property), or personally employ them in any capacity

- Have outside contact (other than incidental contact) with a detainee residing at a Processing Center or their family or close associates, except for those activities which are approved as part of the contract and part of the employee's job description

USA008450



All employees providing services under this contract will be held to these standards. All employees will be required to immediately report to the Facility Administrator or ICE Supervisor any criminal or non-criminal violation or attempted violation of these standards.

Violations may result in employee removal from the Center. GEO agrees failure on the part of GEO either to report a known violation or to take appropriate disciplinary action against offending employee or employees will subject GEO to appropriate action including possible termination of the contract for default.

It is GEO's policy to administer discipline in a consistent and fair manner. There are guidelines and procedures designed and adopted to implement this policy which will guide the internal and safe operations of the Center. The procedures therein do not create any legally enforceable interest or limit the Facility Administrator's authority to terminate any employee.

Employees of the Center will be expected to conduct themselves in a manner that creates and maintains respect for themselves as well as the Center, in all their activities, personal and official. They will be required to be mindful of the high standards of behavior expected of them and avoid any action(s) which might result in, or create the appearance of, impropriety or adversely affect the confidence of the public in the integrity of the Center. Failure by employees to adhere to policy and procedure regarding conduct will result in further disciplinary action, up to and including termination.

GEO will not employ any person who is currently an employee of any federal agency – including active duty military personnel (excluding military reservists or members of the National Guard) – or whose employment would present an actual or apparent conflict of interest.

**N. Removal from Duty**

In order to deter and improve behavior or performance issues, reduce occurrences of employee policy breaches and minimize Standards of Conduct violations, supervisors will be trained and expected to take progressive disciplinary action. This means that when required, employees will be subjected to the progressive disciplinary process, from less severe discipline to more severe discipline, unless the severity of the infraction or violation warrants immediate stronger action. It should be understood that progressive discipline is discretionary, and any violation of company policy, Processing Center, or company handbook, contractual requirement or statutory prohibition can, because of the severity of the offense, result in dismissal as an initial sanction.



At the direction of the COR, GEO will reassign employees who have been arrested or who have alleged misconduct to duties that do not permit direct contact with detainees pending the disposition of the charges. Any alleged misconduct will be reported immediately to the COR. If such reassignments are not available, GEO will remove the employee from work under this contract and other ICE contracts.

Upon receiving and confirming information regarding an employee that would disqualify him/her from employment under the contract, GEO will, upon notification by the COR, immediately remove the employee from duty. The disqualified employee will have his/her identification credentials revoked. GEO will complete any required dispositions.

Disqualifying information includes but is not limited to the following:

1. Conviction of a felony, a crime of violence, domestic violence, or a serious misdemeanor

2. Possessing a record of arrests for continuing offenses

3. Falsification of information entered on suitability forms

4. Non-payment of court ordered payments (child support, liens, etc.) or excessive delinquent debt as determined by credit check

5. Misconduct or negligence in prior employment, which would, have a bearing on efficient service in the position in question, or would interfere with or prevent effective accomplishment by the employing agency of its duties and responsibilities

6. Alcohol abuse of a nature and duration, which suggests that the applicant or appointee would be prevented from performing the duties of the position in question, or would constitute a direct threat to the property or safety of others

7. Illegal use of narcotics, drugs, or other controlled substances, without evidence of substantial rehabilitation

8. Introduction of contraband into or unto the Center

GEO understands an employee may be removed who has been disqualified either for security reasons or for being unfit to perform his/her duties as determined by the COR or the Contracting Officer.

GEO procedures regarding involuntary separation require the development of an involuntary separation recommendation, which includes the following:

- Report of investigation
- Employee's statement



- Report of offense
- Witness statements
- Any previous disciplinary actions in the prior 12-month period before the current incident

Supervisory personnel will take immediate measures to ensure that the employee's access to operations and movement around the Center is minimal and supervised until the employee leaves the Center. Arrangements will be made for the return of Government Furnished Property and GEO-issued property. Once the employee leaves the Center, the employee shall have no further access to the Center. GEO will ensure all procedures to be implemented related to employee removal from duty are aligned with ICE instructions, policies, and procedures for the management of this Center.

## O. Tour of Duty Restrictions

At each Center, the payroll clerk will utilize the KRONOS timekeeper to monitor and ensure compliance with the contract requirement precluding uniformed staff from exceeding 12 hours in any 24-hour period. GEO's shift supervisors will schedule staff accordingly to ensure such employees have a minimum of eight hours off between shifts and that authorization is obtained from the COR prior to an employee performing services that exceed 12 hours. In the event the employee is performing other duties for GEO or another employer, GEO will account for those hours worked towards the 12-hour limitation.

GEO will utilize Kronos Workforce TeleStaff software to manage scheduling. GEO Centers use TeleStaff to maintain rosters, post assignments, ranks, schedules, qualifications, time off requests, and deployment of special events. Operational policies and Telestaff govern practices utilized to backfill planned and unexpected vacancies. GEO has integrated TeleStaff with our other internal systems to automate maintenance of people and to provide integration of schedules, accruals, and timecard punches to GEO's Kronos Time and Attendance software. This web-based solution will allow GEO to provide roster reporting to ICE.

## P. Dual Positions

At each Center proposed under this Requirement, a staff member may be appointed to an acting position when a supervisory officer is not available for duty. In such cases the Chief of Security may identify a temporary replacement. Employees will not be allowed to hold the positions of Officer and Supervisory Officer simultaneously. This will be enforced and verified through daily reviews of the roster by the Chief of Security.

USA008453



For individuals acting in a supervisory position that exceed a two-week period, GEO's policy permits for a temporary promotion to supervisory level.

## Q. Post Relief

At each Center proposed under this Requirement, post orders will state that Housing Officers will not leave their assigned post unless properly relieved and authorized by the Shift Lieutenant. Officers will contact the Shift Lieutenant when they require/request a relief and will remain on post until relieved by designated staff. For gender specific posts, the relieving Officer will be of the same required gender.

All Housing Officers will be required to read and review post orders upon assignment to his/her post daily.

## R. Personnel Files

GEO will maintain a system of personnel files and make all personnel files available to the CO and the COR upon request. These files will be maintained and current for the duration of the employee's tenure under the contract. The files will contain verification of training and experience and credentials for all the staff. The HR Manager at each Center will be responsible for personnel files.

Employees will be encouraged to review their records for accuracy. A written request should be submitted to the Human Resources Department to initiate an appointment. If there is any correction needed, the employee should request it in writing and submit it to the Human Resources Representative at the Center.

In accordance with GEO corporate policy and client requirements, personnel files will contain the following, when required:

- Resume
- Application for employment
- Supplement to application for employment
- Offer letter
- Authority and release for psychological examination and evaluation
- Personnel action forms
- Polygraph release: Polygraph Examiner's Worksheet (without charts) to be retained in the file only for employees hired prior to December 27, 1988
- Release for background investigation information
- New employee background check (credit, criminal, motor vehicle, and any other reports applicable to the Center).

USA008454



- Police/criminal record form letter
- Non-compete agreement
- Relocation agreement
- Employee data form
- Employee disciplinary action form (It is also appropriate to include related correspondence and documents in support of reprimands.)
- Letters of commendation
- Letters of resignation and exit interview statements (This may include other related documents.)
- Performance reviews
- Uniform and accessories record
- Licensing requirements/documents
- All Federal, State, local forms and documents required by law, including fingerprint cards
- All correspondence, memoranda and other materials related to an employee's performance or the terms and conditions of employment.
- Notes of issuance of GEO property (credit cards, keys, etc.)

## S. Uniform Requirements

The uniform requirements described below will apply to Supervisory Officers and Officers who perform work under the contract:

The Center will issue uniforms to those employees with positions that require a uniform appearance, such as officers and supervisory officers, food service personnel, and transportation officers. GEO Policy will set forth the official uniform description and conditions of wear. This policy will be reviewed annually. The Facility Administrator or designee will ensure security staff are inspected daily for uniform compliance and adherence to grooming standards for male and female uniformed staff.

Non-Supervisory security staff will be issued three sets of uniforms which include: polo shirts with GEO insignia, name plate, uniform trousers, duty belt, duty flashlight, jacket, hat, and chain for keys. Supervisory security staff will be issued polo shirts with GEO insignia, gold Lieutenant Bars, gold name plate, uniform trousers, duty belt, flash light, rain coat and chain for keys.

Prior to the contract performance date, GEO will document to the COR the uniform and equipment items that have been issued to each employee. Employees will use GEO-



issued uniforms and equipment only. GEO understands the COR will approve or disapprove any uniform apparel. GEO will provide a submittal of the uniform or any uniform changes to the COR for approval.

All GEO employees providing services at each Processing Center proposed under this requirement, uniformed and non-uniformed, will be required to have GEO-issued and other required identification credentials in their possession while on the premises of the Center. Identification credentials may include:

- Photo identification card bearing an encrypted, personalized bar code which makes the cards difficult to replicate.

- A printed document with personal data and employee physical description including name, gender, date of birth, height, weight, hair color and eye color; date of issuance, employee signature, and supervisor signature.

GEO staff will not possess wallet type badges or credentials. All credentials will be approved by the COR or other ICE-designated official.

## T. Permits and Licenses

GEO is licensed as a qualified security service company in accordance with the requirements of the district, municipality, county, and state in which the ICE work site is located. GEO will ensure all required permits and licensure are maintained throughout the duration of the contract and available for Government Inspection upon request.

### Licensing of Employees

GEO will ensure each employee has the proper registration, commissions, permits, and licensure required by the district, municipality, county and state of California, where the ICE work site is located. GEO will verify all licenses and certifications prior to employees entering duty.

### Jurisdiction

GEO will not extend services into any other areas that are not under the charge or control of ICE.

## U. Encroachment

Security procedures that will be put into place at each Center proposed under this Requirement will prevent GEO employees from having unauthorized access to Government equipment, documents, materials and telephones. Restricted areas will be secured from unauthorized entry.

USA008456



All staff will be provided training on GEO IT procedures and other electronic safeguards during orientation and annual in-service training.

## V. Work Schedules

**Preparation**

One week in advance, the Supervisory and Officer work schedules (inclusive of relief officers) will be prepared, for a two-week period, and posted in Office in Charge (OIC) and staff lounge, where available. A manpower report will be submitted to the COR as required. Changes in duty hours will also be posted on this form in sufficient time to ensure 24-hour advance notice. At the completion of each shift, upon request of the COR, GEO will also provide an employment report listing for each employee who actually worked, work classification, post assignments, and hours worked, as well as total hours worked by supervisory and non-supervisory employees.

**Starting & Stopping Work**

All employees will be required to be dressed in full uniform, if required, and ready to begin work promptly at the beginning of each shift. Each employee will remain at the duty locations until the shift is completed.

**Recording Presence**

The Center will utilize the KRONOS time-keeping system, an electronic module, which captures and computes employee attendance and departures. Upon reporting and departing work, employees will document their attendance by swiping GEO Issued ID Cards then placing their fingers on a biometric finger recognition scanner. This provides real time accountability, leaves no room for errors and provides an extensive reporting capability. The presence, exit, and entry of all visitors entering the Center will be manually captured on the Official visitors log to record their presence. GEO will utilize this system which has proven to meet the Client's needs under other ICE contracts.

**Work Relief**

At all times, GEO will ensure proper relief coverage during the contract. The supervisor will schedule for proper qualified staff to cover the necessary post.

## W. Training

It is GEO policy to provide training to all employees to empower them with the knowledge skills and abilities to perform their assigned job duties. Employees perform more efficiently and effectively when they are properly trained. Training creates a better work environment and enables staff to realize greater job performance satisfaction.

USA008457



GEO's training program at each Center proposed under this Requirement will be managed by a dedicated Training Administrator located full-time at each Center. The Center Training Administrator will schedule, conduct (in concert with Department-head level subject matter experts), facilitate, and document all training activities required under the contract, including management of the GEO Learning Management System (LMS).

Officers will not perform duties under this contract until they have successfully completed all initial training and the COR receives written certification from GEO. Any remuneration or pay due to GEO employees in accordance with U.S. Department of Labor regulations for any training time is GEO's responsibility. GEO will not use alternative or E-training techniques, unless approved in writing by the CO via the COR. The training site will be provided at no additional cost to the Government.

Training objectives will be established along with a specific written statement of the goals expected for successful completion of the training program. Training programs will include established requirements for completion, attendance recording, and a system for recognition of completion.

General program objectives for training will be as follows:
- To inform new employees of the Center's mission and institutional goals
- To instruct new employees in Center policies, procedures, and programs
- To familiarize new employees with the Center 's physical plant
- To provide existing employees with improved skills in their specialty area
- To convey new job skills to employees in all specialty areas
- To provide a team of trained resource staff at all levels of management
- To develop human relations skills to assist in establishing productive, meaningful, and professional relationships with detainees

The Facility Administrator is responsible for the overall operation of the Center training program, and the Training Administrator is responsible for implementation of the training policy.

Training provided to Center staff will include typical classroom instruction as well as other recognized educational strategies. Employee positions and job responsibilities will determine the type and quantity of training required. This will be addressed in the annual training plan.

Each trainee shall be required to pass a written or practical examination to ensure the subject matter has been mastered. This is particularly important in life-safety subject

USA008458



areas such as firearms, chemical agents, self-defense, force and restraints, emergency response, first aid, CPR and in areas of ethical conduct.

Key components in developing the training program include:
- Design of training based on the needs of the Center;
- Scheduling training in phases so applicable standards, contractual obligations, and policies are compliant; and
- Delivering training in professionally developed formats that ensures skill-based competency testing.

All new Officers will receive 180 hours of training during the first year of employment, comprised of Basic, On-the-Job training and Additional Training during their Initial 60-Day Period. Refresher training will be provided annually.

The following training categories will be established:
- Initial training for all staff upon employment with the Center
- Annual refresher training for all staff that serves to maintain minimum competencies in necessary job skills and informational areas
- Emergency training for pre-identified staff so every employee likely to be called on in an emergency can respond efficiently and effectively
- Other specialty training mandated by statute, standards, or regulations

Requirements for training will depend on each employees' job duties and will be performed in accordance with the requirements of the PWS.

All employees at the Center will be trained in basic first aid and CPR. All CPR certified staff will be trained by a certified health organization such as American Red Cross, American Heart Association, or American Safety and Health Institute.

**Supervisory Training**

Prior to assuming duties, all supervisory Officers will receive 40 hours of formal supervisory training. This program includes situational leadership, KRONOS, and transition training. GEO ensures supervisors attend a 40-hour block of instruction designed for New Supervisors. This course is modeled after and uses material from the National Institute of Corrections (NIC). The course includes: Communications Skills, GEO's Uniform Policies, Security Inspections, Staff Motivational Techniques, Use of Tele-Staff for Scheduling and Overtime Control, GEO Human Rights policy, Detainee Supervision Staff- Detainee Relations, Use of Force, and Emergency Response.

USA008459



Additionally, supervisors will receive 24 hours of professional development training each calendar year. Any additional courses added to the above curriculum will undergo an approval process by the COR. New Supervisors Training will be completed prior to a staff member assuming the duties of Supervisor. Records of completion will be maintained in the Learning Management System (LMS) and will be made available to the COR.

Training will be conducted using certified instructors. The Training Administrator will complete, at a minimum, a 40-hour train-the-trainer course. Each instructor will be approved by the COR prior to the start of the training course. GEO ensures all instructors attend a Training for Trainers course prior to instructing any pre-service, in-service or specialty curriculum.  GEO also ensures all specialty trainers such as Defense Tactics, CERT or Firearms have received a Certification within that field from either a State or Federal government or a nationally certified private vendor.

**Training Documentation**
GEO will utilize a Learning Management System (LMS) to ensure that every employee providing services under this contract has completed the appropriate training, that training is up to date, and that the training is provided on time. A monthly training forecast will be developed and submitted to the COR or alternate COR, which includes the dates, times, and locations of scheduled training. A monthly list will be maintained outlining the training completed and a list or database of each employee's training history and pending training requirements. The list will contain the training hours, type of training, date and location of training, and the name of the instructor for each employee. Training records will be updated in the Learning Management System.

## V. DETENTION SERVICES

### A. Detention Site Standards

The Center will operate in strict conformance with ACA and DHS Standards. GEO recognizes there is a relationship between the cleanliness of the Center and the health, safety, security, and morale of the detainees. Policies that detail the process and quality level required to meet sanitation and hygiene standards for each area of the Center will be followed. The Fire and Safety Manager will work with a qualified pest control company to conduct frequent and spot services to ensure the Center is vermin/pest free.

| Under the direction of the Center staff, custodial services will be provided in the following areas: | |
|---|---|
| ✓ Office Areas (including ICE Offices) | ✓ Recreation Areas |

USA008460



| | |
|---|---|
| ✔ Hallways | ✔ Health Services |
| ✔ Entry Areas/Outside Areas | ✔ Hair Care area(s) |
| ✔ Restrooms | ✔ General Use Rooms |
| ✔ Equipment Room | ✔ Visitor Areas |
| ✔ Storage Areas | ✔ Administrative Control Areas |

Clean, well-maintained and suitable linens and bedding supplies are conducive to good morale in the Center. The basic issue of linen typically includes two sheets, one pillow, one pillowcase, one non-combustible mattress with cover, and a sufficient number of clean blankets to provide comfort under existing temperature conditions. GEO will supervise and distribute these items to detainees as required.

GEO will ensure each detainee has access to clean bed linen and towels by supervising and distributing such items at least weekly, or sooner if excessively soiled or unsanitary. GEO will ensure articles necessary for maintaining proper hygiene are available to all detainees. Detainees, including those with disabilities and special needs, will be able to maintain acceptable personal hygiene practices. Detainees will be provided with clean clothing, linen and towels on a regular basis to ensure proper hygiene. Undergarments will be exchanged daily, outer garments at least twice weekly, and sheets, towels, and pillowcases at least weekly. Blankets will be exchanged every 30 days.

GEO will ensure detainee housing areas are inspected by a supervisor a minimum of once per shift. A security logbook will be used to log records of the inspection. The security logbook will be available for review by the COR or ICE designee. The Chief of Security will serve as the coordinator of the sanitation inspection program designed to ensure that:

1. All areas are clean and orderly
2. Lighting, ventilation and heating equipment function properly
3. No fire, safety or health hazards exist
4. All equipment, tools and security devices perform properly
5. All plumbing equipment including toilet, showers, washing and laundry facilities operate properly
6. A review of previous reports of deficiencies is conducted

Each staff member is responsible for overseeing the sanitation levels in their assigned area. If a deficiency is found, the staff member will put in a work order to have the situation remedied. GEO will check all locks, windows, walls, floors, ventilators, ventilation covers, access panels, and doors daily for operational wear and detainee

USA008461



tampering. Any defective equipment will be reported immediately to the COR or ICE designee.

GEO will follow established policies and procedures relating to the security of the Center to prevent possible escape attempts. A comprehensive security-inspection system must cover every area in the Center, including the perimeter fence-line and all security cameras. Officers assuming their posts shall conduct a security check of the area, record the results in the post logbook, and prepare and submit maintenance work requests as necessary. Supervisory staff will conduct a daily patrol, including holidays and weekends, of all areas occupied by detainees.

GEO understands the Center is subject to periodic and random inspection by the COR, ICE designee, or other officials (e.g., ACA, Foreign Counselor Officers) to ensure compliance with ICE Standards. Deficiencies will either be immediately rectified or a plan for correction will be submitted to the COR for approval.

Fire and emergency exits will be unimpeded, permitting prompt evacuation of detainees and staff members in an emergency. All employees will be knowledgeable of and trained on all Center evacuation plans and procedures, including the location of all exits to be used in the event an evacuation is required.

## B. Language Access

Translation services will be provided for communication with detainees who do not speak or comprehend the English Language. GEO will actively recruit bilingual staff and offer incentives to staff within the company for reassignment to the Center to ensure the availability of sufficient bilingual staff. In addition, GEO may provide continuing education assistance to those employees who wish to become bilingual. Detainee interpreters will be used only in emergency situations. GEO utilizes Language Line Services for telephone translation services.

## C. Health and Medical Care Policies

GEO will manage and operate the Center in compliance with written policies and procedures that govern emergency medical care, prompt summoning of emergency medical personnel, evacuation, and duty officer response. GEO Officers will be trained to treat requests for medical treatment with a sense of urgency.

## D. Medical Services

Medical services at the facilities proposed under this Requirement will be provided by Wellpath, under contract with GEO, and will encompass the requirements established in



the PWS. Wellpath is a leading provider of a wide range of health care services, ancillary services, and products with more than 35 years of experience. GEO will provide Officers to cover the medical unit, the infirmary, and mental health, and will escort detainees to the medical clinic for sick call, appointments, and pill line.

**Health Care**
Wellpath has a comprehensive, in-house detainee health care system that includes medical, dental, mental health, recordkeeping and ancillary services. Wellpath will comply with the standards promulgated by the National Commission on Correctional Health Care (NCCHC), ACA, the PBNDS, as well as all applicable State of California regulations, Federal laws and court orders in effect at the time of this Solicitation.

**Health Care Administration** – Health care services are an inherent part of the overall secure services management program. Wellpath's in-house licensed health services staff will provide clinical and management expertise to all detainees at the Facility 24 hours a day, seven (7) days a week. The medical unit will be equipped to provide primary care and emergency health care on-site, to include on-site medical observation. Arrangements with outside laboratories, pharmacies, hospitals, diagnostic services and specialists will be made to augment or complement our health care services and to ensure that the health and welfare of the detainee population is met. The Health Services Administrator is the Facility-designated health authority responsible for the delivery of health care services and will have full authority to act on behalf of Wellpath in all matters relating to the administrative operation of health services at the Facility. The licensed, responsible Physician has the final authority regarding clinical issues. A Regional Manager will oversee all personnel selection, training and supervision to provide professionalism, quality service and compliance with Wellpath's professional and client standards.

**Intake Health Screening** – Intake/Release provides the requirements of detainee intake health screenings. Facility Medical staff will immediately be advised of the detainee(s) arrival and they will perform a preliminary health screening. No detainee will be admitted into a housing assignment without medical clearance.

All new intakes receive a thorough screening for TB at the intake process. Upon receiving a TB test, information is immediately recorded in the health care record and the detainee is given an appointment to return to the medical department for the final reading. The final reading is recorded in the health care record and follow-up with a medical provider is scheduled, if required.

USA008463



An initial receiving/intake screening will be completed on all detainees within 12 hours of entering the Facility. The receiving/intake screening will be completed by health services staff and comply with all requirements of PBNDS Intake Screening Form.

The findings of the receiving/intake screening and subsequent evaluations will be recorded on the appropriate PBNDS form and will become a permanent part of all medical record. Based on the receiving/intake screening, the health services staff will determine what restrictions, if any, must be considered for proper placement of the detainee while at the Facility. In addition, an immediate referral to an appropriate health care service or health care provider will be initiated, as medically indicated.

**Medical, Mental Health and Dental Appraisals** – A comprehensive health assessment will be completed for each detainee within 14 days after arrival at the Facility. When the detainee is readmitted to the system, their health status will be updated as appropriate. All elements of the health assessment will be conducted by the health services staff. Essential elements of the health assessment will include the following:

- Review of receiving/intake screening performed during intake
- Collection of historical data to complete the medical, dental, mental health and immunization histories
- Recording of vital signs, which includes height, weight, pulse, and temperature and blood pressure
- A mental health evaluation
- A physical examination that includes attention toward oral health and dental problems
- Routine lab work to determine the presence of communicable disease, if clinically indicated
- Additional laboratory work, as clinically indicated
- Vision and hearing screening
- Appropriate treatment or therapy as indicated
- Immunizations in compliance with the U.S. Public Health Service (PHS) and Centers for Disease Control (CDC), if indicated

All information recorded during the history and physical examination will be placed into the detainee's permanent medical record. Thereafter, detainees will receive subsequent physical examinations according to established Wellpath Health Services Policies and Procedures for recurrent physical examinations.

**Access to Health Care** – Upon arrival at the Facility, all detainees will receive oral and written information that specifies the medical, dental and mental health services available

USA008464



to them, the procedures for accessing routine or emergency services, and the procedure for utilization of the grievance mechanism in a form and language they can understand. Signs explaining these procedures will be posted in the initial intake area, the medical unit and in all detainee housing units. Wellpath will establish language interpretation services and will not use detainees to translate or interpret medical problems except in emergencies.

Detainees will have daily access to the health services staff by utilizing the medical request form. Health services staff will triage medical requests within 24 hours and detainees will be assessed by health services staff within 24 hours of triage (72 hours on weekends). Detainees will have access to a Physician when medically necessary after assessment by the health services staff.

*Sick Call* – Each detainee assigned to the Facility will have unencumbered access to regularly scheduled sick call. The detainee will complete a Request for Health Services Form, which will be collected daily from a locked box on each housing unit by health services staff. Sick call will be conducted regularly, regardless of housing assignment, by qualified health services staff for non-emergency health services to meet the detainee's routine health care needs. Arrangements will be made to provide regular sick call services and evaluations to restrictive housing unit detainees by health services staff. The Physician will visit the restrictive housing unit as often as medically necessary. Health services staff will maintain a record of restrictive housing unit visits. Health services staff will be available daily to detainees throughout the Facility for access to health services, in addition to the medical request form being filled out by the detainees requesting medical care. Emergency medical, dental and mental health services are provided 24 hours a day.

**Provision of Health Care** – The Medical Health Unit will ensure that a detainee's medical or mental health conditions are closely monitored. Wellpath facilitates medical care 24 hours a day, seven days per week. If a detainee requires the provision of extensive medical care beyond the capability of the Facility medical department, facility staff members can arrange for transfer of the detainee to one of the numerous local hospitals under order of the facility Physician.

*Special Needs Treatment Plans* - Individualized treatment plans will be developed by the examining Physician for detainees with special medical needs, which require close medical supervision and/or multi-disciplinary care. A review of the treatment plan by the health services staff will occur regularly. All detainees with special needs will be monitored closely by the health services staff. The treatment plan will include a diagnostic statement, the frequency of follow-up visits, diagnostic studies and the medication regime.

USA008465



*Infection Control Program* - Because of the unique environment within secure facilities, it is particularly important to stress prevention, early identification, and control of infectious diseases, which are certainly more likely to become epidemic under such conditions. The infection control program will involve monitoring of infectious diseases and communicable diseases among detainees by review of records, investigation of reports of infection, a review of outbreaks of disease and to assure that detainees infected with these diseases receive prompt care and treatment. Typical monitoring functions of this program will include monitoring of detainees with tuberculosis (disease or infection), sexually transmitted diseases, AIDS, hepatitis and other reportable diseases, which will have reports filed consistent with local and Federal laws and regulations. Detainees infected with these diseases will receive prompt care and treatment according to written policies and procedures, to include separation from the detainee population when medically indicated, and compliance with treatment regimen will be initiated within twenty-four (24) hours. The IHSC and local health department will be notified immediately when a communicable disease is suspected. Wellpath has a comprehensive Blood-borne Pathogen Exposure Plan consistent with the Occupational Safety and Health Act (OSHA) and all other Federal codes and regulations.

Wellpath will conduct a monthly environmental and sanitation inspection of the Facility to ensure a safe and sanitary environment for detainees housed in the Facility. Monthly findings will be discussed at both Administrative and Comprehensive Quality Improvement Program meetings.

Standard universal precautions will be strictly adhered to by health services staff and all Officers who have contact with detainees in order to minimize the risk of exposure to blood and body fluids of detainees. The Facility staff will receive training to ensure compliance with Standard Universal Precautions.

*Detoxification* – The responsible health authority will approve established policy, procedures and specific protocols for detainees under the influence of alcohol and/or other drugs or those undergoing withdrawal. Detainees experiencing severe, life-threatening intoxication (overdose) or withdrawal will be immediately transferred to an off-site acute care hospital. Narcan injection or nasal inhaler will be available and utilized as necessary.

The health services staff will follow established policies and procedures for the treatment and observation of individuals manifesting mild or moderate symptoms of intoxication or withdrawal from alcohol and drugs. Acute detoxification is done only under direct

USA008466



medical supervision and the detainee would be transferred to an off-site acute care hospital for treatment.

*Chemical Dependence* – The responsible health authority will approve established policy and defined procedures regarding the clinical management of chemically dependent detainees. An individual treatment plan will be developed and implemented, and referral to community resources will be made when appropriate upon release. Substance abuse counseling and support services will be provided as part of the detainee's education and program activities.

*Pharmaceuticals* – Wellpath will coordinate for the provision of all formulary and non-formulary pharmaceuticals to include over-the-counter medications at the Facility. All such medications will be ordered through the VA Financial Services Center system. Prescription medications will only be ordered by a licensed practitioner (Physician, Psychiatrist, Advanced Practitioner or Dentist) in accordance with State law. All pharmacy services will be monitored by a licensed contract consulting Pharmacist who will comply with all regulations set forth by the State of California and Federal Drug Enforcement Administration Laws, Regulations and Rules. No detainee or Officer will deliver or administer prescription medications.

Wellpath will provide maximum security, storage, and accountability for DEA-controlled substances and needles and other commonly abused items. Wellpath has existing policies and procedures to ensure the security of medications and the integrity of the on-site medication room. The provision of medications on discharge from the Facility will be in accordance with established IHSC policies.

*Mental Health Services* – The mental health services will be provided by qualified mental health professionals who are appropriately credentialed and licensed in the State of California. All detainees will receive an initial mental health screening within 12 hours of arrival. Detainees found to be suffering from a serious mental illness or psychiatric disorder will be referred immediately to a qualified mental health professional for further evaluation and crisis intervention. All detainees at the Facility will have access to mental health services and will receive oral and written information concerning the scope of mental health services and how to access the system. Detainees will access mental health care by completing a medical request form which will be collected by health services staff from a locked box in the housing unit. Detainees who do not speak English will have access to the language line for assistance in making medical requests and understanding medical/psychological intervention offered.



Mental health services will be provided on-site at the Facility and will include the following:

- Receiving screening
- Mental health assessment
- Mental health evaluation by qualified mental health professional, as medically required
- Assessment to suicide/self-harm risk
- Crisis intervention
- Psychological evaluation as required
- Psychiatric assessment and follow-up as required
- Psychotropic medications when clinically indicated
- Appropriate laboratory services for detainees on psychotropic medications
- Documentation of service delivery and development of treatment/management plan

Health services staff will evaluate and determine the health status of detainees who have been receiving mental health treatment, prior to the detainee being admitted to disciplinary, administrative, protective or other segregation. Health services staff will monitor daily, or more often as indicated, detainees with mental health disorders in any segregated housing setting. Mental health treatment will be initiated as clinically indicated for detainees regardless of their housing at the Facility.

Wellpath will immediately notify the IHSC when there are significant concerns related to a detainee's mental health status.

*Dental Services* – All detainees will have an oral screening by a qualified health care professional within 14 days of admission to the Facility. This oral screening is a visual observation of the teeth and gums and notation of any obvious or gross abnormalities requiring immediate referral to a Dentist. A full dental examination will be done within 12 months of admission by a Dentist, supported by x-rays if necessary. A re-admitted detainee who has had a dental exam within the past 12 months will not require a new exam. All routine dental services will be provided by a licensed Dentist. Dental treatment is provided according to a treatment plan, based upon established priorities that, in the Dentist's judgment, are necessary for maintaining the detainee's health status. Detainees will access dental services by completing a medical request form and will deposit in locked box in housing unit. The detainee will be referred to a dental specialist as medically required.

USA008468



The oral screening includes instruction in oral hygiene and dental health education. The dental care will include relief of pain and infection, extractions, restorations, minor repair and adjustments of dentures. Non-urgent or elective dental care will not be provided. Cosmetic dental prosthetics or other dental care for cosmetic purposes will not be provided.

*Experimentation* – Wellpath will not conduct experimentation or pharmaceutical testing on detainees.

*Incident Health Care* – The Facility considers the health and safety of the detainees in its custody of utmost importance; therefore, we take preventative measures to limit severe incidents.

*Suicide Assessment and Prevention* – The threat of suicide and attempted suicide are treated as serious matters by all staff at the Facility. Proper care and supervision of suicidal detainees will be provided. Facility policy and procedure provides for the immediate response to the threat of suicide and the proper notification to health services, administrative, counseling and direct care staff and mental health professionals regarding detainees who have expressed suicidal ideation, have histories of suicidal tendencies and/or arrive at the Facility with documentation indicating that the detainee has threatened or attempted suicide. These detainees will be evaluated on a regular basis by professionals who will assess the detainee's mental health and ensure the prescribed treatment is provided.

*Hunger Strikes* – The Facility's hunger strike management program is reviewed by the responsible health authority. Medical staff members are trained in hunger strike evaluation and treatment and remain up to date on these procedures.
Electronic Health Records (EHR) – As an added value, GEO offers an electronic health record (EHR) to document services provided to include but not limited to medication administration, clinical encounters, chronic care treatment plans, mental health and dental assessments.  Wellpath health professionals will fully utilize the GEO EHR to document delivered services. Statistical data will be obtained from the records for utilization in the Quality Improvement Program. GEO will establish a time line for EHR implementation.

## REQUIREMENT D: Mental Health Services
### Adelanto ICE Processing Center ONLY

The mental health programming described below will only be provided at the Adelanto ICE Processing Center and will consist of six hours daily of comprehensive mental health group programming. There will be appropriate space designated for staff and groups.



*Participation in Mental Health Group Programming*

Wellpath understands based on ICE's analysis of data provided of the detained population, the current facility's mental health caseload is typically 15% of the overall population, many of whom will benefit from behavioral health therapeutic group programming. Any detainee at the facility may be referred to mental health group programming services by the contract behavioral health staff, Contracting Officer's Representative (COR) or Alternate Contracting Officer's Representative (ACOR), or IHSC. Each detainee will have the ability to request enrollment in mental health group programming, with enrollment subject to approval by the behavioral health staffing. Referrals and requests will be routed to Wellpath behavioral health staff who will prioritize and refer detainees to specific therapy sessions based on their clinical assessment.

*Mental Health Group Programming*

Wellpath will use an evidenced and trauma-informed approach, led by a Behavioral Health Program Manager, to implement mental health group programming. Wellpath will promote a holistic approach to mental health treatment and identify areas for individual change across the social, psychological, and emotional spectrum. Group programming will also be culturally appropriate to the ICE population at the facility.

Wellpath will use the following core aspects of structured evidence-based group programming:

- A variety of group methods, including music and art therapy;
- Trauma-focused group programming
- Substance Abuse groups, including for dual diagnosis populations
- Domestic violence group programming, including for both male and female populations
- Mindfulness and meditation programming with a focus on acceptance and commitment
- Programming focused on Illness Management and Recovery
- Facilitated peer support and process groups
- Dialectal Behavioral Therapy Skills Training
- Mood Management Group Programming
- Cognitive-based Therapy or Distress Tolerance Skills Training

Wellpath will create an IHSC-approved Program Plan that includes a Program Schedule detailing the types and frequency of programming. Wellpath utilizes evidence-based group therapy treatment modalities.

USA008470



Group programming will consist of multiple sessions, with interactivity and verbal discussions, and include various written materials as appropriate. These sessions will be tailored to suit detainees with mental illness and individuals with past trauma, as well as other special vulnerabilities. Moreover, group programming will be offered in a language and manner the detainee can understand. Wellpath will use bilingual Spanish-speaking staff and appropriate contracted language access services for other languages spoken by detainees. Additionally, Wellpath will ensure effective communications, including using auxiliary aids and services, with detainees with special needs, including disabilities.

Wellpath will develop an evaluation plan to assess the efficacy of the Group Mental Health Program operations for initial review by GEO prior to providing to both the COR and IHSC. Program objectives will be incorporated in the program evaluation and reports will be routinely provided on a quarterly basis and upon request. The program reports will include quantitative and qualitative data regarding the following objectives:

- Decreased frequency of inpatient hospitalizations
- Decreased frequency of disciplinary incidents, segregation placements and lengths of stay in segregation
- Improved mental health well-being
- Decreased self-injury incidents and suicide attempts
- Compliance with obligations to provide mental health treatment
- Effective and active participation in the detainees' legal process and immigration court proceedings.

Pre-screening data points will be utilized for a comparative analysis and a post outcome survey will be provided after completion of the program.

GEO will provide the required Officers to maintain security for mental health services.

### E. Detainee Voluntary Work Program

GEO will establish a comprehensive volunteer detainee work program at the Center which complies with PBNDS 2011 with 2016 revisions. Assignment to the work program will be strictly voluntary and under the supervision of the Assistant Facility Administrator or his/her designee.

The program will comply with all Federal, State and local work Safety Laws and Regulations. Detainee volunteer workers will be paid $1 per day in accordance with the Performance Work Statement, Part 5. Detention Services, Section E. Detainee Voluntary Work Program, issued with this RFP.

FINAL PROPOSAL REVISION – December 9, 2019
ICE California CDF – RFP No. 70CDCR20R00000002
Section I.1.B Understanding of the PWS *page 50 of 72*

Examples of voluntary detainee work include maintenance, food service, laundry, and sanitation/grounds work. Detainees will remain within sight and sound of a staff member at all times and will be searched when they return from work detail.

Detainees will not:
- Be used to perform the responsibilities of an employee
- Perform work in areas where sensitive information is available
- Be assigned work that is considered hazardous, such as work requiring great heights, extreme temperatures, use of toxic substances, or unusual physical demands

All volunteer workers will be supervised by Center staff. For example, detainees who have volunteered and been medically cleared to participate in food service at the Center will be supervised by staff and provide basic assistance during meal service times.

The Center Fire & Safety Manager will monitor all working conditions to ensure safe conditions are maintained and that detainees receive documented training as it relates to voluntary work program assignments and appropriate clothing and equipment as necessary.

## VI. REQUIRED ADMINISTRATION AND MANAGEMENT SERVICES

### A. Manage the Receiving and Discharge of Detainees

During the admissions process, GEO will ensure that detainees undergo screening for medical purposes, have their files reviewed for classification purposes, submit to a standard body search, and are personally observed and certified regarding the examination, categorization, inventorying, and safeguarding of all personal belongings.

All detainees will be fingerprinted upon admission in accordance with the ICE policy on Admissions Documentation.

Admission processes for a newly admitted detainee includes, but is not limited to:
- Recording basic personal data and information found in ICE documents and obtained during interview of arriving detainees
- Detainee shower and issuance of clean clothing mandated
- Retention of criminal history check within detainee files and records
- Photographing and fingerprinting, including notation of identifying marks or other unusual physical characteristics

USA008472



- Assignment of registered number to the detainee, checked property and computer management system
- Metal detection prior to housing transfer
- PREA Risk Assessment
- Opportunity to make one free three-minute telephone call and are assisted as needed to notify persons of their admission to custody
- Medical, dental, and mental health screenings including suicide/self-harm
- Screening to detect signs or drug/alcohol abuse
- Inventory of personal property
- Secure storage of detainee property, including money and other valuables. The detainee is given a receipt/or all property held until release.

GEO will effectuate departures as directed by ICE.

| **Activities performed by GEO in support of detainee departure will include:** |
|---|
| ✓ *Providing positive identification;* |
| ✓ *Documentation preparation and review;* |
| ✓ *Transportation* |
| ✓ *Escorting* |
| ✓ *Provide sack meals for detainees* |
| ✓ *Placing detainee on proper departing aircraft* |
| ✓ *Remaining at the gate until aircraft is airborne* |
| ✓ *Verifying verbally with carrier gate attendant that aircraft is in flight* |
| ✓ *Certifying departure in writing to the COR* |
| ✓ *Returning all DHS documentation to the appropriate DHS supervisor upon completing the escort assignment* |

GEO will affirm, swear and witness to all actions of effectuating departure that were accomplished, performed, and carried out.

All detainee releases are to be carefully identified and documented. All detainee property is to be returned to the detainee and all issued Center property is to be collected and inventoried prior to his/her release. All Detainees held for 30 or more days that will be released to the community are provided with information about community resources.

USA008473



Procedures followed by GEO for releasing detainees at the end of their term include, but are not limited to, the following:

- Identification of outstanding warrants, wants or detainers
- Verification of identity
- Verification of release papers
- Completion of release arrangements
- Return of personal property
- Verification that no Center property leaves the Center
- Arrangements for completion of any pending actions, such as grievances or claims for damages or lost possessions
- Medical screening and arrangements for community follow-up where needed, to include medication

GEO will provide transportation assistance as required by the PWS to detainees upon release.

## B. Manage and Account for Detainee Assets (Funds, Property)

Detainees will be allowed to retain in their possession a reasonable amount of personally-owned property. Detainee property items not authorized for personal retention and use during processing will be inventoried and be retained in the property room until the detainee's release, transfer or removal.

To prevent overcrowding and related storage problems, staff will encourage detainees to send extra suitcases, television, and other soft contraband to a third party of their choosing. Staff shall inventory, and maintain a record of, detainee personal property being shipped from the Center, with a copy of the record placed in the detainee's processing file.

The detainee handbook or equivalent shall notify the detainees of Center policies and procedures related to personal property, including:

- Which items (including cash) they may retain in their possession
- That, upon request, they shall be provided an ICE/DRO-certified copy of any identity document (e.g., passport, birth certificate) which shall then be placed in their A-files
- The rules for storing or mailing property not allowed in their possession
- The procedure for claiming property upon release, transfer, or removal
- The procedures for filing a claim for lost or damaged property
- Access to detainee personal funds to pay for legal services

USA008474



GEO will provide for the control and safeguarding of detainees' personal property. All personal property will be inventoried, tagged and stored in the property room. An inventoried list of all items to be stored will be provided to the detainee for confirmation and signature. This list will be placed within the detainee's file.

## C. Securely Operate the Processing Center

GEO policy requires a system of maintenance, control accountability, and identification of all keys used in the Center. The strict control of keys in a Center is essential to ensure Center security, public safety, and the safety of staff, visitors and detainees. GEO will adhere to key control policies, in accordance with ICE PBNDS 2011 with 2016 revisions. This includes strict control over keys to ensure Center security, public safety, and safety of staff visitors, and detainees. The Locksmith/Armory Officer will report to the Chief of Security and be responsible for inspections, maintenance, accountability, and testing on all locks and access controls throughout the Center. The Locksmith/Armory Officer shall complete an approved locksmith training program. This training shall be supplemented with additional training in Occupational Safety and Health Administration standards and the National Fire Prevention Association's life safety codes.
All staff shall be trained in and held responsible for adhering to proper procedures for the care and handling of keys, including electronic key pads. Initial training shall be completed before staff is issued keys, and key control shall be among the topics covered in subsequent annual training.

GEO will be responsible for all devices issued to them for ICE buildings, gates, and locks, and will sign and acknowledge receipt of these devices.

In the event a key is lost, stolen, missing or damaged, or if a key or lock is compromised, the Shift Supervisor must report it to the Facility Administrator or designee immediately both verbally and in writing. The Shift Supervisor will gather all documentation of the lost or damaged keys by the end of their shift. The Shift Supervisor will immediately lockdown all detainees in the area and will thoroughly search the area. Staff will not leave until the Facility Administrator authorizes staff to do so.

Each Center equipped with a perimeter road will have constant armed perimeter surveillance.

## D. Establish and Maintain a Program for the Prevention of Sexual Abuse/Assault

GEO will develop and implement a sexual abuse/assault prevention and intervention (SAAPI) program that is in accordance with the ICE 2011 PBNDS with 2016 revisions on SAAPI and the DHS PREA standards as provided in Attachment 13 of this RFP. GEO



will use ICE approved SAAPI program policies and procedures from existing GEO managed ICE Centers as a foundation for developing the FSP SAAPI Program.

GEO policy prohibits sexual conduct between employees, volunteers, contractors or detainees, regardless of consensual status. Such conduct is subject to administrative as well as criminal and disciplinary sanctions.

GEO has a dedicated PREA Coordinator, Director of Contract Compliance, reporting through the Corporate Contract Compliance department. The Corporate PREA Coordinator will be responsible for implementation of PREA monitoring systems and policies as well as developing, implementing and overseeing GEO's compliance with the National DHS PREA Standards in each Processing Center. In addition, the Corporate PREA Coordinator will provide guidance and resources in all matters related to PREA training, reporting, allegations, and investigations.

GEO also employs three PREA Managers of Contract Compliance at the Corporate level with investigative experience who are charged with reviewing and assisting in investigations of PREA incidents as well as operating as a resource to all Centers. An additional Corporate staff member, the PREA Compliance Specialist, is dedicated to collecting and analyzing PREA statistical data and preparing required reports. In addition to the Corporate PREA team, a Prevention of Sexual Abuse (PSA) Compliance Manager will be designated at the Center to ensure SAAPI Compliance at the Center level and will work closely with the corporate team.

This team, as part of the Corporate Contract Compliance Department, will work with staff at each Center to implement the extensive training program for all employees, volunteers, and contractors with additional intensive training for investigators and specialized training for medical personnel.  All detainees will receive PREA education at orientation as part of the intake/admissions process.  Upon employment, all staff receives a three-hour initial training course specifically covering DHS PREA guidelines, with two hours of annual in-service training thereafter. Additionally, all detainees will receive PREA education at orientation as part of the intake/admissions process in a language or manner that the detainee understands, including those who are limited English proficient, deaf, visually impaired or otherwise disabled, as well as to detainees who have limited reading skills.

The Center will take steps to ensure meaningful access to all aspects of the Center's efforts to prevent, detect, and respond to sexual abuse to detainees who are limited English proficient and disabled.



To ensure continuous commitment to PREA, PREA requirements are included in the Quality Control Program and are audited during the Annual Corporate Audit. The audit includes a tour of the Center, review of various PREA related documentation, reviews of investigation files, postings, and evaluation of detainee familiarity with PREA reporting and interviews with staff on their knowledge of PREA requirements.

In addition to training, the Corporate Contract Compliance team performs mock PREA audits to prepare for the certification audit. These mock audits include tours of each Center, reviews of investigation files, postings, and evaluation of detainee familiarity with PREA reporting and interviews with staff on their knowledge of SAAPI requirements.

### E. Collect and Disseminate Intelligence Information

The Chief of Security will be responsible for Intelligence operations. The Chief of Security, through the Facility Administrator's office, will notify the ICE Supervisor on duty immediately on issues which could impact the safe, secure, and orderly operation of the Center.

### F. ICE Notifications

GEO will immediately report all serious incidents or criminal activity to the Field Office Director (FOD) or ICE-designee and the COR, including but not limited to:

- Activation of disturbance control team(s)
- Disturbances (including gang activities, group demonstrations, food boycotts, work strikes, work place violence, civil disturbances/protests)
- Staff uses of force including use of lethal and less-lethal force (includes detainees in restraints more than eight hours)
- Assaults on staff/detainees resulting in injuries that require medical attention (does not include routine medical evaluation after the incident)
- Fires
- Fights resulting in injuries requiring medical attention
- Full or partial lock-down of the Center
- Escape
- Weapons discharge
- Suicide attempts



- Deaths
- Declared or non-declared hunger strikes
- Adverse incidents that attract unusual interest or significant publicity
- Adverse weather
- Fence damage
- Power outages
- Bomb threats
- High profile detainee cases admitted to a hospital
- Significant environmental problems that impact the Center operations
- Transportation accidents (e.g., airlift, bus) resulting in injuries, death or property damage
- Sexual assaults

All criminal activity related to the performance of this contract will be reported to the appropriate law enforcement investigative agency.

GEO will cooperate with the Government on all investigations of any incident pertaining to performance of this contract.

Pursuant to ICE instructions, GEO will notify and coordinate with local law enforcement agencies to counteract civil disturbances, attempts to commit espionage or sabotage, and other acts that adversely affect the normal site conditions, the security and safety of personnel, property, detainees, and the general public.

When a situation exists that requires an emergency response, it is imperative that staff not in the immediate area be alerted to aid and to control the situation. When a staff member becomes aware of an emergency situation their first responsibility is to give the alarm in an appropriate manner to alert staff outside the immediate area. The alarm may be given by telephone to Master Control or by radio to alert staff of the emergency. In situations where a controlled response is indicated, notification by telephone, radio or in person is appropriate.

## G.Maintain Institutional Emergency Readiness

GEO will establish and maintain a Disturbance Control Team in accordance with ICE guidelines. Officers will be diverted from their normal duties as needed to control emergencies.



GEO's emergency plans will abide by ICE PBNDS 2011 Safety Section: 1.1 Emergency Plans, ACA standards and ICE policies. GEO has in place an internal corporate nationwide staff contingency plan consisting of employees who possess the same expertise and skills required of staff working directly on this contract. At the discretion of ICE, these employees will be made available to respond to an institutional emergency at the Center if deemed necessary. Employees considered as part of the national roster for this contingency plan will be selected from other Centers where GEO provides service under contract with ICE, thus ensuring that the employees have attained the proper background screening and training. GEO will obtain the concurrence of the COR for the plan prior to implementation and will not make additional modifications to the plan without the further written concurrence of the CO.

GEO will submit to the COR or ICE designee a proposed inventory of intervention equipment (e.g., weapons, munitions, chemical agents) intended for use during performance of this contract. GEO will not use electro-muscular disruption (EMD) devices.

GEO will await concurrence of the intervention equipment from the COR or ICE designee, prior to issuance of the NTP. The approved intervention equipment inventory will not be modified without prior written concurrence of the CO. GEO will be responsible for the acquisition of such intervention equipment.

GEO will obtain the appropriate authority from state or local law enforcement agencies to use force as necessary to maintain the security of each Center proposed under this Requirement.

**H. Manage Computer Equipment and Services in Accordance with all Operational Security Requirements**

GEO takes reasonable and appropriate steps to protect its information and information systems from a variety of threats such as error, fraud, sabotage, privacy violation, and service interruption. All users of GEO Systems and IT Resources, whether they are GEO employees, temporary employees or consultants, are responsible for protecting sensitive information from unauthorized access, modification, duplication, destruction, or disclosure. GEO endorses and implements the following security principles:

- Identification (e.g. User IDs) and authentication (through passwords and/or PINS)
- Authorization (e.g. access roles and access control)



- Confidentiality (e.g. encryption), integrity (e.g. the accuracy of system, data, and message storage and transmission), and availability (e.g. accessibility when needed)
- Accountability (e.g. tracking and audit)

GEO's security principles give us the ability to identify and record unauthorized access or attempts to access ICE detainee information. Any information technology security incidents will be reported to the COR or ICE designee within four hours of the security incident.

## I. Manage and Maintain a Commissary

Detainees will be given the opportunity to order from the commissary at least once per week. The commissary will be an order and ship operation, whereas orders are placed and are later delivered in an individual bag for each detainee. Detainees will utilize their detainee number to place orders, which will be tied to their fund accounts, which will be used for payment for their purchases. Detainees will be permitted to receive funds from outside sources (i.e., from family, friends, bank accounts). Outside funds or those generated from participation in the voluntary work program may be used to pay for products and services from the commissary.

All items available at the commissary will be those allowed by the Facility Administrator and will be approved by the COR or ICE-designated employee prior to sale to the detainees. As this will be an order and ship operation, no commissary inventory will be kept on site. Notice of any price increases will be provided to the COR. Revenues will be maintained in a separate account and not commingled with any other funds. Any interest earned on this account will be credited to the detainee welfare fund.

Expenditures of profits from the commissary operations will only be made with the approval of the Contracting Officer or designee. GEO will utilize revenues earned in excess of those needed for commissary operations at the Center solely to benefit detainees at the Center. GEO will provide independent auditor certification of the funds to the COR every 90 days.

At the end of the contract period, or as directed by the Contracting Officer, GEO will ensure that a check for any balance remaining in this account is made payable to the Treasury General Trust Fund and given/transmitted to the Contracting Officer.

## J. Manage and Maintain a Detainee Telephone System (DTS)

GEO understands the importance of an efficient, consistently operable telephone system within the processing environment. Access to telephones will enable detainees to



maintain family and community connections, both issues which have a significant impact on the quality of life within the Center.

GEO will provide detainees with reasonable and equitable access to telephones as specified in ICE PBNDS 2011 with 2016 revisions on Telephone Access. The ICE designated DTS Vendor will receive 100% (percent) of all telephone related revenues. The DTS Vendor will be responsible for the costs incurred for installation of the equipment, any monthly telephone charges incurred from the operation of DTS, and the maintenance and operation of the system. The telephone access rules will be provided to each detainee upon admittance, and the rules will be posted where they are easily visible. Telephone access hours will also be posted.

GEO does not expect to be entitled to any commissions, fees, or revenues generated by the use of the DTS or the detainee telephones.

GEO will consistently inspect telephones to ensure they are in working order, in accordance with ICE policies and procedures. GEO will notify the DTS Vendor, and the COR or alternate COR upon discovery of any inoperable telephones. Center staff will be responsible for ensuring daily that telephone systems are operational and that the free telephone list is posted. Ensuring there is a dial tone is only part of what is required: when testing equipment, the officers must be able to demonstrate that an individual has the ability to make calls. Any problems identified must immediately be logged and reported to the appropriate Center and ICE personnel. GEO will ensure a list of card and calling rates is posted in each housing unit.

## VII.    CENTER SECURITY AND CONTROL

### A. Security and Control (General)

It is GEO policy to maintain current written orders for every officer post. Officers assigned to those posts acknowledge in writing that they have read and understand the orders and record the date. The Facility Administrator or designee reviews post orders annually and updates them as needed. Each officer will have written post orders that specifically apply to his/her current duties. The post orders will specify the duties of the post Officer, along with instructions on how to perform those duties. The step-by-step procedures will include enough detail to guide an Officer assigned to the post for the first time. The Facility Administrator will also develop post orders for non-permanent assignments (details, temporary housing units, emergency changes, etc.). If events preclude advance planning, the Facility Administrator will issue a post order as soon as possible after the need arises.

USA008481



GEO will ensure control and security of the Center and its occupants through regular inspections conducted by Officers. Security inspections guard against internal and external breaches in security. The Facility Administrator will be responsible for the identification, repair and/or resolution of any issues requiring corrective measures as soon as possible.

As a standard, GEO policies governing Center security and control for locations under contract with ICE are written in compliance with ICE PBNDS. Site-specific procedures will be developed with consideration for the unique physical plant features of each location proposed under this requirement.

GEO will provide, install, and maintain a building access control system in all ICE and/or DOJ administrative space, and will give the Government administrative access and oversight role for the system. GEO staff will comply with ICE security plans.

### B. Detainee Rights

It is GEO policy to treat all detainees with dignity and respect while maintaining a safe, secure and sanitary Center. Detainee rights are clearly communicated to each detainee in writing within the detainee handbook. GEO mandates a zero-tolerance policy towards all forms of sexual abuse and sexual harassment in all Centers. Detainees have the right to be free from discrimination for any reason, including race, religion, national origin, sex, sexual orientation, gender identity, physical ability, mental ability, or political beliefs.

### C. Unauthorized Access

GEO will utilize supervisory best practices and technology, which may include Morse Keywatcher, badge access, and CCTV, to detect and prevent any individuals from attempting to gain unauthorized access to restricted areas of the site(s) identified in this contract. GEO will immediately contact local law enforcement authorities and inform ICE in the event of an incident at the Center.

### D. Direct Supervision of Detainees

GEO's proposed staffing plan for each Center offered under this Requirement will allow for direct supervision of detainees. GEO will provide supervision of all detainees in all areas, including supervision in detainee housing and activity areas. Officers will be able to hear and respond promptly to emergencies. At least one officer will be assigned to monitor each occupied housing section, which will be separate from any housing control post that may be listed on the staffing plan.

USA008482



## E. Maintain a Video Surveillance Program

GEO will ensure that video cameras monitor hallways, exits, and common areas. Officers assigned to the Central Control Station will be responsible for monitoring this system. Considering that the videos will be recordings of residents who may be seeking asylum or other considerations under U.S. immigration law, GEO will maintain the digital recordings and will not release them to anyone, unless approved by DHS. GEO will keep the videos for a minimum of 90 days, or for the duration of any investigation as necessary for use by local law enforcement, ICE, or investigations conducted by GEO.

## F. Log Books

GEO will complete and document in writing, for each shift, including but not limited to, the following information in the logbooks:

- Activities that have an impact on the detainee population (e.g., detainee counts, shakedowns, detainee movement in and out of the site, and escorts to and from court). The Chief of Security will be responsible for completing these entries, with documentation being maintained in the Security Clerk's office.
- Shift activities (e.g., security checks, meals, recreation, religious services, property lockers, medical visits). The Chief of Security will be responsible for completing these entries, with documentation being maintained in the Security Clerk's office.
- Entry and exit of persons other than detainees, ICE staff, or GEO Staff (e.g., attorneys and other visitors). Logs will be recorded at the Entry Point, with documentation being maintained in the Security Clerk's office.
- Fire drills, routine procedures, emergency situations, and unusual occurrences. This information will be maintained in the Lieutenant's log.

The Chief of Security will ensure log books are updated as required. Logs will be maintained in the Administrative/Security Clerk's office and in accordance with ICE PBNDS.

## G. Reports

Daily, GEO will provide a manifest, managed via GEOtrack, of all detainees currently housed in the Center. The manifest will contain the following information for each detainee: "A" File Number; office received from; name; date of birth; gender; nationality; date of arrival; number of days the detainee has been in the Center; and type of release, if applicable.

On a monthly basis, GEO will provide status reports. The key indicator report will include data on Average Daily Population, Classification, Special Management, Detainee Behavior Incidents, Detainee Grievances, Use of Force incidents, and Personnel. A

USA008483



separate personnel report, listing the key personnel positions of the Center (e.g., position title, name of the employee, vacancies and length of vacancies, dates of service, additional comments) will also be submitted monthly to the COR or ICE designee as required for the previous month's activities and staffing.

GEO will prepare required orders, instructions, and reports of accidents, security violations, fires, and bomb threats. The reports will be maintained on file, concerning all activities in connection with duties and responsibilities for the services performed under this contract. GEO will prepare any special or other reports, or issue further orders and instruction as may be required in support of work within the scope of this contract as requested by ICE.

## H. Detainee Counts

Formal and informal counts will be conducted as necessary to ensure around-the-clock accountability for all detainees. GEO will document the physical detainee counts in the logbook and ensure ICE procedures are followed when the physical detainee count does not show that all detainees have been accounted for. This procedure will require a Center-wide recount by the Shift Supervisor. At a minimum, official detainee counts will be conducted once per shift, with no less than three counts daily, or as directed by the COR or ICE designee. All counts will be documented in separate logs maintained in the applicable locations where detainees are housed, the Control Center, and the Shift Supervisor's office, and will be maintained for a minimum of 30 days.

In accordance with GEO procedures a formal count should be conducted at least once every eight hours, with the shift supervisor verifying its accuracy. Officers will encourage detainee cooperation to encourage the accuracy and completeness of each count. However, officers will not allow detainees to perform the count, nor participate in the preparation or documentation of the count process.

There will be no movement of detainees during formal counts. All detainee movements into, out of, and within the Center must cease before the count begins. Detainee movement will not be allowed to resume anywhere in the Center until the complete Center count has been cleared. If while conducting a count, staff observe an unusual incident (e.g., medical emergency, criminal act), they will cease the count and respond appropriately according to local procedures. Should an emergency arise during the count that necessitates the movement of detainees, a new count will be conducted as soon as possible after the emergency subsides.

USA008484



FINAL PROPOSAL REVISION – December 9, 2019
ICE California CDF – RFP No. 70CDCR20R00000002
Section I.1.B Understanding of the PWS *page 63 of 72*

## I. Daily Inspections

GEO's Officers will conduct daily inspections of all security aspects of the site. All bars, locks, windows, walls, floors, ventilation covers, glass panels, access plates, protective screens, doors, lights, and equipment will be checked for operational wear and detainee tampering. Issues needing immediate attention to prevent injury such as slippery floor surfaces will be reported and attended to in order to prevent injury. This documentation will be made daily in a logbook and on "Work Request Forms" provided by ICE. Problems discovered during these inspections will be clearly identified in the documentation.

GEO will also notify the COR of any abnormalities or problems, including immediate notification of the COR or ICE designee on duty of any damage to the physical Center. Written documentation of any problem areas will be submitted to the COR by the end of the shift.

A general inspection of the Center will be made each week by the Facility Administrator, Assistant Facility Administrator, Chief of Security and Shift Supervisor. Shift Supervisors will visit all housing and activity areas each shift. Supervisory staff will conduct a daily patrol, including holidays and weekends, of all areas occupied by detainees. Patrols and inspections will be documented.

Inspection Procedures will include:

- Visual inspection for evidence of tampering or weakness
- Inspection of living quarters for discrepancies or inoperability of cameras
- Inspection of 'innocent looking' areas, i.e., trash containers, sanitary supplies, lockers and other places of concealment
- Inspection of the secure external perimeter of the Center, visitor holding areas, and doorways

## J. Deviation from Prescribed Schedule Assignments

GEO may deviate from the scheduled assignment when unusual conditions or circumstances so demand, and if prior approval is received from the COR. GEO will record all deviations in the daily logbook. When the COR is not available, GEO will ensure that the ICE Supervisor on duty is notified immediately or as soon as practically possible.

USA008485

### K. Use of Force and Restraints

Officers will use the minimum force necessary to gain control of the detainee; to protect and ensure the safety of detainees, staff, and others; to prevent serious property damage; and to ensure the security and orderly operation of the Center.

In accordance with ICE requirements and GEO policy, the use of physical force by Officers is restricted to instances of justifiable self-protection, protection of others, and protection of property and prevention of escapes. GEO only allows physical force to be used to the degree necessary to safeguard the well-being of the detainee(s) and others in the immediate area. Training on the applications and types of force is outlined during initial training as well as annual refresher training.

In no case will physical force be used as punishment or discipline. GEO will adhere to ICE PBNDS and the ICE Use of Force Policy on the use of deadly and non-deadly force to include the use of intermediate and deadly weapons. GEO's Officers will immediately report all instances of use of physical force to the ICE Supervisor on Duty. Prior to leaving his or her shift, the Supervisory Officer will prepare a written report and submit it to the Facility Administrator, who will review, approve, and provide the report to the COR or ICE Supervisor on Duty within 24 hours of the incident.

GEO will operate in compliance with ICE PBNDS governing the use of restraint equipment including the most recent ICE directive regarding Use of Restraints Directive. GEO does not apply restraints as punishment, nor does it apply restraints for more time than is necessary. Restraints will be applied for the least amount of time necessary to achieve the desired behavioral objectives. Four/five-point restraints will be applied only in extreme circumstances and only when other types of restraints have proven ineffective. GEO does not apply restraints on detainees who are pregnant or during postpartum recovery except for specific conditions outlined in PBNDS and GEO's policy.

GEO will seek advance approval for the use of these four/five-point restraints and will promptly notify the medical staff. Use of these restraints will be continued only in accordance with required procedures and documentation. When directed by the COR, GEO's Officer may use Government-provided disposable nylon straps in lieu of handcuffs or leg restraints in emergencies, mass arrest situations, or if a detainee's wrists or ankles are too large for conventional restraints. GEO will not use any other restraint devices.

Staff will comply with their defensive tactics training and the proper application of those techniques. Staff may not use restraint equipment or devices on a detainee's neck or face, or in any manner that restricts blood circulation or obstructs the detainee's airways

USA008486



(mouth, nose, neck, esophagus). Staff may not use restraint equipment or devices to cause physical pain or extreme discomfort. While causing some discomfort may be unavoidable even when applying restraints properly, examples of prohibited applications include: hog-tying, fetal restraints (cuffed in front with connecting restraint drawn-up to create the fetal position); unnecessarily tight restraints; and improperly applied restraints.

To control a situation involving an aggressive detainee, all staff must be made aware of their responsibilities through ongoing training. All processing personnel will also be trained in approved methods of self-defense, confrontation avoidance techniques, and the use of force to control detainees.

## L. Escapes

GEO will notify the COR and ICE Supervisor on duty immediately if an escape or an attempted escape has occurred, and escape response protocols will be initiated as necessary. GEO will provide the COR with a written report detailing the circumstances surrounding the incident prior to the end of the shift.

In the event of an escape, the order of responsibility and emergency procedures outlined in the site-specific Escape Emergency Plan will be followed, and the Escape Plan Notification Checklist shall be utilized. The Escape Plan Notification Checklist will be maintained in Master Control.

The Escape Emergency Plan establishes the procedures for responding to an escape, and includes specific guidance for notification, verification and assessment, order of responsibility, and staff responsibilities and duties.

The primary responsibility of GEO is to maintain the care, custody and control of detainees committed to our Centers and to ensure the safety and welfare of each staff member and detainee within our Centers, therefore providing for the safety of the public in surrounding communities. The ability of the Center to maintain control at all times during a crisis or emergency is essential. Accordingly, cooperation with local, county, state and federal law enforcement, detention/corrections, and emergency agencies will be an integral part of the daily operations of the Center as well as the Center's Emergency Plan.

In each of GEO's Centers (domestic and international), we consider all of our mutual aid agencies as partners in the development and testing of our procedures.

GEO has experienced excellent success with our established partnerships with community agencies, local, state and federal law enforcement, and our client agencies in



providing mutual assistance during situations requiring our "criminal justice team" to meet the challenges at hand.

As with all of our operations worldwide, we believe that our success is built upon the community support and community relations established well ahead of the formal submission of a proposal to the prospective client agency. Effective relationships can be achieved only through a free-flowing communications network of shared information at all levels within the community, law enforcement and emergency service agencies.

## M. Evacuation Plan

GEO will develop an evacuation and alternate staging plan in place for use in the event of a fire or major emergency at the Center. This plan will be reviewed annually and approved by ICE. Under existing contracts, GEO has established Memorandums of Understanding (MOU) for evacuation and transportation planning. GEO will model these existing agreements and establish arrangements with: Western Region Detention Facility, Adelanto ICE Processing Center, Mesa Verde ICE Processing Center, Central Valley Modified Community Correctional Facility, Desert View Modified Community Correctional Facility, Golden State Modified Community Correctional Facility, and McFarland Female Community Reentry Facility. GEO will also conduct drills as may be required by ICE written policy and procedure.

## N. Sanitation and Hygienic Living Conditions

GEO will comply with the requirements of the Occupational Safety and Health Act of 1970 and all codes and regulations associated with 29 CFR 1910 and 1926. GEO will comply with all applicable ICE, federal, state and local laws, statutes, regulations, and codes. In the event there is more than one reference to a safety, health, or environment requirement in an applicable, law, standard, code, regulation, or ICE policy, GEO will abide by the most stringent requirement.

GEO recognizes there is a relationship between the cleanliness of the Center and the health, safety, security, and morale of the detainees. Policies that detail the process and quality level required to meet sanitation and hygiene standards for each area of the Center will be developed and approved by ICE prior to contract award. The Fire and Safety Manager will work with a qualified pest control company to conduct frequent and spot services to ensure the Center is vermin/pest free.

| Under the direction of the Center staff, custodial services will be provided in the following areas: | |
| --- | --- |
| ✓ Office Areas (including ICE Offices) | ✓ Recreation Areas |
| ✓ Hallways | ✓ Health Services |



| | |
|---|---|
| ✓ Entry Areas/Outside Areas | ✓ Hair Care area(s) |
| ✓ Restrooms | ✓ General Use Rooms |
| ✓ Equipment Room | ✓ Visitor Areas |
| ✓ Storage Areas | ✓ Administrative Control Areas |

**O. Physical Plant**

A description of the physical plant for each Center proposed under this Requirement has been provided as an attachment to this section.

Promptly after the occurrence of any physical damage to the Center (including disturbances), GEO will report details of the damage to the COR or ICE designated official. GEO will repair the damage, to rebuild or restore the institution. Government staff will be on-site to monitor contract performance and manage other Government interests associated with operation of the Center, and GEO will ensure Government staff have full access to all areas of the Center. GEO will obtain pre-approval for access to Government required space from the COR.

**P. Environmental Policy Procedures**

GEO conducted an environmental assessment on each Center proposed under this requirement. GEO is confident that the information provided for each Center will allow ICE to issue a Finding of No Significant Impact (FONSI). The full environmental assessment, developed in compliance with RFP attachment 15, has been provided as Volume IV of our submission.

## VIII. FOOD SERVICE

GEO's Food Service Program is under the direct supervision of the Corporate Director of Food Service and a Registered Dietitian. GEO directly manages 55 kitchens within secure services facilities across the United States. In 2019 (as of September 30), GEO Food Service staff has been responsible for preparing and serving 47.9 million meals. GEO is cognizant of the critical role Food Service plays in the overall safe, secure, and efficient operation of the Center. GEO's expertise in production, line service, as well as medical, and religious diets qualifies us to meet and/or exceed standards as established by governmental health and safety codes, PBNDS, ACA, local standards, and National Technical Information System (NTIS).

GEO will provide all personnel, supervision, items and services necessary to perform full food service (including satellite meals and/or sack meals) required under this contract.



GEO is capable of managing and implementing the full scope of services required for the successful implementation of a food service program, including, but not limited to:

- Menu planning
- Ordering food and supplies
- Receipt, storage, inventory and record keeping
- Food preparation
- Meal service
- Dining Center management
- Cleaning facilities, equipment, and utensils
- Maintaining quality control
- Ensuring operator level maintenance and cleaning
- Contingency planning for continued service

GEO's experience operating under contract with ICE includes adherence to requirements established by numerous governing bodies. As required, GEO will adhere to the documents detailed in the list below.

- American Correctional Association (ACA) Manual
- ALDF Performance Standard: Food Service
- ICE Performance-Based National Detention Standards 2011 with 2016 revisions
- USPHS Food Code FDA
- Local Standards
- National Technical Information System

GEO understands the PBNDS requirements are controlling, and if there is a conflict between PBNDS, ACA standards and local requirements, the PBNDS standards prevail.

GEO will provide the necessary timely assistance to meet emergent requirements as requested by the Assistant Field Office Director (AFOD) or COR.

Food service accommodations for each Center proposed under this requirement are included within the concept design description attachments to this section.

## IX. PROPERTY ACCOUNTABILITY

### A. General

The Facility Administrator and the Business Manager are responsible for the purchasing, accounting, and safeguarding of all GEO and client fixed assets for the Center. Upon

USA008490



FINAL PROPOSAL REVISION – December 9, 2019
ICE California CDF – RFP No. 70CDCR20R00000002
Section I.1.B Understanding of the PWS *page 69 of 72*

expiration or termination of this contract GEO will render a written accounting to the COR of all such property. GEO will assume all risk and will be responsible for any damage to or loss of Government furnished property used by GEO employees.

Upon expiration of the contract or termination of services, GEO will immediately transfer to the COR, any and all Government property in its possession or in the possession of any individuals or organizations under its control, except as otherwise provided for in this contract. GEO will cooperate fully in transferring property to the successor Contractor.

### B.Use of Government Wireless Communication Devices

GEO will allow all personnel that have been issued a Federal Government owned wireless communication device, (i.e., cellular telephones, pagers or wireless Internet devices) to possess and use those items in all areas of the Center in which ICE detainees are present. GEO will provide, install, and maintain cellular, telephone, and wireless boosters to ensure optimal service throughout the Center and ICE and/or DOJ administrative areas.

## X.FIREARMS / BODY ARMOR

### A.Firearms Requirements

GEO will provide well-maintained or new firearms at the start of the contract and maintain sufficient licensed firearms and ammunition to equip each armed Officer and armed supervisor(s) with a licensed weapon while on duty.

No personal firearms will be permitted to be carried while on duty. GEO's Locksmith/Armory Officer will certify all firearms are safe and accurate for use. Transportation Officers will be issued 9mm semi-automatic firearms that meet the recommendations of the firearms manufacturer and use factory ammunition loads only.

Each Officer will be issued sufficient ammunition which consists of three full magazines. The Center's certified Locksmith/Armory Officer will account for all firearms and ammunition daily.

GEO will ensure notification is made to the COR in the event any weapons or ammunition is missing from the inventory.

USA008491



FINAL PROPOSAL REVISION – December 9, 2019
ICE California CDF – RFP No. 70CDCR20R00000002
Section I.1.B Understanding of the PWS *page 70 of 72*

GEO is a Federal Firearms License holder and maintains a Corporate inventory as well as the local Center firearms inventory. GEO, in accordance with this Federal Firearms license, is audited routinely by the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), and there have been no findings. All firearms will be inspected by the certified armorer and those inspections will be documented by the Facility Administrator.

Weapon safety is GEO's standard policy and loading and unloading and cleaning of firearms will take place in designated areas. Gun barrel clearing equipment will be situated outside the armory for clearing purposes and weapons will be cleaned in a secure area of the armory. All firearms will be properly maintained and certified as serviceable by GEO's Locksmith/Armory Officer. The Locksmith/Armory Officer will maintain appropriate supplies of firearm upkeep and maintenance equipment and ensure their safety prior to issuance to the Transportation Officer.

GEO will provide a complete list of licensed firearms by serial number and by location to the COR. GEO will maintain a current list of all licensed firearms and a list of approved firearms will be kept in the safe/vault. GEO will maintain all required state and municipality permits on file at the Center as well as at Corporate Headquarters.

Each officer's weapons permit will be kept on file at the Center as required by ATF, the State and ICE.

GEO will comply with providing the COR with the armed officers weapon permit upon request and will comply with providing a copy of the license three days prior to an assignment. GEO will ensure daily that all armed Officers have valid licenses in their possession at all times.

GEO will ensure accurate receipts and return entries are maintained in the Firearms and Equipment Control Register.

GEO's armed officers will be certified by the ICE COR in an approved intermediate weapon (baton/ASP and/or OC spray) in conformance with PBNDS security section 2.15 Use of Force or Restraints.

GEO will comply with ensuring each safe/vault remains locked at all times when not issuing or returning firearms or ammunition. GEO will ensure compliance with changing the safe/vault combination every six months or when circumstances warrant.

GEO will assign one or more staff to the position of Ammunition Control Officer and Firearms Control Officer (shown on GEO's staffing plan as Locksmith/Armory Officer).

USA008492



## B. Body Armor Requirements

GEO will provide body armor to all armed officer and transportation officers. Officers will be required to wear their issued body armor while on armed duty. In addition, GEO armed officers will be issued at a minimum threat level III protection and comply with GEO firearms policy, state and federal requirements, and as ICE's Body Armor Policy. GEO will ensure the replacement of body armor which becomes unserviceable and at the expiration of service life. Each armed officer's body armor will be replaced every five years.

Each armed officer, as part of the training curriculum, will be made aware of the effects of wearing body armor in high heat/humidity conditions. Water will be supplied during transport missions as well as at the Center enabling each officer to rehydrate. GEO will supply as required a minimum of two undergarment shirts designated for under armor wear. No personal body armor will be worn or authorized to be worn by GEO's/GTI's armed officers.

## XI. Transition

## A. Transition-In

GEO will be responsible for the transition of all activities identified in this PWS. Facilities that are currently active under contract with ICE will require only minimal start-up activities. For Facilities with delayed availability, GEO's transition-in will be accomplished as expeditiously as possible, with a maximum transition-in period of 60 days from Facility availability.

GEO's approach to transitioning is provided in Section I.3 of our response. As required by the PWS, GEO will submit a final Transition-in Plan for approval by the Contracting Officer's Representative (COR) within two (2) weeks after award reflecting input from the COR. This transition in plan will also reflect all necessary activities to facilitate the transition of services to the Contractor and expected completion dates of those activities.

## B. Transition-Out

USA008493



GEO will be responsible for the transition-out of all technical activities identified in this PWS during the final, awarded period of performance. GEO will submit the Transition-out Plan two (2) months prior to the completion of the period of performance of this contract to be approved by the COR. GEO will complete the transition by the end of the period of performance of this Task Order. GEO will fully support the transition of all requirements to any successor to ensure no disruption in operational services.

# Executive Summary - Requirement D

USA008495

# EXHIBIT Q

1   Hon. Patrick J. Walsh (Ret.)
    Special Master
2   Signature Resolution
    633 W. 5th Street, Ste. 1000
3   Los Angeles, CA 90071
    judgewalsh@signatureresolution.com
4   (323) 395-4970

5

6

7

8                    UNITED STATES DISTRICT COURT

9                   CENTRAL DISTRICT OF CALIFORNIA

10                       WESTERN DIVISION

11  KELVIN HERNANDEZ ROMAN, et al.,  )  ED CV 20-00768 TJH(PVC)
                                     )
12          Petitioners-Plaintiffs,  )  SPECIAL MASTER'S REPORT AND
                                     )  RECOMMENDATION FOLLOWING THE
13          v.                       )  INVESTIGATION INTO THE DEATH OF
                                     )  MARTIN VARGAS ARELLANO
14  CHAD T. WOLF, et al.,            )
                                     )
15          Respondents-Defendants.  )
    ─────────────────────────────────)
16

17       This Report and Recommendation is submitted to the Honorable

18  Terry J. Hatter, Jr., following the Special Master's investigation

19  into the death of Mr. Martin Vargas Arellano.  For the reasons set

20  forth below, it is recommended that the government be required to:

21       1.  Report to the Special Master and Plaintiffs/Petitioners'

22  counsel any time a detainee at Adelanto who has previously tested

23  positive for COVID is confined to the infirmary, brought to the

24  hospital, or dies of any cause.  Further, upon request from the

25  Special Master, submit the detainee's medical records to the Special

26  Master and Plaintiffs/Petitioners' counsel for review.

27       2.  Review the medical records of any detainee who has previously

28  tested positive for COVID and is subsequently hospitalized or confined

to the infirmary to determine if he or she is being treated for COVID or for complications stemming from COVID. If any of these records indicate that at least one of the reasons the detainee is hospitalized or in the infirmary is for treatment of COVID or complications stemming from COVID--like shortness of breath or COVID-pneumonia--the government must report that fact to Plaintiffs/Petitioners' counsel and the Special Master and list that detainee as being hospitalized for COVID on the daily status reports.

3. Pay Mr. Vargas' immigration lawyer Ms. Margaret Hellerstein's legal fees from March 5, 2021, when the government released Mr. Vargas without telling her, until March 18, 2021, when she found out from the coroner that Mr. Vargas had died 10 days earlier.

I.

SUMMARY OF FACTS

In April 2019, Martin Vargas Arellano was placed in ICE detention at Adelanto. He was 53 years old at the time and suffered from schizophrenia as well as various physical ailments, including diabetes melitus. Several times thereafter, Mr. Vargas sought release from custody but ICE opposed his motions on the ground that he was a danger to the community.[1]

On November 29, 2020, Mr. Vargas was examined by a member of the Wellpath staff. Apparently, this staff member was positive for COVID-19, though he or she was not aware of it at the time.[2]

---

[1] In their letter briefs, both sides spent time discussing the propriety of Mr. Vargas' detention. This issue is not being addressed in this Report and Recommendation because it is not relevant to the investigation into Mr. Vargas' death.

[2] Wellpath provides medical services at Adelanto.

2

On December 10, 2020, Mr. Vargas tested positive for COVID.  It is assumed that he contracted COVID from the Wellpath medical provider who examined him on November 29, 2020.

On December 11, 2020, Mr. Vargas experienced shortness of breath, burning lungs, fever, dry cough, and loss of taste and smell.  He was taken to the emergency room at a nearby hospital and, the following day, transferred to a different hospital where he could be better cared for.  There, he was diagnosed with COVID-19 pneumonia and hospitalized.  As a result, in its daily census report, ICE began reporting to the Court that Mr. Vargas was hospitalized for COVID.

On December 25, 2020, Mr. Vargas was released from the hospital. The doctor who discharged him included in the discharge diagnosis "COVID-19" and a "suspected COVID-19 virus infection."  (ECF No. 1042-6 at page 13, Medical Records from St. Mary's Medical Center.)  The doctor also noted: "Patient[']s chest x-ray showed interval development of ill-defined opacities in the periphery of both upper lobes, this is concerning for COVID 19 pneumonia . . . ."  (*Id.*)

Mr. Vargas was placed in the infirmary upon his return to Adelanto.  A Wellpath doctor caring for Mr. Vargas at Adelanto described his condition as "slowly improving though with extreme fatigue."  (ECF No. 1042-2 at page 584, Infirmary Records.)  On December 28, 2020, that same doctor noted Mr. Vargas "still felt short winded on and off."  (ECF No. 1042-2 at page 541, Infirmary Records.)

On December 30, 2020, Mr. Vargas reported to a Wellpath nurse that he was feeling weak.  She explained to him that recovery from COVID can be long and slow and counseled him to be patient.  The next day, December 31, 2020, Wellpath Regional Medical Director Dr. Richard Medrano "deemed" Mr. Vargas "recovered" from COVID.  (Exh. 16 to

1   Bansal Decl., Email from Richard Medrano to GEO Staff.)  This

2   designation was not meant to signal that Mr. Vargas had actually

3   recovered from COVID.  Rather, the term "deemed recovered" was "meant

4   as a tool to determine when detainees [are] no longer infectious"

5   under CDC criteria.  (Assistant Field Office Director and Officer in

6   Charge at Adelanto Gabriel Valdez Decl. at ¶ 25.)  But the government

7   misinterpreted this designation and, from January 1, 2021 on, stopped

8   reporting to the Court that Mr. Vargas was being confined to the

9   infirmary or hospitalized for COVID and/or complications stemming from

10  COVID.

11       On January 4, 2021, Mr. Vargas was admitted to the infirmary

12  complaining of shortness of breath.  He was given oxygen.  On January

13  27, 2021, he was hospitalized for COVID, again.  The admitting doctor

14  noted: "Patient was recently diagnosed with COVID 6 weeks ago and was

15  admitted for 3 weeks for COVID [pneumonia].  . . .  Mild diffuse

16  groundglass airspace disease suggestive of COVID-19 pneumonia,

17  decreasing in severity compared with prior [admission]."  (ECF Doc.

18  No. 1042-3 at 474, Medical Records from Saint Mary's for January 26,

19  2021.)

20       On February 4, 2021, Mr. Vargas was released from the hospital

21  and brought back to Adelanto where he was confined to the infirmary.

22  On February 17, he was taken back to the hospital, complaining of

23  shortness of breath.  (ECF Doc. No. 1042-3 at 16, Medical Records from

24  Victor Valley Global Medical Center, February 17, 2021.)  The

25  admitting doctor noted:

26       A 55-year-old-male with history of COVID-19 presenting with

27       [shortness of breath].  Differential diagnosis includes but is

28

4

1   not limited to the following: COVID-19 pneumonia, pulmonary

2   embolism.

3   (*Id.*)

4        Unfortunately, Mr. Vargas' condition continued to deteriorate

5   after he was admitted to the hospital.  The medical records and

6   reports from the hospital at the time showed that his condition was

7   becoming grave.

8        Concerned with this development, on February 19, 2021, Wellpath

9   Medical Director Dr. Alex Ramos working at Adelanto notified ICE Field

10  Medical Coordinator Nicole Knight-Glass that Mr. Vargas was "at great

11  risk of pulmonary embolism and [that there was a] possibility of

12  sudden death" due to multiple ailments, including ongoing weakness and

13  chest pain in the wake of COVID-19 infection.  (Exh. 14 to Bansal

14  Decl., Email from Dr. Alex Ramos to Ms. Nicole Knight-Glass.)  Dr.

15  Ramos urged Ms. Knight-Glass to evaluate whether Mr. Vargas should be

16  released from ICE detention.  In response to Dr. Ramos' inquiry, ICE

17  initiated a plan to release Mr. Vargas and, beginning on February 21,

18  2021, sought the necessary approvals to accomplish this.

19       In furtherance of this process, Sergio Guzman, Mr. Vargas'

20  deportation officer, contacted Mr. Vargas' immigration counsel, Ms.

21  Margaret Hellerstein, to inform her that Mr. Vargas was going to be

22  released from detention.  He asked her to arrange for placement for

23  Mr. Vargas.  Officer Guzman did not tell Ms. Hellerstein that the

24  impetus in releasing Mr. Vargas was that he was gravely ill.  Ms.

25  Hellerstein assumed that Mr. Vargas was being released because the

26  government had had a change of heart regarding his requests to be

27  released.  Over the course of the next several weeks, Ms. Hellerstein

28  made arrangements for housing for Mr. Vargas and for transportation

from Adelanto to the facility where he would be staying once he was released.

At the same time ICE was working with Ms. Hellerstein on Mr. Vargas' release, it was also attempting to locate Mr. Vargas' family so that it could coordinate Mr. Vargas' release through his family instead of Ms. Hellerstein.[3]

On February 26, 2021, Mr. Vargas suffered a stroke, which caused brain death. He was sedated and placed on a ventilator. In the wake of his stroke, ICE understood that Mr. Vargas' condition was dire and, on March 4, 2021, began "the necessary paperwork for a death notification." (Exh. 28 to Bansal Decl. at 4, Email from James Scott to Art Cortez (and others).) The following day, on March 5, 2021, Assistant Field Office Director and Officer in Charge at Adelanto, Gabriel Valdez, sent an email to the hospital along with an "Order of Release," purportedly "releasing" Mr. Vargas on his own recognizance.[4] The Order listed Mr. Vargas' release address as the address of the facility Ms. Hellerstein had arranged for him to live in once he was released. This facility, however, was not equipped to provide services for a patient who was comatose and brain dead.

Despite the fact that ICE's long-standing practice and policy was to notify Ms. Hellerstein, ICE did not notify her. It also did not notify Mr. Vargas' children, who by this time had expressed an

---

[3] The government has not explained why it searched for an alternative to releasing Mr. Vargas to the care facility through his lawyer. Plaintiffs/Petitioners' suspect that it was so that ICE would not have to inform Ms. Hellerstein that Mr. Vargas had been released or died.

[4] The government has not explained when and how Mr. Vargas stopped being a danger to the community and qualified for release on his own recognizance.

interest in keeping abreast of Mr. Vargas' condition.  No one at the hospital noticed Officer Valdez's email and the attached release order.

On March 8, 2021, Mr. Vargas passed away due to complications brought on by COVID.  That same day, ICE reported to the Court through its weekly census that Mr. Vargas had been released.

On March 9, 2021, ICE learned that Mr. Vargas had died the day before.  ICE did not inform Ms. Hellerstein or Mr. Vargas' family.  As a result, Ms. Hellerstein continued to work on facilitating Mr. Vargas' release and arranging for his transportation.

Class counsel Jessica Bansal learned that Mr. Vargas had been released when she reviewed the March 8, 2021, weekly status report. On March 15, 2021, she emailed Ms. Hellerstein to congratulate her on securing his release.  Ms. Hellerstein was confused because she did not know that Mr. Vargas had been released.  She was worried that Mr. Vargas was wandering around the city alone, which was especially problematic because he suffered from schizophrenia and had no money or support.

Ms. Hellerstein called Officer Guzman to find out where Mr. Vargas was.  (Hellerstein Depo. at 67-69, 86-89.)  He did not tell her that Mr. Vargas had died the week before, something Officer Guzman had known since March 9th.  Instead, he led her to believe that Mr. Vargas had been released to the street but that he did not know the details concerning the release.  (Guzman Depo. at 59-63; 91-92.)  He explained that "higher-ups" were responsible for releasing Mr. Vargas.  (Guzman Depo. at 59-92.)  Officer Guzman provided Ms. Hellerstein with the

7

address of the Immigration Court in Los Angeles and advised her that
she should go there to find out what had happened to Mr. Vargas.[5]

The following day, March 16, 2021, Ms. Hellerstein sent an email
to Officer Guzman, again seeking information about Mr. Vargas'
whereabouts.  Before responding, Officer Guzman showed the email to
his supervisor, who told him not to respond and not to talk to Ms.
Hellerstein about Mr. Vargas.  (Guzman Depo. at 67.)

In the days that followed, Ms. Hellertein employed a network of
attorneys and contacts to help her find Mr. Vargas.  (Hellerstein
Decl. at para. 23.)  She called police stations, hospitals, and
shelters and posted a notice on social media.  (Hellerstein Decl. at
para. 23.)  She filed a missing person's report with the Sheriff's
Department.  (Hellerstein Decl. at para. 24.)  And she contacted the
Mexican Consulate.  (Hellerstein Decl. at para. 26.)  On March 18,
2021, Ms. Hellerstein called the county coroner, who informed her that
Mr. Vargas had died in the hospital ten days earlier.

II.

DISCUSSION

1.    It is highly likely, that Mr. Vargas contracted COVID-19
from Wellpath medical staff at Adelanto.

2.    Wellpath's decision that Mr. Vargas was "deemed recovered"
on December 31, 2020, did not mean that he had recovered from COVID.
The term "deemed recovered" was "meant as a tool to determine when
detainees [are] no longer infectious" under CDC criteria.  (Assistant

---

[5]    Officer Guzman has offered several justifications for
misleading Ms. Hellerstein, including: (1) he was no longer
responsible for Mr. Vargas since Mr. Vargas had been "released"; and
(2) he was not sure what he could or should tell Ms. Hellerstein and
needed to check with his supervisor.

Field Office Director and Officer in Charge at Adelanto Gabriel Valdez Decl. at ¶ 25.) Mr. Vargas never recovered from COVID-19. His visits to the infirmary in January 2021 and his hospitalizations in January, February, and March were all due to complications brought on by COVID-19. The medical staff at Adelanto and the doctors in the hospitals were all treating him for complications stemming from COVID, including shortness of breath brought on by COVID and COVID-related pneumonia, as reflected in the medical charts. As such, ICE should have been reporting these hospital visits and infirmary stays as COVID-related to the Court, counsel, and the Special Master. Its failure to do so violated this Court's order that it report detainees being hospitalized for COVID. By not informing the Court, the Special Master, and Plaintiffs/Petitioners' counsel that Mr. Vargas was hospitalized for COVID, all three were kept in the dark. This completely frustrated the purpose of the Court's intervention in this case and the appointment of a Special Master.

3. The only practical effect of the government's "release" of Mr. Vargas' from detention on March 5, 2021--while he was comatose and near death--was that he was moved off the "books" at ICE, Adelanto, and Wellpath and deposited on the hospital's "books." Because ICE released him to the hospital, all three were relieved of their obligations to report his death. Further, this seems to have been the sole purpose of the release.

4. The evidence supporting this finding includes the fact the release was triggered by a request from Wellpath's medical director, Dr. Ramos, and was precipitated by Dr. Ramos' realization that Mr. Vargas was about to die. It is further evidenced by the fact that ICE violated its own policies and procedures by releasing Mr. Vargas

9

without telling his lawyer and, in fact, trying to go around his
lawyer by releasing him to family.  It is further evidenced by the
fact that when Ms. Hellerstein asked Deportation Officer Guzman what
had happened to Mr. Vargas a week after he had died, Officer Guzman
intentionally concealed what had happened.  This conduct was ratified
by his supervisor, who learned of Officer Guzman's interactions with
Ms. Hellerstein and instructed him not to respond to Ms. Hellerstein's
email looking for information about Mr. Vargas and not to talk with
her about Mr. Vargas either.  The government's argument that there was
nothing untoward about Mr. Vargas' release or its conduct following
his release is rejected.  So, too, is its claim that ICE was actually
trying to help Mr. Vargas by "releasing" him while he lay unconscious
in a hospital bed three days before he died.

     4.   Officer Guzman (or someone else working for ICE) should have
followed long-standing policies and practices and notified Ms.
Hellerstein on March 5, 2021, that ICE was releasing Mr. Vargas to a
hospital because he was about to die.  Officer Guzman (or someone at
ICE) should also have told her on March 9, 2021, that Mr. Vargas had
died.  Finally, Officer Guzman should not have intentionally misled
Ms. Hellerstein when he spoke to her on March 15, 2021, and told her
that he did not know the details of Mr. Vargas' release and did not
know where he was.  Officer Guzman's explanations for why he misled
Ms. Hellerstein, i.e., that Mr. Vargas' file had been transferred to
another officer and that he was not sure what he could say, are
rejected.  Those are not valid justifications for officers of the
United States government to intentionally mislead someone.  What is
even more disconcerting about his explanation is the fact that he
understood that he did not have to seek authorization from his

10

supervisor to mislead Ms. Hellerstein about what had happened to Mr. Vargas but, if he wanted to tell her the truth, he had to get permission from his supervisor. Even giving Officer Guzman the benefit of the doubt and accepting that he truly believed that he was prohibited from telling Ms. Hellerstein the truth, he should not have misled her. He should have simply informed her: "I'm not allowed to discuss this matter with you. Here's my supervisor's phone number. Why don't you call him and he will explain to you what happened to Mr. Vargas?" His failure to tell Ms. Hellerstein what happened or direct her to his supervisor caused her to spend needless time and energy in a frantic search to locate Mr. Vargas, only to learn days later that he had died a week before she had spoken to Mr. Guzman.

7. The government makes much of the fact that it did not violate any federal laws or regulations in connection with its treatment of Mr. Vargas or Ms. Hellerstein. That is likely true but that fact does not excuse or justify the callousness it exhibited here.

### III.

### CONCLUSION

For the reasons set forth above, the Special Master recommends that the Court enter an order accepting and adopting this Report and Recommendation and ordering the government to:

1. Report to the Special Master and Plaintiffs/Petitioners' counsel any time a detainee at Adelanto who has previously tested positive for COVID dies, is confined to the infirmary, or brought to the hospital for any reason. Further, upon request from the Special Master, submit the detainee's medical records to the Special Master and Plaintiffs/Petitioners' counsel for review.

11

2.  Review the medical records of any detainee who has previously tested positive for COVID and is subsequently hospitalized or confined to the infirmary to determine if he or she is being treated for COVID or for complications stemming from COVID.  If any of these records indicate that at least one of the reasons the detainee is hospitalized or in the infirmary is for treatment of COVID or complications stemming from COVID--like shortness of breath or COVID-pneumonia-- report that fact to Plaintiffs/Petitioners' counsel and the Special Master and list that detainee as being hospitalized for COVID on the daily status reports and weekly census reports.

3.  As a sanction for its conduct, pay Mr. Vargas' immigration lawyer Ms. Margaret Hellerstein's legal fees from March 5, 2021, when Mr. Vargas was released, until March 18, 2021, when she found out from the coroner that Mr. Vargas had died 10 days earlier.[6] [7]

DATED: July 16, 2021

*Patrick J. Walsh*

HON. PATRICK J. WALSH (Ret.)
Special Master

---

[6]  Petitioners/Plaintiffs complained in their brief that it appeared that ICE was not following COVID protocols and barring its employees from having contact with detainees after they contracted COVID or were exposed to or could have been exposed to someone with COVID.  There is no evidence that the medical care provider who examined Mr. Vargas on November 29 knew that he or she had COVID or had been exposed to someone with COVID.  For that reason, this issue was not addressed in this Report and Recommendation.

[7]  Pursuant to the Court's Order appointing the Special Master, the parties have seven days to file objections to this Report and Recommendation.  The Special Master has not had any ex parte communications with counsel or the parties since the last Report and Recommendation.

# EXHIBIT R

FILED UNDER SEAL