Stacy Tolchin (CA SBN #217431)
*Email: Stacy@Tolchinimmigration.com*
Megan Brewer (CA SBN #268248)
*Email: Megan@Tolchinimmigration.com*
Law Offices of Stacy Tolchin
776 E. Green St., Suite 210
Pasadena, CA 91101
Telephone: (213) 622-7450
Facsimile: (213) 622-7233

Khaled Alrabe (CA SBN #349899)
*Email: khaled@nipnlg.org*
Matthew S. Vogel (admitted *pro hac vice*)
*Email: matt@nipnlg.org*
Amber Qureshi (admitted *pro hac vice*)
*Email: amber@nipnlg.org*
National Immigration Project of the National Lawyers Guild (NIPNLG)
2201 Wisconsin Ave NW, Suite 200
Washington, DC 20007
Telephone: (202) 470-2082
Facsimile: (617) 227-5495

Counsel for Plaintiff
(*continued on next page*)

## UNITED STATES DISTRICT COURT FOR THE
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Martin VARGAS, individually and as Successor in Interest of the Estate of Martin Vargas Arellano, | Case No. 5:23-cv-00380-JWH-SP |
| Plaintiff, | **SECOND AMENDED COMPLAINT FOR DAMAGES** |
| v. | |
| UNITED STATES OF AMERICA; THE GEO GROUP; and WELLPATH, LLC. | |
| Defendants. | <u>Jury Trial Requested</u> |

Laboni A. Hoq (CA SBN #224140)
*Email: laboni@hoqlaw.com*
Hoq Law APC
P.O. Box 753
South Pasadena, CA  91030
Telephone: (213) 973-9004

**INTRODUCTION**

1.      Plaintiff Martin Vargas is the son of Martin Vargas Arellano and files this action individually and as Mr. Vargas Arellano's successor in interest.

2.      In December 2020, Mr. Vargas Arellano contracted COVID-19 while detained at the Adelanto ICE Processing Center ("Adelanto") under the custody of U.S. Immigration and Customs Enforcement ("ICE"). Adelanto is a privately operated immigration detention center operated by The GEO Group, Inc. ("GEO"). GEO contracts medical services at Adelanto to Wellpath, LLC ("Wellpath").

3.      In the three months following his COVID-19 infection, Mr. Vargas Arellano suffered a string of COVID-related medical complications that led to multiple hospitalizations, a stroke, and his death.

4.      On March 8, 2021, Mr. Vargas Arellano died at the age of 55 due to complications brought on by COVID-19. He was in ICE custody from April 2019 up until a few days prior to his death.

5.      Defendants were aware that Mr. Vargas Arellano, who was wheelchair bound, was at high risk of serious illness and death if he were to contract COVID-19 due to his age and multiple chronic conditions including high blood pressure, diabetes, liver disease, cellulitis, and severe psychiatric illness. ICE was also acutely aware of the risk of COVID-19 transmission in its detention facilities and the urgent need to release individuals at risk of death. At the time, this Court in *Fraihat v. U.S. Immigr. & Customs Enf't*, 445 F. Supp. 3d 709 (C.D. Cal. 2020) *rev'd and remanded*, 16 F.4th 613 (9th Cir. 2021), had found ICE's response to the pandemic systemically deficient and ordered ICE to establish custody redeterminations for individuals at risk of COVID-19. Moreover, because of the deficient conditions in Adelanto, this Court in *Roman v. Wolf*, No. 5:20-cv-00768-THJ-PVC, a class action suit on behalf of immigrants detained in Adelanto seeking relief based on the facility's failure to implement necessary protective measures during the COVID-19 pandemic, specifically ordered ICE to reduce the

population of Adelanto by releasing individuals at risk of COVID-19.

6.      Between September 2020 and December 2020, Defendants' inadequate COVID-19 practices led to multiple persistent outbreaks of the virus at the Adelanto facility. By October 2020, Adelanto had the largest COVID-19 outbreak among immigration detention centers in the United States with almost 150 detained individuals testing positive for the virus, in addition to significant numbers of Defendants' staff testing positive as well. After the first week of October, the outbreak had already required the hospitalization of 16 detained persons for COVID-19. The *Roman* Court determined that the outbreak was likely caused by an Adelanto staff member who reported to work while carrying the COVID-19 virus. *Roman v. Wolf*, No. EDCV2000768TJHPVCX, 2020 WL 5797918, at 2 (C.D. Cal. Sept. 29, 2020), *aff'd in part, vacated in part, remanded*, 977 F.3d 935 (9th Cir. 2020) ("September 29, 2020, *Roman* Order"). The Court in *Roman* also found that the ICE Officer in Charge at Adelanto had been actively and arbitrarily blocking the use of universal testing for COVID-19 for months in violation of the constitutional rights of detainees. *Id*.

7.      Despite Mr. Vargas Arellano's extreme vulnerability to COVID-19, and the multiple COVID-19 outbreaks at Adelanto, ICE repeatedly denied his requests for release during the pandemic, even after he became severely sick. In October 2020, ICE denied Mr. Vargas Arellano's request for release under this Court's order in *Fraihat*, and failed to follow the legal requirements of *Fraihat* mandating a non-cursory justification for continued detention and a timely custody determination. In fact, even after Mr. Vargas Arellano had begun experiencing severe, lasting symptoms from COVID-19 and while he lay in a hospital bed at Providence St. Mary Medical Center, ICE opposed his release alleging he was a threat to public safety without explanation.

8.      On December 10, 2020, Mr. Vargas Arellano tested positive for COVID-19. A Special Master in *Roman* found that Mr. Vargas Arellano likely

contracted COVID-19 from a Wellpath medical provider who examined him on November 29, 2020. *Roman v. Wolf*, No. 5:20-cv-00768-THJ-PVC, Dkt. 1220 at 8 (C.D. Cal. Jul. 16, 2021) ("Special Master Report").[1] In response to the Special Master inquiry, the United States attested in an interrogatory in *Roman* that Mr. Vargas Arellano contracted COVID-19 from a Wellpath medical provider and that this was Arellano's only known contact with a COVID-19 positive individual.

9.      After Mr. Vargas Arellano suffered a stroke on February 26, 2021, which caused brain death, ICE released him purportedly on his own recognizance while in the hospital on March 5, 2021. Mr. Vargas Arellano died three days later. In fact, ICE regularly orders the "release" of individuals on their deathbeds in order to avoid the requirement to report custodial deaths.

10.      ICE actively concealed Mr. Vargas Arellano's worsening medical condition from his Qualified Representative,[2] Margaret Hellerstein, in violation of its own policies. ICE also failed to notify Ms. Hellerstein or Plaintiff Vargas of Mr. Vargas Arellano's "release" on his own recognizance or his death.

11.      Regardless of *how* Mr. Vargas Arellano contracted COVID-19 in November/December 2020, he should not have been in ICE custody *at all* at that time due to his severe medical vulnerabilities, and the *Fraihat* order. Defendant

---

[1] On March 23, 2021, in *Roman v. Mayorkas*, No. 5:20-cv-00768-TJH-PVC this Court referred the death of Mr. Vargas Arellano to a Special Master for investigation. On July 16, 2021, the Special Master issued a Report and Recommendation, which was accepted by the Court on August 8, 2021, finding, among other things, that Mr. Vargas Arellano died of complications due to COVID-19, which he contracted at Adelanto. *See* Special Master Report at 8.

[2] In 2013, an immigration judge deemed Mr. Vargas Arellano to be a member of the *Franco-Gonzalez v. Holder*, No. CV 10-cv-2211-DMG (DTBX) (C.D. Cal.), class action based on his lack of mental competency to represent himself in removal proceeding. Mr. Vargas Arellano was assigned a Qualified Representative to assist in his representation.

USA unlawfully refused to release Mr. Vargas Arellano and failed to comply with internal policy and federal court orders requiring non-cursory justification for continued detention and timely custody redetermination for individuals like Mr. Vargas Arellano. Defendant USA also actively concealed his medical status and his eventual death from his family and attorney in violation of its own policies.

12.   While the Special Master in *Roman* found that it was likely a Wellpath nurse who transmitted the virus to Mr. Vargas Arellano, this finding was made based on a limited record that contains conclusory representations from Defendant USA that the Wellpath nurse was Mr. Vargas Arellano's *only* exposure to COVID-19, which discovery in this case shows is in question here. Wellpath was not a party to the *Roman* litigation.

13.   Regardless of how Mr. Vargas contracted COVID-19 in detention, all Defendants failed to maintain appropriate procedures to protect him from contracting the virus while in detention in violation of their duty of care and the applicable detention standards.  Among other things, the *Roman* litigation exposed a September 2020 COVID-19 outbreak that was likely caused by Adelanto staff; ICE specifically barred available universal testing for COVID-19 at the facility for months until the *Roman* court required testing after the outbreak occurred; and the *Roman* court expressed concern in October 2020 that staff were not all wearing masks when in housing units and that the facility was not sufficiently isolating or quarantining detainees who are symptomatic of COVID-19, suspected of having COVID-19, or have been confirmed positive for COVID-19. All of this is underscored by the fact that GEO has likely destroyed video surveillance that could have verified Defendants' compliance with the requisite COVID-19 standards.

14.   Plaintiff Vargas seeks monetary damages as Mr. Vargas Arellano's Successor in Interest.

**EXHAUSTION**

15.   On August 15, 2022, Plaintiff submitted an administrative claim under

5

the Federal Tort Claims Act with the Department of Homeland Security ("DHS"). In his complaint, Plaintiff sought monetary damages in the amount of $2,000,000. That claim has now been pending for more than six months.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over the present action based on 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1346(b) (federal defendant), 28 U.S.C. §§ 2674, 2680 (Federal Tort Claims Act), and 28 U.S.C. § 1367 (Supplemental Jurisdiction).

17.     Venue is properly with this Court pursuant to 28 U.S.C. § 1391(e) (general venue) and 28 U.S.C. § 1402(b) (torts against the United States) because this is a civil action in which Defendant is the United States of America; because a substantial part of the events or omissions giving rise to the claim occurred in Adelanto, California, in the Central District of California; and there is no real property involved in this action.

## PARTIES

18.     Plaintiff Vargas is a citizen of the United States.  Plaintiff Vargas is the biological son of Martin Vargas Arellano and the Successor in Interest to his father Martin Vargas Arellano.  At the time of his death, Mr. Vargas Arellano was unmarried.  Plaintiff Vargas resides in Victorville, California.

19.     Defendant United States of America is the appropriate defendant under the Federal Tort Claims Act.  28 U.S.C. § 1346(b). All federal officers referenced in the complaint were at all relevant times employees of the United States, working within the scope and course of their employment and acting as investigative and law enforcement officers for federal agencies including, but not limited to, DHS and ICE.

20.     Defendant GEO is a private prison corporation, headquartered in Boca Raton, Florida, that operates Adelanto and receives substantial federal

funding.  Defendant GEO contracts with ICE to provide detention and medical services at Adelanto. The contract between GEO and ICE requires compliance with ICE's Performance Based National Detention Standards ("PBNDS"), among other standards described herein.

21.     Defendant Wellpath, formerly known as Correct Care Solutions, is the medical provider at Adelanto. GEO has subcontracted the provision of medical care at the Adelanto facility to Wellpath since at least 2016. Wellpath is a corporation headquartered in Nashville, Tennessee and is one of the nation's largest for-profit correctional health care providers, currently servicing approximately 394 county jails and community facilities and more than 140 state and federal prisons in approximately 36 states.

## FACTUAL ALLEGATIONS

### *ICE's Response to the COVID-19 Pandemic*

22.     DHS operates the largest immigration detention system in the world. ICE, as a federal law enforcement agency within DHS, is responsible for managing the detention of noncitizens in the interior of the United States. ICE operates or oversees more than 100 jails and detention centers. Immigrants may be detained in ICE facilities, in county and local jails that contract with ICE to detain noncitizens, or in detention facilities contracted to private prison corporations such as GEO.

23.     ICE does not directly provide medical care to all detainees housed within ICE detention centers.  Instead, it contracts frequently with private medical contractors. However, the ICE Health Services Corps ("IHSC") provides medical oversight at the facilities with private contracts.

24.     In December 2019, the virus SARS-CoV-2 was identified in China as causing an outbreak of a new, communicable respiratory illness, now known as coronavirus disease 2019, or COVID-19. Following the spread of the virus to the United States, the U.S. Secretary of Health and Human Services declared a nationwide public health emergency on January 31, 2020.

25.     On March 27, 2020, ICE issued a Memorandum on Coronavirus Disease 2019 (COVID-19), Action Plan, Revision 1.[3] On April 10, 2020, ICE published its COVID-19 Pandemic Response Requirements ("PRR").[4] The memorandum and PRR established COVID-19 guidelines for facilities which included requiring GEO to conduct screening of all detention facility staff for temperature and COVID-19 symptoms, and requiring that staff who did not meet the screening criteria be denied entry into the detention facility.

26.     Through subsequently issued memoranda and PRRs, ICE indicated its intention to reduce the detainee population by identifying detainees who are at a higher-risk for serious illness from COVID-19.[5]

27.     These higher risk populations included people aged 65 and older, and people of all ages with underlying medical conditions, particularly if not well controlled. Specified medical conditions included chronic lung disease, moderate to severe asthma, serious heart conditions, immunocompromising conditions,

---

[3] Memorandum from Enrique M. Lucero, Executive Associate Director of ICE Enforcement and Removal Operations, Memorandum on Coronavirus Disease 2019 (COVID-19) Action Plan, Revision 1 (Mar. 27, 2020), https://www.ice.gov/doclib/coronavirus/attF.pdf.

[4] ICE Enforcement and Removal Operations, COVID-19 Pandemic Response Requirements, Version 1.0 (Apr. 10, 2020), https://www.ice.gov/doclib/coronavirus/eroCOVID19responseReqsCleanFacilities-v1.pdf. Updated versions of the PRR can be accessed here: https://www.ice.gov/coronavirus/prr.

[5] *See, e.g.*, PRR, Version 3.0 at 21 (Jul. 28, 2020), https://www.ice.gov/doclib/coronavirus/eroCOVID19responseReqsCleanFacilities-v3.pdf; PRR, Version 5.0 at 19 (Oct. 27, 2020), https://www.ice.gov/doclib/coronavirus/eroCOVID19responseReqsCleanFacilities-v5.pdf; PRR, Version 6.0 at 25 (Mar. 16, 2021), https://www.ice.gov/doclib/coronavirus/eroCOVID19responseReqsCleanFacilities-v6.pdf.

severe obesity, diabetes, chronic kidney disease undergoing dialysis, and liver disease.[6]

28.    Despite these policies, ICE – and the contractors it was required to oversee – have failed to meet these standards and failed to follow the Centers for Disease Control and Prevention ("CDC")'s guidance on COVID-19 management in detention centers.[7]

29.    In fact, this Court found in *Fraihat v. U.S. Immigr. & Customs Enf't*, 445 F. Supp. 3d 709 (C.D. Cal. 2020) *rev'd and remanded*, 16 F.4th 613 (9th Cir. 2021), that ICE's directives and management of detention facilities were severely lacking. The *Fraihat* court certified two subclasses of people detained in ICE custody with risk factors or disabilities which placed them at heightened risk of severe illness and death upon contracting the virus. The *Fraihat* court also issued a preliminary injunction compelling ICE to, *inter alia*, make timely custody re-determinations for class members.

### *The Adelanto Detention Center*

30.    In 2011, ICE and the City of Adelanto entered into an Intergovernmental Service Agreement ("IGSA") to establish an immigration facility in Adelanto. GEO was subcontracted to run the facility.

---

[6] *See* PRR, Version 1.0 at 5–6 (Apr. 10, 2020), https://www.ice.gov/doclib/coronavirus/eroCOVID19responseReqsCleanFacilities-v1.pdf. In later iterations of the PRR, ICE expanded the higher risk population category to include, *inter alia*, adults aged 55 and older, people of all ages with chronic health conditions, people with severe psychiatric illness. *See, e.g.*, PRR Version 5.0 at 8–9 (Oct. 27, 2020), https://www.ice.gov/doclib/coronavirus/eroCOVID19responseReqsCleanFacilities-v5.pdf.

[7] Current CDC guidelines on COVID-19 prevention and management at correctional and detention facilities can be accessed here: https://www.cdc.gov/correctionalhealth/guidance.html. Prior versions of these guidelines can be accessed here: https://www.cdc.gov/other/archived-content.html.

31.    In 2016, after a number of allegations about medical negligence at Adelanto emerged including several related to detainee deaths, ICE officials required GEO to improve medical care, particularly as it applies to people with chronic care needs. In February 2016, GEO stopped providing medical care at Adelanto and contracted with Correct Care Solution, the corporate predecessor of Wellpath to provide medical care at the facility.[8]

32.    Wellpath, and its corporate predecessor Correct Care Solutions, has been sued for more than 70 deaths over the past five years and has a pattern of providing substandard care that has led to avoidable deaths.[9]

33.    In 2015, the DHS Office for Civil Rights and Civil Liberties ("CRCL") found the medical treatment at Adelanto to be substandard and found that clinical leadership was not competent. Two years later, after Wellpath took over medical care are the facility, CRCL's independent subject-matter experts found that no corrections were made to address this history.[10]

---

[8] Leslie Berestein Rojas, *Have Changes at Adelanto Immigrant Detention Center Led to Better Health Care?*, LAist 89.3 (Oct. 12, 2016), https://www.kpcc.org/2016-10-12/have-changes-at-adelanto-immigrant-detention-cente.

[9] *See* Blake Ellis and Melanie Hicken, *CNN Investigates: Help Me Before it's Too Late*, CNN (Jun. 25, 2019), https://www.cnn.com/interactive/2019/06/us/jail-health-care-ccs-invs/; Hassan Kanu, *DOJ Report Exposes Failures of Jail Reform Measures*, Reuters (Sept. 9, 2021), https://www.reuters.com/legal/government/doj-report-exposes-failures-jail-reform-measures-2021-09-09/; Michael Fenne, *Private Equity Firms Rebrand Prison Healthcare Companies, But Care Issues Continue*, Private Equity Stakeholder Project (Nov. 2022), https://pestakeholder.org/wp-content/uploads/2022/11/Wellpath_HIG_2022v2.pdf.

[10] Nick Schwellenbach, *DHS Office for Civil Rights and Civil Liberties Review of Adelanto–Sent to ICE in April 2018*, Project on Government Oversight (Sept. 6, 2019), https://www.pogo.org/document/2019/09/dhs-office-for-civil-rights-and-civil-liberties-review-of-adelanto-sent-to-ice-in-april-2018.

34.     In 2018, CRCL recommended that ICE in Adelanto hire a competent, qualified, and effective onsite clinical leader immediately, and that until new leadership took effect, at-risk detainees should immediately be removed from the facility and transferred to other facilities with well-functioning medical programs.[11]

35.     CRCL also found that psychiatric leadership was absent at Adelanto and that sub-standard mental health care was occurring as a result.[12]

36.     In 2019, Adelanto ICE leadership continued to reject CRCL's findings that the lack of adequate health care leadership put detainees at risk and did not believe that fundamental or systematic change was necessary.[13]

37.     On June 25, 2019, the City of Adelanto terminated the IGSA with ICE. On the same day, ICE awarded a contract to run Adelanto directly to GEO.[14]

### *Response to the COVID-19 Pandemic at the Adelanto Facility*

38.     The Adelanto facility's response to COVID-19 has been woefully inadequate. In *Roman v. Wolf*, this Court's factual findings make clear that Adelanto was not safe for individuals vulnerable to COVID-19.

39.     On April 23, 2020, this Court in *Roman* issued a preliminary injunction compelling ICE*, inter alia*, to reduce the population at the facility in response to the COVID-19 pandemic. *Roman v. Wolf*, No.

---

[11] *Id.*

[12] *Id.*

[13] Majority Staff Report, U.S. House of Representatives Committee on Homeland Security, *ICE Detention Facilities Failing to Meet Basic Standards of Care* at 11 (Sept. 21, 2020), https://web.archive.org/web/20200926041027/https://homeland.house.gov/imo/media/doc/Homeland%20ICE%20facility%20staff%20report.pdf.

[14] Rebecca Plevin, *How a Private Prison Giant Has Continued to Thrive in a State That Wants it Out*, Desert Sun (Jan. 24, 2020), https://www.desertsun.com/in-depth/news/2020/01/24/private-prison-giant-geo-thrives-california-state-wants-out/2589589001/.

EDCV2000768TJHPVCX, 2020 WL 1952656 (C.D. Cal. Apr. 23, 2020), *aff'd in part, vacated in part sub nom. Hernandez Roman v. Wolf*, 829 F. App'x 165 (9th Cir. 2020), *and supplemented*, No. EDCV2000768TJHPVCX, 2020 WL 5797918 (C.D. Cal. Sept. 29, 2020).

40.     The Court found, and the Ninth Circuit affirmed, that the conditions at the Adelanto facility in April 2020 violated detainees due process right to reasonable safety under the Fifth Amendment to the U.S. Constitution. Specifically, "the Government had failed to impose social distancing because there were 'too many detainees at Adelanto for its size'; newly arrived detainees were either mixed with the general population or housed with other new detainees who had arrived at different times, both of which undermined the ostensible 14-day quarantine period for new arrivals; staff were not required to wear gloves and masks; there was a lack of necessary cleaning supplies, resulting in cleaning of communal spaces that was 'haphazard, at best'; there were only three functioning showers for 118 women; there was inadequate access to hand sanitizer because dispensers were often empty and detainees had to wait for days to receive hand soap; and detainees were forced to sleep within six feet of each other due to the positions of their beds." *Hernandez Roman v. Wolf*, 829 F. App'x 165, 171 (9th Cir. 2020).

41.     Although the Ninth Circuit affirmed the preliminary injunction and accepted the factual findings in *Roman*, it vacated the specific measures ordered in the preliminary injunction because circumstances at Adelanto had changed by the time the case was before the Ninth Circuit several months later during the September 2020 outbreak. The Ninth Circuit remanded with instructions for the district court to develop preliminary injunction provisions based on the conditions that existed at Adelanto at that time. *Id*. at 175.

42.     On September 29, 2020, this Court in *Roman* again found that the conditions at Adelanto were objectively unreasonable and that ICE acted in callous

disregard for the reasonable safety of the individuals in detention with respect to their exposure to COVID-19 in violation of the detained individuals' Fifth Amendment due process rights. *See* September 29, 2020, *Roman* Order, at 6.

43.    Specifically, the Court found that an ICE employee, Officer Valdez, the Assistant Field Office Director and Officer in Charge at Adelanto had been actively and arbitrarily blocking the use of universal testing for COVID-19 for months, even though the facility had sufficient tests onsite delivered for that purpose, including by overruling a decision by GEO to test detainees and ICE staff. *Id*. at *2–3. The Court held that ICE's "decision to block universal testing was objectively unreasonable and in callous disregard of the constitutional right of every one of Adelanto's detainees to reasonable safety." *Id* at 3.

44.    Additionally, the Court found that ICE's determination that detainees can maintain a distance of six feet from each other at all times was based on a single ICE employee, again Officer Valdez, who, without measuring any area, "walked around the facility and imagined in his head that every detainee had a sphere around their body." *Id*. at 4. The Court held that "[t]his evidence is further indication of Valdez's callous disregard for the reasonable safety of the civil detainees who have been placed in his custody." *Id*.

45.    The Court also noted that contact tracing was not completed following the COVID-19 outbreak at Adelanto. *Id*. at 2. The Court ordered ICE to begin weekly testing for COVID-19 for all detainees and implement other measures to protect detainees from COVID-19. *Id*. at 6.

46.    On October 6, 2020, ICE reported to the *Roman* Court that almost 20% of the detainees at the facility had tested positive for COVID-19.[15]

---

[15] Rebecca Plevin, *'I'm Scared for My Life': Nearly 20% of Detainees at Adelanto ICE Facility Have COVID-19*, Desert Sun (Oct. 8, 2020), https://www.desertsun.com/story/news/2020/10/07/nearly-20-detainees-adelanto-ice-facility-have-covid-19/5918914002/.

47.     On October 15, 2020, the Court in *Roman* issued a population reduction order that found that the population level at that time and the conditions at the facility continue to pose an unreasonable risk to the safety of individuals in detention in violation of their Fifth Amendment right to reasonable safety. *See Roman v. Wolf*, No. ED CV 20-00768 TJH, 2020 WL 6107069 (C.D. Cal. Oct. 15, 2020), *order clarified*, No. ED CV 20-00768 TJH, 2021 WL 4621946 (C.D. Cal. Mar. 10, 2021)("October 15, 2020, *Roman* Order"). The Court expressed concerns that Adelanto was not sufficiently isolating or quarantining detainees who are symptomatic of COVID-19, suspected of having COVID-19, or have been confirmed positive for COVID-19. *Id*. at 5.

48.     During the months leading up to Mr. Vargas Arellano's death, ICE had repeatedly and consistently violated the Fifth Amendment rights of individuals detained at Adelanto, including Mr. Vargas Arellano.

### ***Detention Standards***

49.     ICE's contract with GEO to operate Adelanto mandates compliance with ICE's 2011 Performance-Based National Detention Standards ("PBNDS") as revised in December 2016.[16]

50.     ICE's PBNDS establish mandatory, non-discretionary policies and practices relating to medical care that facilities and operators of facilities must follow.

51.     ICE is responsible for ensuring that the requirements of the PBNDS are followed at immigration detention facilities, including Adelanto.

52.     GEO and Wellpath are contractually required to adhere to the PBNDS standards.

53.     The PBNDS provide "Medical Care" standards that require facilities to ensure that detainees have access to a continuum of health care services,

---

[16] *See* ICE Performance-Based National Detention Standards 2011, https://www.ice.gov/doclib/detention-standards/2011/pbnds2011r2016.pdf.

including screening, prevention, health education, diagnosis, and treatment.[17]

54.     The PBNDS Medical Care standards provide that CDC "guidelines for the prevention and control of infectious and communicable diseases shall be followed."[18] The PBNDS Medical Care standards also provide that "[f]acilities shall comply with current and future plans implemented by federal, state or local authorities addressing specific public health issues."[19]

55.     The PBNDS Medical Care standards provide that: "Every facility shall directly or contractually provide its detainee population with . . . [m]edically necessary and appropriate medical . . . health care."[20] In furtherance of that requirement, "[e]ach facility shall have written plans that address the management of infectious and communicable diseases, including screening, prevention, education, identification, monitoring and surveillance, immunization (when applicable), treatment, follow-up, isolation (when indicated) and reporting to local, state and federal agencies."[21] Such "[p]lans shall include . . . control, treatment and prevention strategies; . . . procedures for the identification, surveillance, immunization, follow-up and isolation of patients; hand hygiene; [and] management of infectious diseases."[22]

56.     The PBNDS Medical Care standards further require that "a plan is developed that provides for continuity of medical care in the event of a change in

---

[17] *Id*. at 257–281.

[18] *Id*. at 258.

[19] *Id*. at 261–62.

[20] *Id*. at 260.

[21] *Id*. at 261.

[22] *Id*.

detention placement or status."[23] "The detainee's medical needs shall be taken into account prior to any transfer of the detainee to another facility."[24]

57.     The PBNDS also include strict requirements on attorney notification upon the transfer of an individual in detention. The standards require that "the legal representative-of-record shall be notified as soon as practicable, but no later than 24 hours after the detainee is transferred." It is the responsibility of ICE to make such attorney notifications.[25]

58.     In the event that a detainee is gravely ill, the PBNDS also imposes on ICE the obligation to "immediately notify (or make reasonable efforts to notify) the detainee's next-of-kin of the medical condition and status, the detainee's location, and the visiting hours and rules at that location, in a language or manner which they can understand."[26]

59.     In April 2020, ICE established COVID-19 specific Pandemic Response Requirements ("PRR"), which supplements the PBNDS obligations and sets forth mandatory requirements related to the management of COVID-19 at immigration detention facilities. ICE has updated the PRR several times throughout the course of the COVID-19 pandemic.[27] At the time of Mr. Vargas Arellano's COVID-19 illness and death, the PRR Version 5.0 was in effect.[28] The

---

[23] *Id*. at 276.

[24] *Id*.

[25] *Id*. at 457.

[26] *Id*. at 339.

[27] *See supra* note 4.

[28] *See* PRR, Version 5.0 (Oct. 27, 2020), https://www.ice.gov/doclib/coronavirus/eroCOVID19responseReqsCleanFacilities-v5.pdf.

PRR 5.0 required a list of measures be implemented at immigration detention facilities related to COVID-19 testing, isolation, prevention, and treatment.

60.     The PRR 5.0 required that detainees at high risk of COVID-19 complications must receive twice-daily "[t]emperature screening and verbal screening for symptoms of COVID-19 and contacts with COVID-19 cases of all new entrants."[29]

61.     According to PRR 5.0, if a detainee has symptoms of COVID-19, "[a] medical provider must perform an initial evaluation to determine their care plan and housing placement." A medical assessment must be performed at least daily, and vital signs must be performed more frequently. Detainees with COVID-19 symptoms or who test positive for COVID-19 must be "immediately placed under medical isolation in a separate environment from other individuals, and medically evaluated."[30] Those at high-risk of complications "should be housed in the medical housing unit or infirmary area of the facility or, if unavailable, hospitalized."[31] Those "detainees who require a higher level of care than can be safely provided at the detention facility must be referred to community medical resources when needed."[32]

62.     The PRR 5.0 also required that "[i]f there has been a suspected COVID-19 case inside the facility (among incarcerated/detained persons, staff, or visitors who have recently been inside), facilities shall begin implementing management strategies while test results are pending. Essential management strategies include placing cases and individuals with symptoms under medical

---

[29] *Id*. at 14.

[30] *Id*. at 16.

[31] *Id*. at 15.

[32] *Id*.

isolation, quarantining their close contacts, and facilitating necessary medical care while observing relevant infection control and environmental disinfection protocols and wearing recommended PPE."[33]

63.     The PRR 5.0 also mandated that facilities must comply with the CDC's Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities.[34] Like the PRR, the CDC's interim guidance imposes several requirements on ICE related to the prevention and management of COVID-19 in immigration detention facilities.[35]

64.     ICE's contract with GEO at Adelanto requires that the facility comply with ICE's 2011 PBNDS.  Under the contract, ICE is responsible for monitoring, assessing, recording, and reporting on the technical performance, including compliance with the PBNDS standards, of GEO on a day-to-day basis. The contract also requires IHSC's Field Medical Coordinator to ensure that medical care at the facility meets detention standards. Starting on July 28, 2020, ICE's COVID-19 PRRs established compliance measures that required the agency to conduct bi-weekly spot checks at ICE detention facilities that detain individuals for

---

[33] *Id.* at 29.

[34] *Id*. at 8.

[35] The version of the CDC's guidance in effect during part of Mr. Vargas Arellano's COVID-19 illness—from December 3, 2020 to February 18, 2021—can be accessed here: https://web.archive.org/web/20201210030827/https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.

The version of the CDC's guidance in effect during part of Mr. Vargas Arellano's COVID-19 illness and his subsequent death—from February 19, 2021 to March 8, 2021—can be accessed here: https://web.archive.org/web/20210308143935/https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.

more than 72 hours and issue Contract Discrepancy Reports (CDRs) for non-compliance at dedicated ICE detention facilities governed by a Quality Assurance Surveillance Plan, such as Adelanto.[36]

65.     ICE did not comply with its mandatory oversight obligations and took no corrective action– under the PBNDS, PRR, or its contract with GEO–against GEO's failure to follow the above-referenced standards during the height of the COVID-19 pandemic.

### ***Reporting of Custodial Deaths***

66.     In 2018, Congress required ICE to publicly release reports on every in-custody death within 90 days.[37]

67.     ICE is required to report custodial deaths to Congress, nongovernmental organization stakeholders, and the public in the Detainee Death report.[38]

68.     There are only five detainee deaths listed by ICE for FY 2021, the year that applied when Martin Vargas Arellano passed away.[39]

69.     Martin Vargas Arellano is not listed among the five detainees who died.

70.     Martin Vargas Arellano's release was ordered on March 5, 2021, when he was immobile in a hospital bed after he suffered a stroke. He died three days later.

---

[36] *See* PRR, Version 3.0 (July 28, 2020).

[37] House Committee on Appropriations, Department of Homeland Security Appropriations Bill, 2018, Rep. No. 115-239, www.congress.gov/115/crpt/hrpt239/CRPT-115hrpt239.pdf.

[38] *See* ICE Detainee Death Reporting (last updated Dec. 5, 2022), https://www.ice.gov/detain/detainee-death-reporting.

[39] *Id.*

71.    ICE regularly orders the "release" of detainees who are essentially on their deathbeds in order to avoid reporting custodial deaths to Congress.[40]

### *Mr. Vargas Arellano's Immigration History*

72.    Mr. Vargas Arellano is a native of Mexico who arrived in the United States when he was 2 years old.

73.    On May 15, 2013, ICE took Mr. Vargas Arellano into custody and placed him in removal proceedings.

74.    He was not eligible for release from custody due to his convictions, and at the time of his initial custody in 2013, he fell under the mandatory custody provisions of 8 U.S.C. § 1226(c).

75.    Later in 2013, an immigration judge found him to be a member of the plaintiff class in *Franco-Gonzalez v. Holder*, Case No. 10-2211 (C.D. Cal.) because he was not competent to represent himself in his removal proceeding. Pursuant to *Franco*, Mr. Vargas Arellano was assigned a Qualified Representative to assist in his representation in 2014.

76.    ICE released Mr. Vargas Arellano from custody on December 23, 2014 while his Petition for Review was pending before the Ninth Circuit when ICE determined that he was not a danger to others or a flight risk.

77.    While he had criminal convictions, due to the law at the time, he was no longer subject to mandatory custody under 8 U.S.C. § 1226(c) because he had been detained in immigration custody for more than 180 days.

78.    In 2018, the Ninth Circuit remanded his case at the request of the parties.

---

[40] Andrea Castillo and Jie Jenny Zou, *ICE Rushed to Release a Sick Woman, Avoiding Responsibility for Her Death. She Isn't Alone*, Los Angeles Times (May 13, 2022), https://www.latimes.com/world-nation/story/2022-05-13/ice-immigration-detention-deaths-sick-detainees.

79.     ICE took Mr. Vargas Arellano in custody again on March 28, 2019, and placed him at the Adelanto facility, after he was arrested based on an October 2018 violation of his obligation to register as a sex offender.  His obligation to register as a sex offender arose from a 1985 conviction, when he was a juvenile. Mr. Vargas Arellano had sustained no other criminal convictions between 2014 and 2018.

80.     Mr. Vargas Arellano was not subject to mandatory custody under 8 U.S.C. § 1226(c) when he was taken into custody in 2019 due to his successful petition for review before the Ninth Circuit, as set forth in *Casas-Castrillon v. Dep't of Homeland Sec.,* 535 F.3d 942 (9th Cir. 2008), which established that § 1226(c) does not apply to cases remanded from the courts of appeals. In addition, as of September 14, 2019, Mr. Vargas Arellano was also not subject to mandatory custody under § 1226(c) because at that time more than 180 days had lapsed since his March 28, 2019 detention, under the authority in *Rodriguez v. Holder,* 2:07-cv-03239-TJH-RNB (C.D. Cal. Aug. 6, 2013) and *Franco-Gonzalez v. Holder,* No. 10-cv-02211 DMG (DTBX), 2013 WL 8115423 (C.D. Cal. Apr. 23, 2013).

81.     Hence, after September 14, 2019, Mr. Vargas Arellano was eligible for release from custody pursuant to 8 U.S.C. § 1226(a).

82.     On April 24, 2019, ICE moved for a *Franco* bond redetermination hearing before the immigration judge, noting that Mr. Vargas Arellano was eligible for release. That request was withdrawn, but by so moving ICE clearly acknowledged that Mr. Vargas Arellano was not subject to mandatory custody under 8 U.S.C. § 1226(c).

83.     Despite ample authority allowing ICE to release Mr. Vargas Arellano, he remained detained at Adelanto.

84.      In November 2019, an immigration judge denied Mr. Vargas Arellano's application for withholding of removal and protection under the

Convention Against Torture. Mr. Vargas Arellano's Qualified Representative appealed that decision to the Board of Immigration Appeals.

85.     On April 14, 2021, a month after Mr. Vargas Arellano's death, the Board of Immigration Appeals remanded the case to the immigration court to reconsider his eligibility for withholding of removal and protection under the Convention Against Torture, citing clear error by the immigration judge.

86.     On April 22, 2021, Mr. Vargas Arellano's removal case was terminated due to his death.

### *Mr. Vargas Arellano's Detention And Requests for Release During the COVID-19 Pandemic*

87.     ICE was well aware that Mr. Vargas Arellano was at risk of serious illness and death if he were to contract COVID-19, due to his age (55) and because he suffered from a number of chronic conditions including high blood pressure, diabetes, cellulitis, liver disease, and severe psychiatric illness (schizophrenia).

88.     Even before he contracted COVID-19, Mr. Vargas Arellano was a wheelchair-bound patient with chronic health issues in need of specialized medical care that the Adelanto facility admittedly could not provide. Between April 2019 and April 2020, ICE transferred Mr. Vargas Arellano at least eleven times for inpatient care at a hospital or clinic, with stays ranging from days to several weeks.

89.     Despite these facts, in June 2020, ICE denied, without explanation, Mr. Vargas Arellano's petition for humanitarian parole and release.

90.     On October 7, 2020, this Court in *Fraihat* clarified that its preliminary injunction applied to people subject to both discretionary and mandatory detention and that "[o]nly in rare cases should a Subclass member not subject to mandatory detention remain detained." *Fraihat v. U.S. Immigr. & Customs Enf't*, No. EDCV191546JGBSHKX, 2020 WL 6541994, at *12 (C.D. Cal. Oct. 7, 2020).

91.     The order required that ICE provide a justification for the refusal to release a *Fraihat* class member, and mandated that "blanket" or "cursory" refusals

did not meet the Court's mandate. *Id.* The *Fraihat* order required custody redeterminations within one week of the October 7, 2020 order, with an exception only in rare cases. *Id.* It further mandated that § 1226(c) did not bar release to *Fraihat* class members, and set forth that subclass members subject to mandatory detention "should only continue to be detained after individualized consideration of the risk of severe illness or death, with due regard to the public health emergency." *Id.*

92.     Mr. Vargas Arellano was a class member in *Fraihat*. He was wheelchair-bound and suffered from multiple chronic conditions placing him at extremely high risk of severe illness or death upon contracting COVID-19, and he in fact did become severely ill as a result of contracting COVID-19 during his detention. Yet, despite acknowledging his medical vulnerabilities, ICE repeatedly denied his requests for release from the onset of the pandemic to days before his death.

93.     On October 29, 2020, ICE denied Mr. Vargas Arellano's request based on *Fraihat* for his release, more than three weeks after the *Fraihat* October 7, 2020 order. The purported factual basis for ICE's October 29, 2020, denial of release was a single, blanket and cursory statement: "Threat to Public Safety."

94.     After Mr. Vargas Arellano tested positive for COVID-19 in December 2020, his Qualified Representative, Margaret Hellerstein, sought a bond hearing which was scheduled for January 26, 2021. Mr. Vargas Arellano, as a *Franco* class member, was entitled to a bond hearing after 180 days of detention at which the government bears the burden of justifying continued detention.

95.     On January 20, 2021, Ms. Hellerstein spoke with Mr. Vargas Arellano about his upcoming bond hearing, and he informed her that he was still suffering from the effects of COVID-19 and that he was under medical observation. They agreed that she would file a motion to continue the bond hearing until he could meaningfully participate.

96.     The next day, when Ms. Hellerstein again spoke with him, he explained that he was feeling a bit better and that he wanted to proceed with the bond hearing. A telephonic *Franco* bond hearing was scheduled for February 2, 2021.

97.     On January 27, 2021, Mr. Vargas Arellano was hospitalized for COVID-19 pneumonia at St. Mary's Hospital. Ms. Hellerstein was not informed by ICE of this transfer.

98.     On February 1, 2021, Ms. Hellerstein attempted to set up a call with Mr. Vargas Arellano at Adelanto for the following morning's bond hearing. She was informed by Adelanto staff that he was offsite.

99.     On February 2, 2021, at the telephonic bond hearing, while Mr. Vargas Arellano was in hospital, ICE refused to stipulate to bond citing his criminal record.

100.    Mr. Vargas Arellano had sustained no new criminal convictions between 2014, when ICE determined that he was not a danger to others or a flight risk and released him from custody, and 2018, when was arrested and convicted for failing to register as a sex offender based on a 1985 conviction when he was a juvenile. Between 1985 to 2018, Mr. Vargas Arellano had not once failed to register as required.

101.    At the February 2, 2021, bond hearing, Ms. Hellerstein withdrew the request for custody redetermination and informed the Immigration Judge that she would make a new motion once Mr. Vargas had returned from the hospital.

### *September COVID-19 Outbreak*

102.    In September 2020, COVID-19 rapidly spread through the Adelanto facility, resulting in the worst COVID-19 outbreak in an immigration detention facility in the United States.

103.    By Sept. 29, 2020, the outbreak had "grown to 81 confirmed positive cases of COVID-19 among the detainees, including 20 *Fraihat* sub-class members, and 9 detainees who required hospitalization." At least 8 staff members had tested

positive. *Id.* September 29, 2020, *Roman* Order, at 2. By October 8, 2020, twenty percent of the detained population had tested positive for COVID-19 with around 148 active cases in the facility.[41]

104.    The medical experts of both the United States and the petitioners in the *Roman* litigation agreed that the outbreak was likely caused by an infected staff member who reported to work at Adelanto.

105.    On September 29, 2020, the *Roman* court chastised ICE's unilateral decision to bar COVID-19 testing of detained individuals and mandated weekly testing for all persons detained at the Adelanto facility. *See* September 29, 2020, *Roman* Order. However, Adelanto staff tested Mr. Vargas Arellano only five times between October 6, 2020, and November 30, 2020. His results were negative for COVID-19.

106.    Adelanto staff did *not* select Mr. Vargas Arellano for COVID-19 testing in the November 4, November 9, November 16, November 23, and November 30 rounds of weekly tests.

107.    On December 3, 2020, the Court in *Roman* ordered the government to file a status report explaining why it had failed to initiate saturation testing of all detainees and staff at Adelanto.

### *Martin Vargas Arellano's Illness: Contracting COVID-19*

108.    Despite the outbreak and Mr. Vargas Arellano's extreme vulnerability to COVID-19, Defendants did not adequately protect Mr. Vargas Arellano from the virus in line with mandatory procedures to do so. Mr. Vargas was in close proximity to and interacting with other detainees during the height of the outbreak. Defendants were not in compliance with multiple mandatory policies, including for

---

[41] Rebecca Plevin, *'I'm Scared for My Life': Nearly 20% of Detainees at Adelanto ICE Facility Have COVID-19*, Desert Sun (Oct. 8, 2020), https://www.desertsun.com/story/news/2020/10/07/nearly-20-detainees-adelanto-ice-facility-have-covid-19/5918914002/.

example the July 28, 2020 PRR 5.0 requirement of twice-daily temperature and verbal screenings for high-risk detainees.

109.   On November 28, 2020, Mr. Vargas Arellano was admitted to the infirmary due to high blood pressure.

110.   On November 29, 2020, according to the *Roman* Special Master's Report, a Wellpath medical provider who later tested positive for COVID-19 on December 7, 2020, came into contact with Mr. Vargas Arellano. In response to the *Roman* Special Master inquiry,  the United States attested in the *Roman* litigation that this was Mr. Vargas Arellano's only known contact with a COVID-19 positive individual. The United States did not provide any information about how it arrived at this conclusion, the nature of any contact tracing it did, whether it reviewed video surveillance recordings, whether the Wellpath staff passed the required screening upon entry to the facility, what PPE the Wellpath medical staff was utilizing, or whether the Wellpath staff's contact with Mr. Vargas Arellano was otherwise in compliance with the applicable standards. Nonetheless, likely based on USA's attestation, the Special Master "assumed that [Mr. Vargas Arellano] contracted COVID from the Wellpath medical provider who examined him on November 29, 2020.[42]

111.   However, because each Defendant failed to follow required protocols, mandated court orders, and their duty of care towards Mr. Vargas Arellano in multiple ways, he could have contracted COVID-19 from one of several other known sources.

112.    During Mr. Vargas Arellano's November 28-December 1, 2020 infirmary stay, he was subject to round the clock observation by GEO staff, whose COVID-19 status is the subject of ongoing discovery.

---

[42] Special Master Report at 3.

113.   On December 1, 2020, Adelanto staff discharged Mr. Vargas Arellano from the infirmary and moved him to his cell in unit W5, block B.

114.   On December 4, 2020, Adelanto staff tested Mr. Vargas Arellano for COVID-19 as part of the court mandated weekly tests. He tested negative. At least one other detainee in unit W5, block B tested positive for COVID-19 during that testing cycle. Medical records state that on December 4, 2020, Mr. Vargas Arellano was "observed sitting in his wheelchair at the table with another detainee."

115.   On December 5, 2020, Mr. Vargas Arellano was again admitted into the infirmary due to high blood pressure, and remained in the infirmary until December 10, 2020.

116.   On December 8, 2020, the test results for another detained person who had been in the infirmary for around two weeks came back positive for COVID-19, indicating he had contracted COVID-19 in the infirmary and had been positive during the time of Mr. Vargas Arellano's December 5-10, 2020 infirmary stay.

117.   On December 10, 2020, Mr. Vargas Arellano tested positive for COVID-19. Prior to this date, Mr. Vargas Arellano had not left the Adelanto facility since September 19, 2020 for a hospital visit, indicating that he could not have contracted COVID-19 from anyone other than those he came into contact with at the facility.

118.   On December 12, 2020, the test results for another detained person who had been in the infirmary for a month came back positive for COVID-19, indicating he had contracted COVID-19 in the infirmary and had been positive during the time of Mr. Vargas Arellano's December 5-10, 2020 infirmary stay.

119.   Defendant GEO would have had video surveillance tapes to demonstrate whether Adelanto staff and detainees where in compliance with COVID-19 protocols and mandates in the period leading up to Mr. Vargas-Arellano testing positive for COVID-19, but GEO has failed to produce them and states it likely destroyed them. GEO also was in charge of screening individuals who came

into the facility for COVID-19 symptoms and exposure, but has failed to produce the required documentation of this screening for the relevant time period.

### *Martin Vargas Arellano's Illness: Health Deterioration*

120.   From December 2020 until March 2021, Mr. Vargas Arellano suffered a string of COVID-related medical complications that led to multiple hospitalizations, a stroke, and his eventual death.

121.   On December 11, 2020, the day after he tested positive for COVID-19, Mr. Vargas Arellano suffered from shortness of breath, fever, dry cough, and eventually COVID-19 pneumonia, for which he had to be hospitalized.

122.   On December 12, 2020, Mr. Vargas Arellano was transferred back to the Adelanto detention center but was transferred later that day to Providence St. Mary Medical Center due to COVID-19 pneumonia where he was hospitalized for several weeks.

123.   On December 25, 2020, Mr. Vargas Arellano was discharged from Providence St. Mary Medical Center and placed back in Adelanto.

124.   On January 4, 2021, Mr. Vargas Arellano was admitted to the Adelanto infirmary after complaining of shortness of breath.

125.   On January 26, 2021, Mr. Vargas Arellano was again hospitalized for COVID-19 pneumonia at Providence St. Mary Medical Center.

126.   On February 4, 2021, Mr. Vargas Arellano was released from Providence St. Mary Medical Center and placed back in the Adelanto infirmary.

127.   On February 17, 2021, after experiencing further shortness of breath, Mr. Vargas Arellano was hospitalized for the third and final time for COVID-19.

128.   ICE did not report any of Mr. Vargas Arellano's COVID-19 infirmary visits or hospitalizations in December through February to the court in *Roman.* The Special Master concluded that ICE's failure to report to the court violated the court's order that it report detainees being hospitalized for COVID-19.

### *Martin Vargas Arellano's Death and ICE's Concealment*

129.   On February 19, 2021, a Wellpath Medical Director emailed ICE's medical coordinator explaining that Mr. Vargas Arellano's medical condition has become grave, and that he was "'at great risk of pulmonary embolism and [that there was a] possibility of sudden death' due to multiple ailments, including ongoing weakness and chest pain in the wake of COVID-19 infection." Special Master Report, at 5. The Wellpath Medical Director urged ICE to evaluate whether Mr. Vargas Arellano should be released from ICE detention. *Id.*

130.   After ICE learned that Mr. Vargas Arellano was at risk of sudden death, it initiated a plan to release him. On February 22, 2021, Mr. Vargas Arellano's Deportation Officer, Sergio Guzman, reached out to Ms. Hellerstein informing her that ICE was considering releasing Mr. Vargas Arellano and for her to provide information about his housing and transportation. Ms. Hellerstein shared that information by email and asked that Mr. Guzman let her know as soon as a decision was made about Mr. Vargas Arellano's release. Mr. Guzman did not inform Ms. Hellerstein of Mr. Vargas Arellano's grave condition nor that it was the reason for ICE's consideration of release.

131.   On or about February 26, 2021, Ms. Hellerstein reached out to Mr. Guzman for an update. He informed her that no decision had been made yet about his release. He agreed to update her once the agency made a decision about his release. Ms. Hellerstein began making arrangements with the halfway house where Mr. Vargas Arellano was going to stay.

132.   On or about February 26, 2021, Mr. Vargas Arellano suffered a stroke that caused brain death.

133.   On March 5, 2021, ICE "released" Mr. Vargas Arellano purportedly on his own recognizance while in the hospital, even though he was comatose and brain dead. The release order listed the release address that Ms. Hellerstein had shared with Mr. Guzman. ICE did not inform Ms. Hellerstein nor Mr. Vargas Arellano's family of this release or his medical condition.

134.   On March 8, 2021, Mr. Vargas Arellano passed away due to complications brought by COVID-19. ICE did not inform Ms. Hellerstein nor Plaintiff of Mr. Vargas Arellano's death. ICE also did not report Mr. Vargas Arellano's death to this Court in *Roman*, where he had been a class member. ICE merely reported to the Court that Mr. Vargas Arellano was released on March 8, 2021.

135.   On March 15, 2021, after class counsel in *Roman* informed Ms. Hellerstein that Mr. Vargas Arellano had been released, she contacted Officer Guzman, by phone, inquiring about his whereabouts. He informed her that he was unaware of Mr. Vargas Arellano's location. He did not inform her of Mr. Vargas Arellano's death. The next day she emailed Mr. Guzman to follow up. Mr. Guzman was instructed by his supervisors to ignore Ms. Hellerstein's email and not speak with her any further about Mr. Vargas Arellano's case.

136.   Over the next few days, Ms. Hellerstein reached out to hospitals, shelters, police stations, and the Mexican Consulate seeking information about Mr. Vargas Arellano. On March 18, 2021, she learned of her client's death after contacting the coroner's office. Plaintiff learned of his father's death shortly thereafter.

137.   Because Mr. Vargas Arellano was "released" from ICE custody prior to his death on March 8, 2021, ICE did not report his death as a custodial death to Congress.[43]

138.   Defendant USA failed to disclose any Mortality Review of Mr. Vargas Arellano's death as referenced in ICE's Directive 11003.5 on Notification, Review, and Reporting Requirements for Detainee Deaths.

---

[43] *See* ICE Detainee Death Reporting (last updated Dec. 5, 2022), https://www.ice.gov/detain/detainee-death-reporting.

## CAUSES OF ACTION

## COUNT ONE

### (Federal Tort Claims Act)

### (Negligence)

### *Defendant United States*

139.   Plaintiff incorporates the allegations in the paragraphs above as though fully set forth here.

140.   The United States is liable pursuant to the Federal Tort Claims Act for the tortious acts of its employees in "circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."  28 U.S.C. § 1346(b).

141.   Plaintiff brings this cause of action as a successor in interest to Mr. Vargas Arellano under California Code of Civil Procedure § 377.30 (Survival Action).

142.   Plaintiff is Mr. Vargas Arellano's biological son and successor in interest.

143.   At all relevant times, ICE officials acted within their scope of their employment and/or official duties as employees of DHS, an agency of the United States.

144.   ICE Health Services Corps (IHSC) oversees Wellpath's compliance with national detention standards and oversees care for ICE detainees housed in contracted facilities.

145.   ICE is contractually required to implement multiple oversight and compliance mechanisms to ensure that GEO adheres to all relevant detention standards.

146.   ICE retained direct control at Adelanto in several areas pertaining to COVID-19 prevention, including the level and degree of COVID-19 testing at the facility and the adequacy of social distancing. California Civil Code § 1714

provides a statutory cause of action for negligence. To establish a claim for negligence, a plaintiff must show (1) that the defendant owed the plaintiff a legal duty; (2) that the defendant breached that duty; and (3) that the breach was a proximate or legal cause of the plaintiff's injuries.

147.   California law recognizes a "special relationship" between jailer and prisoner that gives rise to a duty of care that requires jailers to protect prisoners against "unreasonable risk of physical harm." *Giraldo v. Department of Corrections and Rehabilitation*, 168 Cal.App.4th 231, 248 (2008) (quoting *Haworth v. State*, 592 P.2d 820, 824 (1979)).

148.   The Supreme Court has explained that this California duty of care arising from the special relationship between jailer and prisoner applies to private actors. *See Minneci v. Pollard*, 565 U.S. 118, 128 (2012) ("California courts have specifically applied [this special duty] to jailers, *including private operators of prisons*.") (emphasis added).

149.   The Ninth Circuit has recognized that this special duty of care applies to private contractors like GEO in the context of the outbreak of infectious disease. *Edison v. United States*, 822 F.3d 510, 522 n.7 (9th Cir. 2016).

150.   Additionally, under California law, there is a general duty of care that dictates that "everyone is responsible, not only for the result of his or her willful acts, but also for an injury occasioned to another by his or her want of ordinary care or skill in the management of his or her property or person[.]" Cal. Civ. Code § 1714(a).

151.   Agents of the United States thus owed a duty of care to Mr. Vargas Arellano, and breached their mandatory, non-discretionary duties to Plaintiff as Mr. Vargas Arellano's successor-in-interest, including but not limited to in the following ways:

a.  Failing to follow all required protocols, policies, procedures and court-mandated orders to adequately shield him from contracting COVID-19;

b.  Failing to adhere to the court-mandated procedures for custody redetermination of Mr. Vargas Arellano under *Fraihat*

c.  Failing to provide facilities and care sufficient to meet his medical needs; an individual with Mr. Vargas Arellano's serious medical conditions could not be detained at the Adelanto facility during the COVID-19 pandemic without placing him at unreasonable risk of physical harm;

d.  Failing to adhere to its own policies and contractual obligations requiring it to implement oversight and compliance procedures over facilities and staff; and

e.  Failing to act with reasonable diligence to communicate with Mr. Vargas Arellano's designated representative and next of kin regarding his illness, transfer to hospital, and brain death.

152.  Martin Vargas Arellano was the direct victim of negligence by Defendant.  Defendant's breach of duty was the direct and proximate cause and a substantial factor in bringing about Martin Vargas Arellano's injuries.

153.  The actions of Defendant United States constitute the tort of negligence under the laws of the State of California.

**COUNT TWO**
**(Federal Tort Claims Act)**
**(Negligent Infliction of Emotional Distress)**
***Defendant United States***

154.  Plaintiff incorporates the allegations in the paragraphs above as though fully set forth here.

155.   The United States is liable pursuant to the Federal Tort Claims Act for the tortious acts of its employees in "circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."  28 U.S.C. § 1346(b).

156.   Plaintiff brings this cause of action as a successor in interest to Mr. Vargas Arellano under California Code of Civil Procedure § 377.30 (Survival Action).

157.   Plaintiff is Mr. Vargas Arellano's biological son and successor in interest.

158.   At all relevant times, ICE officials acted within their scope of their employment and/or official duties as employees of DHS, an agency of the United States.

159.   ICE Health Services Corps (IHSC) oversees Wellpath's compliance with national detention standards and oversees care for ICE detainees housed in contracted facilities.

160.   The elements of a negligent infliction of emotional distress cause of action under California law are (1) the defendant engaged in negligent conduct, (2) the plaintiff suffered serious emotional distress; and (3) the defendants' negligent conduct was a cause of the serious emotional distress.

161.   Agents of the United States engaged in negligent conduct because they owed a duty of care to Mr. Vargas Arellano, and breached their mandatory, non-discretionary duties to Plaintiff, as Mr. Vargas Arellano's successor-in-interest, including but not limited to in the following ways:

　　　a. Failing to follow all required protocols, policies, procedures and court-mandated orders to adequately shield him from contracting COVID-19;

　　　b. Failing to adhere to the court-mandated procedures for custody redetermination of Mr. Vargas Arellano under *Fraihat*

   c. Failing to provide facilities and care sufficient to meet his medical needs; an individual with Mr. Vargas Arellano's serious medical conditions could not be detained at the Adelanto facility during the COVID-19 pandemic without placing him at unreasonable risk of physical harm;

   d. Failing to adhere to its own policies and contractual obligations requiring it to implement oversight and compliance procedures over facilities and staff; and

   e. Failing to act with reasonable diligence to communicate with Mr. Vargas Arellano's designated representative and next of kin regarding his illness, transfer to hospital, and brain death.

162. Agents of the United States acted in bad faith by actively concealing the seriousness of Mr. Vargas Arellano's condition and death from his counsel and family, and "releasing" him on his deathbed in order to avoid having to report a custodial death to Congress.

163. Mr. Vargas Arellano suffered serious emotional distress as a result of Defendant's negligent conduct.

164. Martin Vargas Arellano was the direct victim of negligence by Defendant. Defendant's breach of duty was the direct and proximate cause and a substantial factor in bringing about Martin Vargas Arellano's serious emotional distress.

165. The actions of Defendant United States constitute the tort of negligent infliction of emotional distress under the laws of the State of California.

## **COUNT THREE**
### **(Federal Tort Claims Act)**
### **(Intentional Infliction of Emotional Distress)**
### *Defendant United States*

166.   Plaintiff incorporates the allegations in the paragraphs above as though fully set forth here.

167.   The United States is liable pursuant to the Federal Tort Claims Act for the tortious acts of its employees in "circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."  28 U.S.C. § 1346(b).

168.   Plaintiff brings this cause of action as a successor in interest to Mr. Vargas Arellano under California Code of Civil Procedure § 377.30 (Survival Action).

169.   Plaintiff is Mr. Vargas Arellano's biological son and successor in interest.

170.   At all relevant times, ICE officials acted within their scope of their employment and/or official duties as employees of DHS, an agency of the United States.

171.   ICE Health Services Corps (IHSC) oversees Wellpath's compliance with national detention standards and oversees care for ICE detainees housed in contracted facilities.

172.   The elements of an intentional infliction of emotional distress cause of action under California law are (1) outrageous conduct by the defendant, (2) intention to cause or reckless disregard of the probability of causing emotional distress, (3) severe emotional suffering, and (4) actual and proximate causation of the emotional distress.

173.   Agents of the United States committed outrageous conduct when they did not take adequate steps to shield Mr. Vargas Arellano from contracting COVID-19 and when they failed to release him thereafter despite multiple requests, knowing that he suffered from chronic co-morbidities including high blood pressure, diabetes, liver disease, cellulitis, and severe psychiatric illness.

174.   Agents of the United States detained Mr. Vargas Arellano under conditions in which the facilities and level of care were not adequate to meet his medical needs.

175.   Agents of the United States acted in bad faith by actively concealing the seriousness of Mr. Vargas Arellano's condition and death from his counsel and family, and "releasing" him on his deathbed in order to avoid having to report a custodial death to Congress.

176.   Mr. Vargas Arellano endured severe emotional suffering as a result of the outrageous conduct of Defendant United States.

177.   The actions of Defendant constitute the tort of intentional infliction of emotional distress under the laws of the State of California.

## **COUNT FOUR**
### **(Federal Tort Claims Act)**
### **(False Arrest/ Imprisonment)**
### ***Defendant United States***

178.   Plaintiff incorporates the allegations in the paragraphs above as though fully set forth here.

179.   The United States is liable pursuant to the Federal Tort Claims Act for the tortious acts of its employees in "circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."  28 U.S.C. § 1346(b).

180.   Plaintiff brings this cause of action as a successor in interest to Mr. Vargas Arellano under California Code of Civil Procedure § 377.30 (Survival Action).

181.   Plaintiff is Mr. Vargas Arellano's biological son and successor in interest.

182.   At all relevant times, ICE officials acted within their scope of their employment and/or official duties as employees of DHS, an agency of the United States.

183.   Agents of the United States intentionally imprisoned Mr. Vargas Arellano, purportedly under the mandatory custody provision of 8 U.S.C. § 1226(c), without lawful privilege, as he was not subject to § 1226(c) and was eligible for release under 8 U.S.C. § 1226(a).  Mr. Vargas Arellano's removal case was remanded from the Ninth Circuit and he was detained for more than 180 days at the time of the October 29, 2020 *Fraihat* detention decision, rendering him eligible for release under 8 U.S.C. § 1226(a). *Rodriguez v. Holder,* 2:07-cv-03239-TJH-RNB (C.D. Cal. Aug. 6, 2013); *Franco-Gonzalez v. Holder,* No. 10-cv-02211 DMG (DTBX), 2013 WL 8115423 (C.D. Cal. Apr. 23, 2013).[44] So did a separate Ninth Circuit decision— *Casas-Castrillon v. Dep't of Homeland Sec.,* 535 F.3d 942 (9th Cir. 2008).

184.   Agents of the United States intentionally imprisoned Mr. Vargas Arellano without lawful privilege when ICE delayed the October 29, 2020 detention decision for more than the seven days authorized by *Fraihat*, 2020 WL 6541994, at *12.

185.   Agents of the United States intentionally imprisoned Mr. Vargas Arellano without lawful privilege when ICE denied Mr. Vargas Arellano's release on October 29, 2020 and issued a blanket and cursory denial failing to provide an individualized determination justifying his continued detention, in violation of the legal mandate in *Fraihat*, 2020 WL 6541994, at *12.

186.   Agents of the United States intentionally imprisoned Mr. Vargas Arellano, without lawful privilege, because even if Mr. Vargas Arellano was subject to mandatory custody under 8 U.S.C. § 1226(c), ICE was still required to

---

[44] Arellano was a *Franco-Gonzalez* class member because he was not competent to represent himself in removal proceedings.

follow the legal mandate established in *Fraihat*, 2020 WL 6541994, at *12, to consider Mr. Vargas Arellano's release based on his vulnerable medical state, and it failed to do so.

187.   Agents of the United States intentionally imprisoned Plaintiff without lawful privilege and without Plaintiff's consent.  This act constituted the tort of false imprisonment under the laws of the State of California. *Rhoden v. United States*, 55 F.3d 428, 431 (9th Cir. 1995).

## COUNT FIVE

### (Violation of Detention Standards)

### *Defendants Wellpath and GEO*

188.   Plaintiff incorporates the allegations in the paragraphs above as though fully set forth here.

189.   Plaintiff brings this cause of action on his father's behalf as successor in interest to Mr. Vargas Arellano under California Code of Civil Procedure § 377.30 (Survival Action) as an individual who has been injured by the tortious actions of a private detention facility operator under Cal. Gov. Code § 7320.

190.   Plaintiff is Mr. Vargas Arellano's biological son and successor in interest.

191.   GEO is a private detention facility operator.

192.   Wellpath is an agent of a private detention facility.

193.   GEO and Wellpath are required to exercise a duty of ordinary care and skill in their compliance and adherence to the detention standards of care and confinement agreed upon in the Adelanto Detention Facility contract for operations.

194.   ICE's PBNDS are the applicable standards of care as set forth in the Adelanto Detention Facility contract for operations. The PBNDS incorporates CDC guidelines on COVID-19 and ICE's PRRs.

195.   GEO and Wellpath engaged in tortious actions in violation of the PBNDS when they, among other things:

  f. failed to adequately protect Mr. Vargas Arellano from contracting COVID-19;

  g. failed to provide appropriate facilities and care for Mr. Vargas Arellano's medical needs.

196. GEO's and Wellpath's violations of the PBNDS caused Mr. Vargas Arellano's pain, suffering, and eventual death.

**<u>COUNT SIX</u>**

**(Negligence)**

***Defendants Wellpath and GEO***

197. Plaintiff incorporates the allegations in the paragraphs above as though fully set forth here.

198. Plaintiff brings this cause of action on his father's behalf as successor in interest to Mr. Vargas Arellano under California Code of Civil Procedure § 377.30 (Survival Action).

199. Plaintiff is Mr. Vargas Arellano's biological son and successor in interest.

200. California Civil Code § 1714 provides a statutory cause of action for negligence. To establish a claim for negligence, a plaintiff must show (1) that the defendant owed the plaintiff a legal duty; (2) that the defendant breached that duty; and (3) that the breach was a proximate or legal cause of the plaintiff's injuries.

201. California law recognizes a "special relationship" between jailer and prisoner that gives rise to a duty of care that requires jailers to protect prisoners against "unreasonable risk of physical harm." *Giraldo v. Department of Corrections and Rehabilitation*, 168 Cal.App.4th 231, 248 (2008) (quoting *Haworth v. State*, 592 P.2d 820, 824 (1979)).

202. The Supreme Court has explained that this California duty of care arising from the special relationship between jailer and prisoner <u>applies to private actors</u>. *See Minneci v. Pollard*, 565 U.S. 118, 128 (2012) ("California courts have

40

specifically applied [this special duty] to jailers, *including private operators of prisons*.") (emphasis added).

203.   The Ninth Circuit has recognized that this special duty of care applies to private contractors like GEO in the context of the outbreak of infectious disease. *Edison v. United States*, 822 F.3d 510, 522 n.7 (9th Cir. 2016).

204.   Additionally, under California, there is a general duty of care that dictates that "everyone is responsible, not only for the result of his or her willful acts, but also for an injury occasioned to another by his or her want of ordinary care or skill in the management of his or her property or person[.]" Cal. Civ. Code § 1714(a).

205.   Defendants Wellpath and GEO thus owed a duty of care to Mr. Vargas Arellano and breached that duty of care when they, among other things:

    h.   detained Mr. Vargas Arellano under conditions in which the facilities and level of care were not adequate to meet his medical needs;

    i.   failed to adequately protect Mr. Vargas Arellano from contracting COVID-19.

206.   Defendants' breach of their duty of care to Mr. Vargas Arellano caused his pain, suffering, and eventual death.

207.   Martin Vargas Arellano was the direct victim of Defendants' negligence.  Defendant's breach of duty was the direct and proximate cause and a substantial factor in bringing about Martin Vargas Arellano's injuries.

208.   Defendants breached their duty of care when they failed to adequately protect Mr. Vargas Arellano from contracting COVID-19, and that breach caused his pain, suffering, and eventual death.

## COUNT SEVEN

### (Negligent Infliction of Emotional Distress)

### *Defendants Wellpath and GEO*

209.   Plaintiff incorporates the allegations in the paragraphs above as though fully set forth here.

210.   Plaintiff brings this cause of action on his father's behalf as successor in interest to Mr. Vargas Arellano under California Code of Civil Procedure § 377.30 (Survival Action).

211.   Plaintiff is Mr. Vargas Arellano's biological son and successor in interest.

212.   To establish a claim for negligent infliction of emotional distress under California law, a plaintiff must show (1) that the defendant engaged in negligent conduct, (2) that the plaintiff suffered serious emotional distress; and (3) that the defendants' negligent conduct was a cause of the serious emotional distress.

213.   Defendants engaged in negligent conduct by breaching their duty of care when they, among other things, detained Mr. Vargas Arellano under conditions in which the facilities and level of care were not adequate to meet his medical needs, and that breach caused his serious emotional distress.

214.   Martin Vargas Arellano was the direct victim of Defendants' negligence.  Defendant's breach of duty was the direct and proximate cause and a substantial factor in bringing about Martin Vargas Arellano's serious emotional distress.

215.   Defendants breached their duty of care when they failed to adequately protect Mr. Vargas Arellano from contracting COVID-19, and that breach caused his serious emotional distress.

## COUNT EIGHT

### (Wrongful Death)

#### *All Defendants*

216.   Plaintiff incorporates the allegations in the paragraphs above as though fully set forth here.

42

217.   Mr. Vargas Arellano's death was a direct and proximate result of the aforementioned negligence, wrongful acts, conduct, and omissions of Defendants. As a direct and proximate result of the negligence, wrongful acts, conduct, and omissions of the Defendants, and each of them, Plaintiff has been deprived of the decedent's love, companionship, comfort, care, assistance, protection, affection, society, support, and guidance, and present value of services to his family.

218.   Further, agents of the United States acted in bad faith in multiple ways including but not limited to intentionally concealing Mr. Vargas Arellano's serious illness and death from his Qualified Representative and family.

219.   Plaintiff is entitled to recover wrongful death damages pursuant to California Code of Civil Procedure § 377.60. Plaintiff has suffered pecuniary and non-pecuniary losses in an amount to be determined at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that this Court grant the following relief:

(1)   Award compensatory and punitive damages to Plaintiff in an amount to be proven at trial;

(2)   Award costs and reasonable attorney fees under the Equal Access to Justice Act, 28 U.S.C. § 2412(b), Cal. Gov. Code § 7320(c), and any other applicable law;

(3)   Grant such further relief as the Court deems just and proper.

Dated: March 8, 2024                              Respectfully submitted,

Stacy Tolchin
*Stacy@Tolchinimmigration.com*
Megan Brewer
*Megan@Tolchinimmigration.com*
Law Offices of Stacy Tolchin
776 E. Green St. Suite 210

Pasadena, CA  91101
Telephone: (213) 622-7450
Facsimile: (213) 622-7233

Khaled Alrabe
*khaled@nipnlg.org*
Matthew S. Vogel†
*matt@nipnlg.org*
Amber Qureshi
*amber@nipnlg.org*
National Immigration Project of
the National Lawyers Guild
(NIPNLG)
2201 Wisconsin Ave NW, Suite
200
Washington, DC 20007
Telephone: (202)470-2082
Facsimile: (617) 227-5495


† *not admitted in DC; working remotely*
*from and admitted in Louisiana only*

Laboni A. Hoq
*laboni@hoqlaw.com*
Hoq Law APC
P.O. Box 753
Pasadena, CA  91030
Telephone: (213) 973-9004

Counsel for Plaintiff


By: s/ Stacy Tolchin
    Stacy Tolchin

44