Stacy Tolchin (CA SBN #217431)
*Email: Stacy@Tolchinimmigration.com*
Megan Brewer (CA SBN #268248)
*Email: Megan@Tolchinimmigration.com*
Law Offices of Stacy Tolchin
776 E. Green St., Suite 210
Pasadena, CA 91101
Telephone: (213) 622-7450
Facsimile: (213) 622-7233

Khaled Alrabe (CA SBN #349899)
*Email: khaled@nipnlg.org*
Matthew S. Vogel (admitted *pro hac vice*)
*Email: matt@nipnlg.org*
National Immigration Project of the National Lawyers Guild (NIPNLG)
2201 Wisconsin Ave NW, Suite 200
Washington, DC 20007
Telephone: (202) 470-2082
Facsimile: (617) 227-5495

Counsel for Plaintiff
(*continued on next page*)

# UNITED STATES DISTRICT COURT FOR THE
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Martin VARGAS, individually and as Successor in Interest of the Estate of Martin Vargas Arellano,<br><br>     Plaintiff,<br><br>          v.<br>THE GEO GROUP and WELLPATH L.L.C.<br><br>     Defendants. | **THIRD AMENDED COMPLAINT FOR DAMAGES**<br><br><br>Jury Trial Requested |

Laboni A. Hoq (CA SBN #224140)
*Email: laboni@hoqlaw.com*
Hoq Law APC
P.O. Box 753
South Pasadena, CA  91030
Telephone: (213) 973-9004

1

**<u>INTRODUCTION</u>**

1.      Plaintiff Martin Vargas is the son of Martin Vargas Arellano and files this action individually and as Mr. Vargas Arellano's successor in interest.

2.      Mr. Vargas Arellano was a medically vulnerable individual who was detained by the U.S. Immigration and Customs Enforcement ("ICE") at the Adelanto Processing Center ("Adelanto") during the COVID-19 pandemic, and then died there due to Defendants' gross negligence.

3.      Adelanto is a privately operated immigration detention center operated by Defendant The GEO Group, Inc. ("GEO") through its contract with ICE. GEO sub-contracted medical services at Adelanto to Defendant Wellpath, LLC ("Wellpath") during this time.

4.      On or about December 10, 2020, Mr. Vargas Arellano contracted COVID-19 while detained at Adelanto. In the three months following his COVID-19 infection, Mr. Vargas Arellano suffered a string of COVID-related medical complications, including multiple hospitalizations, a stroke, and ultimately his death.

5.      On March 8, 2021, Mr. Vargas Arellano died at the age of 55 due to complications brought on by COVID-19.

6.      GEO was aware that Mr. Vargas Arellano, who was wheelchair bound, was at high risk of serious illness and death if he were to contract COVID-19 due to his age and multiple chronic conditions including high blood pressure, diabetes, liver disease, cellulitis, hepatitis C, and severe psychiatric illness.

7.      As the entity responsible for operating the Adelanto Detention Center, including ensuring the health and well-being of detainees, under its contract with ICE, GEO also was subject to a number of COVID-19 specific detention standards. Among those were ICE's COVID-19 Pandemic Response Requirements ("PRR"), ICE's Performance Based National Detention Standards ("PBNDS"), U.S. Centers for Disease Control ("CDC") guidelines on managing COVID-19 in correctional

facilities, and federal court orders in *Roman v. Wolf*, No. 5:20-cv-00768-THJ-PVC (C.D. Cal.), a class action suit on behalf of immigrants detained in Adelanto seeking relief based on the facility's failure to implement necessary protective measures during the COVID-19 pandemic.

8. Despite its knowledge of Mr. Vargas Arellano's immuno-compromised condition and the heightened measures it was required to take to protect detainees like him from COVID-19, GEO failed to implement and enforce the required COVID-19 protections at Adelanto.

9. These failures resulted in multiple widespread outbreaks of COVID-19 at Adelanto both before and after Mr. Vargas Arellano contracted COVID-19, including between September 2020 and January 2021.

10. In September 2020, Adelanto had the largest COVID-19 outbreak among immigration detention centers in the United States with almost 150 detained individuals testing positive for the virus, in addition to significant numbers of GEO staff testing positive as well. Because of the deficient conditions in Adelanto, the Court in *Roman v. Wolf*, No. 5:20-cv-00768-THJ-PVC, determined that the conditions at the facility violated detainees' due process rights to reasonable safety under the Fifth Amendment.

11. The *Roman* Court determined that the September outbreak was likely caused by an Adelanto staff member who reported to work while carrying the COVID-19 virus. *Roman v. Wolf*, No. EDCV2000768TJHPVCX, 2020 WL 5797918, at 2 (C.D. Cal. Sept. 29, 2020), *aff'd in part, vacated in part, remanded*, 977 F.3d 935 (9th Cir. 2020) ("September 29, 2020, *Roman* Order").

12. A second COVID-19 outbreak occurred in November and December of 2020 with hundreds of staff and detainees testing positive for COVID-19. A Special Master in the *Roman* case again concluded that the virus was most likely brought into the facility by Adelanto staff.

13. GEO failed to comply with its obligations under the PBNDS, PRR,

and CDC mandates. GEO's staff screening was severely inadequate, as it failed to comprehensively screen all staff, and allowed staff exposed to COVID-19 to enter the facility. GEO also did not conduct mandatory twice-daily screenings for detainees at high risk, did not log PPE use among staff, did not conduct contact tracing of Mr. Vargas Arellano (or any other detainees) following their infection, did not discipline any employees for COVID-19 compliance issues including PPE and social distancing, and did not have a COVID-19 mitigation plan as it was required to do so.

14. Wellpath provided inadequate care to Mr. Vargas Arellano, including failing to transfer him to a higher level of care despite his severe post-COVID-19 complications; ignoring critical symptoms such as significant weight loss, and persistent anemia; neglecting to provide necessary pulmonary rehabilitation and physical therapy; disregarding his high risk of blood clots and stroke; failing to adequately monitor or treat his ongoing shortness of breath and chest pain; failing to account for his severe mental illness including schizophrenia which compromised his ability to make informed decisions about his medical care; and delaying response to his medical crises, including a severe fall he suffered while in the infirmary that left him bloody and bruised, which Defendants did not discover until the next day.

15. On December 10, 2020, Mr. Vargas Arellano tested positive for COVID-19 while in the Adelanto infirmary, which he never fully recovered from. Following his death on March 8, 2021, in response to a *Roman* Court-ordered inquiry into his death, ICE attested in an interrogatory that Mr. Vargas Arellano contracted COVID-19 from a Wellpath medical provider and that this was Mr. Vargas Arellano's only known contact with a COVID-19 positive individual. This statement was incorrect.

16. The ICE response in that interrogatory was based on representations made by GEO staff, including James Janecka, Adelanto's Facility Administrator,

4

who did so in consultation with his superiors Joseph Moorhead and Paul Laird, as well as GEO's counsel Spencer Winepol, and Wellpath staff, who failed to provide ICE with full information about how Mr. Vargas Arellano likely contracted COVID-19. GEO knowingly provided ICE false information about all possible sources of Mr. Vargas Arellano's COVID-19 exposure, instead attempting to point the finger solely at a Wellpath staff member, to evade responsibility for its own failures to take multiple required precautions that would have prevented Mr. Vargas Arellano from contracting COVID-19 when he did.

17. In fact, by the time Mr. Vargas Arellano tested positive for COVID-19 in the Adelanto infirmary on December 10, 2020, multiple patients housed in the infirmary, as well as Adelanto staff assigned there at that time, had also contracted or been exposed to COVID-19 in early December 2020. However, GEO and Wellpath failed to conduct adequate contact tracing of staff, or *any* contact tracing whatsoever of *any* of the detainees who had tested positive for COVID-19 at that time.

18. Additionally, GEO allowed Adelanto staff who had been exposed to and who had contracted COVID-19 to enter the facility and work at the infirmary at that time, without being tested for COVID-19, being subject to regular symptoms checks, or being monitored to ensure compliance with mask and social distancing mandates, in violation of the PRR and *Roman* court mandates.

19. Compounding these failures, GEO staff including James Janecka, Joseph Moorhead, Paul Laird and other key GEO staff failed to comply with known obligations to preserve video surveillance, and as a result GEO destroyed video surveillance that could have verified the extent of Defendants' compliance with the requisite COVID-19 standards, including GEO and Wellpath staff compliance with mask mandates and other PPE obligations, social distancing, and the likely sources of Mr. Vargas Arellano's COVID-19 exposure, as well as their overall compliance with required detainee medical care standards.

20.    Plaintiff Vargas seeks damages for pain and suffering, as well as punitive damages related to Defendants' actions that caused the death of Mr. Vargas Arellano in excess of $75,000 as Mr. Vargas Arellano's Successor in Interest.

## JURISDICTION AND VENUE

21. This Court has jurisdiction over the present action based on 28 U.S.C. § 1332(a) (diversity) because the matter in controversy exceeds $75,000 and is between citizens of different states. Plaintiff is a citizen of California. Defendant GEO is a corporation headquartered in Florida, and Defendant Wellpath is a corporation headquartered in Tennessee.

22. The amount in controversy in this action exceeds $75,000. Plaintiff seeks damages for pain and suffering, as well as punitive damages related to Defendants' death of Mr. Vargas Arellano, in addition to attorneys' fees available under Cal. Gov. Code § 7320, all of which well exceed the $75,000 jurisdictional threshold.

23. Venue is properly with this Court pursuant to 28 U.S.C. § 1391(b) (general venue) because a substantial part of the events or omissions giving rise to the claim occurred in Adelanto, California, in the Central District of California; and there is no real property involved in this action.

## PARTIES

24. Plaintiff Vargas is a citizen of the United States.  Plaintiff Vargas is the biological son of Martin Vargas Arellano and the Successor in Interest to his father Martin Vargas Arellano.  At the time of his death, Mr. Vargas Arellano was unmarried.  Plaintiff Vargas resides in Victorville, California.

25. Defendant GEO is a private prison corporation, headquartered in Boca Raton, Florida, that operates Adelanto and receives substantial federal funding. Defendant GEO contracts with ICE to provide detention services and medical care for detainees at Adelanto. GEO is incorporated in Florida and its principal place of business is Boca Raton, Florida.

26. Defendant Wellpath, formerly known as Correct Care Solutions, is the medical provider at Adelanto. During all times relevant to this case, GEO subcontracted to Wellpath its contractual obligation to ICE to provide medical care to immigration detainees at the Adelanto facility. Wellpath is a citizen of Delaware. Wellpath is a Delaware limited liability company, wholly owned by Justice Served Health Holdings, LLC, a Delaware limited liability company. Justice Served Health Holdings, LLC's sole member is Wellpath Holdings, Inc., a Delaware corporation.

27. The United States was previously a defendant in this case but has entered into a settlement agreement with Plaintiff and has since been dismissed from this action.

**FACTUAL ALLEGATIONS**

**ICE Mandates to Protect Detainees from COVID-19**

28. In December 2019, the virus SARS-CoV-2 was identified in China as causing an outbreak of a new, communicable respiratory illness, now known as coronavirus disease 2019, or COVID-19. Following the spread of the virus to the United States, the U.S. Secretary of Health and Human Services declared a nationwide public health emergency on January 31, 2020.

29. On March 27, 2020, ICE issued a Memorandum on Coronavirus Disease 2019 (COVID-19), Action Plan, Revision 1.[1] On April 10, 2020, ICE published its COVID-19 Pandemic Response Requirements ("PRR").[2]

---

[1] Memorandum from Enrique M. Lucero, Executive Associate Director of ICE Enforcement and Removal Operations, Memorandum on Coronavirus Disease 2019 (COVID-19) Action Plan, Revision 1 (Mar. 27, 2020), https://www.ice.gov/doclib/coronavirus/attF.pdf.

[2] ICE Enforcement and Removal Operations, COVID-19 Pandemic Response Requirements, Version 1.0 (Apr. 10, 2020), https://www.ice.gov/doclib/coronavirus/eroCOVID19responseReqsCleanFacilities-

30. ICE's contract with GEO to operate Adelanto mandates GEO's compliance with ICE's 2011 Performance-Based National Detention Standards ("PBNDS") as revised in December 2016.[3]

31. Similarly, GEO's contract with Wellpath required Wellpath to follow the PBNDS as revised in December 2016.

32. The PBNDS establishes required policies and practices relating to detainee care and facility management, which GEO and Wellpath failed to follow at times relevant to this case, including but are not limited to the following:

   a. facilities must ensure that detainees have access to a continuum of health care services, including screening, prevention, health education, diagnosis, and treatment.[4] This includes mental health treatment;

   b. CDC "guidelines for the prevention and control of infectious and communicable diseases shall be followed;"[5]

   c. "[f]acilities shall comply with current and future plans implemented by federal, state or local authorities addressing specific public health issues."[6]

   d. "[e]very facility shall directly or contractually provide its detainee population with . . . [m]edically necessary and appropriate medical . . .

---

v1.pdf. Updated versions of the PRR can be accessed here: https://www.ice.gov/coronavirus/prr.

[3] *See* ICE Performance-Based National Detention Standards 2011, https://www.ice.gov/doclib/detention-standards/2011/pbnds2011r2016.pdf.

[4] *Id*. at 257–281.

[5] *Id*. at 258.

[6] *Id*. at 261–62.

health care;"[7] and

   e. "[e]ach facility shall have written plans that address the management of infectious and communicable diseases, including screening, prevention, education, identification, monitoring and surveillance, immunization (when applicable), treatment, follow-up, isolation (when indicated) and reporting to local, state and federal agencies,"[8] and such "[p]lans shall include . . . control, treatment and prevention strategies; . . . procedures for the identification, surveillance, immunization, follow-up and isolation of patients; hand hygiene; [and] management of infectious diseases."[9]

   f.   "[a] detainee who is determined to require health care beyond facility resources shall be transferred in a timely manner to an appropriate facility."

33. In April 2020, ICE established the PRR, which supplements the PBNDS obligations and sets forth mandatory requirements related to the management of COVID-19 at immigration detention facilities. ICE has updated the PRR several times throughout the course of the COVID-19 pandemic.[10] At the time of Mr. Vargas Arellano's COVID-19 illness and death, the PRR Version 5.0 was in effect.[11] The PRR 5.0 required a list of measures be implemented at immigration

---

[7] *Id*. at 260.

[8] *Id*. at 261.

[9] *Id*.

[10] *See supra* note 4.

[11] *See* PRR, Version 5.0 (Oct. 27, 2020), https://www.ice.gov/doclib/coronavirus/eroCOVID19responseReqsCleanFacilities-v5.pdf.

detention facilities related to COVID-19 testing, isolation, prevention, and treatment.

34. GEO and Wellpath are contractually required to adhere to the PRR standards, but repeatedly failed to do so at times relevant to this case. Their noncompliance included, but was not limited to the following PRR standards:

g. "[T]emperature and verbal screening of high risk (vulnerable) detainees will be conducted twice daily during detention utilizing a structured screening tool and be documented in the facility's records."[12]

h. Medical providers must immediately evaluate symptomatic detainees to determine their care plan and housing placement.

i. A medical assessment was to be conducted daily, with more frequent monitoring of vital signs.

j. Those who tested positive or exhibited symptoms had to be "immediately placed under medical isolation in a separate environment from other individuals and medically evaluated."[13]

k. High-risk detainees who tested positive were to be "housed in the medical housing unit or infirmary area of the facility or, if unavailable, hospitalized."[14]

l. If a facility could not provide the necessary level of care, "detainees who require a higher level of care than can be safely provided at the detention facility must be referred to community medical resources

---

[12] *Id*. at 14.

[13] *Id.* at 16.

[14] *Id.* at 15

when needed."[15]

    m. Upon identification of a suspected COVID-19 case inside the facility, "facilities shall begin implementing management strategies while test results are pending."[16] These measures included placing symptomatic individuals under medical isolation, quarantining close contacts, and ensuring necessary medical care while following infection control protocols and PPE requirements.

    n. Every facility housing ICE detainees was required to maintain "a COVID-19 mitigation plan."[17]

    o. Staff screening protocols required screening for COVID-19 symptoms and exposure history upon entry.[18] Those exhibiting symptoms "must be denied access to the facility"[19] to be barred from entry, while asymptomatic staff identified as close contacts of a confirmed COVID-19 case were expected to quarantine at home "to the maximum extent possible" unless essential staffing shortages precluded quarantine.[20]

    p. The use of personal protective equipment ("PPE") was required for all staff and detainees, consistent with CDC guidelines.

    q. Cohorting, isolation, and quarantine measures were required for

---

[15] *Id.* at 15.

[16] *Id.* at 29.

[17] PRR 5.0, at 6.

[18] *Id.* at 26.

[19] *Id.*

[20] *Id.* at 20.

11

suspected and confirmed COVID-19 cases;[21]

    r.  Detainees exhibiting severe symptoms must be provided with adequate medical care and hospitalization referrals;[22]

35. The CDC also issued "Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities," which were incorporated into ICE's PRRs, but also constituted independent mandates that Defendants were required to follow. Among them was the requirement that "[s]taff identified as close contacts of someone with COVID-19 should self-quarantine at home for 14 days, unless a shortage of critical staff precludes quarantine."[23] GEO repeatedly and continuously defied this obligation, resulting in two of the biggest COVID-19 outbreaks in detention centers across the country, the second of which led to Mr. Vargas Arellano contracting COVID-19 and dying.

**The Adelanto Detention Center's History of Failing to Meet Detainee Healthcare Standards**

36. In 2011, ICE and the City of Adelanto entered into an Intergovernmental Service Agreement ("IGSA") to establish an immigration facility in Adelanto. GEO was subcontracted to run the facility.

37. In 2016, after a number of allegations about medical negligence at Adelanto emerged including several related to detainee deaths, ICE officials required GEO to improve medical care, particularly as it applies to people with

---

[21] PRR 5.0, at 30, 17.

[22] PRR 5.0, at 15.

[23] The version of the CDC's guidance in effect during part of Mr. Vargas Arellano's COVID-19 illness—from December 3, 2020 to February 18, 2021—can be accessed here: https://web.archive.org/web/20201210030827/https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.

chronic care needs. In February 2016, GEO stopped providing medical care at Adelanto and contracted with Correct Care Solutions, the corporate predecessor of Wellpath to provide medical care at the facility.[24]

38. Wellpath, and its corporate predecessor Correct Care Solutions, has been sued for more than 70 deaths over the past five years and has a pattern of providing substandard care that has led to avoidable deaths.[25]

39. In 2015, the DHS Office for Civil Rights and Civil Liberties ("CRCL") found the medical treatment at Adelanto to be substandard and found that clinical leadership was not competent. Two years later, after Wellpath took over medical care are the facility, CRCL's independent subject-matter experts found that no corrections were made to address this history.[26]

40. In 2018, CRCL recommended that Adelanto ICE hire a competent, qualified, and effective onsite clinical leader immediately, and that until new leadership took effect, at-risk detainees should immediately be removed from the

[24] Leslie Berestein Rojas, *Have Changes at Adelanto Immigrant Detention Center Led to Better Health Care?*, LAist 89.3 (Oct. 12, 2016), https://www.kpcc.org/2016-10-12/have-changes-at-adelanto-immigrant-detention-cente.

[25] *See* Blake Ellis and Melanie Hicken, *CNN Investigates: Help Me Before it's Too Late*, CNN (Jun. 25, 2019), https://www.cnn.com/interactive/2019/06/us/jail-health-care-ccs-invs/; Hassan Kanu, *DOJ Report Exposes Failures of Jail Reform Measures*, Reuters (Sept. 9, 2021), https://www.reuters.com/legal/government/doj-report-exposes-failures-jail-reform-measures-2021-09-09/; Michael Fenne, *Private Equity Firms Rebrand Prison Healthcare Companies, But Care Issues Continue*, Private Equity Stakeholder Project (Nov. 2022), https://pestakeholder.org/wp-content/uploads/2022/11/Wellpath_HIG_2022v2.pdf.

[26] Nick Schwellenbach, *DHS Office for Civil Rights and Civil Liberties Review of Adelanto–Sent to ICE in April 2018*, Project on Government Oversight (Sept. 6, 2019), https://www.pogo.org/document/2019/09/dhs-office-for-civil-rights-and-civil-liberties-review-of-adelanto-sent-to-ice-in-april-2018.

facility and transferred to other facilities with well-functioning medical programs.[27]

41. CRCL also found that psychiatric leadership was absent at Adelanto and that sub-standard mental health care was occurring as a result.[28]

42. In 2019, Adelanto ICE leadership continued to reject CRCL's findings that the lack of adequate health care leadership put detainees at risk and did not believe that fundamental or systematic change was necessary.[29]

43. On June 25, 2019, the City of Adelanto terminated the IGSA with ICE. On the same day, ICE awarded a contract to run Adelanto directly to GEO.[30]

44. A subsequent July 2021 CRCL investigation of the conditions at the Adelanto facility, also found myriad deficiencies in conditions at the facility including a lack of chronic illness interventions, particularly for individuals with mental health issues finding that there is little to no access to an inpatient level of care for seriously mentally ill detainees. The investigation also involved direct interviews with detainees and staff, who reported allegations of staff not wearing masks, and that both staff and detainees did not wear face masks consistent with CDC guidelines or manufacturer specifications.

//

//

---

[27] *Id.*

[28] *Id.*

[29] Majority Staff Report, U.S. House of Representatives Committee on Homeland Security, *ICE Detention Facilities Failing to Meet Basic Standards of Care* at 11 (Sept. 21, 2020), https://web.archive.org/web/20200926041027/https://homeland.house.gov/imo/media/doc/Homeland%20ICE%20facility%20staff%20report.pdf.

[30] Rebecca Plevin, *How a Private Prison Giant Has Continued to Thrive in a State That Wants it Out*, Desert Sun (Jan. 24, 2020), https://www.desertsun.com/in-depth/news/2020/01/24/private-prison-giant-geo-thrives-california-state-wants-out/2589589001/.

**The Adelanto Facility's Inadequate Response to the COVID-19 Pandemic**

45. The Adelanto facility's response to COVID-19 has been woefully inadequate. In *Roman v. Wolf*, the Court's rulings, bolstered by the factual findings of the Court appointed Special Master in that case, make clear that Adelanto was not safe for individuals vulnerable to COVID-19. The Court found, and the Ninth Circuit later affirmed, that the conditions at the Adelanto facility violated detainees' due process right to reasonable safety under the Fifth Amendment to the U.S. Constitution. Specifically, "the Government had failed to impose social distancing because there were 'too many detainees at Adelanto for its size'; newly arrived detainees were either mixed with the general population or housed with other new detainees who had arrived at different times, both of which undermined the ostensible 14-day quarantine period for new arrivals; staff were not required to wear gloves and masks; there was a lack of necessary cleaning supplies, resulting in cleaning of communal spaces that was 'haphazard, at best'; there were only three functioning showers for 118 women; there was inadequate access to hand sanitizer because dispensers were often empty and detainees had to wait for days to receive hand soap; and detainees were forced to sleep within six feet of each other due to the positions of their beds." *Hernandez Roman v. Wolf*, 829 F. App'x 165, 171 (9th Cir. 2020).

46. *Roman v. Wolf* was filed on April 13, 2020, shortly after the onset of the COVID-19 pandemic, alleging that the Adelanto detention center was failing to abide by their obligations to protect immigration detainees housed there from contracting COVID-19. In addition to suing ICE officials responsible for the Adelanto facility, plaintiffs in that case also named the GEO Facility Administrator James Janecka as a Respondent, because *Roman* was a habeas case seeking detainees' release from detention which requires that the "jailer" or custodian of the facility where detainees are being held be named as a defendant. However,

15

Defendant GEO itself was not a party to the *Roman* action.

47. On April 23, 2020, this Court in *Roman* issued a preliminary injunction compelling ICE officials*, inter alia*, to reduce the population at the facility in response to the COVID-19 pandemic. *Roman v. Wolf*, No. EDCV2000768TJHPVCX, 2020 WL 1952656 (C.D. Cal. Apr. 23, 2020), *aff'd in part, vacated in part sub nom. Hernandez Roman v. Wolf*, 829 F. App'x 165 (9th Cir. 2020), *and supplemented*, No. EDCV2000768TJHPVCX, 2020 WL 5797918 (C.D. Cal. Sept. 29, 2020).[31]

48. The medical experts of both the United States and the petitioners in the *Roman* litigation agreed that the outbreak was likely caused by an infected staff member who reported to work at Adelanto.

49. On September 29, 2020, this Court in *Roman* again found that the conditions at Adelanto were objectively unreasonable and contravened the reasonable safety of the individuals in detention with respect to their exposure to COVID-19 in violation of the detained individuals' Fifth Amendment due process rights. *See* September 29, 2020, *Roman* Order, at 6.

50. The Court also noted that contact tracing was not completed following the COVID-19 outbreak at Adelanto. *Id*. at 2. The Court ordered weekly testing for COVID-19 for all detainees and implement other measures to protect detainees from COVID-19. *Id*. at 6.

51. On October 6, 2020, ICE reported to the *Roman* Court that almost 20% of the detainees at the facility had tested positive for COVID-19.[32]

---

[31] Defendant the GEO Group twice filed a motion to intervene in the *Roman* case, on June 3, 2021 and January 4, 2024. The Court denied both motions

[32] Rebecca Plevin, *'I'm Scared for My Life': Nearly 20% of Detainees at Adelanto ICE Facility Have COVID-19*, Desert Sun (Oct. 8, 2020), https://www.desertsun.com/story/news/2020/10/07/nearly-20-detainees-adelanto-ice-facility-have-covid-19/5918914002/.

16

52. On October 10, 2020, the *Roman* Court appointed a Special Master to monitor and enforce compliance with the court's preliminary injunction.

53. On October 15, 2020, the Court in *Roman* issued a population reduction order. *See Roman v. Wolf*, No. ED CV 20-00768 TJH, 2020 WL 6107069 (C.D. Cal. Oct. 15, 2020), *order clarified*, No. ED CV 20-00768 TJH, 2021 WL 4621946 (C.D. Cal. Mar. 10, 2021)("October 15, 2020, *Roman* Order"). The Court expressed concerns that the facility was not sufficiently isolating or quarantining detainees who are symptomatic of COVID-19, suspected of having COVID-19, or have been confirmed positive for COVID-19. *Id*. at 5.

54. Additionally, the DHS's Office of Inspector General conducted an investigation into COVID-19 related detention conditions in ICE facilities in September and October of 2020 and it could not confirm whether Adelanto was adequately screening staff.

55. On November 18, 2020, the Special Master issued a First Report and Recommendation, noting at the time that there were no positive COVID-19 cases among detainees and seven positive cases among staff at Adelanto; summarizing the government's compliance with the preliminary injunction; and noting that the parties have agreed that 20% of detainees who have not had a positive test will be randomly tested each week and that Adelanto will test and isolate detainees who are suspected of having COVID-19. Additionally, the Special Master recommended that if a staff member tests positive, Adelanto should test all detainees in every housing unit that the staff member entered during a seven-day look-back period before and seven days after testing positive. Finally, the Special Master recommended that if there is a rise in infection among detains, the facility must immediately begin weekly saturation testing for all detainees in the affected side of the facility.

56. On December 3, 2020, after a concerning outbreak and a spike of positive cases among detainees at the facility, the Court in *Roman* ordered the respondents

17

to file a status report explaining why they had failed to initiate saturation testing of all detainees and staff at Adelanto.

57. On December 16, 2020, the Special Master issued a report on a new outbreak at the facility. The Special Master noted that since mid-November, the number of positive COVID-19 cases among staff doubled from 7 to 17 in a matter of days, then tripled to 24 within two weeks. The Special Master again concluded that the facility staff were responsible for the introduction of the COVID-19 into the facility.

58. By December 14, the number of positive cases rose to 47 among staff. The Special Master revised the testing protocol to include increasing random testing from 10% to 20% weekly and extending the look back period for contact tracing from seven days to ten days.

59. As discussed, a CRCL investigation from July 2021 found that some Adelanto staff were still failing to wear masks consistent with the CDC COVID-19 guidelines and the PRRs, that GEO did not consistently take corrective measures when staff and detainees were improperly masked, and that the sanitary practices at the facility did not comply with the PBNDS, PRR, or COVID-19 guidance. During times relevant to this case, no staff members were subjected to any disciplinary consequences for failing to wear proper PPE, including masks, creating an environment in which COVID-19 transmission was particularly dangerous.

**Martin Vargas Arellano's Detention in Adelanto**

60. Mr. Vargas Arellano was born in Mexico but had lived in the United States since he was two years old.

61. ICE first detained Mr. Vargas Arellano on May 15, 2013, and placed him in removal proceedings.

62. He suffered from severe mental illness, which the government had recognized in 2013 when an immigration judge found him incompetent to represent himself in removal proceedings. As a result, he was designated a member of the

18

*Franco-Gonzalez v. Holder*, Case No. 10-2211 (C.D. Cal.) class and was appointed a Qualified Representative.

63. On December 23, 2014, ICE released Mr. Vargas Arellano after determining that he was neither a danger to others nor a flight risk. His Petition for Review was pending before the Ninth Circuit at the time.

64. Mr. Vargas Arellano lived in the community for several years without new criminal convictions.

65. On March 28, 2019, ICE redetained Mr. Vargas Arellano and placed him at the Adelanto facility following an arrest related to an alleged 2018 failure to register as a sex offender. His registration obligation stemmed from a 1985 juvenile conviction, and he had no other criminal convictions between 2014 and 2018. Throughout his time in detention, Mr. Vargas Arellano, through his Qualified Representative, continued to challenge his removal and pursued immigration relief.

66. At the time of his 2019 detention, Defendants were fully aware of Mr. Vargas Arellano's longstanding mental health issues, prior determination of incompetency, and chronic medical conditions which included schizophrenia, diabetes, hepatitis C, hyperthyroidism, anemia, hypertension, deep vein thrombosis of the leg, and cellulitis.

**Contracting COVID-19**

67. Despite the September and November 2020 outbreaks at Adelanto and Mr. Vargas Arellano's extreme vulnerability to COVID-19, Defendants did not adequately protect Mr. Vargas Arellano from the virus in line with mandatory procedures to do so. GEO allowed Mr. Vargas to be in close proximity to and interacting with other unmasked detainees during the height of the outbreak. Defendants were not in compliance with multiple mandatory policies including but not limited to those referenced in paragraph 32 and 34 above.

68. During the height of the outbreak, Adelanto staff tested Mr. Vargas Arellano six times between October 6, 2020, and December 04, 2020. His results were negative for COVID-19.

69. Adelanto staff did *not* select Mr. Vargas Arellano for COVID-19 testing in the November 4, November 9, November 16, November 23, and November 30 rounds of weekly tests, despite his status as a medically vulnerable detainee at a time when they knew COVID-19 was surging at the detention center.

70. On November 28, 2020, Mr. Vargas Arellano was admitted to the infirmary due to high blood pressure. He was also suffering from worsening delusions. He was being treated for high blood pressure, diabetes, schizophrenia, and wound care, but he was not being treated for his hepatitis C.

71. On November 29, 2020, according to the *Roman* Special Master's Report, a Wellpath medical provider who later tested positive for COVID-19 on December 7, 2020, came into contact with Mr. Vargas Arellano. In response to the *Roman* Special Master inquiry, ICE attested in the *Roman* litigation that this was Mr. Vargas Arellano's only known contact with a COVID-19 positive individual. ICE did not provide any information about how it arrived at this conclusion, the nature of any contact tracing it did, whether it reviewed video surveillance recordings to assure the veracity of this claim, whether the Wellpath staff passed the required screening upon entry to the facility, what PPE the Wellpath medical staff was utilizing, or whether the Wellpath staff's contact with Mr. Vargas Arellano was otherwise in compliance with the applicable standards. Their response was based solely on information provided to them by GEO, including James Janecka, who together with his superiors Joseph Moorhead and Paul Laird, had failed to ensure detainees including Mr. Vargas Arellano were subject to required contact tracing, or that staff contact tracing was conducted in accordance with CDC and *Roman* court-imposed mandates. Nonetheless, likely based on ICE's attestation, which was not based on its personal knowledge, the Special Master "assumed that [Mr. Vargas

20

Arellano] contracted COVID from the Wellpath medical provider who examined him on November 29, 2020.[33]

72. The information provided to the *Roman* court, that the Wellpath employee was the only known contact with a COVID-19 positive individual, was false.

73. During Mr. Vargas Arellano's November 28-December 1, 2020 infirmary stay, he was subject to round-the-clock observation by GEO and Wellpath staff, some of whom had been exposed to and later tested positive for COVID-19. Additionally, a number of patients at the infirmary contracted COVID-19 while housed there at the same time. Finally, around the same time, at least one detainee had tested positive in the general housing unit Mr. Vargas was housed in.

74. On December 1, 2020, Adelanto staff discharged Mr. Vargas Arellano from the infirmary and moved him to his cell in unit W5, block B.

75. On December 4, 2020, Adelanto staff tested Mr. Vargas Arellano for COVID-19 as part of the court-mandated weekly tests. He tested negative. At least one other detainee in unit W5, block B tested positive for COVID-19 during that testing cycle. Medical records state that on December 4, 2020, Mr. Vargas Arellano was "observed sitting in his wheelchair at the table with another detainee." GEO staff, including James Janecka, failed to ensure any contact tracing of the COVID-19 positive detainee, let alone follow other CDC and PRR standards to quarantine Mr. Vargas Arellano and take other precautions required for medically vulnerable detainees like him.

76. Between December 1, 2020 and December 5, 2020, when Mr. Vargas Arellano was housed in the W5B housing unit of the Adelanto facility, he did not receive the twice daily temperature and COVID-19 symptoms screenings, as required by the PRRs and CDC guidance. In fact, at no point were these screenings conducted on Mr. Vargas Arellano when he was in the housing unit. GEO Facility

---

[33] Special Master Report at 3.

Administrator James Janecka was responsible for ensuring these checks were being done, and failed to do so. His superiors Joseph Moorhead and Paul Laird also failed their obligations to ensure quality control over these obligations as they never put in place a COVID-19 mitigation plan as they were required to do.

77. On December 5, 2020, Mr. Vargas Arellano was transferred to the infirmary for delusions and high blood pressure. His medical records note that his uncontrolled high blood pressure put him at risk of a stroke or internal bleeding, but no COVID-19 screening was conducted. On December 6, Mr. Vargas Arellano was placed in the mental health infirmary in a room that was not a negative pressure room, even though the infirmary had several negative pressure rooms.[34]

78. On December 8, 2020, the test results for another detained person who had been in the infirmary for around two weeks came back positive for COVID-19, indicating he had contracted COVID-19 *in the infirmary* and had been positive during the time of Mr. Vargas Arellano's December 5-10, 2020 infirmary stay.

79. Mr. Vargas Arellano remained in the non-negative pressure room in the health infirmary until December 10, 2020, the day he tested positive for COVID-19.

80. Between November 28 and December 10, 2020, GEO allowed staff members to enter the facility even though they had been exposed to COVID-19 and at least two of those were in the infirmary and were assigned to observe Mr. Vargas Arellano, including entering his room to provide his meals, and transport him to other rooms in the infirmary for medical needs. This practice of allowing exposed

---

[34] A negative pressure room are designed to contain the spread of infectious diseases, like COVID-19, by preventing contaminated air from escaping into the surrounding environment by maintaining lower air pressure inside the room. *See* Cal. Dep't of Pub. Health, *Best Practices for Ventilation of Isolation Areas to Reduce COVID-19 Transmission Risk*, CDPH, https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/COVID-19/Best-Practices-for-Ventilation-of-Isolation-Areas-to-Reduce-COVID-19-Transmission-Risk.aspx

staff to enter the facility was sanctioned by GEO corporate, including Joseph Moorhead, Paul Laird and Spencer Winepol.

81. Several of these GEO staff members tested positive for COVID-19 after being in the infirmary with Mr. Vargas Arellano between November 28 and December 10, 2020, but were not reported to the *Roman* court when it inquired into Mr. Vargas Arellano's death.

82. On December 10, 2020, Mr. Vargas Arellano developed a fever of 101.9°F and reported ear pain. He tested positive for COVID-19. Prior to this date, Mr. Vargas Arellano had not left the Adelanto facility since September 19, 2020 for a hospital visit, indicating that he could not have contracted COVID-19 from anyone other than those he came into contact with at the facility.

83. On December 11, 2020, Mr. Vargas Arellano suffered from shortness of breath, fever, dry cough, and eventually COVID-19 pneumonia, for which he had to be hospitalized. He was seen briefly at one hospital before being returned to the facility, despite worsening symptoms.

84. On December 12, 2020, the test results for another detained person who had been in the infirmary for a month came back positive for COVID-19, indicating he had contracted COVID-19 in the infirmary and had been positive during the time of Mr. Vargas Arellano's December 5-10, 2020 infirmary stay.

85. On December 12, 2020, Mr. Vargas Arellano was transferred back to the Adelanto detention center but was transferred later that day to Providence St. Mary Medical Center due to COVID-19 pneumonia where he was hospitalized for several weeks.

86. GEO's screening of staff into the facility was woefully inadequate, and the decision to allow COVID-19 exposed staff to enter the facility was in violation of the CDC and PRR guidelines, and as discussed was sanctioned by GEO corporate officers including Joseph Moorhead, Paul Laird and Spencer Winepol. GEO did not conduct comprehensive screening of all staff into the facility,

23

including between November 28 and December 12, 2020, as it was required to do so, including staff who had repeated contact with Mr. Vargas Arellano and who tested positive for COVID-19 prior to his testing positive.

87. GEO engaged in many grossly and recklessly negligent acts, which resulted in Mr. Vargas Arellano contracting COVID-19 and becoming terminally ill, including but not limited to: GEO's failure to conduct required twice-daily symptoms screenings for Mr. Vargas Arellano who was at high risk of becoming severely ill upon COVID-19 exposure; GEO's failure to screen staff exposed to COVID-19; GEO's failure to staff to quarantine asymptomatic exposed staff at home "to the maximum extent possible"; GEO's failure to monitor mask and other PPE compliance among staff or mete out any disciplinary consequences for their failing to comply with PPE requirements; GEO's failure to conduct contact tracing of COVID-19 positive detainees including those who had come in contact with Mr. Vargas Arellano to ensure potential early detection and mitigation of his exposure; GEO's failure to conduct contract tracing of Mr. Vargas Arellano upon his contracting COVID-19 to understand the source of his exposure and to contain further spread among infirmary detainees and staff; and GEO's failure to have a COVID-19 mitigation plan to ensure it was complying with the above-referenced and other mandates, which likely would have prevented Mr. Vargas Arellano from contracting COVID-19 and his untimely death.

**Long COVID-19 and Health Deterioration**

88. On December 25, 2020, Mr. Vargas Arellano was discharged from Providence St. Mary Medical Center and placed back in the Adelanto infirmary. He continued to experience significant shortness of breath.

89. On December 30, 2020, he informed a nurse that he was feeling sick, was concerned about COVID, and whether he "was going to make it," and she responded that recovery from COVID-19 takes time.

90. On December 31, 2020, he was deemed "recovered" from COVID-19 despite ongoing COVID-19 symptoms.

91. On January 2, 2021, he was deemed "clinically stable" and cleared to return to the general detainee population, despite a high heart rate and significant weight loss. No nutritional assessment or physical therapy was conducted. Mr. Vargas Arellano remained in the infirmary.

92. Between January 3 and 5, 2021, his pulse remained abnormally high, and his oxygen levels dropped as low as 86%.

93. On January 4, 2021, Mr. Vargas Arellano complained of shortness of breath he was given supplemental oxygen, and a provider ordered an x-ray and a blood test to check for blood clots.

94. On January 6, 2021, medical staff attempted to send him for a CT scan to check for a lung clot, but he refused. Given his mental health issues, Defendants should have sought further intervention to attempt to administer the test under applicable health guidelines, but failed to do so. Instead, his blood thinner medication, which had been stopped in December, was restarted after this refusal.

95. On January 8, 2021, he required continuous oxygen support, but no follow-up was done on his blood clot test results.

96. On January 14, 2021, a critical lab result indicating a high risk of blood clots was finally reviewed; eleven days after the test was ordered.

97. On January 18, 2021, his blood pressure was dangerously low, and his blood sugar was unstable, leading to a temporary hold on his medications.

98. On January 20, 2021, medical records note significant anemia, but no action was taken.

99. On January 26, 2021, he was again hospitalized for COVID-19 pneumonia at Providence St. Mary Medical Center. He was tested for a possible heart attack and blood clots but was returned to Adelanto on February 4 without a clear diagnosis.

25

100.   Between February 4 and 17, 2021, he continued to report severe chest pain, and his oxygen levels remained unstable. His weight was not reassessed, and no nutritional or physical therapy support was provided. In that same period, his medical record makes at least six references to "post COVID-19 syndrome" or "sequela of COVID-19 infection." Both phrases are synonymous with what is now known to be long COVID.

101.   On or about February 17, 2021, Mr. Vargas Arellano woke up in a puddle of blood after a fall that resulted in a large bruise. He was not immediately discovered by Wellpath or GEO staff, who were tasked with regularly monitoring him.

102.   On or about February 18, 2021, after experiencing further shortness of breath, Mr. Vargas Arellano was hospitalized for the third and final time for COVID-19. He was transferred to the hospital for shortness of breath and was diagnosed with fluid around his heart. A stroke was suspected.

**Martin Vargas Arellano's Death**

103.   On February 19, 2021, a Wellpath Medical Director emailed ICE's medical coordinator explaining that Mr. Vargas Arellano's medical condition has become grave, and that he was "'at great risk of pulmonary embolism and [that there was a] possibility of sudden death' due to multiple ailments, including ongoing weakness and chest pain in the wake of COVID-19 infection."[35] The Wellpath Medical Director urged ICE to evaluate whether Mr. Vargas Arellano should be released from ICE detention. *Id*.

104.   After ICE learned that Mr. Vargas Arellano was at risk of sudden death, it initiated a plan to release him. On February 22, 2021, Mr. Vargas Arellano's Deportation Officer, Sergio Guzman, reached out to Mr. Vargas' Qualified Representative, Margaret Hellerstein, informing her that ICE was

[35] Special Master Report, at 5

26

considering releasing Mr. Vargas Arellano and asking for her to provide information about his housing and transportation. Ms. Hellerstein shared that information by email and asked that Mr. Guzman let her know as soon as a decision was made about Mr. Vargas Arellano's release. Mr. Guzman did not inform Ms. Hellerstein of Mr. Vargas Arellano's grave condition nor that it was the reason for ICE's consideration of release.

105.   On or about February 26, 2021, Ms. Hellerstein reached out to Mr. Guzman for an update. He informed her that no decision had been made yet about his release. He agreed to update her once the agency made a decision about his release. Ms. Hellerstein began making arrangements with the halfway house where Mr. Vargas Arellano was going to stay.

106.   On or about February 26, 2021, Mr. Vargas Arellano suffered a stroke that caused brain death.

107.   On March 5, 2021, ICE "released" Mr. Vargas Arellano purportedly on his own recognizance while in the hospital, even though he was comatose and brain dead. The release order listed the release address that Ms. Hellerstein had shared with Mr. Guzman.

108.   On March 8, 2021, Mr. Vargas Arellano passed away due to complications brought by COVID-19. ICE did not inform Ms. Hellerstein nor Plaintiff of Mr. Vargas Arellano's death. ICE also did not report Mr. Vargas Arellano's death to this Court in *Roman*, where he had been a class member. ICE merely reported to the Court that Mr. Vargas Arellano was released on March 8, 2021.

109.   On March 15, 2021, after class counsel in *Roman* informed Ms. Hellerstein that Mr. Vargas Arellano had been released, she contacted Officer Guzman, by phone, inquiring about his whereabouts. He informed her that he was unaware of Mr. Vargas Arellano's location. He did not inform her of Mr. Vargas Arellano's death. The next day she emailed Mr. Guzman to follow up. Mr. Guzman

was instructed by his supervisors to ignore Ms. Hellerstein's email and not speak with her any further about Mr. Vargas Arellano's case.

110. Over the next few days, Ms. Hellerstein reached out to hospitals, shelters, police stations, and the Mexican Consulate seeking information about Mr. Vargas Arellano. On March 18, 2021, she learned of her client's death after contacting the coroner's office. Plaintiff learned of his father's death shortly thereafter.

111. Because Mr. Vargas Arellano was "released" from ICE custody prior to his death on March 8, 2021, ICE did not report his death as a custodial death to Congress.[36]

112. No autopsy was performed. His death certificate lists brain death, stroke, and pneumonia as causes, with contributing factors including respiratory failure and hepatitis C. COVID-19 infection is known to exacerbate these conditions.

113. On April 14, 2021, a month after Mr. Vargas Arellano's death, he won his immigration case before the Board of Immigration Appeals, which remanded the case to the immigration court to reconsider his eligibility for withholding of removal and protection under the Convention Against Torture, citing clear error by the immigration judge. On April 22, 2021, Mr. Vargas Arellano's removal case was terminated due to his death.

114. Several months after his death, in response to a complaint filed by Mr. Vargas Arellano's immigration attorney, to DHS's Office of Civil Rights and Civil Liberties ("CRCL") conducted an investigation into his deathbed release from custody, highlighting ICE's failure to prepare a "DDR" or Detainee Death Report. CRCL stated, "From a Quality Assurance/Quality Improvement perspective, not

---

[36] *See* ICE Detainee Death Reporting (last updated Dec. 5, 2022), https://www.ice.gov/detain/detainee-death-reporting.

doing a DDR for patients who die shortly after release from custody who are hospitalized and subsequently die is a missed opportunity to improve the care provided and reduce liability."

**GEO Consciously Disregarded  Mr. Vargas' Safety and Engaged in Egregious and Reckless Conduct**

115.   GEO acted with conscious disregard for detainee safety and engaged in egregious and reckless misconduct that directly placed Mr. Vargas Arellano at risk of contracting COVID-19 and death. GEO's officers and managing agents – including James Janecka, Adelanto's Facility Administrator; Joshua Johnson, Assistant Facility Administrator; Joe Moorhead, Western Region Director;  Paul Laird, Western Region Vice President; and Spencer Winepol, corporate counsel – knowingly violated the PRR and PBND standards intended to protect medically vulnerable individuals like Mr. Vargas Arellano from contracting COVID-19 and suffering its terminal consequences; provided false information to ICE about the source of Mr. Vargas Arellano's COVID-19 infection, about contact tracing to determine the source of the exposure, and about Wellpath and GEO's use of PPE when they interacted with Mr. Vargas Arellano during the period he was infected; failed to comply with known obligations to preserve surveillance video footage to conceal violations; and unlawfully permitted COVID-19 exposed staff to work at the facility. James Janecka and Joshua Johnson directly managed day-to-day operations at Adelanto, while Joe Moorhead and Paul Laird supervised Janecka and were responsible for setting GEO's COVID-19 policies and compliance standards.

116.   Additionally, GEO staff destroyed surveillance footage that would have shown whether staff were complying with PPE mandates, social distancing, and COVID-19 protocols, in violation of its legal obligations under its own litigation hold and the National Archives Records Administration (NARA) retention policy.

<u>**CAUSES OF ACTION**</u>

29

## COUNT ONE

### (Violation of Detention Standards)

### *Defendants Wellpath and GEO*

117. Plaintiff incorporates the allegations in the paragraphs above as though fully set forth here.

118. Plaintiff brings this cause of action on his father's behalf as successor in interest to Mr. Vargas Arellano under California Code of Civil Procedure § 377.30 (Survival Action) as an individual who has been injured by the tortious actions of a private detention facility operator under Cal. Gov. Code § 7320.

119. Plaintiff is Mr. Vargas Arellano's biological son and successor in interest.

120. GEO is a private detention facility operator.

121. Wellpath is an agent of a private detention facility.

122. GEO and Wellpath are required to exercise a duty of ordinary care and skill in their compliance and adherence to the detention standards of care and confinement agreed upon in the Adelanto Detention Facility contract for operations.

123. ICE's PBNDS are the applicable standards of care as set forth in the Adelanto Detention Facility contract for operations. The PBNDS incorporates CDC guidelines on COVID-19 and ICE's PRRs.

124. GEO engaged in tortious actions in violation of the PBNDS, as described throughout this complaint, including but not limited to the violations described in paragraphs 13, 32, 34 and 87 above.

125. Wellpath engaged in tortious actions in violation of the PBNDS, as described throughout this complaint, including but not limited to the violations described in paragraphs 14, 32, and 34 above.

126. GEO acted with conscious disregard for Mr. Vargas Arellano's safety, and its conduct was particularly egregious, as described throughout this complaint, including but not limited to paragraphs 115–116. Further, GEO acted with malice,

30

willfulness and/or reckless indifference to the rights of Mr. Vargas Arellano, entitling him to punitive damages against GEO under Cal. Civ. Code § 3294. GEO's officers, directors, or managing agents—including James Janecka, Joshua Johnson, Joe Moorhead, Paul Laird, and Spencer Winepol—were personally involved in, directed, authorized, or ratified this misconduct.

127. GEO's and Wellpath's violations of the PBNDS caused Mr. Vargas Arellano's pain, suffering, and eventual death.

## COUNT TWO

### (Negligence)

### *Defendants Wellpath and GEO*

128. Plaintiff incorporates the allegations in the paragraphs above as though fully set forth here.

129. Plaintiff brings this cause of action on his father's behalf as successor in interest to Mr. Vargas Arellano under California Code of Civil Procedure § 377.30 (Survival Action).

130. Plaintiff is Mr. Vargas Arellano's biological son and successor in interest.

131. California Civil Code § 1714 provides a statutory cause of action for negligence. To establish a claim for negligence, a plaintiff must show (1) that the defendant owed the plaintiff a legal duty; (2) that the defendant breached that duty; and (3) that the breach was a proximate or legal cause of the plaintiff's injuries.

132. California law recognizes a "special relationship" between jailer and prisoner that gives rise to a duty of care that requires jailers to protect prisoners against "unreasonable risk of physical harm." *Giraldo v. Department of Corrections and Rehabilitation*, 168 Cal.App.4th 231, 248 (2008) (quoting *Haworth v. State*, 592 P.2d 820, 824 (1979)).

133. The Supreme Court has explained that this California duty of care arising from the special relationship between jailer and prisoner applies to private

31

actors. *See Minneci v. Pollard*, 565 U.S. 118, 128 (2012) ("California courts have specifically applied [this special duty] to jailers, *including private operators of prisons*.") (emphasis added).

134.   The Ninth Circuit has recognized that this special duty of care applies to private contractors like GEO in the context of the outbreak of infectious disease. *Edison v. United States*, 822 F.3d 510, 522 n.7 (9th Cir. 2016).

135.   Additionally, under California, there is a general duty of care that dictates that "everyone is responsible, not only for the result of his or her willful acts, but also for an injury occasioned to another by his or her want of ordinary care or skill in the management of his or her property or person[.]" Cal. Civ. Code § 1714(a).

136.   Defendants GEO thus owed a duty of care to Mr. Vargas Arellano and breached that duty through their actions and omissions, as described throughout this complaint, including but not limited to paragraphs 13 and 87 above.

137.   Defendants Wellpath thus owed a duty of care to Mr. Vargas Arellano and breached that duty through their actions and omissions, as described throughout this complaint, including but not limited to paragraphs 14 above.

138.   GEO acted with conscious disregard for Mr. Vargas Arellano's safety, and its conduct was particularly egregious, as described throughout this complaint, including but not limited to paragraphs 115–116. Further, GEO acted with malice, willfulness and/or reckless indifference to the rights of Mr. Vargas Arellano, entitling him to punitive damages against GEO under Cal. Civ. Code § 3294. GEO's officers, directors, or managing agents—including James Janecka, Joshua Johnson, Joe Moorhead, Paul Laird, and Spencer Winepol—were personally involved in, directed, authorized, or ratified this misconduct.

139.   Martin Vargas Arellano was the direct victim of Defendants' negligence.  Defendants' breach of duty was the direct and proximate cause and a substantial factor in bringing about Martin Vargas Arellano's injuries.

## **<u>COUNT THREE</u>**

### **(Negligent Infliction of Emotional Distress)**

### ***Defendants Wellpath and GEO***

140. Plaintiff incorporates the allegations in the paragraphs above as though fully set forth here.

141. Plaintiff brings this cause of action on his father's behalf as successor in interest to Mr. Vargas Arellano under California Code of Civil Procedure § 377.30 (Survival Action).

142. Plaintiff is Mr. Vargas Arellano's biological son and successor in interest.

143. To establish a claim for negligent infliction of emotional distress under California law, a plaintiff must show (1) that the defendant engaged in negligent conduct, (2) that the plaintiff suffered serious emotional distress; and (3) that the defendants' negligent conduct was a cause of the serious emotional distress.

144. Defendants engaged in negligent conduct by breaching their duty of care when they, among other things, detained Mr. Vargas Arellano under conditions in which the facilities and level of care were not adequate to meet his medical needs, and that breach caused his serious emotional distress.

145. GEO acted with conscious disregard for Mr. Vargas Arellano's safety, and its conduct was particularly egregious, as described throughout this complaint, including but not limited to paragraphs 115–116. Further, GEO acted with malice, willfulness and/or reckless indifference to the rights of Mr. Vargas Arellano, entitling him to punitive damages against GEO under Cal. Civ. Code § 3294. GEO's officers, directors, or managing agents—including James Janecka, Joshua Johnson, Joe Moorhead, Paul Laird, and Spencer Winepol—were personally involved in, directed, authorized, or ratified this misconduct.

146.    Martin Vargas Arellano was the direct victim of Defendants' negligence.  Defendant's breach of duty was the direct and proximate cause and a substantial factor in bringing about Martin Vargas Arellano's serious emotional distress.

**COUNT FOUR**

**(Wrongful Death)**

*All Defendants*

147.    Plaintiff incorporates the allegations in the paragraphs above as though fully set forth here.

148.    Mr. Vargas Arellano's death was a direct and proximate result of the aforementioned negligence, wrongful acts, conduct, and omissions of Defendants. As a direct and proximate result of the negligence, wrongful acts, conduct, and omissions of the Defendants, and each of them, Plaintiff has been deprived of the decedent's love, companionship, comfort, care, assistance, protection, affection, society, support, and guidance, and present value of services to his family.

149.    Plaintiff is entitled to recover wrongful death damages pursuant to California Code of Civil Procedure § 377.60. Plaintiff has suffered non-pecuniary losses in an amount to be determined at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that this Court grant the following relief:

      (1)    Award compensatory and punitive damages under Cal. Civ. Code § 3294 to Plaintiff in an amount to be proven at trial;

      (2)    Award costs and reasonable attorney fees under Cal. Gov. Code § 7320(c), and any other applicable law;

      (3)    Grant such further relief as the Court deems just and proper.

Dated: March 19, 2025                     Respectfully submitted,

Stacy Tolchin
*Stacy@Tolchinimmigration.com*
Megan Brewer
*Megan@Tolchinimmigration.com*
Law Offices of Stacy Tolchin
776 E. Green St. Suite 210
Pasadena, CA  91101
Telephone: (213) 622-7450
Facsimile: (213) 622-7233

Khaled Alrabe
*khaled@nipnlg.org*
Matthew S. Vogel†
*matt@nipnlg.org*
National Immigration Project of
the National Lawyers Guild
(NIPNLG)
2201 Wisconsin Ave NW, Suite
200
Washington, DC 20007
Telephone: (202)470-2082
Facsimile: (617) 227-5495

† *not admitted in DC; working remotely from and admitted in Louisiana only*

Laboni A. Hoq
*laboni@hoqlaw.com*
Hoq Law APC
P.O. Box 753
Pasadena, CA  91030
Telephone: (213) 973-9004

Counsel for Plaintiff

By: s/ Khaled Alrabe
    Khaled Alrabe